Eugene P. Ramirez (State Bar No. 134865)
  *eugene.ramirez@manningkass.com*
Lynn Carpenter (State Bar No. 310011)
  *lynn.carpenter@manningkass.com*
Kayleigh Andersen (State Bar No. 306442)
  *kayleigh.andersen@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, COUNTY OF SAN BERNARDINO; CORY MCCARTHY, ANDREW POLLICK; DAVID MOORE, and CRISTINA OLIVAS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| A.J.P. and A.M.P., minors by and through their guardian ad litem Cynthia Nunez, individually and as successor in interest to Albert Perez, deceased; and PATRICIA RUIZ, individually,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN BERNARDINO; and DOES 1-10, Inclusive,<br><br>Defendant. | Case No. 5:22-CV-01291 SSS (SHKx)<br><br>*[Honorable Sunshine Suzanne Sykes, Magistrate Judge, Shashi H. Kewalramani]*<br><br>**NOTICE OF MOTION AND MOTION BY DEFENDANTS FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>***Filed concurrently with:***<br> 1. *Statement of Uncontroverted Facts;*<br> 2. *Declaration of Kayleigh Andersen;*<br> 3. *Declaration of Sergeant Gaytan;*<br> 4. *Declaration of Corporal McCarthy;*<br> 5. *Declaration of Corporal Olivas;*<br> 6. *Declaration of Corporal Pollick;*<br> 7. *Declaration of  Deputy Moore;*<br> 8. *Declaration of Deputy Stone;*<br> 9. *Declaration of Sergeant Scalise;*<br>  *and*<br> 10.  *[Proposed] Order*<br><br>Date: April 19, 2024<br>Time: 2:00 p.m.<br>Crtrm.: Courtroom 2, 2nd Floor<br><br>*Action Filed:      07/22/2022* |

**TO THE COURT, PLAINTIFFS, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on April 19, 2024, at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 2 (second floor) of the above-captioned Court, located at 3470 Twelfth Street, Riverside, California 92501, defendants COUNTY OF SAN BERNARDINO ("County"), CORY MCCARTHY ("Corporal McCarthy"), ANDREW POLLICK ("Corporal Pollick"), DAVID MOORE ("Deputy Moore"), and CRISTINA OLIVAS ("Corporal Olivas") ("Defendnat Deputies") (collectively "Defendants") will move this Court for an order granting summary judgment in their favor based on plaintiffs A.J.P. and A.M.P., minors by and through their guardian ad litem Cynthia Nunez, individually and as successor in interest to Albert Perez, deceased; and PATRICIA RUIZ, individually ("plaintiffs"), Second Amended Complaint filed on June 2, 2023, [Dkt. 36].

This motion is based upon the grounds that there are no triable issues of material fact and that the moving Defendants are entitled to judgment as a matter of law as follows:

1.     Defendant Deputies are entitled to judgment on plaintiffs' first cause of action for excessive force under 42 U.S.C. § 1983 because under the uncontroverted facts, Defendant Deputies' use of force was objectively reasonable under the totality of the circumstances.  Further, there is no evidence that Defendant Deputies violated Perez' clearly established constitutional rights at the time of the incident, which entitles them to qualified immunity.

2.     Defendant Deputies are entitled to judgment on plaintiffs' second cause of action for denial of medical care under 42 U.S.C. § 1983 because medical care was promptly given and summoned to the scene when it was safe to do so.  Further, there is no evidence that Defendant Deputies violated Perez' clearly established constitutional rights at the time of the incident, which entitles them to qualified immunity.

3.      Defendant Deputies are entitled to judgment on plaintiffs' third cause of action for due process – interference with familial relations under 42 U.S.C. § 1983 because there is no evidence that Defendant Deputies acted with deliberate indifference and/or a purpose to harm unrelated to legitimate law enforcement objectives.  Further, there is no evidence that Defendant Deputies violated any clearly established constitutional rights at the time of the incident, which entitles them to qualified immunity.

4.      Defendant County of San Bernardino is entitled to judgment on plaintiffs' fourth cause of action for *Monell* Liability – inadequate training under 42 U.S.C. § 1983 because Defendant Deputies used only objectively reasonable force under the totality of the circumstances.  Further, there is no evidence that the County failed to train its deputies.

5.      Defendant County of San Bernardino is entitled to judgment on plaintiffs' fifth cause of action for *Monell* Liability – unconstitutional custom, practice, and policy under 42 U.S.C. § 1983 because Defendant Deputies used only objectively reasonable force under the totality of the circumstances.  Further, there is no evidence that the County had an unlawful custom, practice or policy.

6.      Defendant Deputies are entitled to judgment on plaintiffs' sixth cause of action for battery and plaintiffs' seventh cause of action for negligence because Defendant Deputies used only objectively reasonable force under the totality of the circumstances.   For the same reasons no constitutional violations occurred, no violations of California law were committed.

7.      Defendant Deputies are entitled to judgment on plaintiffs' eighth cause of action for violation of the Bane Act because there is no evidence that Defendant Deputies acted with the specific intent to violate Perez' right to be free from an unreasonable seizure.

8.      Defendant County of San Bernardino is entitled to judgment for each of plaintiffs' state law claims, as Defendant Deputies are not liable and there is no basis

MANNING | KASS

MK

1  for respondeat superior liability against the County.  Cal. Gov. Code § 815.2(a).

2      9.      Defendant Deputies are entitled to judgment on plaintiffs' claim for

3  punitive damages because there is no evidence that he acted with malice, oppression,

4  or reckless disregard for the decedent's rights during the incident.

5      In accordance with Local Rule 7-3, prior to the filing of the motion, on February

6  15, 2024, Defendants' counsel sent plaintiffs' counsel a comprehensive meet and

7  confer letter inviting further discussions regarding the dispositive issues presented in

8  this motion.  [*See* Andersen Decl., ¶ 15, Ex. N.]  On February 20, 2024, plaintiffs'

9  counsel, Shannon Leap, provided a response to Defendants' meet and confer letter

10  stating that, plaintiffs' counsels position is that a motion for summary judgment

11  relating to plaintiffs' claims for excessive force under the Fourth Amendment (Claim

12  #1 in the SAC), plaintiff's claim for Interference with Familial Relationship under the

13  Fourteenth Amendment (Claim #3), and plaintiffs' state law claims (Claims #6-8)

14  would be frivolous, but that plaintiffs' counsel would consider dismissing Plaintiffs'

15  *Monell* claims (Claims 4 and 5), plaintiff's Delay in Medical Care (Claim #2), as well

16  as plaintiffs' claims for punitive damages against the individual defendants if

17  Defendants agree not to file the motion at all.  [*See* Andersen Decl., ¶ 16, Ex. O.]

18      On February 22, 2023, Defendants' counsel, Kayleigh Andersen, and plaintiffs'

19  counsel, Shannon Leap, telephonically met and conferred for approximately ten (10)

20  minutes or less regarding the issues presented in Defendants' meet and confer letter

21  regarding the dispositive issues presented in this motion as well as plaintiffs' counsels

22  position regarding Defendants' meet and confer letter.  However, the parties were

23  unable to reach an agreement to resolve the issues informally.  [*See* Andersen Decl.,

24  ¶ 17.]

25      Defendants' motion is based on this notice of motion, the attached

26  memorandum of points and authorities, statement of undisputed facts, and the

27  declarations of Kayleigh Andersen, Sergeant Gaytan, Corporal McCarthy, Corporal

28  Olivas, Corporal Pollick, Deputy Moore, Deputy Stone, and Sergeant Scalise filed

concurrently herewith, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

DATED:  March 1, 2024          **MANNING & KASS**
                               **ELLROD, RAMIREZ, TRESTER LLP**


                               By:  _____/s/ Kayleigh A. Andersen, Esq._____
                                    Eugene P. Ramirez, Esq.
                                    Lynn Carpenter, Esq.
                                    Kayleigh A. Andersen, Esq.
                                    Attorneys for Defendants, COUNTY OF
                                    SAN BERNARDINO; CORY
                                    MCCARTHY, ANDREW POLLICK;
                                    DAVID MOORE, and CRISTINA
                                    OLIVAS

NOTICE OF MOTION AND MOTION BY DEFENDANTS FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES..............................................11

I.     INTRODUCTION ............................................................................................11

II.    STATEMENT OF UNCONTROVERTED FACTS ......................................11

III.   SUMMARY JUDGMENT STANDARD ......................................................16

IV.   ARGUMENT ..................................................................................................17

     A.    Defendant Deputies Used Objectively Reasonable Force Under the Totality of The Circumstances.............................................17

         1.    Perez posed an immediate threat to Defendant Deputies, other deputies on the scene, and the public. ...............................17

         2.    Perez was brandishing a gun, ignored the deputies commands, and escalated the incident by running toward gun. ................................................................................................20

         3.    Case law supports the Defendant Deputies' actions. ................20

     B.    Plaintiffs' Claim for Denial of Medical Care is Without Merit............21

     C.    Plaintiffs' Claim for Due Process/Interference with Familial Relations Fails.............................................................................22

     D.    Defendant Deputies are Entitled to Qualified Immunity......................23

     E.    Plaintiffs' Claims for *Monell* Liability Lack Merit. ...........................25

     F.    Plaintiffs' Redundant Claims for Battery, Negligence, and Violation of the Bane Act Fail.............................................26

         1.    Pre Force Negligence Claim....................................................28

         2.    Violation of the Bane Act ........................................................29

     G.    The County Cannot be Liable For Any of Plaintiffs' State Law Claims. .............................................................................30

     H.    Plaintiffs' Request for Punitive Damages Lacks Merit. ......................30

V.    CONCLUSION ..............................................................................................31

**NOTICE OF MOTION AND MOTION BY DEFENDANTS FOR SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

**Page**

## CASES

*A. D. v. State of Cal. Highway Patrol,*
712 F.3d 446 (9th Cir. 2012)........................................................................23

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986) .....................................................................................16

*Anderson v. Russell,*
247 F.3d 125 (4th Cir. 2001) .......................................................................18

*Archibald v. Cty. of San Bernardino,*
2018 U.S. Dist. LEXIS 171243 (C.D. Cal. Oct. 2, 2018) ...........................27

*Bordegaray v. Cty. of Santa Barbara,*
2016 U.S. Dist. LEXIS 172269(C.D. Cal. Dec. 12, 2016) ..........................21

*Borges v. City of Eureka,*
2017 U.S. Dist. LEXIS 10721 (N.D. Cal. Jan. 25, 2017) ...........................21

*Brown v. Ransweiler,*
171 Cal. App. 4th 516 (2009) ......................................................................27

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) .....................................................................................16

*City of Los Angeles v. Heller,*
475 U.S. 796 (1986) .....................................................................................25

*Connick v. Thompson,*
563 U.S. 51 (2011) .......................................................................................26

*Crittenden v. City of Tahlequah,*
2018 U.S. Dist. LEXIS 106662 (E.D. Okla. June 25, 2018) .......................22

*Cruz v. City of Anaheim,*
765 F.3d 1076 (9th Cir. 2014) .....................................................................24

*Dang v. Cross,*
422 F.3d 800 (9th Cir. 2005) .......................................................................30

*Edson v. City of Anaheim,*
63 Cal. App. 4th 1269 (1998).......................................................................27

*Estate of Adomako,*
2018 U.S. Dist. LEXIS 15018 ......................................................................21

**NOTICE OF MOTION AND MOTION BY DEFENDANTS FOR SUMMARY JUDGMENT**

*Fewell v. California*,
    2017 WL 6043080 (C.D. Cal. Apr. 11, 2017)............................................................23

*George v. Morris*,
    736 F.3d 829 (9th Cir. 2013) ..................................................................................18

*Gonzalez v. City of Anaheim*,
    747 F.3d 789 (9th Cir. 2014) ............................................................................23, 24

*Graham v. Connor*,
    490 U.S. 386 (1989) ...........................................................................17, 20, 27, 28

*Hayes v. County of San Diego*,
    57 Cal.4th 622 (2013)......................................................................................27, 28

*Hayes v. County of San Diego*,
    736 F.3d 1223 (9th Cir. 2013) ................................................................................24

*Hernandez v. City of Pomona*,
    46 Cal. 4th 501 (2009) ............................................................................................28

*Jean-Baptiste v. Gutierrez*,
    627 F.3d 816 (11th Cir. 2010) ................................................................................24

*Jones v. Kmart Corp.*,
    17 Cal. 4th 329 (1998) ............................................................................................29

*Kisela v. Hughes*,
    138 S. Ct. at 1153 (2018) ................................................................................20, 24

*Labensky v. Cornwell*,
    763 F. Supp. 2d 921(S.D. Ohio 2010).....................................................................21

*Martinez  v. County of Los Angeles*,
    47 Cal. App. 4th 334 (1996)....................................................................................27

*Matsushita Elec. v. Zenith Radio*,
    475 U.S. 574(1986) ................................................................................................16

*Monell v. Department of Soc. Serv.*,
    436 U.S. 658 (1978) .........................................................................................25, 26

*Mullenix v. Luna*,
    577 U.S. 7 (2015) ...................................................................................................24

*Munoz v. City of Union City*,
    120 Cal. App. 4th 1077 (2004)................................................................................27

*O'Doan v. Sanford*,
    991 F.3d 1027 (9th Cir. 2021) ................................................................................25

*Oyenik v. Corizon Health, Inc.*,
    696 F. App'x 792 (9th Cir. 2017)...........................................................................26

MANNING | KASS

MK

*Porter v. Osborn*,
    546 F.3d 1131 (9th Cir. 2008) .................................................................23

*Reese v. Cty. of Sacramento*,
    888 F.3d 1030 (9th Cir. 2018) .................................................................29

*Romero v. Kitsap County*,
    931 F.2d 624 (9th Cir. 1991) ...................................................................24

*S.B. v. Cnty. of San Diego*,
    864 F.3d 1010 (9th Cir. 2017) .................................................................17

*Scott v. Henrich*,
    39 F.3d 912 (9th Cir. 1994) .....................................................................25

*Shoyoye v. Cnty. of L.A.*,
    203 Cal.App.4th 947 (2012) ....................................................................29

*Smith v. Agdeppa*,
    2023 U.S. App. LEXIS 22954 (9th Cir. Aug. 30, 2023) .......................25

*Smith v. City of Hemet*,
    394 F.3d 689 (9th Cir. 2005) .............................................................17, 24

*Smith v. Wade*,
    461 U.S. 30 (1983) ...................................................................................30

*Strong v. State*,
    201 Cal. App. 4th 1439 (2011) ................................................................30

*Tatum v. City & Cty. of San Francisco*,
    441 F.3d 1090 (9th Cir. 2006) .................................................................21

*Tennessee v. Garner*,
    471 U.S. 1 (1985) .....................................................................................18

*Trevino v. Gates*,
    99 F.3d 911 (9th Cir. 1996) .....................................................................25

*Villalobos v. City of Santa Maria*,
    85 Cal. App. 5th 383 (2022) ....................................................................28

*Ward v. City of San Jose*,
    967 F.2d 280 (9th Cir. 1991) ...................................................................30

*White v. Pauly*,
    580 U.S. 73 (2017) ...................................................................................24

**STATUTES**

California Civil Code § 52.1 ..........................................................................29

California Government Code § 815.2(a) ........................................................30

California Penal Code § 196 ........................................................................ 27

California Penal Code § 417(a) .................................................................... 20

Federal Rule of Civil Procedure 56(c) ........................................................ 16

**<u>OTHER AUTHORITIES</u>**

Ninth Circuit Model Jury Instruction 5.5 (2018) ........................................ 30

**NOTICE OF MOTION AND MOTION BY DEFENDANTS FOR SUMMARY JUDGMENT**

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

Plaintiffs bring this action against Defendants for violation of constitutional rights and state laws in connection with the August 29, 2021, deputy-involved shooting incident involving Albert Perez ("Perez") and Defendant Deputies. However, the uncontroverted material facts establish that Defendants did not violate legal rights under California state law or the Constitution.  [*See generally* UF 1-47.] Therefore, Defendants are entitled to summary judgment on each of plaintiffs' claims.

**II.   STATEMENT OF UNCONTROVERTED FACTS**

On Sunday, August 29, 2021, at approximately 1726 hours, San Bernardino County Sheriffs' Dispatch received a 911 call for service at 16576 Zenda Street #1, Victorville.  [UF 1.]

The reporting party, Helen Fregoso, reported her daughter's friend, Perez, was in the garage, causing a disturbance, and that he had a gun in his front right pocket. [UF 2.]  Fregoso's daughter, Renee Caudillo, advised Sheriffs Dispatch that Perez told her that she was causing him problems and thought people were after him, and that he pulled out a black gun from his pocket.  [UF 3.]

Deputy Carter was the first to arrive at the incident location, and located Perez in the garage and observed a black gun in Perez' hand.  [UF 4.]  Deputy Carter ordered Perez to drop the gun, but Perez did not comply.  [UF 5.]  Perez remained in the garage with the gun in his hand and refusing commands from deputies to drop the gun.  [UF 6.]

At approximately 1900 hours, Sergeant Gaytan requested via text message that all members of  the San Bernardino County Sheriff's Department Specialized Enforcement Division Team 1 ("SED Team") respond to Zenda Street in Victorville for a barricade situation where the subject had threatened a female with a firearm, and the subject was still armed and barricaded in the garage of a multi-unit complex where he did not live.  [UF 7.]  Sergeant Gaytan also notified the SED Team that a crisis

MANNING | KASS

MK

negotiator, Negotiator Alcala, was also responding to the incident location.  [UF 8.]

Sergeant Gaytan had all members of the SED Team, which included Sergeant Gaytan, Corporal Pollick, Deputy Stone, Deputy Moore, Corporal Olivas, Corporal McCarthy, and Corporal Gary, meet at the Victorville Library just west of the incident location for a briefing prior to arriving at the subject location.  [UF 9.]  During this briefing, the SED Team learned that patrol deputies from the Victorville Sheriff's Station were negotiating with the suspect, Perez, who was seated on a stool at the rear of the garage behind a pool table and was in possession of a gun.  [UF 10.]  The SED Team also learned that the door from the garage to the home had been locked by the homeowner, and that both sides of the garage were contained by patrol units and they were trying to de-escalate the situation by attempting to convince him to surrender peacefully, but he refused to put the gun down.  [UF 11.]

During this briefing, the SED Team also developed an operational plan, which included medical plans, gas plans, and less lethal plans, before going to the incident location.  [UF 12.]  The SED Team's medical plan included requesting Victorville Fire Department, American Medical Response, and air rescue, the sheriff's helicopter, to be on standby in the event that there was a medical emergency, the BearCat and Corporal Olivas' vehicle were also set up as medical extract vehicles.  [UF 13.]  The SED Team's gas plans included Corporal Pollick and Deputy Moore having chemical agents should the need and opportunity to use them arise, and Corporal Pollick developed a chemical agent plan for the house.  The SED Team developed numerous less lethal plans to be used at the appropriate point if the opportunity presented itself.  [UF 14.]

The SED Team's operational plan included containing both sides of the garage, with Corporal McCarthy, Corporal Olivas and Deputy Stone to be positioned on the southeast corner of the garage, with Corporal Olivas with a shield and her pistol, Corporal McCarthy behind Corporal Olivas with lethal cover, and Deputy Stone with a less lethal 40 mm multi-launcher. On the other side, Deputy Moore, Corporal

Pollick, and Sergeant Gaytan were to be positioned on the southwest corner of the garage, with Deputy Moore with a shield and his pistol, Corporal Pollick behind Deputy Moore with lethal cover, and Sergeant Gaytan with a less lethal 40 mm single-launcher.  [UF 15.]

Additionally, the SED Team was going to position the BearCat, which is an armored rescue vehicle, in the driveway and face it towards the garage to light up the garage because it was dark outside.  [UF 16.]

Sergeant Gaytan made it clear to the SED Team that if the suspect was to separate himself from the firearm, the team could not allow him to gain access back to that firearm because he did not want him to be able to shoot at the deputies or any members of the public.  [UF 17.]

Additionally, during the briefing, the SED Team learned that there was a family who stayed in their home in the northwest corner of the multi-unit complex.  [UF 18.] The SED Team made contact with the family, and the family decided to stay in the home as there was an elderly female at the home who was not easily mobile, and the SED Team advised the family to shelter in place.  [UF 19.]

The SED Team arrived to the incident location with the BearCat and met with the patrol sergeant to gain additional information.  [UF 20.]  The SED Team learned that Perez was kind of nodding off, he was kind of lucid, and that it was unclear if he was under the influence of any narcotics or alcohol.  [UF 21.]

Due to the patrol deputies being fatigued after hours of attempted negotiations and attempts to gain compliance from Perez, the SED Team took over and took their assigned positions on the corners of the garage as was discussed in briefing.  [UF 22.]

Perez remained seated directly behind the pool table, approximately 16 feet away from the garage opening, with the gun in his right hand, and looking back and forth between the members of the SED Team on each side of the garage.  [UF 23.]

Before the lethal force encounter, Corporal McCarthy changed positions from the side of the garage to the BearCat in the driveway so that he could have a different

1   vantage point to see Perez in the garage.  [UF 24.]

2       During the incident, Negotiator Alcala was the assigned crisis negotiator and
3   attempted numerous times to negotiate with Perez and gain his compliance.  [UF 25.]
4   During the negotiation, Negotiator Alcala was eventually able to convince Perez to
5   put the gun down. Perez put the gun by the stool behind the pool table, and the
6   deputies viewed this as an act of compliance.  [UF 26.]

7       Then, Negotiator Alcala encouraged Perez to stand up and walk towards the
8   deputies, Perez complied and walked toward the front of the garage.  [UF 27.]  As
9   Perez started to move towards the front of the garage, where the SED Team was
10  waiting, Sergeant Gaytan instructed Perez to stop so that the SED Team could safely
11  take Perez into custody.  [UF 28.]

12      Sergeant Gaytan communicated to Perez that the deputies were going to have
13  to take him into custody, which appeared to the deputies to frustrate Perez, and lead
14  the deputies to believe that Perez was no longer cooperating.  [UF 29.]  For a few
15  minutes, while Sergeant Gaytan continued to talk to Perez to have him peacefully
16  surrender, Perez stood parallel to the middle of the pool table, approximately eight
17  feet north of the garage opening and approximately eight feet away from  the gun's
18  location, Perez then put his hands up and shook his head back and forth, with an
19  irritated and frustrated look, without making eye contact with anyone.  [UF 30.]

20      Suddenly, Perez turned slightly east, stepping back with his left foot, and
21  pivoting on his right foot.  [UF 31.]  As soon as Perez stepped back, Deputy Stone
22  deployed a less-lethal 40-millimeter round, as was discussed in the SED Teams
23  planning briefing, which hit Perez somewhere between his waist and the top of his
24  shoulders.  [UF 32.]  Sergeant Gaytan and Deputy Stone each deployed another less-
25  lethal round at Perez, which also appeared to strike Perez at center mass.  However,
26  the less-lethal rounds appeared to be ineffective in gaining Perez' compliance.  [UF
27  33.]  Although it appeared to the deputies that Perez was hit with three (3) less-lethal
28  rounds, he accelerated and ran toward where the gun was located at the back of the

1   pool table.  [UF 34.]

2        After the less-lethal rounds had been deployed and were ineffective in gaining

3   Perez' compliance, and in response to Perez accelerating toward the back of the pool

4   table where the gun was located, Corporal Cory McCarthy, Deputy Olivas, Deputy

5   Pollick, and Deputy Moore each fired lethal rounds at Perez in order to stop the

6   immediate threat they perceived from Perez' actions.  [UF 35.]  The deputies fired at

7   Perez as he ran toward the back of the garage, started to round the back corner of the

8   pool table, dropped his center of gravity as if crouching down behind the pool table

9   within arms' reach of where the gun was located on the floor.  The deputies reasonably

10  believed that Perez was trying to get the gun to shoot someone.  [UF 36.]  Based on

11  the totality of the circumstances, Perez having the gun in his hands for several hours

12  and having every opportunity to surrender peacefully, the deputies had no reason to

13  believe that Perez was running back into the garage for any other reason than to get

14  back to the gun.  [UF 37.]

15       Sergeant Gaytan ordered the deputies to stop shooting as it appeared Perez had

16  fallen to the ground and had stopped moving.  [UF 38.]  The deputies at the scene

17  retrieved an SED robot, to confirm that Perez was no longer a threat.  Once it was

18  confirmed Perez was no longer moving, the SED Team approached and secured to

19  scene. [UF 39.]  Corporal Pollick and Corporal McCarthy approached Perez and saw

20  that Perez was laying on top of the gun.  [UF 40.]  Deputy Stone saw the gun sticking

21  out from under Perez' stomach where his hands were also located, and kicked it away

22  from him so that Corporal Pollick and Corporal McCarthy could start to provide

23  medical aid.  [UF 41.]

24       Corporal Pollick and Corporal McCarthy, who are certified EMTs, provided

25  immediate medical aid to Perez, who was still breathing when they approached him.

26  [UF 42.]  Victorville Fire Department and American Medical Response were staged

27  in the area, and responded and provided medical treatment immediately after the scene

28  was secured.  [UF 43.]  Perez was transported to Victor Valley Global Medical Center

1   for treatment.  [UF 44.]

2      The Deputies on the scene were not able to give commands to Perez before to

3   lethal force encounter occurred as the situation was very dynamic, uncertain, and

4   rapidly-evolving.  [UF 45.]

5      San Bernardino County Sheriff's Department Policy 3.608, The Use of Lethal

6   Force, states that a deputy may use deadly force to protect himself or others from what

7   he reasonably believes to be a threat of death or serious bodily injury.  [UF 46.]  Since

8   the Sheriff's academy, Corporal McCarthy, Deputy Olivas, Deputy Pollick, Deputy

9   Moore, Deputy Stone, and Sergeant Gaytan have been trained in accordance with San

10  Bernardino County Sheriff's Department Policy 3.608, The Use of Lethal Force, that

11  the use of lethal force is justified to protect themselves or others from what they

12  reasonably believe to be an immediate threat of death or serious bodily injury.  [UF

13  47.]

14  **III.   SUMMARY JUDGMENT STANDARD**

15     Summary judgment is proper if the moving party demonstrates "that there is no

16  genuine issue as to any material fact . . . "  Fed.R.Civ.P. 56(c).  In a trilogy of cases,

17  the United States Supreme Court clarified the burden of proof of each party with

18  regard to the resolution of summary judgment motions.  *Celotex Corp. v. Catrett,* 477

19  U.S. 317, 323 (1986) ("the moving party bears the burden of informing the court of

20  the basis for its motion, and identifying parts of the file which it believes indicated an

21  absence of a general issue of material fact."); *Anderson v. Liberty Lobby,* 477 U.S.

22  242, 248 (1986) ("The non-moving party must set forth specific facts showing that

23  there is a genuine issue of material fact for trial."); *Matsushita Elec. v. Zenith Radio,*

24  475 U.S. 574, 576 (1986) (In opposing a motion for summary judgment, it is

25  insufficient to merely show that there is some "metaphysical doubt as to material

26  facts.").

27

28

IV.    ARGUMENT

A.    **Defendant Deputies Used Objectively Reasonable Force Under the Totality of The Circumstances.**

In *Graham v. Connor*, 490 U.S. 386, 388 (1989), the Supreme Court held that an excessive force claim is properly analyzed under the Fourth Amendment's objective reasonableness standard.  The *Graham* Court set forth a non-exhaustive list of factors to be considered in evaluating whether the force used to effect a particular seizure is reasonable: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists detention or attempts to escape.  *Id*. at 394-95.  The test is an objective one, viewed from the vantage of a reasonable officer at the scene, and is highly deferential to the police officer's need to protect himself or others.  *Id.* at 396-97.  The "calculus of reasonableness" in these circumstances "must embody allowance for the fact that police officers are often forced to make split-second judgments" and the courts should not apply the "20/20 vision of hindsight."  *Id.*

The *Graham* factors as analyzed below weigh in favor of finding that Defendant Deputies are entitled to judgment on all of plaintiffs' force-based claims, including the federal claims and the state law claims for battery, negligence, and violation of the Bane Act.

1.    **Perez posed an immediate threat to Defendant Deputies, other deputies on the scene, and the public.**

In analyzing an incident under the *Graham* criteria, the "most important single element of the three specified factors: ***whether the suspect poses an immediate threat to the safety of the officers or others,"*** is the starting point.  *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (emphasis added); *see also S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017).  Further, "[i]f the person is armed – or reasonably suspected of being armed – a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."  *George v. Morris*, 736 F.3d

MANNING | KASS

829, 838 (9th Cir. 2013).  Reasonableness doesn't "always require[d] officers to delay their fire until a suspect turns his weapon on them."  *Id.*  Thus, a police officer may use *deadly* force where the officer reasonably believes (has probable cause that) the suspect poses an immediate threat of death or serious physical harm to the officer or others: in order to protect himself/others or to prevent escape.  *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  Officers shouldn't have to "wait until a gun is pointed at [them] before [they are] entitled to take action."  *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001).

Here, the SED Team arrived at the incident location where patrol deputies were negotiating with Perez after he threatened a female with a firearm, was armed with a gun, and refusing commands while barricaded in the garage of a multi-unit complex where he did not live.  [UF 1-11.]  The SED Team learned that Perez was kind of nodding off, it was unclear if he was under the influence, and that there was a family who stayed in their home in the complex.  [UF 18, 19, 21.]

When the SED Team took their assigned positions on the corners of the garage, Perez was still seated directly behind the pool table, approximately 16 feet away from the garage opening, with the gun in his right hand, and looking back and forth between the members of the SED Team.  [UF 15, 22, 23.]

Negotiator Alcala, after lengthy negotiations with Perez, was able to convince Perez to put the gun down by the stool behind the pool table.  [UF 8, 25, 26.]  Negotiator Alcala encouraged Perez to stand up and walk towards the deputies, Perez complied and walked toward the front of the garage.  [UF 27.]  As Perez started to move towards the front of the garage, where the SED Team was waiting, Sergeant Gaytan instructed Perez to stop so that the SED Team could safely take Perez into custody.  [UF 28.]

Sergeant Gaytan communicated to Perez that the deputies were going to have to take him into custody, ***which appeared to the deputies to frustrate Perez***, and lead the deputies to believe that Perez was no longer cooperating.  [UF 29.]  For a few

minutes, while Sergeant Gaytan talked to Perez, Perez stood parallel to the middle of the pool table, approximately eight feet north of the garage opening and approximately eight feet away from the gun's location, ***Perez then put his hands up and shook his head back and forth, with an irritated and frustrated look, without making eye contact with anyone***.  [UF 30.]

   ***Suddenly, Perez turned slightly east, stepping back with his left foot, and pivoting on his right foot***.  [UF 31.]  As soon as Perez stepped back, Deputy Stone deployed a less-lethal 40-millimeter round, followed by Sergeant Gaytan and Deputy Stone each deploying another less-lethal round, however, the (3) less-lethal rounds were ineffective in gaining Perez' compliance, and ***Perez accelerated and ran toward where the gun was located at the back of the pool table.***  [UF 32-34.]

   In response, Corporal Cory McCarthy, Deputy Olivas, Deputy Pollick, and Deputy Moore each fired lethal rounds at Perez in order to stop the immediate threat they perceived from Perez' actions.  [UF 35.]  The deputies fired at ***Perez as he ran toward the back of the garage, rounding the corner of the pool table, dropped his center of gravity as if crouching down behind the pool table within arms' reach of where the gun was located on the floor.***  The deputies reasonably believed that Perez was trying to get the gun to shoot someone.  [UF 36.]

   Specifically, based on the totality of the circumstances, and after the less-lethal force appeared to have no effect, because the situation was very dynamic, uncertain, and rapidly-evolving, the deputies had no reason to believe that Perez was running back into the garage for any other reason than to get back to the gun.  [UF 37, 45.]

   Significantly, after SED robot confirmed that Perez was no longer a threat, Corporal Pollick and Corporal McCarthy approached Perez and saw that Perez was laying on top of the gun.  [UF 39, 40.]  Further, ***Deputy Stone saw the gun sticking out from under Perez' stomach where his hands were also located***.  [UF 41.]

   Accordingly, the uncontroverted evidence supports that Perez posed an ***immediate threat to the safety*** of Defendant Deputies, the other deputies on the scene,

1  and the public, as he stopped complying with the deputies commands and accelerated

2  and ***eventually reached the gun***.

### 2.     Perez was brandishing a gun, ignored the deputies commands, and escalated the incident by running toward gun.

5     The other *Graham* factors also weigh toward justification of the lethal force.

6     First, the severity of the crime factor also supports that Defendant Deputies'

7  actions were objectively reasonable.  Here, there can be no dispute that Perez was

8  holding a gun in his hand for hours while he sat on a chair in the garage and deputies

9  attempted to negotiate a peaceful surrender with him.  [UF 4, 6, 7, 10, 11, 23, 25.]

10 This act violated Cal. Penal Code § 417(a).[1]

11    Also, although after many hours of negotiating, Perez finally complied with

12 commands to put the gun down and then to stand up and walk towards the deputies,

13 Perez escalated the incident by stepping back and then accelerating and reaching for

14 where the gun was located.  [UF 26-31, 34-37.]

### 3.     Case law supports the Defendant Deputies' actions.

16    Under leading case law, "where a suspect threatens an officer with a weapon

17 such as a ***gun*** or knife, ***the officer is justified in using deadly force***."  *Smith*, 394 F.

18 3d at 704 (emphasis added); *accord Kisela v. Hughes*,138 S. Ct. at 1153 (2018) (rev'g

19 denial of qualified immunity where an erratic, knife-armed suspect moved toward a

20 civilian in a perceived-threatening manner, despite officer commands to drop the

21 knife, the officer's use of deadly force was entitled to judgment.).

22    Further, where the uncontroverted objective evidence supports an officer's

23 belief that a suspect was dangerous to others and/or potential risk to the safety of the

24 officer or others, the officer is entitled to summary judgment because his responding

---

[1] "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel is guilty of a misdemeanor, punishable by imprisonment in a county jail for not less than 30 days."

1  use of force is deemed reasonable as a matter of law.  *See, e.g., Labensky v. Cornwell*,

2  763 F. Supp. 2d 921, 922-25, 929 (S.D. Ohio 2010) ("To use force, actual danger need

3  not threaten the officer or other officers; an officer need only have a reasonable

4  perception of danger."  Thus, "[a]n officer need not see a weapon to presume that a

5  suspect may be reaching for or attempting to use a weapon.")

6        Here, there can be no dispute that Perez posed an ***immediate threat to the safety***

7  of the Defendant Deputies and the others in the vicinity.  [UF 1-38.]  Importantly, all

8  personnel surrounding the garage at the time of the use of force, despite their differing

9  perspectives and vantage points, including those not parties to this action, identified

10  the same actions of Perez that posed an immediate threat, specifically that Perez

11  stopped complying with commands, moved quickly toward the back of the pool table

12  where the gun was located, and lowered his body in the direction of the gun.  [UF 29-

13  37.]  Accordingly, Defendant Deputies' use of force was justified in response to the

14  immediate deadly threat from Perez' actions.

15        **B.     Plaintiffs' Claim for Denial of Medical Care is Without Merit.**

16        "Claims of denial of medical care during and immediately following an arrest

17  are analyzed under the Fourth Amendment and its 'objective reasonableness'

18  standard."  *Estate of Adomako*, 2018 U.S. Dist. LEXIS 15018, at *13 (*citing Borges*

19  *v. City of Eureka*, 2017 U.S. Dist. LEXIS 10721, at *18 (N.D. Cal. Jan. 25, 2017)).

20  "An officer fulfills this [Fourth Amendment] obligation by promptly summoning the

21  necessary medical help or taking the injured detainee to a hospital."  *Bordegaray v.*

22  *Cty. of Santa Barbara*, 2016 U.S. Dist. LEXIS 172269, at *24 (C.D. Cal. Dec. 12,

23  2016) (*citing Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir.

24  2006).  "Just as the Fourth Amendment does not require a police officer to use the

25  least intrusive method of arrest, [] neither does it require an officer to provide what

26  hindsight reveals to be the most effective medical care for an arrested suspect."

27  *Tatum*, 441 F.3d at 1098(9th Cir. 2006) (internal citations omitted).

28        As an initial matter, the SED team during their briefing, developed a medical

**NOTICE OF MOTION AND MOTION BY DEFENDANTS FOR SUMMARY JUDGMENT**

MANNING | KASS

MK

plan, which included requesting Victorville Fire Department, American Medical Response, and air rescue, the sheriff's helicopter, ***to be on standby in the event that there was a medical emergency***, the BearCat and Corporal Olivas' vehicle were also set up as medical extract vehicles.  [UF 12, 13.]

Importantly, after the lethal force encounter, after the SED robot confirmed that Perez was no longer a threat, Corporal Pollick and Corporal McCarthy approached Perez and saw that Perez was laying on top of the gun, Deputy Stone kicked the gun away from Perez, to secure the scene in order to provide medical aid.  [UF 39-41.]

Immediately, Corporal Pollick and Corporal McCarthy, who are certified EMTs, provided immediate medical aid to Perez, who was still breathing when they approached him.  [UF 42.]  Victorville Fire Department and American Medical Response were staged in the area, and responded and provided medical treatment immediately after the scene was secured.  [UF 43.]  Perez was transported to Victor Valley Global Medical Center for treatment.  [UF 44.]

Defendants are unaware of any Supreme Court or Ninth Circuit decision holding that under the circumstances of this case, Defendants and emergency personnel should have ignored their safety procedure training in favor of giving Perez medical assistance or allowed medical personnel on the scene before it was secured. *See, e.g. Crittenden v. City of Tahlequah*, 2018 U.S. Dist. LEXIS 106662, at *48-49 (E.D. Okla. June 25, 2018) (no Supreme Court or Tenth Circuit decision holding that officers should have ignored their safety procedure training to give the suspect medical assistance or allow EMS personnel on the scene before it was secured).

Accordingly, there is no evidence of an untimely delay in summoning medical treatment or that Defendant Deputies "consciously disregarded a substantial risk of serious harm" to Perez' health or safety.

**C.    Plaintiffs' Claim for Due Process/Interference with Familial Relations Fails.**

A claim against an officer for substantive due process rights under the 14th

Amendment considers the subjective intent of the officer. *A. D. v. State of Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2012). In circumstances with "constant flux" that require officers to make "snap judgments," substantive due process violations exist only when the officer "shocks the conscience" or intends to "harm, terrorize or kill" the suspect without a legitimate law enforcement objective. *Porter v. Osborn*, 546 F.3d 1131, 1140-1141 (9th Cir. 2008). "Legitimate law enforcement objectives [include] arrest, self-defense, or the defense of others." *Fewell v. California*, 2017 WL 6043080, at *6 (C.D. Cal. Apr. 11, 2017). Summary judgment for the officer is appropriate when there is no evidence of an ulterior motive. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 798-799 (9th Cir. 2014).

Here, Defendant Deputies had to make a ***snap decision*** to stop Perez from getting the gun and shooting someone as the less-lethal deployments were ineffective in gaining Perez' compliance and Perez accelerated and reached toward the location of the gun. [UF 29-37.] Accordingly, actual deliberation was not practical or feasible under the circumstances as the situation was very dynamic, uncertain, and rapidly-evolving. [UF 45.] Thus, there is no evidence that Defendant Deputies acted with a purpose to harm, such that his conduct "***shocks the conscience***."

Rather, the evidence shows that although after many hours of negotiating, Perez finally complied with commands to put the gun down and then to stand up and walk towards the deputies to end the situation peacefully, Perez escalated the incident by stepping back with his left foot, pivoting on his right foot, and then accelerating and reaching for where the gun was located. [UF 26-31, 34-37.]

**D. Defendant Deputies are Entitled to Qualified Immunity.**

Even if the Defendant Deputies' actions in defending themselves, the other deputies on the scene, and the public rose to the level of a constitutional violation, they are nevertheless entitled to qualified immunity from suit on plaintiffs' federal claims.

An officer is entitled to qualified immunity when at the time of the use of force

incident there was no prior case precedent with substantially analogous facts to put the officer on notice that his conduct violated the suspect's clearly established constitutional or statutory rights. *White v. Pauly,* 580 U.S. 73, 79 (2017). Although a case directly on point is not required for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotations omitted); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152-54 (2018). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotations and citations omitted). It is plaintiffs' burden to establish that the right in question was clearly established at the time of the incident. *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

Here, at the time of the incident, it was clearly established that the use of deadly force is reasonable if a suspect "poses a significant threat of death or serious physical injury to the officer or others." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (emphasis added) (internal quotation omitted). However, "the mere fact that a suspect possesses a weapon does not justify deadly force," "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Hayes v. County of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013) (internal alteration omitted); *Smith*, 394 F.3d at 704; *see also Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014) ("It would be unquestionably reasonable for police to shoot a suspect ... if he reaches for a gun in his waistband.")

Further, other circuits have held that an officers' use of deadly force was justified where the officer reasonably believed the suspect possessed a gun and the suspect was resisting or fleeing from law enforcement, even if the suspect never threatened the officers. *See, e.g.*, *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (holding officer's use of deadly force against an armed suspect was objectively reasonable "[r]egardless of whether [the suspect] had drawn his gun"

because "[the suspect's] gun was available for ready use, and [the officer] was not required to wait and hope[ ] for the best" and explaining that "[t]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect" (citations and internal quotation marks omitted)).

Accordingly, plaintiffs cannot prove that "clearly established law" prohibited the deputies from using lethal force. *O'Doan v. Sanford*, 991 F.3d 1027, 2037 (9th Cir. 2021).

Here, after many hours of negotiating, Perez finally complied with commands to put the gun down and then to stand up and walk towards the deputies. Perez then escalated the incident by stepping back and then accelerating and reaching for where the gun was located. [UF 26-31, 34-37.] Specifically, based on the totality of the circumstances and because the situation was very dynamic, uncertain, and rapidly-evolving, the deputies had no reason to believe that Perez was running back into the garage for any other reason than to get back to the gun. [UF 37, 45.]

Accordingly, "[n]o clearly established law requires the officers to have sustained more grievous injuries or worse before using lethal force in the particular situation they confronted." *Smith v. Agdeppa*, 2023 U.S. App. LEXIS 22954, at *24 (9th Cir. Aug. 30, 2023). Thus, Defendant Deputies are entitled to qualified immunity.

**E.** **Plaintiffs' Claims for *Monell* Liability Lack Merit.**

Plaintiffs' claims for *Monell* liability fails because in the absence of an underlying constitutional violation by its deputies, there can be no *Monell* liability against the County of San Bernardino. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994); *see also Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (stating the requirements to establish *Monell* liability).

However, assuming this Court finds that a constitutional violation occurred, there is no evidence to establish a policy, practice, or custom or a failure to train

caused a violation of plaintiffs' civil rights. *Monell v. Department of Soc. Serv.*, 436 U.S. 658, 691 (1978). The Ninth Circuit has held that a single incident will not suffice to show a policy. *See Oyenik v. Corizon Health, Inc.,* 696 F. App'x 792, 794 (9th Cir. 2017) (noting that "one or two incidents are insufficient to establish a custom or policy"). And, in order to demonstrate a constitutional failure to train, Plaintiffs must show a pattern of similar constitutional violations by untrained employees. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Such is absent here.

As an initial matter, San Bernardino County Sheriff's Department Policy 3.608, The Use of Lethal Force, states that a deputy may use deadly force to protect himself or others from what he reasonably believes to be a threat of death or serious bodily injury. [UF 46.]

Further, the uncontroverted evidence shows that after many hours of negotiating, Perez finally complied with commands to put the gun down and then to stand up and walk towards the deputies in order to end the situation peacefully, Perez escalated the incident by stepping back and then accelerating and reaching for where the gun was located. [UF 26-31, 34-37.] Specifically, based on the totality of the circumstances and because the situation was very dynamic, uncertain, and rapidly-evolving, the deputies had no reason to believe that Perez was running back into the garage for any other reason than to get back to the gun. [UF 37, 45.]

Importantly, since the Sheriff's academy, Defendant Deputies have been trained in accordance with San Bernardino County Sheriff's Department Policy 3.608 that the use of lethal force is justified to protect themselves or others from what they reasonably believe to be an immediate threat of death or serious bodily injury. [UF 47.]

### F. Plaintiffs' Redundant Claims for Battery, Negligence, and Violation of the Bane Act Fail.

Plaintiffs' state law force claims are evaluated under the same federal reasonableness standard for Fourth Amendment excessive force cases, as set forth in

*Graham v. Connor*, 490 U.S. 386 (1989).  *See also Hayes v. County of San Diego*, 57 Cal.4th 622, 637-39 (2013) (adopting *Graham* reasonableness standard for seizure-related negligence claims against officers but clarifying that scope of liability may extend to pre-seizure conduct under certain circumstances); *Archibald v. Cty. of San Bernardino*, 2018 U.S. Dist. LEXIS 171243, at *22 (C.D. Cal. Oct. 2, 2018) (acknowledging that Plaintiffs' battery, negligence, and Bane Act claims are governed by the same inquiry that governs their excessive force claims); *Martinez  v. County of Los Angeles*, 47 Cal. App. 4th 334, 349-50 (1996) (citing Cal. Penal Code § 196 and holding that where officers used reasonable force under the Fourth Amendment standards, there could be no liability under comparable state-law torts); *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272-73 (1998) (holding that the standard for reasonable force under state assault/battery law is the same as it is for federal excessive force cases); *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 525 (2009) (holding that an officer is immune from any state-law claim for negligence in "pre-shooting conduct" and tactical decisions associated with the use of force where the use of force itself is reasonable under the Fourth Amendment standard); *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1101-03 (2004) (holding that as to a state-law battery claim, whether the force was unreasonable must be decided under the Fourth Amendment reasonableness standard).

Here, the uncontroverted evidence shows that after many hours of negotiating, Perez finally complied with commands to put the gun down and then to stand up and walk towards the deputies in order to end the situation peacefully, Perez escalated the incident by stepping back and then accelerating and reaching for where the gun was located.  [UF 26-31, 34-37.]  Specifically, based on the totality of the circumstances and because the situation was very dynamic, uncertain, and rapidly-evolving, the deputies had no reason to believe that Perez was running back into the garage for any other reason than to get back to the gun.  [UF 37, 45.]

Importantly, Defendant Deputies were not required to hold fire and wait for

Perez to shoot them. *See Villalobos v. City of Santa Maria*, 85 Cal. App. 5th 383, 389 (2022). Because Defendant Deputies' use of force was objectively reasonable under *Graham,* Defendant Deputies are entitled to judgment on plaintiffs' redundant state law claims for and battery, negligence, and violation of the Bane Act.

### 1. Pre Force Negligence Claim

Under California law, the *scope* of conduct that is potentially actionable in negligence also includes pre-force/pre-seizure officer conduct. *Hayes*, 57 Cal.4th at 254.) Accordingly, an officers' pre-force tactical conduct may be actionable in negligence, even if the use of force itself is otherwise reasonable-at-law, only if: (1) from the perspective of a reasonable officer, the pre-force conduct is objectively unreasonable under the totality of the circumstances known to the defendant officer at the time; and (2) the pre-force conduct unreasonably provokes-causes the suspect to take the very action that the officer, in turn, relies upon to justify his subsequent use of force. *Id.* at 637-40.

However, although preshooting conduct is included in the totality of circumstances, law enforcement personnel have a degree of discretion as to how they choose to address a particular situation, and there is no particular preshooting protocol that is always required. *Id.* at 258 Therefore, summary judgment is appropriate when the trial court determines that, viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence. *Id.* at 258 *relying on Hernandez v. City of Pomona*, 46 Cal. 4th 501, 521 (2009).

Here, Defendant Deputies cannot be liable for any negligent pre force tactics that led to use of deadly force, as the uncontroverted evidence shows that Defendant Deputies ***were not involved with the negotiations or communications with Perez***, prior to the use of deadly force. [UF 4-6, 8, 10, 25-30.] Further, Defendant Deputies did not deploy any of the less-lethal rounds that were deployed in response to Perez stepping back with his left foot, and pivoting on his right foot. [UF 32, 33.]

Accordingly, Defendant Deputies cannot be liable as they were not involved in

**NOTICE OF MOTION AND MOTION BY DEFENDANTS FOR SUMMARY JUDGMENT**

1    ***any*** of the pre-force/pre-seizure officer conduct.

2              **2.  Violation of the Bane Act**

3         In order to establish a violation of Civil Code § 52.1, a plaintiff must show that

4    the defendant interfered or attempted to interfere with plaintiff's legal rights by the

5    use of threats, intimidation or coercion.  *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334

6    (1998).  Plaintiff must show coercion independent from the coercion inherent in the

7    violation of the constitutional right.  *Shoyoye v. Cnty. of L.A.*, 203 Cal.App.4th 947,

8    959-60 (2012).   Plaintiffs must prove the officer had a specific intent to violate

9    decedent's right to be free from unreasonable seizures.  *See Reese v. Cty. of*

10   *Sacramento*, 888 F.3d 1030, 1043-44 (9th Cir. 2018).

11        Here, the uncontroverted evidence shows that the SED Team, during their

12   briefing developed an operational plan, which included medical plans, gas plans, and

13   less lethal plans, before going to the incident location.  [UF 9-16.]  Further, once the

14   SED Team arrived at the subject location, and took their assigned positions on the

15   corners of the garage, Negotiator Alcala continued to negotiate with Perez to gain his

16   compliance and to end the situation peacefully.  [UF 22, 25.]

17        Then, after many hours of negotiating, Perez finally complied with commands

18   to put the gun down and then to stand up and walk towards the deputies in order to

19   end the situation peacefully, Perez escalated the incident by stepping back and then

20   accelerating and reaching for where the gun was located.   [UF 26-31, 34-37.]

21   Specifically, based on the totality of the circumstances and because the situation was

22   very dynamic, uncertain, and rapidly-evolving, the deputies had no reason to believe

23   that Perez was running back into the garage for any other reason than to get back to

24   the gun.  [UF 37, 45.]

25        Accordingly, there is no evidence that Deputy Defendants specifically intended

26   to deprive Perez of his constitutional rights.

27

28

**NOTICE OF MOTION AND MOTION BY DEFENDANTS FOR SUMMARY JUDGMENT**

**G.    The County Cannot be Liable For Any of Plaintiffs' State Law Claims.**

To the extent that plaintiffs' are attempting to hold the County liable under California Government Code § 815.2(a), plaintiffs have not presented any evidence that Defendant Deputies or any County employee is liable to plaintiffs, thus the County cannot be held liable. *See Strong v. State*, 201 Cal. App. 4th 1439, 1448 (2011) (Pursuant to Government Code § 815.2, "[A] public entity's liability hinges on the liability of its employee").

**H.    Plaintiffs' Request for Punitive Damages Lacks Merit.**

To obtain punitive damages a plaintiff must prove that a defendant's actions were malicious, oppressive, or in reckless disregard of the decedent's rights. *Dang v. Cross,* 422 F.3d 800, 810 (9th Cir. 2005); Ninth Circuit Model Jury Instruction 5.5 (2018). The United States Supreme Court has determined that punitive damages are available in a § 1983 action only when a defendant's conduct is shown to be motivated by evil motive or intent or when it involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade,* 461 U.S. 30, 51 (1983). Where there is no evidence that a § 1983 defendant has acted with evil intent, there is no legal right to punitive damages. *Ward v. City of San Jose,* 967 F.2d 280, 286 (9th Cir. 1991).

Here, the uncontroverted evidence shows that after many hours of negotiating, Perez finally complied with commands to put the gun down and then to stand up and walk towards the deputies in order to end the situation peacefully, Perez escalated the incident by stepping back and then accelerating and reaching for where the gun was located. [UF 26-31, 34-37.] Specifically, based on the totality of the circumstances and because the situation was very dynamic, uncertain, and rapidly-evolving, the deputies had no reason to believe that Perez was running back into the garage for any other reason than to get back to the gun. [UF 37, 45.]

Thus, there is no evidence that the conduct of the Defendant Deputies during

MANNING | KASS

the incident was malicious, oppressive, or in reckless disregard of Perez' rights

## V.  CONCLUSION

In light of all of the foregoing, Defendants request that their motion for summary judgment be granted in its entirety.

DATED:  March 1, 2024

**MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP**

By:  _____/s/ Kayleigh A. Andersen_____

Eugene P. Ramirez, Esq.
Lynn Carpenter, Esq.
Kayleigh A. Andersen, Esq.
Attorneys for Defendants, COUNTY OF
SAN BERNARDINO; CORY
MCCARTHY, ANDREW POLLICK;
DAVID MOORE, and CRISTINA
OLIVAS

## L.R. 11-6.2. Certificate of Compliance

The undersigned, counsel of record for Defendants COUNTY OF SAN BERNARDINO; CORY MCCARTHY, ANDREW POLLICK; DAVID MOORE, and CRISTINA OLIVAS, certifies that this brief contains 6985 words, which complies with the word limit of L.R. 11-6.1.

DATED:  March 1, 2024

_____/s/ Kayleigh A. Andersen_____
Kayleigh A. Andersen

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 801 S. Figueroa St, 15th Floor, Los Angeles, CA 90017-3012.

On March 1, 2024, I served true copies of the following document(s) described as **NOTICE OF MOTION AND MOTION BY DEFENDANTS FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** on the interested parties in this action as follows:

LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq.
Shannon Leap, Esq.
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333
Fax: (818) 347-4118
Email: dalekgalipo@yahoo.com;
sleap@galipolaw.com;
slaurel@galipolaw.com

*ATTORNEYS FOR PLAINTIFFS, A.J.P.,*
*AND A.M.P.. ET AL.*

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 1, 2024, at Los Angeles, California.

*Maria T. Castro*
_____
Maria T. Castro