Eugene P. Ramirez (State Bar No. 134865)
  eugene.ramirez@manningkass.com
Lynn Carpenter (State Bar No. 310011)
  lynn.carpenter@manningkass.com
Kayleigh Andersen (State Bar No. 306442)
  kayleigh.andersen@manningkass.com
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, COUNTY OF
SAN BERNARDINO; CORY
MCCARTHY, ANDREW POLLICK;
DAVID MOORE, and CRISTINA
OLIVAS

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| A.J.P. and A.M.P., minors by and through their guardian ad litem Cynthia Nunez, individually and as successor in interest to Albert Perez, deceased; and PATRICIA RUIZ, individually, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN BERNARDINO; and DOES 1-10, Inclusive, <br><br> Defendant. | Case No. 5:22-CV-01291 SSS (SHKx) <br><br> *[Honorable Sunshine Suzanne Sykes, Magistrate Judge, Shashi H. Kewalramani]* <br><br> **DECLARATION OF KAYLEIGH ANDERSEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> ***Filed concurrently with:*** <br> *1. Notice of Motion and Motion;* <br> *2. Statement of Uncontroverted Facts;* <br> *3. Declaration of Sergeant Gaytan;* <br> *4. Declaration of Corporal McCarthy;* <br> *5. Declaration of Corporal Olivas;* <br> *6. Declaration of Corporal Pollick;* <br> *7. Declaration of  Deputy Moore;* <br> *8. Declaration of Deputy Stone;* <br> *9. Declaration of Sergeant Scalise; and* <br> *10.   [Proposed] Order* <br><br> Date: April 19, 2024 <br> Time: 2:00 p.m. <br> Crtrm.: Courtroom 2, 2nd Floor <br><br> *Action Filed:        07/22/2022* |

1

**DECLARATION OF KAYLEIGH ANDERSEN**

I, Kayleigh Andersen, declare as follows:

1.      I am an attorney duly admitted to practice before this Court.  I am an attorney with Manning & Kass, Ellrod, Ramirez, Trester LLP, attorneys of record for Defendants, COUNTY OF SAN BERNARDINO; CORY MCCARTHY, ANDREW POLLICK; DAVID MOORE, and CRISTINA OLIVAS.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.  I make this declaration in support of Defendants' Motion for Summary Judgment.

2.      Attached hereto as Exhibit "A" is a true and correct copy of the Detailed Call Log History ("Call Log History ") from the subject incident in this case.  (*See* Scalise Decl., ¶ 4.)

3.      Attached hereto as Exhibit "B" is a true and correct copy of excerpts of the Deposition of Helen Fregoso ("Fregoso Depo.") dated January 30, 2024, which was taken in the instant case.

4.      Attached hereto as Exhibit "C" is a true and correct copy of excerpts of the Deposition of Corporal Andrew Pollick ("Pollick Depo.") dated September 15, 2023, which was taken in the instant case.

5.      Attached hereto as Exhibit "D" is a true and correct copy of excerpts of the Deposition of Corporal Cory McCarthy ("McCarthy Depo.") dated November 9, 2023, which was taken in the instant case.

6.      Attached hereto as Exhibit "E" is a true and correct copy of excerpts of the Deposition of Deputy David Moore ("Moore Depo.") dated September 15, 2023, which was taken in the instant case.

7.      Attached hereto as Exhibit "F" is a true and correct copy of excerpts of the Deposition of Corporal Christina Olivas ("Olivas Depo.") dated October 3, 2023, which was taken in the instant case.

8.      Attached hereto as Exhibit "G" is a true and correct copy of excerpts of the Deposition of Deputy Joshua Stone ("Stone Depo.") dated December 14, 2023, which was taken in the instant case.

9.      Attached hereto as Exhibit "H" is a true and correct copy of excerpts of the Deposition of Negotiatory Anthony Alcala ("Alcala Depo.") dated December 28, 2023, which was taken in the instant case.

10.     Attached hereto as Exhibit "I" is a true and correct copy of excerpts of the Deposition of Sergeant Luke Gaytan ("Gaytan Depo.") dated December 14, 2023, which was taken in the instant case.

11.     Attached hereto as Exhibit "J" is a true and correct copy of the audio from Sergeant Luke Gaytan's recorder taken on August 29, 2021 ("Incident Audio") from the subject incident in this case.  (*See* Gaytan Decl., ¶ 19.)

12.     Attached hereto as Exhibit "K" is a true and correct copy of photos of Perez sitting on a stool in the garage that where sent to members of the SED Team via text message on August 29, 2021, ("Perez Photos") from the subject incident in this case.  (*See* McCarthy Decl., ¶ 14; Olivas Decl., ¶ 14; Pollick Decl., ¶ 14; Moore Decl., ¶ 14.)

13.     Attached hereto as Exhibit "L" is a true and correct copy of photos of the garage, the incident location, taken by members of the SED Team after the subject incident on August 29, 2021, ("Garage Photos") which were produced in the instant case.  (*See* Scalise Decl., ¶ 5.)

14.     Attached hereto as Exhibit "M" is a true and correct copy of San Bernardino County Sheriff's Department Policy 3.608 The Use of Lethal Force ("Use of Force Policy"), which was produced in the instant case.  (*See* Scalise Decl., ¶ 6.)

15.     On February 15, 2024, Defendants' counsel sent plaintiffs' counsel a comprehensive meet and confer letter inviting further discussions regarding the dispositive issues presented in this motion.  Attached hereto as Exhibit "N" is a true and correct copy of Defendants' Meet and Confer Letter sent to plaintiffs' counsel.

3

16.     On February 20, 2024, plaintiffs' counsel, Shannon Leap, provided a response to Defendants' meet and confer letter stating that, plaintiffs' counsels position is that a motion for summary judgment relating to plaintiffs' claims for excessive force under the Fourth Amendment (Claim #1 in the SAC), Ppaintiff's claim for Interference with Familial Relationship under the Fourteenth Amendment (Claim #3), and plaintiffs' state law claims (Claims #6-8) would be frivolous, but that plaintiffs' counsel would consider dismissing plaintiffs' *Monell* claims (Claims 4 and 5), Plaintiff's Delay in Medical Care (Claim #2), as well as plaintiffs' claims for punitive damages against the individual defendants if Defendants agree not to file the motion at all.  Attached hereto as Exhibit "O" is a true and correct copy of plaintiffs' counsel's response to Defendants' Meet and Confer Letter .

17.     On February 22, 2023, Defendants' counsel, Kayleigh Andersen, and plaintiffs' counsel, Shannon Leap, telephonically met and conferred for approximately ten (10) minutes or less regarding the issues presented in Defendants' meet and confer letter regarding the dispositive issues presented in this motion as well as plaintiffs' counsels position regarding Defendants' meet and confer letter. However, the parties were unable to reach an agreement to resolve the issues informally.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 1st day of March, 2024, at Los Angeles, California.


                                         /s/ Kayleigh Andersen
                                         Kayleigh Andersen

**DECLARATION OF KAYLEIGH ANDERSEN ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Exhibit "A"

Exhibit "A"

# Detailed History for Police Inc# #VC212410229 As of 8/31/2021 07:31:12

**Output for: F3085**

Priority:4 Type:LFE - Lethal Force Encounter
Location:16567 ZENDA ST #1, VVC btwn CULLEY ST and S MOJAVE DR

| Created: | 08/29/2021 17:26:55 | DC57 | C5697 |
|---|---|---|---|
| Entered: | 08/29/2021 17:29:56 | DC57 | C5697 |
| Dispatch: | 08/29/2021 17:31:20 | DC10 | H8873 |
| Enroute: | 08/29/2021 17:31:20 | DC10 | H8873 |
| Onscene: | 08/29/2021 17:38:14 | MVCP14 | F5443 |
| Control: | 08/29/2021 19:20:06 | DC10 | H8873 |
| Closed: | 08/30/2021 19:27:47 | DC06 | E2409 |

IC: PrimeUnit:60H13 Dispo:RTF Type:LFE - Lethal Force Encounter
Jur:VC Group:VC Squad Area:VC2 RptDist:VC031
Case #:SPR2100165, VCR2108196 ☐ Detail

| 17:26:55pdt | CREATE | Location:16567 ZENDA ST #1, VVC Type:415S Inf/Name:FREGOSO,HELEN Phone:626/485-4425 Source:WPH2 Group:VC RD:VC031 TypeDesc:SUBJECT DISTURB LocDesc:btwn CULLEY ST and S MOJAVE DR Priority:1 Response:1PAT Jur:VC LocType:S RPCont:Y GeoLong:-117.300431 GeoLat:34.523516 |
|---|---|---|
| 17:29:56 | ENTRY | Text:DAUS FRIEND S1 IN THE GARAGE, HBD AND BEING 415V, CLAIMS HE HAS A GUN IN HIS RIGHT FRONT POCKET |
| 17:29:56 | ALI | E911Phne:626/485-4425 E911Pilot:909/511-1338 E911Add:16350 MOJAVE DR, VVC E911Subs:T-MOBILE USA E911Srce:WPH2 Tower:TMOB AliLong:-117.302495 AliLatitude:34.52332900 Confidence:90 |
| 17:29:56 | ALIGEO | GeoLong:-117.302495 GeoLat:34.52332900 ClosestAdd:16158 ALLEY ALY ClosestInt:ALLEY ALY / CULLEY ST InterDesc:191 ft NE Area1:VC031 |
| 17:29:56 | SUBJ | S#:1 Race:H Sex:M Age:33 Hght:505 Wght:180 Name:PEREZ,ALBERT Misc:LSW: BLU SWEATER, GRAY SWEATS |
| 17:29:56 | -PREMIS | Text:PPR |
| 17:29:57 | RFT | Name:PEREZ ,ALBERT Race:H Sex:M Repeat:Yes |
| 17:30:28 | -SELECT | |
| 17:31:17 | MISC | Text:BOLOD P22 |
| 17:31:19 | MISC | Text:P22 COPIES |
| 17:31:20 | DISPER | 17P22 Operator:F5443 OperNames:CARTER,STEVEN |
| 17:31:20 | -PRIU | 17P22 |
| 17:31:20 | HOLD | |
| 17:31:48 | PRIOR | Location:16567 ZENDA ST #1, VVC PremType:PPR |
| 17:31:51 | LOGM | 17P22 Message:032108300031000386 MessageType:XML Received:08/29/2021 17:31:49 Text:CHL |
| 17:32:30 | INFO | Text:RP PUT DAU ON THE PHONE, SAID HE CAME TO VISIT AND STARTED TALKING ABOUT HER CAUSING HIM PROBLEMS, PULLED OUT BLK HANDGUN FROM HIS POCKET, DID NOT BRANDISH IT AT RP BUT THINKS PEOPLE ARE AFTER HIM. |
| 17:33:44 | INFO | Text:UNK H/S BUT ACTING PARANOID. MALE CAME TO HER RESD IN SIL KIA RIO. DAU TOLD HIM TO LEAVE THEN WENT INSIDE THE HOME. DOORS AND WINDOWS LOCKED. |
| 17:34:10 | MISC | 17P22 Text:COPIES |
| 17:34:26 | INFO | |
| 17:34:26 | SUBJ | S#:2 Sex:F Age:51 DOB:12/06/1969 Name:CAUDILLO,RENEE Misc:DAU |
| 17:34:28 | RFT | Name:CAUDILLO ,RENEE Sex:F DOB:19691206 Repeat:Yes |
| 17:34:48 | INFO | Text:ONLY RP AND DAU IN THE RESD. UNK IF HE IS STILL OUTSIDE IN THE |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          CQSB 000034

| | | | |
|---|---|---|---|
| | | GARAGE, HAS NO VISUAL | |
| 17:35:36 | INFO | Text:RP STS GARAGE IS IN THE BACK ALLEY / | |
| 17:35:56 | MISC | 17P22 Text:COPIESA | |
| 17:38:14 | *ONSCN | 17P22 | |
| 17:41:01 | *ASSIST | 17P26 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:H8270 | |
| | | OperNames:SALAS, JERAMEY | |
| 17:41:03 | MISC | 17P22 Text:SUBJ WITH GUN / C33 | |
| 17:41:10 | MISC | 17P22 Text:REFUSING TO PUT DOWN | |
| 17:41:26 | MISC | 17P26 Text:CODE MOJAVE VILLAGE | |
| 17:41:33 | *ASSIST | 17P24 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:H5829 | |
| | | OperNames:GUTHAUS,PATRICK | |
| 17:41:33 | *ASSIST | 17P23 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:I1592 F5189 | |
| | | OperNames:WOLFF,GARRETT; SMITH,ESHTON | |
| 17:41:38 | MISC | 17P22 Text:NOT FOLLOWING COMMANDS | |
| 17:41:41 | CRIT | 17P22 Terminal:DC11 | |
| 17:42:20 | MISC | 17P22 Text:IN THE BACK ALLEY / GARAGE/ HOLDING A BLK HANDGUN | |
| 17:42:38 | MISC | 17P23 Text:1 MIN OUT | |
| 17:42:46 | ASSIST | 17S9 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:C4061 | |
| | | OperNames:LAFEVER,COREY | |
| 17:42:47 | RFT | 17P22 InvType:SNS Name:CAUDILLO,RENEE Sex:M DOB:12/06/1969 | |
| 17:42:47 | RFT | 17P22 Text:INQUIRY SNS,CAUDILLO,RENEE,,,M,120669,,,,X,X,X,,X,,,,,,,,, | |
| 17:43:06 | LOGM | 17P22 Message:032108300043000519 MessageType:Text Received:08/29/2021 17:42:55 | |
| | | Text:CDL CAUDILLO C30 | |
| 17:43:12 | *ONSCN | 17P26 | |
| 17:43:17 | MISC | 17P22 Text:STILL NOT FOLLOWING COMMANDS | |
| 17:43:20 | MISC | 17P22 Text:START 40K | |
| 17:43:52 | ASSIST | 40K4 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:D8558 B4157 | |
| | | OperNames:DICKEY,TOMMY; BYERLY,TED | |
| 17:43:58 | MISC | 40K4 Text:ENRT FROM VALLEY | |
| 17:44:16 | MISC | Text:FIRE BEING STAGED AS PRECAUTION | |
| 17:44:16 | MISC | 17P22 Text:HMA DRK BLU SWEATSHIRT/ LIGHT GRY PANTS/ GRY SHOES | |
| 17:44:20 | *ONSCN | 17P23 | |
| 17:44:27 | RFT | 17P22 Text:INQUIRY GUN,,,,,,,,,,,,,,,,,CAUDILLO,RENEE,,120669,,,,, | |
| 17:44:47 | LOGM | 17P22 Message:032108300044000530 MessageType:Text Received:08/29/2021 17:44:28 | |
| | | Text:NEG GUN REG TO CAUDILLO | |
| 17:44:55 | MISC | 17P23 Text:GRABBING LESS LETHAL | |
| 17:45:18 | MISC | Text:FIRE ADVISED | |
| 17:45:33 | LOGM | 17P22 Message:032108300045000534 MessageType:HTML Received:08/29/2021 17:45:26 | |
| | | Text:CHL SINCE 2019 | |
| 17:45:57 | NOMORE | | |
| 17:46:38 | BACKOS | 17S5 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Text:2 OUT | |
| 17:46:52 | PRMPT | 17S5 | |
| 17:47:04 | BACKOS | 17S5 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Text:2 OUT | |
| 17:47:15 | *ASSIST | 17P25 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:H9794 | |
| | | OperNames:MORALES, ROBERTO | |
| 17:47:16 | PRMPT | 17S5 | |
| 17:47:19 | MISC | 17S9 Text:2 OUT | |
| 17:47:59 | *ONSCN | 17P24 | |
| 17:48:33 | CLOS | 17P25 Location:NORTHSIDE OF COMPLEX | |
| 17:49:33 | *ASSIST | 17X7 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:G6198 | |
| | | OperNames:MATA,JULIAN | |
| 17:49:50 | MISC | 17P22 Text:DAU AND RP WILL EXIT OUT FRONT GATE | |
| 17:50:02 | MISC | 17P25 Text:WILL MEET | |
| 17:50:46 | MISC | 17P22 Text:NOT COMPLYING | |
| 17:50:56 | MISC | 17P25 Text:2 EXITING HOME | |

CONFIDENTIAL : SUBJECT TO PROTECTIVE ORDER

| 17:51:54 | MISC | 40K4 Text:12-15 MIN ETA FROM SB |
|---|---|---|
| 17:53:09 | ASSIST | 17S5 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:B6735 OperNames:CLARK,NICHOLAS |
| 17:54:27 | *ONSCN | 17X7 |
| 17:54:39 | MISC | 17P22 Text:SUBJ IN GARAGE SITTING IN CHAIR NON VERBAL STILL HOLDING GUN |
| 17:54:46 | MISC | 40K4 Text:13 MIN OUT |
| 17:55:54 | MISC | 17P25 Text:RESD/RP LOCKED GARAGE FROM INSIDE RESD SUBJ WILL NOT BE ABLE TO GO OUT DOOR UNLESS HE BREAKS IT/ UNK HS MOST LIKELY HBD |
| 17:56:16 | RFT | 17P22 Text:INQUIRY CDL,PEREZ,ALBERT,X,,,,,,,VICTORVILLE,, |
| 17:57:12 | RFT | 17P22 InvType:SNS Name:PEREZ,ALBERT Sex:M DOB:07/27/1994 |
| 17:57:13 | RFT | 17P22 Text:INQUIRY SNS,PEREZ,ALBERT,,M,07/27/1994,,,,X,X,X,,X,,,,,,, |
| 17:57:31 | LOGM | 17P22 Message:032108300057000677 MessageType:Text Received:08/29/2021 17:57:23 Text:CDL PEREZ |
| 17:57:41 | LOGM | 17P22 Message:032108300057000679 MessageType:HTML Received:08/29/2021 17:57:10 Text:CNI PEREZ |
| 17:57:56 | RFT | 17P22 Text:INQUIRY GUN,,,,,,,,,BOTH,,,,,,,,,PEREZ,ALBERT,,07271994,,,,, |
| 17:58:53 | MISC | 17P22 Text:STILL REFUSING COMMANDS |
| 17:59:07 | LOGM | 17P22 Message:032108300059000681 MessageType:Text Received:08/29/2021 17:57:58 Text:NEG GUN REG TO PEREZ 072799 |
| 17:59:12 | MISC | 40K4 Text:8 MIN OUT |
| 17:59:30 | MISC | 17P22 Text:SUBJ CONTAINED IN GARAGE STILL NON RESPONSIVE TO DEPS |
| 18:01:04 | MISC | 17P23 Text:CLEAR RESD EAST AND WEST OF INCLOC |
| 18:02:13 | MISC | 17S9 Text:ANYONE ON FRONT END OF RESD |
| 18:03:33 | MISC | Text:LARGE WHI COMPLEX W/O BEING EVAUATED |
| 18:03:48 | MISC | 17S9 Text:CLEAR EAST AND WEST FROM PRIMARY |
| 18:04:12 | RFT | 17P22 InvType:SNS Name:PEREZ,ALBERTO Sex:M DOB:02/24/1989 |
| 18:04:13 | RFT | 17P22 Text:INQUIRY SNS,PEREZ,ALBERTO,,M,02/24/1989,,,,X,X,X,,X,,,,,,, |
| 18:04:28 | LOGM | 17P22 Message:032108300104000720 MessageType:HTML Received:08/29/2021 18:04:12 Text:CNI PEREZ 022489** |
| 18:05:08 | MISC | 17P25 Text:16583 ZENDA #D IS BEING EVACUATED |
| 18:05:39 | LOGM | Message:032108300105000722 MessageType:Text Received:08/29/2021 18:05:27 Text:CDL PEREZ 022489 |
| 18:05:56 | RFT | Text:INQUIRY GUN,,,,,,,,,BOTH,,,,,,,,,PEREZ,ALBERTO,,02241989,,,,, |
| 18:06:20 | MISC | 17P25 Text:16583 ZENDA #B BEING EVACUATED |
| 18:06:31 | ONSCN | 40K4 |
| 18:06:43 | LOGM | 17P22 Message:032108300106000726 MessageType:Text Received:08/29/2021 18:05:59 Text:NEG GUN REG TO PEREA 022489 |
| 18:06:50 | LOGM | 17P22 Message:032108300106000727 MessageType:Text Received:08/29/2021 18:05:59 Text:NEG GUN REG TO PEREZ 022489** |
| 18:07:15 | MISC | 17P25 Text:16583 ZENDA #C EVACUATED |
| 18:07:50 | MISC | 40K4 Text:ANOTHER UNIT TO NORTHSIDE AND FRONT BLOCK THE RD/ PEOPLES SEEN ON NORTHSIDE OF STREET |
| 18:08:05 | MISC | 40K4 Text:HESPERIA OR AP TO ASSIST |
| 18:08:30 | ASSIST | 18R21 CalSgn:40K4 Location:16567 ZENDA ST #1, VVC Operator:H7621 OperNames:GUZMAN,GREGORY |
| 18:08:33 | MISC | 17P25 Text:16553 ZENDA #1 EVACUATED |
| 18:09:07 | ASSIST | 19X5 CalSgn:17P25 Location:NORTHSIDE OF COMPLEX Operator:H6883 OperNames:ROGOFF,TANNER |
| 18:09:25 | MISC | 40K4 Text:NEXT UNIT THAT GOES 97 TO BLOCK COOLEY / ZENDA |
| 18:09:46 | MISC | 40K4 Text:ALSO AT 16591 ZENDA BLOCK STREET/ NEXT TO SEMI |
| 18:09:50 | CHGLOC | 18R21 Location:COOLEY / ZENDA Text:TO BLOCK |
| 18:11:30 | MISC | 17S5 Text:STILL NO MOVEMENT SILLL ATTEMPTING TO COMMUNICATE |
| 18:12:36 | MISC | 17S9 Text:16850 16582 RAMADA WILL SHELTER IN PLACE |
| 18:12:51 | MISC | 17S9 Text:16580 16582 RAMADA WILL SHELTER IN PLACE** |

| Time | Type | Unit/Text |
|---|---|---|
| 18:14:30 | CHGLOC | 19X5 Location:16591 ZENDA ST, VVC |
| 18:15:24 | MISC | 17S5 Text:STILL ATTEMPTING COMMUNICATE STILL NO RESPONSE |
| 18:16:42 | ONSCN | 17S5 17S9 |
| 18:17:10 | *ONSCN | 18R21 |
| 18:19:00 | MISC | 40K4 Text:P25 TO PARK UNIT E/O AND BLOCK OTHERSIDE OF INTERSECTION |
| 18:21:32 | MISC | 40K4 Text:NORTHSIDE AND SOUTHSIDE PERIMETER IS GOOD |
| 18:22:29 | CLOS | 18R21 Location:CULLEY ST/ZENDA ST, VVC |
| 18:26:46 | MISC | 17S5 Text:STILL ATTEMPTINNG TO TALK NO RESPONSE |
| 18:28:59 | ONSCN | 19X5 |
| 18:31:37 | MISC | 17P25 Text:RP ADV SIL VEH BETWEEN JEEP AND BLK SUV WILL BE SUS VEH |
| 18:31:52 | MISCA | 40K4 Plate:6JRC947 Text:PLT |
| 18:31:54 | RFT | 40K4 Plate:6JRC947 / / / |
| 18:31:54 | RFT | 40K4 Text:INQUIRY CADQ,,,,,,,,,,,6JRC947,,,,,,,,, |
| 18:32:16 | LOGM | 40K4 Message:032108300132000883 MessageType:Text Received:08/29/2021 18:31:56 Text:06 KIA |
| 18:32:40 | LOGM | 17P25 Message:032108300132000885 MessageType:HTML Received:08/29/2021 18:32:38 Text:PLT INV SINCE 2019 |
| 18:33:19 | RFT | 17P25 InvType:SNS Name:GONZALES,EVA Sex:F DOB:09/04/1979 |
| 18:33:19 | RFT | 17P25 Text:INQUIRY SNS,GONZALES,EVA,,F,09/04/1979,,,,X,X,X,,X,,,,,,,, |
| 18:33:29 | LOGM | 17P25 Message:032108300133000894 MessageType:HTML Received:08/29/2021 18:33:17 Text:RO OF KIA/ CNI GONZALES |
| 18:33:47 | LOGM | 17P25 Message:032108300133000897 MessageType:Text Received:08/29/2021 18:33:39 Text:RO OF KIA/ CDL GONZALES |
| 18:34:13 | *CLEAR | 17P25 |
| 18:34:36 | MISC | 40K4 Text:DEP ON RIGHT SIDE OF GARAGE BE AWARE LONG GUN |
| 18:34:39 | *RFT | 18R21 Text:INQUIRY CR-HST,,33537117,,,,,,,,,,,,,,,,,,,,,,,,,,H7621 INV,X,, |
| 18:35:10 | LOGM | 17P24 Message:032108300135000907 MessageType:HTML Received:08/29/2021 18:34:57 Text:INV GONZALES SINCE 2017 |
| 18:37:47 | *RFT | 18R21 Text:INQUIRY CR-HST,,25834277,,,,,,,,,,,,,,,,,,,,,,,,,,H7621 INV,X,, |
| 18:40:48 | MISC | 17S9 Text:SED ADVD 1 SQUAD IS RESPONDING |
| 18:43:49 | MISC | Text:WILL KEEP TALKING TO HIM WHILE SED ENRT |
| 18:43:57 | MISC | 40K4 Text:PERIMETER LOOKS GOOD |
| 18:44:11 | MISC | 40K4 Text:1 SUBJ SOUTHSIDE OF FIELD RECORDING |
| 18:44:36 | MISC | 40K4 Text:WILL BREAK FOR FUEL |
| 18:44:37 | PRMPT | 40K4 |
| 18:45:05 | CRIT | 17P22 Terminal:DC10 |
| 18:59:27 | MISC | 17S5 Text:STILL TRYING TO TALK, NO RESPONSE |
| 19:00:25 | *RFT | 17S9 Text:INQUIRY CR-HST,,33537117,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,LAFEVER,INV, 212410229, 417,,X, |
| 19:03:52 | MISC | 17S9 Text:DROP THE MARKER |
| 19:04:00 | MISC | Text:MAINTAINING 33 WITHOUT THE MARKER |
| 19:06:52 | CRIT | 17P22 Terminal:DC11 |
| 19:07:12 | MISC | 17S5 Text:STILL ATTEMPTING COMMUNICATION, NO RESPONSE |
| 19:08:22 | RFT | 17S9 InvType:SNS Name:PEREZ,ALBERT Sex:M DOB:02/24/1989 |
| 19:08:22 | RFT | 17S9 Text:INQUIRY SNS,PEREZ,ALBERT,,M,02241989,,,,X,X,X,,X,,,,,, |
| 19:08:30 | LOGM | Message:032108300208001135 MessageType:HTML Received:08/29/2021 19:08:23 Text:PEREZ/31 |
| 19:08:50 | LOGM | Message:032108300208001137 MessageType:HTML Received:08/29/2021 19:08:45 Text:PEREZ/INVS |
| 19:08:53 | LOGM | Message:032108300208001138 MessageType:Text Received:08/29/2021 19:08:50 Text:PEREZ/CDL |
| 19:09:37 | RFT | 17S9 Text:INQUIRY GUN,,,,,,,,,BOTH,,,,,,,,,PEREZ,ALBERTO,,02241989,,,,, |
| 19:09:41 | RFT | 17S9 Text:INQUIRY SNS,PEREZ,ALBERT,,M,02241989,,,,X,X,X,,X,,,,,, |
| 19:10:08 | RFT | 17S9 Text:INQUIRY GUN,,,,,,,,,BOTH,,,,,,,,,PEREZ,ALBERT,R,02241989,,,,, |
| 19:10:44 | MISC | Text:NEG GUNS REG TO PEREZ WITH NAME/DOB GIVEN |

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| 19:16:33 | MISC | 17S9 Text:THERE IS NO FAMILY BUT THE FRIEND IS UP ON THE WEST SIDE ON THE GRASS IN A BLK DRESS |
|---|---|---|
| 19:17:51 | RFT | Text:INQUIRY QL,6JRC947,,,,,,,,,, |
| 19:18:09 | LOGM | Message:032108300218001183 MessageType:Text Received:08/29/2021 19:17:52 Text:06 KIA/PEREZ VEH |
| 19:18:54 | ASSIST | 61Z15 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:F7805 OperNames:OLIVAS,CHRISTINA |
| 19:18:54 | ASSIST | 61S1 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:B5575 OperNames:GAYTAN,LUCAS |
| 19:18:54 | ASSIST | 61Z11 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:F7810 OperNames:POLLICK,ANDREW |
| 19:18:54 | ASSIST | 61Z13 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:F5144 OperNames:MOORE,DAVID |
| 19:18:54 | ASSIST | 61Z14 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:F5197 OperNames:MCCARTHY,CORY |
| 19:18:54 | ASSIST | 61Z45 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:G6200 OperNames:NERENBERG,RYAN |
| 19:19:26 | MISC | 61Z14 Text:MEDS TO STAGE |
| 19:19:41 | MISC | 17S5 Text:MEDS ARE HERE |
| 19:19:58 | MISC | Text:UNK UNIT, MEDS ARE AT ZENDA/CULLEY |
| 19:20:06 | OK | 19X5 |
| 19:21:01 | SCDOFF | 61Z45 |
| 19:21:05 | PRMPT | 61Z45 |
| 19:21:40 | ASSIST | 61Z45 CalSgn:61Z15 Location:16567 ZENDA ST #1, VVC Operator:E5340 OperNames:STONE,JOSHUA |
| 19:21:40 | ASSIST | 61Z30 CalSgn:61Z15 Location:16567 ZENDA ST #1, VVC Operator:E6895 OperNames:GARY,GREG |
| 19:22:32 | MISC | 61Z14 Text:HAVE MEDS RELOCATE TO THE WEST SIDE OF THE CITY LIBRARY ON THE WEST SIDE OF THE PARKING LOT |
| 19:23:03 | MISC | Text:MEDS UPDATED |
| 19:24:59 | *RFT | 17S9 Text:INQUIRY CR-HST,,25834277,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,LAFEVER, INV,212410229,417,,,X |
| 19:35:46 | ASSIST | 61Z84 CalSgn:61Z13 Location:16567 ZENDA ST #1, VVC Operator:F3081 OperNames:ALCALA,ANTHONY |
| 19:43:07 | ASSIST | 17D6 CalSgn:17S9 Location:19 Operator:C8957 OperNames:PLACENCIA,MIGUEL Text:FOR SW |
| 19:43:37 | *MISC | 61Z84 Text:NEED 21 FOR PEREZ IF POSS |
| 19:51:59 | INFO | Location:16567 ZENDA ST, VVC Type:INFO Inf/Name:ROLDAN,RUBEN InfAdd:15689 BEAR VALLEY Phone:760/963-7371 Source:W911 Group:VC TypeDesc:INFORMATION CALL LocDesc:btwn CULLEY ST and S MOJAVE DR Priority:4 RPCont:P Text:RP ADV HE WAS AT A RES NEXT DOOR WHEN THE INC OCCURRED HE LEFT HIS VEH IFO THE LOC/ STS THAT HIS WALLET AND PROPERTY IS IN THE VEH/ WANTED TO ADV THE DEPUTIES IN CASE THEY COME ACROSS THE VEH OR THERE IS AN ISSUE/ NFI |
| 19:51:59 | ALI | E911Phne:760/963-7371 E911Pilot:909/511-3614 E911Add:15545 BEAR VALLEY RD, HES E911Subs:VERIZON WIRELESS 1-800-451-5242 E911Srce:WPH2 Tower:VZW AliLong:-117.321270 AliLatitude:34.46995300 Confidence:90 |
| 19:51:59 | ALIGEO | GeoLong:-117.321270 GeoLat:34.46995300 ClosestAdd:12062 ELEVENTH AVE ClosestInt:ELEVENTH AVE / BEAR VALLEY RD InterDesc:232 ft S Area1:HE103 |
| 19:51:59 | VEH | V#:1 VehCol:BLK Make:HOND Misc:XTERRA / NM PLATE InvType:INVV |
| 19:57:33 | MISC | 17S5 Text:SUBJ IS HOLDING THE GUN WITH BOTH HANDS, WILL BE DEPLOYING THE BEANBAG |
| 20:07:59 | *ONSCN | 61Z84 |
| 20:08:24 | *ONSCN | 61Z15 |
| 20:10:01 | *ASSIST | 17P25 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:H9794 OperNames:MORALES, ROBERTO |
| 20:12:17 | MISC | 61Z14 Text:CTC AIR RESCUE AND SEE IF THEY CAN STAGE AT VICTOR VALLEY |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | | HOSPITAL |
|---|---|---|
| 20:14:22 | MISC | Text:PER COMM CENTER, AIR RESCUE 6 IS EOW AT 1800 HOURS |
| 20:14:37 | MISC | Text:PER 40K4, AIR RESCUE WAS NOTIFIED AND WILL BE LAUNCHING. |
| 20:16:03 | *ONSCN | 17P25 |
| 20:16:13 | MISC | 17S5 Text:STILL TRYING TO TALK, NO RESPONSZE |
| 20:16:16 | MISC | 17S5 Text:STILL TRYING TO TALK, NO RESPONSE** |
| 20:25:50 | MISC | Text:PER 40K, AR6 WILL BE RESPONDING JUST GOT CALLED OUT / UNK ETA |
| 20:26:01 | MISC | 17S5 Text:CHK WITH CHP FOR BITE DOG |
| 20:27:22 | MISC | Text:INLAND CHP ADVISED OF REQ FOR K9, WILL CHK AND CB. |
| 20:30:10 | *MISC | 61Z11 Text:323-593-1685 WINONIA FEMALE IN #2 95 YO FEMALE JOICE JEFFERSON IS ALSO INSIDE |
| 20:31:03 | MISC | Text:CHP DOESN'T HAVE A K9 AVAIL |
| 20:32:18 | MISC | Text:ONTARIO PD CHKS NEG FOR BITE DOG |
| 20:33:52 | MISC | 17S9 Text:CHK WITH BPD/RIALTO PD FOR BITE DOG |
| 20:34:08 | MISC | Text:BAPD NEG ANY K9'S |
| 20:37:21 | MISC | 61Z84 Text:INITIAL NEGOTIATIONS ATTEMPTED, STILL NOT CORRESPONDING. |
| 20:37:38 | MISC | Text:RIALTO PD HAS A BITE DOG ENRT, K92, DRIVE TIME FROM THEIR CITY. |
| 20:38:42 | INFO | Location:16580 RAMADA DR, VVC Inf/Name:MARIA Group:VC LocDesc:btwn CULLEY ST and ALLEY ALY RPCont:Y Text:ASKING IF SITUATION HAS BEEN RESOLVED // ADV'D TO CONTINUE TO SHELTER IN PLACE |
| 20:39:17 | ASSIST | K92 |
| 20:41:36 | MISC | 17S9 Text:K92 TO 87 AT ZENDA/CULLEY IN THE ALLEY WAY |
| 20:51:20 | MISC | 61S1 Text:WILL BE HEADING TO THE FRONT OF THE LOC TO ATTEMPT TO EVACUATE APT #2 FROM ZENDA SIDE |
| 20:55:06 | *ASSIST | 17P21 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:H5128 OperNames:ALVAREZ,SUNI |
| 20:55:48 | MISC | 61Z84 Text:NEGOTIATIONS ARE STILL INEFFECTIVE |
| 20:56:04 | MISC | 61Z84 Text:PEREZ STILL HAS THE FIREARM IN HIS RIGHT HAND |
| 20:56:38 | MISC | 61Z14 Text:2 SE PERSONNEL TRYING TO MAKE CTC AT THE APTS TO THE WEST |
| 20:57:48 | ONSCN | 17D6 |
| 20:58:39 | MISC | Text:RIALTO K9 ENR FROM 15/GLEN HELEN PKWY |
| 20:59:39 | MISC | 61Z14 Text:UNIT #2 WILL SHELTER IN PLACE |
| 21:07:14 | MISC | 17S5 Text:STILL TRYING ON NEGOTIATIONS. SUBJ IS STARTING TO GET TIRED. |
| 21:13:02 | *CHANGE | 17P22 Type:415S-->417 CAS:0141 TypeDesc:SUBJECT DISTURB-->BRANDISHING WPN |
| 21:13:02 | *CASE | 17P22 Case#:VCR2108196 |
| 21:13:16 | *RI | 17P22 |
| 21:16:27 | *ASSIST | 17P11 CalSgn:17P26 Location:16567 ZENDA ST #1, VVC Operator:H8234 OperNames:ESQUIVEL,TRAVIS |
| 21:16:33 | *ONSCN | 17P21 |
| 21:17:22 | *CLEAR | 18R21 |
| 21:23:54 | MISC | Text:UNK UNIT, BEARCAT IS MOVING |
| 21:23:57 | *ONSCN | 17P11 |
| 21:27:10 | MISC | 61S1 Text:UNITS TO STAY WIDE AND BEHIND COVER |
| 21:35:47 | CONTCT | 17P22 K92 17D6 17P11 17P21 17P23 17P24 17P25 17P26 17S5 Contact:00 |
| 21:35:47 | CONTCT | 17S9 17X7 19X5 61S1 61Z11 61Z13 61Z14 61Z15 61Z30 61Z45 Contact:00 |
| 21:35:47 | CONTCT | 61Z84 Contact:00 |
| 21:36:36 | MISC | Text:UNK UNIT HAS VISUAL OF BOTH HANDS ON EACH LEG, I CANNOT SEE THE GUN. |
| 21:38:29 | MISC | 61S1 Text:UNIT TO GIVE THE SUBJ COMMANDS TO STAND UP AND SHOW HIS HANDS |
| 21:38:38 | MISC | 61S1 Text:IF HE GOES TO THE GUN WE WILL DEPLOY LESS LETHAL |
| 21:40:19 | MISC | 61S1 Text:IF THE SUBJ MAKES ANY FURTHER MOVEMENTS WE ARE USING LESS LETHAL |
| 21:43:52 | MISC | 61S1 Text:SHOTS FIRED, SUSP IS DOWN |

| Time | Type | Text |
|---|---|---|
| 21:44:11 | MISC | Text:UNK UNIT, HAVE OBS ON THE SUBJ AND HIS HANDS ARE UNDER THE TABLE |
| 21:44:33 | MISC | 61S1 Text:SENDING THE ROBOT IN TO SEE IF WE CAN GET EYES ON HIS HANDS |
| 21:46:45 | MISC | 61S1 Text:ROBOT IS DEPLOYED, HANDS OF THE SUSPECT ARE UNDER HIS BODY |
| 21:47:00 | MISC | 61S1 Text:PREPARING FOR APPROACH, ONCE CLEARED WILL TRANSITION TO MEDICAL |
| 21:47:09 | BACKOS | 17P13 CalSgn:17P11 Location:16567 ZENDA ST #1, VVC |
| 21:48:15 | MISC | 61Z14 Text:MOVING IN ON THE SUSP NOW |
| 21:48:56 | MISC | 61S1 Text:SUSP IS SECURED, CHECKING HIM FOR WEAPONS AND PROVIDING MEDICAL-AID |
| 21:49:41 | MISC | 61S1 Text:MEDICAL IS CLEAR IN |
| 21:50:06 | MISC | Text:MEDS ADVISED |
| 21:50:27 | COMBIN | Service:P Inc#:#VC212410307 Type:SHOTSH Jur:VC |
| 21:54:21 | MISC | 17P25 Text:PER 17D6 SW HAS BEEN SENT OFF |
| 21:57:37 | MISC | Text:PER COMM CENTER, AIR RESCUE 306 TO GO TO CHANNEL EMS2 |
| 21:58:52 | MISC | Text:AIR RESCUE ADVISED |
| 22:02:19 | MISC | 17S5 Text:SEND A+ |
| 22:03:39 | MISC | 17P21 Text:FAMILY MEMBERS LOCATED BY THE AMBULANCE AND ARE HYSTERICAL |
| 22:03:50 | MISC | 61S1 Text:UNITS TO PUSH THE FAMILY MEMBERS BACK AND KEEP THE LIGHT OFF HIM |
| 22:03:57 | MISC | Text:UNK UNIT, MORALES WILL BE RIDING WITH |
| 22:05:32 | CHGLOC | 17P25 Location:VICTOR VALLEY HOSPITAL, VVC Text:FOLLOWING AMR |
| 22:05:34 | MISC | Text:PER COMM CTR, AR306 22'D, AR43 WILL BE ENRT TO HOSP |
| 22:06:21 | OK | 17P22 17P13 K92 17D6 17P11 17P21 17P23 17P24 17P25 17P26 Contact:00 |
| 22:06:21 | OK | 17S5 17S9 17X7 19X5 61S1 61Z11 61Z13 61Z14 61Z15 61Z30 Contact:00 |
| 22:06:21 | OK | 61Z45 61Z84 Contact:00 |
| 22:06:28 | MISC | 17P22 Text:LIFT 33 |
| 22:06:33 | MISC | Text:33 LIFTED |
| 22:06:42 | MISC | Text:C33 LIFTED ON DCTAC2 |
| 22:06:48 | *CLEAR | 17P13 |
| 22:08:53 | MISC | 17P25 Text:97 WITH AMR |
| 22:09:49 | MISC | 17S5 Text:APPEARS THE FAMILY HEADED TO THE HOSPITAL AS WELL. |
| 22:11:58 | MISC | 17D6 Text:SW SIGNED |
| 22:12:41 | BACKOS | 17P13 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:H9010 OperNames:RAPISARDI, DOMINIC |
| 22:16:27 | MISC | 17S9 Text:RESD AT 16567 #2 CHK IS C4. |
| 22:16:41 | MISC | 17S9 Text:THEY WERE THE RESD WHO ORIGINALLY SHELTERED IN PLACE. |
| 22:18:20 | MISC | 17P25 Text:CPR IN PROGRESS |
| 22:18:34 | *MISC | 17P25 Text:CIVILIAN WHO FOLLOWED AND SHOWED UP VVGMC WITH AMR - SUMMER ARISPE // 04/24/1995 // (909) 789-2407 |
| 22:18:51 | MISC | Text:RESD AT 16553 ZENDA #1 ASKING IF THEY CAN RETURN |
| 22:18:56 | RFT | InvType:SNS Name:ARISPE,SUMMER Sex:F DOB:04/24/1995 |
| 22:18:56 | RFT | Text:INQUIRY SNS,ARISPE,SUMMER,,F,04241995,,,,X,X,X,,X,,,,,,,, |
| 22:19:31 | MISC | 17S9 Text:GET INFO FOR SUBJS AT 16553 ZENDA AND I WILL MAKE 21 CTC |
| 22:19:39 | LOGM | Message:032108300519002436 MessageType:Text Received:08/29/2021 22:19:11 Text:ARISPE/CDL |
| 22:20:42 | INFO | Location:16567 ZENDA ST #1, VVC Inf/Name:CHAVEZ,OSCAR Phone:760/684-1331 Group:VC LocDesc:btwn CULLEY ST and S MOJAVE DR RPCont:P Text:RESD AT 16553 ZENDA #1 REQ 21 REF RETURNING HOME |
| 22:22:49 | ASSIST | 61C CalSgn:61S1 Location:16567 ZENDA ST #1, VVC Operator:F0357 OperNames:FERBER,KEVIN |
| 22:23:10 | MISC | 17P25 Text:HANDCUFFS WERE JUST REMOVED |
| 22:23:18 | MISC | 17P25 Text:CPR STILL IN PROGRESS |
| 22:24:44 | MISC | 17P25 Text:AIR SHIP 97 |

| 22:28:52 | MISC | 17P25 Text:TOD 2228 HOURS |
|---|---|---|
| 22:30:01 | -XREF | Service:P Inc#:#CO$DC0602058 Type:COR1 Jur:COR Text:CTC DEP ON 21 |
| 22:31:08 | XREF | Service:P Inc#:#CO212410048 Type:COR1 Jur:VC |
| 22:39:41 | CHGLOC | 17P23 17X7 Location:19 |
| 22:51:56 | CLOS | 61C Location:19 |
| 22:52:27 | PRMISE | Location:16567 ZENDA ST #1, VVC |
| 22:52:53 | ONSCN | 17P23 17X7 |
| 22:55:39 | ASSIST | 60S1 CalSgn:61C Location:19 Operator:D2685 OperNames:WARRICK,MICHAEL |
| 22:55:39 | ASSIST | 60H13 CalSgn:61C Location:19 Operator:F3085 OperNames:SPRAGUE,BRYAN |
| 22:55:39 | ASSIST | 60H14 CalSgn:61C Location:19 Operator:D4311 OperNames:GARDEA,MICHAEL |
| 22:55:39 | ASSIST | 60H15 CalSgn:61C Location:19 Operator:G3825 OperNames:GOSSWILLER,IAN |
| 22:55:39 | ASSIST | 60H16 CalSgn:61C Location:19 Operator:A2689 OperNames:DELRIO,MICHELLE |
| 23:01:27 | CONTCT | 17P22 K92 17D6 17P11 17P13 17P21 17P23 17P24 17P25 17P26 Contact:00 |
| 23:01:27 | CONTCT | 17S5 17S9 17X7 19X5 60H13 60H14 60H15 60H16 60S1 61C Contact:00 |
| 23:01:27 | CONTCT | 61S1 61Z11 61Z13 61Z14 61Z15 61Z30 61Z45 61Z84 Contact:00 |
| 23:15:19 | CHGLOC | 17P22 17P24 17P26 Location:19 |
| 23:18:11 | ASSIST | 42A44 CalSgn:17P25 Location:VICTOR VALLEY HOSPITAL, VVC Operator:D6636 OperNames:MATHIS,SHIRA |
| 23:21:11 | ONSCN | 60H13 |
| 23:25:06 | ONSCN | 17P22 |
| 23:25:16 | ONSCN | 17P24 17P26 |
| 23:27:44 | ONSCN | 60H14 |
| 23:31:20 | CONTCT | 17P22 17P24 17P26 Contact:00 |
| 23:33:12 | ASSIST | 42A5 CalSgn:17P13 Location:16567 ZENDA ST #1, VVC Operator:F5307 OperNames:RUSS,MICHAEL |
| 23:42:31 | ONSCN | 42A44 |
| 23:49:26 | *RI | 17P13 |
| 23:57:43 | SCDOFF | K92 |
| 23:57:45 | PRMPT | K92 |
| [08/30/2021] | | |
| 00:05:55 | *CLEAR | 19X5 |
| 00:06:30 | CHANGE | 60H13 Type:417-->LFE Priority:1-->4 CAS:0005 TypeDesc:BRANDISHING WPN-->Lethal Force Encounter |
| 00:06:30 | -TEMPNO | Number:SPR$DC06059 ID:SPR |
| 00:06:30 | CASE | 60H13 Case#:SPR2100165 |
| 00:06:33 | -PERMNO | Number:SPR$DC06059-->SPR2100165 |
| 00:11:15 | *CHGLOC | 17P21 Location:19 |
| 00:17:11 | ONSCN | 42A5 |
| 00:20:57 | *CLOS | 17P21 |
| 00:25:27 | MISC | 17S9 Text:PUBLIC WORKS FOR HARD CLOSURES |
| 00:27:11 | MISC | Text:PUBLIC WORKS ADVISED TO CLOSE CULLEY/ZENDA, CULLEY/ALLEY, S MOJAVE/ALLEY, S MOJAVE/ZENDA. |
| 00:49:41 | *ASSIST | 17P15 CalSgn:17P25 Location:VICTOR VALLEY HOSPITAL, VVC Operator:G9963 OperNames:LAROCCO,SOFIA |
| 00:49:45 | *ONSCN | 17P15 |
| 00:49:56 | *CLOS | 17P15 Location:VV HOSP |
| 00:50:05 | CHGLOC | 17P25 Location:19 |
| 00:55:22 | OK | 17P22 17D6 17P11 17P13 17P15 17P21 17P23 17P24 17P25 17P26 Contact:00 |
| 00:55:22 | OK | 17S5 17S9 17X7 42A5 42A44 60H13 60H14 60H15 60H16 60S1 Contact:00 |
| 00:55:22 | OK | 61C 61S1 61Z11 61Z13 61Z14 61Z15 61Z30 61Z45 61Z84 Contact:00 |
| 00:57:31 | MISC | 17P25 Text:97 |
| 00:57:57 | *CLEAR | 17P25 |
| 01:08:37 | MISC | 17P13 Text:CITY IS 97 |
| 01:42:52 | PRMPT | 17P21 |
| 01:42:57 | PRMPT | 17P23 |

| 01:43:47 | CLOS | 17S5 17S9 Location:19 |
|---|---|---|
| 02:32:48 | CONTCT | 17S5 17S9 Contact:00 |
| 02:42:27 | PRMPT | 61C |
| 03:04:29 | *CLEAR | 17S9 |
| 03:14:22 | *RI | 17P13 |
| 03:32:00 | SCDOFF | 17P22 |
| 03:32:00 | SCDOFF | 17P24 |
| 03:32:00 | SCDOFF | 17P26 |
| 03:32:00 | SCDOFF | 17S5 |
| 03:32:04 | PRMPT | 17P22 17P24 17P26 17S5 |
| 03:32:04 | -PRIU | 17X7 |
| 03:55:49 | PRMPT | 17D6 |
| 04:01:47 | *CLEAR | 17P11 |
| 04:13:49 | PRMPT | 61Z11 |
| 04:25:56 | CLOS | 60H13 |
| 04:27:26 | SCDOFF | 61S1 |
| 04:27:26 | SCDOFF | 61Z13 |
| 04:27:26 | SCDOFF | 61Z14 |
| 04:27:26 | SCDOFF | 61Z15 |
| 04:27:26 | SCDOFF | 61Z30 |
| 04:27:30 | PRMPT | 61S1 61Z13 61Z14 61Z15 |
| 04:27:33 | PRMPT | 61Z30 |
| 04:29:07 | SCDOFF | 60S1 |
| 04:29:07 | SCDOFF | 61Z45 |
| 04:29:07 | SCDOFF | 61Z84 |
| 04:29:12 | PRMPT | 60S1 61Z45 61Z84 |
| 04:29:15 | SCDOFF | 17X7 |
| 04:29:19 | PRMPT | 17X7 |
| 04:29:19 | -PRIU | 17P13 |
| 04:30:53 | *RI | 17P13 |
| 04:51:08 | OK | 17P13 17P15 42A5 42A44 60H13 60H14 60H15 60H16 Contact:00 |
| 05:47:43 | *CLEAR | 17P15 |
| 06:22:08 | *ASSIST | 17P16 CalSgn:17P13 Location:16567 ZENDA ST #1, VVC Operator:H5892 OperNames:ALMARAZ,KENNETH |
| 06:53:51 | *OK | 17P16 |
| 07:28:56 | PRMPT | 17P13 |
| 07:28:56 | -PRIU | 60H13 |
| 07:31:15 | *CHGLOC | 17P16 Location:19 |
| 07:31:31 | *ASSIST | 17P22 CalSgn:17P16 Location:19 Operator:H5128 OperNames:ALVAREZ,SUNI |
| 07:45:50 | PRMPT | 17P22 Text:Preempted and dispatched to call #VC212420070 |
| 07:47:45 | *ASSIST | 17P22 CalSgn:17P16 Location:19 Operator:H5128 OperNames:ALVAREZ,SUNI |
| 07:47:56 | *ONSCN | 17P22 |
| 07:51:10 | *CHGLOC | 17P16 Location:16567 ZENDA ST, VVC |
| 07:57:59 | *CLEAR | 17P16 |
| 08:04:05 | OK | 17P22 |
| 08:12:09 | *CLOS | 17P22 Location:16567 ZENDA STREET |
| 08:31:24 | OK | 17P22 Contact:000 |
| 09:09:59 | DISPOS | 17D1 Operator:F8534 OperNames:BRANDT,CLAYTON |
| 09:10:29 | BACKOS | 17D8 CalSgn:17D1 Location:16567 ZENDA ST #1, VVC Operator:D4321 OperNames:BECHTOL,THOMAS |
| 09:10:36 | OK | 17D1 17D8 Contact:000 Text:0 |
| 09:19:13 | ASSIST | 17D2 CalSgn:17D1 Location:16567 ZENDA ST #1, VVC Operator:G3225 OperNames:CULLUM,STUART |
| 09:19:19 | OK | 17D2 |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| 09:42:52 | *CLEAR | 17P22 |
| 09:43:36 | BACKOS | 17P22 CalSgn:17D1 Location:16567 ZENDA ST #1, VVC Operator:H5128 OperNames:ALVAREZ,SUNI |
| 09:43:41 | OK | 17P22 |
| 10:45:28 | CONTCT | 17D2 17P22 |
| 10:59:54 | BACKOS | 61Z84 Operator:F3081 OperNames:ALCALA,ANTHONY |
| 11:00:19 | *CHGLOC | 61Z84 Location:CENTRAL STATION |
| 11:12:29 | PRMPT | 17D1 17D8 Text:Preempted and dispatched to call #VC212420150 |
| 11:26:00 | CONTCT | 60H13 17D2 17P22 42A5 42A44 60H14 60H15 60H16 61Z84 Contact:0 |
| 11:27:53 | PRMPT | 17D2 |
| 11:28:44 | PRMPT | 61Z84 |
| 12:11:21 | *ASSIST | 17X2 CalSgn:17P22 Location:16567 ZENDA ST #1, VVC Operator:F8945 OperNames:BENNINGTON,CURTIS |
| 12:21:10 | *ONSCN | 17X2 |
| 12:31:17 | CONTCT | 60H13 17P22 17X2 42A5 42A44 60H14 60H15 60H16 Contact:0 |
| 12:37:05 | *OK | 17X2 |
| 13:06:35 | *PRMPT | 17X2 Text:Preempted and dispatched to call #VC212420189 |
| 16:17:49 | PRMPT | 42A44 |
| 17:02:17 | OK | 17P22 Contact:00 |
| 18:56:07 | *CLEAR | 17P22 |
| 18:58:06 | SCDOFF | 60H14 |
| 18:58:06 | SCDOFF | 60H15 |
| 18:58:06 | SCDOFF | 60H16 |
| 18:58:13 | PRMPT | 60H14 60H15 60H16 |
| 18:58:23 | CONTCT | 60H13 42A5 Contact:00 |
| 18:58:31 | MISC | 60H13 Text:STILL AT THE SCENE |
| 19:27:41 | CLEAR | 60H13 Dispo:RTF |
| 19:27:47 | PRMPT | 42A5 |
| 19:27:47 | -CLOSE | |

CONTACT INFO:

| Inf/Name | Phone | InfAdd | RPCont | Language | HBD/HS | RPArmed |
|---|---|---|---|---|---|---|
| FREGOSO,HELEN | 626/485-4425 | | Y | | | |
| ROLDAN,RUBEN | 760/963-7371 | 15689 BEAR VALLEY | P | | | |
| MARIA | | | Y | | | |
| CHAVEZ,OSCAR | 760/684-1331 | | P | | | |

https://10.11.0.52/PRD...   CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER   ...2410229   COSB 000043

**Exhibit "B"**

**Exhibit "B"**

**CERTIFIED COPY**

1            UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

A.J.P. and A.M.P., minors )    CASE NO.
4  by and through their      )    5:22-CV-01291
   guardian ad litem Cynthia )    SSS (SHKx)
5  Nunez, individually and   )
   as successor in interest  )
6  to Albert Perez,          )
   deceased; and PATRICIA    )
7  RUIZ, individually,       )
                             )
8            Plaintiffs,     )
                             )
9  v.                        )
                             )
10 COUNTY OF SAN BERNARDINO; )
   and DOES 1-10, Inclusive, )
11                           )
             Defendants.     )
12 _____ )

13

14          DEPOSITION OF HELEN FREGOSO

15              JANUARY 30, 2024

16

17

18

19

20

21

22

23

24  Dana Mann-Chipkin, CSR No. 14056
    1089898
25

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose         (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento      (800) 222-1231 Martinez         (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside       (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City   (347) 821-4611 Brooklyn         (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago         00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai        001+1+800 222 1231 Hong Kong

1              UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

A.J.P. and A.M.P., minors )   CASE NO.
4   by and through their      )   5:22-CV-01291
    guardian ad litem Cynthia )   SSS (SHKx)
5   Nunez, individually and   )
    as successor in interest  )
6   to Albert Perez,          )
    deceased; and PATRICIA    )
7   RUIZ, individually,       )
                              )
8            Plaintiffs,      )
                              )
9   v.                        )
                              )
10  COUNTY OF SAN BERNARDINO; )
    and DOES 1-10, Inclusive, )
11                            )
             Defendants.      )
12  _____ )

13

14      STENOGRAPHIC DEPOSITION VIA VIDEOCONFERENCE OF

15                    HELEN FREGOSO

16            TUESDAY, JANUARY 30, 2024

17                    10:25 A.M.

18

19

20

21

22

23  Reported By:  Dana Mann-Chipkin
    CSR No. 14056
24  Job No. 1089898

25

                           1

```
 1              (All Appearances Via Videoconference.)

 2

 3    APPEARANCES OF COUNSEL:

 4

 5    For Plaintiffs:

 6                    LAW OFFICES OF DALE K. GALIPO
                      BY:  SHANNON LEAP, ESQ.
 7                    21800 Burbank Boulevard, Suite 310
                      Woodland Hills, California  91367
 8                    Phone:  (818) 347-3333
                      Fax:    (818) 347-4118
 9                    sleap@galipolaw.com

10

      For Defendant COUNTY OF SAN BERNARDINO:
11
                      MANNING & KASS
12                    ELLROD, RAMIREZ, TRESTER LLP
                      BY:  KAYLEIGH ANDERSEN, ESQ.
13                    801 S. Figueroa Street, 15th Floor
                      Los Angeles, California  90017-3012
14                    Phone:  (213) 624-6900
                      Fax:    (213) 624-6999
15                    kayleigh.andersen@manningkass.com

16

17

18

19

20

21

22

23

24

25
```

2

1    the police?

2        A.  After the police were here, that's when I

3    went over there.

4        Q.  Okay.

5            Did you call the police regarding the

6    incident with Albert in the garage?

7        A.  I was asked to call, so I called them, and I

8    told them there was a gentleman -- if I remember this

9    correctly -- that there was a person in the garage

10   with a -- he has a gun and he was acting strange,

11   something like that, and they said, okay, we'll be

12   right there, and then they showed up.

13       Q.  You said you were asked to call the police.

14   Was that by your daughter Renee?

15       A.  Mm-hmm.

16       Q.  "Yes"?

17       A.  Yes --

18       Q.  Okay.

19       A.  -- 'cause she was shaking, herself.

20           We were all a nervous wreck in here.

21       Q.  Okay.

22           And why did you call the police?

23       A.  Because it was -- we felt we were in danger.

24   He had that gun -- from what I was told, he had the

25   gun on the table, I didn't see it, but he was just

32

HELEN FREGOSO

1   very strange, like I said, and I noticed when he was

2   walking out, like, and they told me he was not -- he

3   was not responding.   That's what it was.

4       Q.   Did Renee ever tell you that Albert had

5   pointed the gun at her?

6       A.   Not that I can recall, honestly.

7       Q.   And once the police arrived, where did you

8   go?

9       A.   Well, I went out to the front, and we were

10  standing out there and -- on the edge of the street

11  by the back of the house.   I was standing out in that

12  area.

13          All the neighbors --

14      Q.   And is it correct that --

15      A.   Mm-hmm.

16      Q.   I'm sorry, keep going.   Keep going,

17  Ms. Fregoso.   I didn't mean to cut you off.

18      A.   That's okay.

19          No, I -- we were all out there with my

20  neighbors.   They were asked to, you know, leave their

21  homes also.   So there was a bunch of us out --

22  you know, across the street and around the corner

23  there.

24      Q.   And --

25      A.   Everybody was just like:   What's going on?

33

**Exhibit "C"**

**Exhibit "C"**

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.J.P. and A.M.P., minors, by and     )
     through their guardian ad litem       )
 5   Cynthia Nunez, individually and as    )
     successor in interest to Albert Perez,)
 6   deceased, and PATRICIA RUIZ,          )
     individually,                         )
 7                                         )
                     Plaintiffs,           )
 8                                         )
                     vs.                   )Case No.
 9                                         )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES    )
10   1-10, inclusive,                      )
                                           )
11                   Defendants.           )
     _____)
12

13

14

15          REMOTE VIDEOCONFERENCE DEPOSITION OF

16                     ANDREW POLLICK

17                  SEPTEMBER 15, 2023

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  6788
```

```
 1                 UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.J.P. and A.M.P., minors, by and     )
     through their guardian ad litem       )
 5   Cynthia Nunez, individually and as    )
     successor in interest to Albert Perez,)
 6   deceased, and PATRICIA RUIZ,          )
     individually,                         )
 7                                         )
                    Plaintiffs,            )
 8                                         )
                    vs.                    )Case No.
 9                                         )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES    )
10   1-10, inclusive,                      )
                                           )
11                  Defendants.            )
     _____)

12

13

14

15          The remote videoconference deposition of ANDREW

16   POLLICK, taken on behalf of the Plaintiffs, beginning at 1:05

17   p.m., and ending at 3:00 p.m., on Friday, September 15, 2023,

18   before Jinna Grace Kim, Certified Stenographic Shorthand

19   Reporter No. 14151.

20

21

22

23

24

25
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Andrew Pollick on 09/15/2023**                                    **Page 3**

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiffs:
 3
                LAW OFFICES OF DALE K. GALIPO
 4              BY:  DALE K. GALIPO, ESQ.
                BY:  SHANNON J. LEAP, ESQ.
 5              21800 Burbank Boulevard, Suite 310
                Woodland Hills, California 91367
 6              Tel:  818-347-3333
                Fax:  818-347-4118
 7              E-mail:  dalekgalipo@yahoo.com
                E-mail:  sleap@galipolaw.com
 8

 9    For the Defendants:

10              MANNING & KAZZ ELLROD, RAMIREZ, TRESTER, LLP
                BY:  LYNN CARPENTER, ESQ.
11              801 South Figueroa Street, 15th Floor
                Los Angeles, California 90017
12              Tel:  213-624-6900
                Fax:  213-624-6999
13              E-mail:  llc@manningllp.com

14

15    Also Present:  David Moore, Christina Olivas

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | CALIFORNIA |
| 2 | FRIDAY, SEPTEMBER 15, 2023 |
| 3 | 1:05 P.M. |
| 4 | ANDREW POLLICK, |
| 5 | called as a witness on behalf of the Plaintiffs, having been |
| 6 | first duly sworn remotely via videoconference, was examined |
| 7 | and testified as follows: |
| 8 | EXAMINATION |
| 9 | BY MR. GALIPO: |
| 10 | Q.   Can you please state your name. |
| 11 | A.   Yes.  It's Andrew Pollick. |
| 12 | Q.   How long have you been a law enforcement officer? |
| 13 | A.   I would say coming up on approximately ten years. |
| 14 | Q.   Do you recall the incident generally that we're here |
| 15 | to talk about? |
| 16 | A.   I do. |
| 17 | Q.   Do you recall the date of the incident? |
| 18 | A.   I believe it was on or around August 29th of 2021. |
| 19 | Q.   And do you recall about what time the shooting |
| 20 | occurred? |
| 21 | A.   I would say it was probably at around 9:00 p.m. or |
| 22 | so, give or take a little bit of time. |
| 23 | Q.   What time did you get to the scene? |
| 24 | A.   I believe I arrived on-scene around 7:00 p.m. |
| 25 | Q.   And approximately what time did you first see |

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                              **Page 6**

1    **Mr. Perez?**

2        A.    When I initially arrived there was a period of I

3    would say around an hour, give or take, where we were

4    planning, and the garage was visible from where we were

5    planning away from the location.

6            And I could see the deputies, and they were like

7    engaging with Perez trying to negotiate with him in the

8    garage.  So that happened for around maybe 45 minutes to an

9    hour before I got actually in to a position at the garage.

10       Q.    About what time do you think you got into your

11   position at the garage?

12       A.    I would estimate it was around 8:00 p.m.

13       Q.    One second, please.

14       A.    Yes, sir.

15       Q.    Thank you for your patience.

16            I'm finishing up a mediation, and they're coming to

17   me with notes and all kinds of stuff.

18       A.    No problem.

19       Q.    So about 8 o'clock approximately is when you got

20   into a position in the area of the garage?

21       A.    Yes, sir.

22       Q.    Prior to that had you been involved in some

23   discussions about using less-lethal options?

24       A.    Yes.

25       Q.    And can you tell me what less-lethal options you

1   were involved in discussing?

2        A.    Yes.  During the planning phase we discussed with

3   our team leader Sergeant Gaytan at the time.  There was a

4   discussion that if there was to be separation between

5   Mr. Perez and the firearm, that less-lethal would need to be

6   deployed if he was trying to basically close that distance

7   and get access to the firearm.

8            So that was a discussion.  We also discussed the use

9   of chemical agents such as CS gas which we use on the SWAT

10  Team.  There was a chemical agent plan developed for that

11  location, and then that was something we also took into

12  consideration.

13       Q.    With respect to the chemical agents, was it

14  ultimately decided not to go that route?

15       A.    Yes.  It was there in case we needed it, but

16  ultimately the tactical commander on scene which was Sergeant

17  Gaytan decided not to use them.

18       Q.    And the chemical agents would be what,

19  essentially?

20       A.    It's called CS gas.  It's stands for a longer term.

21           I can't recall the specific term.  It's very

22  scientific and has a lot of letters in it.

23           But essentially, it's a chemical irritant that

24  causes involuntary eye closure, tightness in the chest,

25  difficulty breathing, and draining of the mucous membranes of

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 12

```
 1             But from where I was standing to where Perez was
 2   behind the pool table, I would estimate between approximately
 3   10 and 15 feet.
 4        Q.   From where you were standing to where the chair
 5   was?
 6        A.   To where Perez was sitting in the chair with the gun
 7   in his hand to where I was standing was approximately 10 to
 8   15 feet.
 9        Q.   And then at some point did you see Mr. Perez put the
10   gun down?
11        A.   Yes.  At some point during negotiation phase, Alcala
12   was able to convince Perez to place the gun on the ground.
13   While Perez was seated, he leaned forward and he slowly set
14   the gun on the ground and then sat back up on the chair.
15        Q.   And where was the gun at that point in relation to
16   the chair?
17        A.   It would have been on the south side of the chair
18   just in front of it on the ground.
19        Q.   And I don't think we've talked too much about
20   directions yet, but is going from the chair to the threshold
21   of the garage, the main garage door, is that in a south
22   direction?
23        A.   Yes.
24        Q.   So you essentially were looking north, maybe
25   slightly northeast?
```

```
 1      A.   That's correct, sir.

 2      Q.   And then at some point did you see Mr. Perez stand

 3   up?

 4      A.   Yes.

 5      Q.   And start walking slowly in your direction?

 6      A.   Yes.

 7      Q.   Did he stop fairly close to the end of the pool

 8   table?

 9      A.   Yes.  I would estimate where he stopped was about

10   five feet from where I was.

11      Q.   And would that be close to the end of the pool

12   table?

13      A.   Yes.  It would be around the area of the south side

14   of the pool table.

15      Q.   It was he close to that corner of the pool table?

16      A.   Yes.  I believe that's a fair statement.

17      Q.   And you're estimating that distance is about five

18   feet?

19      A.   That's correct.

20      Q.   So we're going to try to put up a few pages of your

21   statement and look at it together.  So let's first see if we

22   can get up to Page 20 -- I think 20.  Let's try to go to Page

23   20 if we can.

24           Okay so let's go to the bottom of Lines 18 through

25   26.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 18

```
 1   long.  It was several hours.  It was hours that patrol was
 2   there prior to Specialized Enforcement Division was there.
 3          So that very well could have been the case.
 4      Q.  Okay.  Let's go to the next page, please, the top of
 5   Page 21.
 6          You referenced at the top -- can you see that on
 7   your screen?
 8      A.  Yes.
 9      Q.  "Alcala continued to talk about, you know, him being
10   there for his daughters, doing the right thing to allow us to
11   help him, telling him to put the gun down."
12          Do you see that reference?
13      A.  Yes.  Do you mind if I read the entire passage?
14      Q.  I don't mind at all.  Take your time.
15      A.  Okay.  Go ahead with your question, sir.
16      Q.  Sure.  Do you recall Alcala talking about
17   Mr. Perez's daughters with him?
18      A.  I do recall that, yes.
19      Q.  And asking Mr. Perez to put the gun down?
20      A.  Yes.  I do recall him asking him to put the gun down
21   as well.
22      Q.  And at some point you've already told me that you
23   saw him put the gun down on the floor?
24      A.  That's correct.
25      Q.  That would be by his feet, essentially?
```

1      A.   That's correct.

2      Q.   And your impression at that time was at least he

3   looked like he was starting to listen and obey some commands.

4           Was that generally your hope or impression?

5      A.   That's correct.

6      Q.   I mean putting the gun down, obviously, was a good

7   thing at that point from your perspective?

8      A.   I would say it was a step in the right direction to

9   ending the incident peacefully.  That's what we were

10  hoping.

11     Q.   And then it goes on in the next paragraph that he

12  was given instructions to stand up and walk towards us, and

13  you indicate the 10 or 15 yards away from us.

14          But you're telling me that you were intending to

15  mean feet, but you kept saying yards?

16     A.   So what's your question, sir?

17     Q.   The question is:  Was he given instructions to stand

18  up and walk towards you at some point?

19     A.   Yes.

20     Q.   And did he do that?

21     A.   He did.

22     Q.   And you indicate that he stopped about five yards

23  from your team, but you're telling me that you were intending

24  to say feet?

25     A.   That's correct, sir.  And further on in my

A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Andrew Pollick on 09/15/2023                                          Page 20

 1   interview, I believe the detectives got some clarification on

 2   that distance in which they were asking me how many feet away

 3   which is consistent with what I'm telling to now, what I'm

 4   testifying to now, is that unit of measurement is feet.

 5       Q.   Okay.  Now, at some point you became aware that

 6   less-lethal had been deployed?

 7       A.   Yes.

 8       Q.   And at the bottom of Page 21 you indicate at some

 9   point that Sergeant Gaytan kind of stepped in and started

10   talking to Perez?

11       A.   Sir, can you give me a second to read the passage --

12       Q.   Yeah.  At the very bottom of the page.

13       A.   Okay.

14       Q.   There we go.  Do you see the last two lines?

15       A.   Yes.  Are those the lines --

16       Q.   Do you recall that happening?

17       A.   Those are the lines you're referring to, the last

18   two?

19       Q.   The last two, right.  Gaytan stepping in and

20   starting to talk to Perez.

21       A.   Yes.  I do recall that.

22       Q.   And then at some point you saw him take a step back

23   with his left foot?

24       A.   Yes.

25       Q.   And that's when you saw Deputy Stone hit him with a

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Andrew Pollick on 09/15/2023**                    Page 21

1    **40-millimeter round?**

2        A.    Yes.  So Mr. Perez took a step back with his left

3    foot, and he made himself closer to the firearm that was on

4    the floor.  And the directives that were given were

5    less-lethal was to be deployed if he decided to close that

6    distance.

7              When he closed that distance, Deputy Stone deployed

8    a less-lethal 40-millimeter round on him.

9        Q.    Okay.  One second, please.

10             Okay.  Remind me not to do a depo and a mediation at

11   the same time anymore, please.

12       A.    No problem, sir.

13       Q.    The good thing for you is my train of thought gets

14   broken up every five minutes.

15             So when he takes that step back with the left foot,

16   is he still in that area of that corner of the pool table you

17   described?

18       A.    He is one step closer to where the firearm is when

19   he takes that step.

20       Q.    You heard Deputy Moore say the step back was about

21   half a foot?  Was that about your observation as well?

22       A.    I believe in my statement and my recollection of it

23   is it was between maybe around 12 to 18 inches or something

24   like that, approximately.

25       Q.    And it was just a step back with the one foot?

1     A.   I saw him take one step back with his left foot.

2     Q.   Was he still generally facing in the same

3   direction?

4     A.   Aside from his left foot now being closer to the

5   firearm, yes, he was generally facing south.

6     Q.   And do you have an estimate as to how much time

7   passed from him taking that step back with his left foot to

8   the less-lethal being deployed?

9     A.   I would say it was several seconds, a couple seconds

10   approximately.

11     Q.   Was there any verbal announcement that less-lethal

12   was going to be deployed?

13     A.   I did not hear a verbal announcement that

14   less-lethal was being deployed.

15     Q.   Could you see Mr. Perez's hands when he took that

16   step back?

17     A.   I could see Mr. Perez's hands were down on his side

18   when had he took that step back.

19     Q.   And when the less-lethal was deployed, were his

20   hands also at his side?

21     A.   I don't recall specifically what his hands did after

22   the less-lethal hit him.  It appeared to stun him and catch

23   him off guard, but I don't recall specifically what his hands

24   were doing at that time.

25     Q.   What did you see that gave you the impression that

 1   it stunned him and caught him off guard?

 2        A.   I saw his shoulders kind of rise up above his ears

 3   or to his ear level.  It appeared to startle him.

 4        Q.   And could you tell if it struck him?

 5        A.   Yes.  It appeared to hit him in the left shoulder

 6   when he was hit the 40-millimeter less-lethal round.

 7        Q.   Was that the first round?

 8        A.   To my understanding, yes.

 9        Q.   Were there additional 40-millimeter rounds fired, if

10   you know?

11        A.   I believe so, yes.

12        Q.   And what was your observation or impression in that

13   regard?

14        A.   My observations were Perez took a step back.

15             He was struck in the left shoulder by a

16   40-millimeter round.  He immediately turned full sprint, ran

17   back to where the gun was on the floor, and I believe Gaytan

18   and Stone both fired additional rounds.

19             I don't know specifically how many they fired as

20   Perez was making his way to where the gun was.

21        Q.   Did you see Mr. Perez turn in the direction of the

22   gun after the first 40-millimeter round was fired?

23        A.   Yes.  I believe Mr. Perez turned in the direction

24   after that first round was fired from the less-lethal.

25        Q.   Do you know if any other 40-millimeter rounds were

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Andrew Pollick on 09/15/2023**                                    Page 24

```
1    fired at him before he turned?

2         A.    My testimony that I just gave you, sir, was that he

3    turned around.  I believe Gaytan and Stone fired additional

4    rounds.  I just don't know how many, and I don't know if it

5    struck him.

6         Q.    So your impression was he took that step back still

7    facing south, the initial 40-millimeter round was fired,

8    struck him in the left shoulder, he looked shocked and

9    startled, and that's when he turned and started running in

10   the direction of the gun?

11        A.    Yes.

12        Q.    And after he turned you believe other less-lethal

13   rounds were fired.

14              You're just not sure how many?

15        A.    That's a fair statement, yes.

16        Q.    How many rounds did you hear being fired, whether

17   they were less-lethal or lethal before you fired your first

18   round?

19        A.    I recall Stone firing his round; Perez turning and

20   running towards to where the gun was on the floor.  I recall

21   hearing additional less-lethal rounds.  Like I told you

22   before, I am not sure specifically how many.

23              And that was when I shot at Perez.  I would not be

24   able to give you a specific number of shots that I heard.

25        Q.    Do you know if some of those rounds may have been
```

A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Andrew Pollick on 09/15/2023                                    Page 25

1    lethal rounds, or you believe they were only non-lethal?

2        A.   The 40-millimeter launcher makes a very distinct

3    noise when it is fired.  I described it in the past as being

4    similar to someone firing a T-shirt cannon at a baseball

5    game.

6             It doesn't sound like gunfire.  It's very distinct.

7             And so I heard those additional noises consistent

8    with a 40-millimeter being fired after Perez turned and he

9    was running.  And so that's what I can testify to today,

10   sir.

11       Q.   And would you at least agree that in your statement

12   at least in one portion of your statement, you said that at

13   the time you started firing, Mr. Perez was a couple of yards

14   from the gun?

15       A.   Yes.  And I believe I testified today as well that

16   that unit of measurement would be feet.

17       Q.   Do you have a general understanding that yards are

18   essentially three feet to a yard?

19       A.   Yes.

20       Q.   So your initial volley of shots, you believe was

21   five to eight?

22       A.   That's correct, yes.  A volley of around five to

23   eight rounds fired.

24       Q.   And do you have any estimate as to how much time

25   passed from the first shot to the last shot in the first

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                           Page 26

```
 1   volley?
 2       A.   I would say approximately -- the first volley you're
 3   referring to you said?
 4       Q.   Yes.
 5       A.   I would say from the first round fired to the last
 6   round fired to the very first volley, it could have been
 7   approximately a second and a half to two seconds, in that
 8   area somewhere.
 9       Q.   Did you give any commands to Mr. Perez before you
10   fired?
11       A.   I did not have the opportunity.  The situation was
12   very dynamic, uncertain, and rapid-evolving.
13            And Perez was in full sprint to where the firearm
14   was on the floor.  So I didn't have the opportunity to give
15   any verbal command or verbal warning prior to using deadly
16   force.
17       Q.   Did you give him any commands or warnings at anytime
18   from the time you got in your position that you described up
19   to the time of the shooting?
20       A.   No.  The Specialized Enforcement Division, they're
21   very job specific.  So we had a crisis negotiator that was
22   responsible for giving him commands.  At one point Sergeant
23   Gaytan took over and gave commands.
24            And then after the lethal force encounter, I believe
25   Deputy Olivas and Deputy Stone were tasked with giving
```

```
 1   commands to Perez.
 2        Q.   When you were firing, what part of his body were you
 3   firing at in the first volley?
 4        A.   First volley or rounds as Perez was making his way
 5   to where the gun was, I would say he was about ten feet away
 6   from me.  My sight picture was center mass of his upper torso
 7   as he was facing away from me.  He was beginning to crouch
 8   down, lowering to where that firearm was on the floor.
 9        Q.   So his center torso as he is facing away from you,
10   would that be his back?
11        A.   That's correct, yes.
12        Q.   And when you obtained your sight picture, you would
13   have essentially been aiming towards his back?
14        A.   As he was running towards where the firearm was on
15   the floor, he would have been facing away from me.  So that
16   was the only target that I had was him facing me.
17        Q.   How much time would you say passed from the initial
18   less-lethal round you heard, the one that struck him in the
19   left shoulder and you firing your first shot?
20        A.   I would estimate the time from when he was struck
21   with the less-lethal round to me firing that first shot to be
22   approximately a couple of seconds.
23        Q.   And you indicated that after he was struck with that
24   first round, he appeared startled, and he turned and started
25   to run.
```

A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
Andrew Pollick on 09/15/2023                                  Page 28

```
 1              Do I have that right?
 2      A.   Yes.  When he was struck with that first round, it
 3  did catch him off guard, but it was ineffective because he
 4  ran toward where the firearm was on the floor.
 5      Q.   And how much time do you think passed from when he
 6  turned and started to run to when you fired your first
 7  shot?
 8      A.   It was maybe a half a second, three quarters of a
 9  second.  This is all approximate.
10      Q.   And how far do you think he got in that half a
11  second to three quarters of a second?
12      A.   From which time frame are you referring to?
13      Q.   From when he turned and started to run to when you
14  fired your first shot.
15      A.   I believe he was able to cover maybe approximately
16  five to ten feet in that time frame.  It was very fast.
17      Q.   Now, you indicate in your statement that Perez had
18  dove behind the pool table.
19              Do you remember?
20      A.   I do remember saying that he dove behind the pool
21  table, yes.
22      Q.   Is that something that you observed?
23      A.   Yes.
24      Q.   And when he was on the ground after diving behind
25  the pool table, could you still see a portion of his body?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 30

```
 1   remember hearing were those less-lethal rounds.  I was

 2   hyper-focused on Perez.  I don't recall while I was firing

 3   hearing anybody else firing.

 4           I believe in my statement I did indicate hearing

 5   additional firing after my first volley.

 6      Q.   And is it your belief from your observations that at

 7   the time you fired, the gun was still on the floor where

 8   Mr. Perez had placed it?

 9      A.   When I fired my weapon Mr. Perez was deliberately

10   closing the distance and making his way towards where that

11   firearm was on the floor.

12      Q.   You believe the firearm was still on the floor when

13   you fired?

14      A.   My first volley when I fired that, the firearm was

15   on the floor, and Perez was closing the distance to where

16   that firearm was on the floor.

17      Q.   He would have been also running away from the

18   officers; is that true?

19           MS. CARPENTER:  Objection to the extent it calls for

20   speculation.

21           You can answer.

22           THE WITNESS:  Based on where the firearm was, sir,

23   that was the furthest north point.  We were south of, and

24   Perez was between us.  So he was running towards the firearm

25   and away from us.
```

```
 1   BY MR. GALIPO:

 2       Q.   Now, you fired additional shots after he went to the

 3   ground; is that correct?

 4       A.   When Perez went to the ground his lower extremities

 5   were exposed.  He was what I believe in the vicinity of that

 6   firearm.  I heard additional rounds being fired, and I -- it

 7   appeared Perez was trying to take position of cover and

 8   concealment behind the pool table.

 9           At that point I was under the impression that Perez

10   was firing at me and also trying to take a position of cover

11   and concealment.  So I went ahead and engaged in a second

12   volley of fire.

13       Q.   While Mr. Perez was on the floor, did you ever see a

14   gun in his hand at that time?

15           MS. CARPENTER:  Objection.  Lacks foundation.

16           You can answer.

17           THE WITNESS:  Sir, what time specifically are you

18   referring to because there was medical aid was provided, and

19   I saw the firearm and --

20   BY MR. GALIPO:

21       Q.   Okay.  So I'm trying to focus on your -- it sounds

22   like he went to the ground; you saw him dive behind the pool

23   table; and at some time after that you fired your second

24   volley of shots.

25       A.   When I fired my second volley of shots, Perez was
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                      Page 33

 1          Do you know if it was from the knees down or the

 2   thighs down?

 3      A.   I would estimate around his mid thigh to his feet

 4   were exposed.

 5      Q.   So in your second volley of shots, you were aiming

 6   at his legs?

 7      A.   Yes.  Before -- when we were briefing with the team,

 8   there was a discussion about a pool table being present in

 9   the room.

10          So knowing that the pool table was there and Perez

11   was behind it, I know pool tables are particularly thick and

12   a good means of cover and concealment.  I wasn't confident

13   that my rounds would penetrate the pool table to engage Perez

14   in center mass.

15          The only target of opportunity that I had was his

16   legs which were exposed.  So I went ahead and targeted his

17   legs center mass for my second volley.

18      Q.   Did you give any commands or warnings before firing

19   your second volley of shots?

20      A.   Sir, as I testified before, the situation was very

21   dynamic, uncertain, and rapidly evolving.  I didn't have the

22   opportunity to give commands.  I was simply reacting to what

23   I perceived as a threat at that time.

24      Q.   How much time passed between your first volley of

25   shots and your second volley of shots?

1    then at that point I observed that he had dove in behind the

2    pool table.

3        Q.   So your observing him diving behind the pool table

4    would be immediately after your first volley?

5        A.   When I made the observation that he was behind the

6    pool table, it was after my first volley of fire.

7        Q.   Okay.  And did you consider that he might have been

8    diving behind the pool table to avoid being shot?

9        A.   The reason that I decided to use lethal force, sir,

10   as I testified before is I believed that he was an imminent

11   threat; that he was running for that firearm and trying to

12   use it against us.

13        So that was why I fired my rounds.  That was what I

14   was thinking.

15        Q.   I asked a little bit of a different question.

16        When you saw him dive behind the table, did you

17   consider the possibility that he might have done that to

18   avoid continuing being shot at?

19        MS. CARPENTER:  Objection.  Speculation.

20        You can answer.

21        THE WITNESS:  When he dove behind the pool table, in

22   my mind, what I believed was that he was attempting to take a

23   position of cover and concealment, and I believed that he was

24   firing at us at that point.

25   BY MR. GALIPO:

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                   Page 40

1      Q.   As he was diving?

2      A.   Your question was that when he was behind the pool

3   table, what I was thinking; correct?

4      Q.   Correct.  Whether you thought he might be trying to

5   avoid being shot at.

6           MS. CARPENTER:  Asked and answered; speculation.

7           You can answer again.

8           THE WITNESS:  I understand your question, sir.

9           What I was thinking at that time, what I testified

10   to and what I told the investigators was that when he was

11   behind the pool table, I believed he was taking a position of

12   cover and concealment, and I believed that he was shooting at

13   my team and I.  That's what I was thinking of.

14   BY MR. GALIPO:

15      Q.   Did you ever see him pick up the gun?

16      A.   I saw that he was in the vicinity of where the gun

17   was.  Where the firearm was, was where his body was at that

18   point.

19      Q.   Did you ever see him pick it up?

20           That is my question.

21           MS. CARPENTER:  Lacks foundation; asked and

22   answered.

23           You can answer again.

24           THE WITNESS:  Once again, sir, where he was is where

25   the firearm was.  I couldn't see the firearm because I would

1  have to look through his body.  But he was where the firearm

2  was last seen.

3  BY MR. GALIPO:

4      **Q.   So are you saying that your view would have been**

5  **blocked if he had picked up the firearm?**

6          MS. CARPENTER:  Misstates his testimony.

7          You can answer.

8          THE WITNESS:  I'm saying that when I fired that

9  second volley, I could see his legs, and I knew that he was

10  where the firearm was last.

11  BY MR. GALIPO:

12     **Q.   Let me just try to break this down.**

13         **Before he dove to the ground behind the pool table,**

14  **did you see him pick the gun up?**

15     A.   Say that one more time?

16     **Q.   Before you saw him dive behind the pool table, did**

17  **you see him pick the gun up?**

18     A.   Before he dove behind the pool table, I saw him

19  sprint running to where the firearm was, lowering his center

20  of gravity to where the firearm was.

21     **Q.   I get all that.  I'm wondering if you saw him pick**

22  **it up.**

23         MS. CARPENTER:  Asked and answered; lacks

24  foundation.

25         You can answer again.

1    BY MR. GALIPO:

2        Q.   I take it it's a no; you didn't see him pick it up,

3    but maybe --

4        A.   I --

5        Q.   Go ahead.

6        A.   I saw him running to where it was, sir.

7             Like I said before, he was between me and the

8    firearm.  And so I would have to look through him.  I'm not

9    saying that I saw him pick it up.  I don't know if he picked

10   it up, but I believed that he was going to where the firearm

11   was at that point.

12       Q.   Okay.  And then did you have the impression that

13   your second volley of shots struck him in the leg as he was

14   in that position you described?

15       A.   When I engaged with my second volley on Mr. Perez, I

16   believed I had a good sight picture when I was targeting his

17   legs, and I believe that the rounds were hitting him.

18       Q.   Have you ever looked at the autopsy report?

19       A.   I have.

20       Q.   And did you note when you looked at it various shots

21   that struck him in the legs?

22       A.   I'm aware of the injuries to Mr. Perez from the

23   shots that hit him in the legs.

24       Q.   Including the shots to the legs?

25       A.   Yes.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Andrew Pollick on 09/15/2023**                    Page 44

```
 1      Q.   Could you tell if it was lethal versus

 2   less-lethal?

 3      A.   I do not believe that it was less-lethal rounds.

 4           I believe the shots that I heard after my last

 5   volley, after I stopped firing, were lethal rounds.

 6      Q.   At some point did Sergeant Gaytan yell out "cease

 7   fire?"

 8      A.   He did.

 9      Q.   And if you know, was a robot initially utilized to

10   approach Mr. Perez?

11      A.   Are you referring to after gunfire stopped?

12      Q.   This is all after the gunfire, yes.

13      A.   Yes.  A robot was utilized by our team.

14      Q.   And was that, if you know, deployed by Deputy

15   Moore?

16      A.   Deputy Moore was the robot operator assigned to the

17   team.  So yes, he would have been the one to use the robot at

18   that point.

19      Q.   You eventually approached -- take your time.

20      A.   Excuse me.

21      Q.   I'll let you take some water and take a breath.

22      A.   What was your question, sir?

23           I coughed when you were speaking.

24      Q.   I stopped once you started coughing because I wanted

25   to let you finish.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 45

```
 1              Are you okay now?
 2      A.   Yes.  Thank you.
 3      Q.   You're welcome.
 4              At some point did you approach Mr. Perez after all
 5   the shots had taken place?
 6      A.   Yes.  I believe you mentioned the robot.
 7              We utilized the robot technology to try to stimulate
 8   movement from Perez and to get a closer eye on what he was
 9   doing.
10              After that point we decided to render medical aid to
11   Mr. Perez.
12      Q.   And when you approached him, was he still
13   breathing?
14      A.   He was.
15      Q.   Did you note multiple gunshot wounds to his legs,
16   torso, arms, and head?
17      A.   Yes.  That's correct.  We noted multiple gunshot
18   wounds.
19      Q.   Could you tell where in his head he had been shot?
20      A.   I believe when I was doing my medical assessment of
21   Perez, I had the top half of his body, and I did observe
22   penetrating trauma just below the nose and what appeared to
23   be penetrating trauma at the back side of his head.
24      Q.   In your statement you characterize it as a massive
25   hemorrhage that he had coming out of the back of his head?
```

```
 1      A.    Yes.  Massive hemorrhage is used to describe
 2   bleeding.
 3      Q.    Do you know how much time passed between the
 4   shooting ending and medical personnel getting to him?
 5      A.    Describe medical personnel.
 6      Q.    Well, like the EMTs or paramedics.
 7      A.    So for a SWAT call the SWAT Team has tactical
 8   emergency medical service providers which are certified as
 9   EMTs.  We're nationally registered, and we act in a tactical
10   capacity.
11           Myself and Detective McCarthy were the TEMS
12   providers assigned to the team.  So initially, we were the
13   ones that rendered aid.  I would say it was within a couple
14   of minutes of the last shot being fired.
15      Q.    And was he eventually transported to the hospital?
16      A.    He was, yes.
17      Q.    And was he still breathing, if you know, at that
18   time?
19      A.    During my initial medical assessment on Mr. Perez,
20   he was bleeding.  We were treating the injuries that he had.
21   There was a period of time where he briefly stopped
22   breathing, and that was when the paramedics from the
23   Victorville Fire Department were there.
24           They took over.  We were assisting them.  During
25   that time there was a brief period I would say around maybe
```

1    30 seconds to a minute where he stopped breathing.

2              They put some leads on him and got his vitals, and

3    then he spontaneously started breathing again.  He was

4    transported shortly after that.

5        Q.    So is the reason that CPR was not administered to

6    him is because he was still breathing?

7        A.    I'm sorry.  Which period are you talking --

8        Q.    **Well, before the -- during the time you were with**

9    **him, CPR was not administered to him, it sounds like, because**

10   **he was still breathing.**

11       A.    As I testified before, when I initially contact

12   Perez, he was still breathing.  I began to render medical

13   aid.  McCarthy was doing so as well.

14             During that time the Fire Department, paramedics

15   responded, and they were considered a higher level of care.

16             So we transitioned the care to them and began

17   assisting them.  At that point he did stop breathing briefly,

18   I believe I said about 30 seconds to a minute.

19             But then he spontaneously started breathing again,

20   and then  he was transported shortly after that.

21       Q.    Okay.  Thank you.

22             Did you ever speak to any of the family members at

23   any time before the shooting or after the shooting?

24       A.    I'm sorry.  Which family members are you referring

25   to?

 1   compliment.

 2          But go ahead.

 3          MS. CARPENTER:  Cheeky.

 4          THE WITNESS:  Thank you for the compliment, sir.

 5          I couldn't tell you.  I'm not sure.  I just made

 6   that notation when reviewing the reports.  And like I said

 7   before, the investigators got some clarification from that,

 8   from me, towards the end of the interview as well.

 9   BY MR. GALIPO:

10       Q.   Did you see anyone move the gun after the

11   shooting?

12       A.   So after the shooting there was a plan developed to

13   try to safely render aid to Perez.  Myself and McCarthy were

14   like I said before designated as the TEMS providers, and

15   Sergeant Gaytan and I believe Stone assisted us with lethal

16   cover in case he was lying in wait or something like that.

17          So McCarthy and I rolled Perez, and I saw the gun

18   where his hands were.  He was laying on top of it.  I began

19   to handcuff Perez, and then at some point I don't remember

20   who moved the gun, but somebody moved it away from our

21   working space out of arms' reach from Perez.

22       Q.   When you started firing your first volley of shots,

23   was Mr. Perez on the side of the pool table?

24       A.   As I began to acquire my sight picture for that

25   first volley, Perez was on the west side of the pool table

1    anyone before?

2        A.   Prior to my use of deadly force, like I said before,

3    Perez was sitting with the gun armed in his hand.  I had a

4    responsibility.  The tactical team a had possibility to

5    safeguard lives and property, and that was why we were there.

6             We were there because of the actions of Perez.

7             If Perez hadn't been there with a firearm, we

8    wouldn't have been there.

9        Q.   No.  I understand.  I guess in the totality of the

10   circumstances, you've heard that term before; right?

11       A.   I have.

12       Q.   Part of the totality of the circumstances here was

13   that he had never pointed the gun at anyone; had put it down;

14   had stood up; had walked towards you; was more or less

15   stationary for five or ten minutes; then was shot with

16   less-lethal; then started moving in the direction of the gun.

17            Would that be part, not all of the circumstances,

18   but part of it?

19            MS. CARPENTER:  Objection to the extent it misstates

20   the testimony and the record evidence; lacks foundation.

21            You can answer.

22            THE WITNESS:  I would say based on the totality of

23   the circumstances, there was a lot happening in the scene,

24   but at one point Perez made a run to where the gun was, and I

25   believed he was an immediate threat, and I decided to use

 1    lethal force against that threat.

 2    BY MR. GALIPO:

 3        Q.   And you obviously had training with respect to the

 4    use of deadly force; correct?

 5        A.   Correct.

 6        Q.   And was part of your training that officers are

 7    responsible to justify every shot?

 8        A.   Yes.

 9        Q.   And obviously, part of your training was in order to

10    use deadly force, there has to be an immediate or imminent

11    threat of death or serious bodily injury?

12        A.   Yes.  That's correct.

13        Q.   And was your training on the converse, that if there

14    is not an imminent threat of death or serious bodily injury,

15    you should not use deadly force?

16        A.   The department policy says that a safety member may

17    use deadly force to protect himself or others from what he

18    reasonably believes to be a threat of death or serious bodily

19    injury.

20             And when I used deadly force, I was under that

21    impression, that there was an immediate threat of death or

22    serious bodily injury that had Perez got ahold of that gun.

23        Q.   Right.  And is it your understanding from the policy

24    and training that if there is not a reasonable belief of an

25    immediate threat of death or serious bodily injury, you

Exhibit "D"

Exhibit "D"

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.J.P. and A.M.P., minors, by and    )
     through their guardian ad litem      )
 5   Cynthia Nunez, individually and as   )
     successor in interest to Albert Perez,)
 6   deceased, and PATRICIA RUIZ,         )
     individually,                        )
 7                                        )
                 Plaintiffs,              )
 8                                        )
                 vs.                      )Case No.
 9                                        )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES   )
10   1-10, inclusive,                     )
                                          )
11                Defendants.             )
     _____)
12

13

14

15           REMOTE VIDEOCONFERENCE DEPOSITION OF

16                     CORY MCCARTHY

17                   NOVEMBER 9, 2023

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  26304
```

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4    A.J.P. and A.M.P., minors, by and      )
      through their guardian ad litem        )
 5    Cynthia Nunez, individually and as     )
      successor in interest to Albert Perez,)
 6    deceased, and PATRICIA RUIZ,           )
      individually,                          )
 7                                           )
                       Plaintiffs,           )
 8                                           )
                       vs.                   )Case No.
 9                                           )5:22-CV-01291-SSS-SHK
      COUNTY OF SAN BERNARDINO, and DOES     )
10    1-10, inclusive,                       )
                                             )
11                     Defendants.           )
      _____)

12

13

14

15          The remote videoconference deposition of CORY

16    MCCARTHY, taken on behalf of the Plaintiffs, beginning at

17    10:06 a.m., and ending at 12:21 p.m., on November 9, 2023,

18    before Jinna Grace Kim, Certified Stenographic Shorthand

19    Reporter No. 14151.

20

21

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiffs:
 3
                LAW OFFICES OF DALE K. GALIPO
 4              BY:  DALE K. GALIPO, ESQ.
                BY:  SHANNON J. LEAP, ESQ.
 5              21800 Burbank Boulevard, Suite 310
                Woodland Hills, California 91367
 6              Tel:  818-347-3333
                Fax:  818-347-4118
 7              E-mail:  dalekgalipo@yahoo.com
                E-mail:  sleap@galipolaw.com
 8

 9    For the Defendants:

10              MANNING & KAZZ ELLROD, RAMIREZ, TRESTER, LLP
                BY:  KAYLEIGH ANDERSON, ESQ.
11              801 South Figueroa Street, 15th Floor
                Los Angeles, California 90017
12              Tel:  213-624-6900
                Fax:  213-624-6999
13              E-mail:  kaa@manningllp.com

14

15

16

17

18

19

20

21

22

23

24

25
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                    Page 9

```
 1   were actually there when the shots were fired.

 2       A.   Yes, sir.  Again, I don't have the exact number, but

 3   I would estimate over at least ten or over ten.

 4       Q.   What was your assignment or assignments at the time

 5   frame of this incident?

 6       A.   Well, sir, I was assigned to the Specialized

 7   Enforcement Division or SWAT Team for the San Bernardino

 8   County Sheriff's Department, and I was assigned to Squad One

 9   at the time.  I was also at home at the time the call came

10   out.

11       Q.   And how long had you been assigned to that division

12   prior to the incident with Mr. Perez?

13       A.   I'd been assigned to the Specialized Enforcement

14   Division at that time for approximately five years.

15       Q.   And you went to the police academy when?

16       A.   I started the police academy or the Sheriff's

17   Academy in 2012.

18       Q.   And for some period of time you were assigned to

19   patrol; is that correct?

20       A.   Yes, sir.

21       Q.   Do you any military experience?

22       A.   I do not.  Prior to this I was an emergency medical

23   technician and worked on the ambulance.

24       Q.   You worked for AMR for a period of time?

25       A.   Yes, sir.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                          Page 13

```
 1      A.   Yes.

 2      Q.   And do you know if that was more or less than five

 3   times?

 4      A.   I believe so.  I believe it was more than five

 5   times.

 6      Q.   And obviously, you were not trained that you can

 7   shoot anyone merely for seeing a knife in their hand; is that

 8   fair?

 9      A.   No, sir.  Again, there -- there are other factors

10   that -- that person or safety member reasonably believes that

11   that person that has the knife or firearm is an immediate

12   threat to themselves or others of death or serious bodily

13   injury.

14      Q.   And that's part of your deadly force training;

15   correct?

16      A.   Yes, sir.

17      Q.   I just want to ask you a little bit about your

18   training and then we'll get into the incident.

19           I'm assuming at the police academy you had training

20   with respect to tactics?

21      A.   Yes, sir.

22      Q.   And you also had training with respect to the use of

23   force both less-lethal and lethal force?

24      A.   Yes, sir.

25      Q.   And do you recall having to study POST Learning
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                              Page 19

1       Q.    And I think you alluded to it earlier, but you're

2    generally trained that deadly force can only be used in

3    limited circumstance; is that fair?

4       A.    Again, sir, I don't know if I would classify it as

5    limited circumstances.  I would refer to our policy as when

6    that safety member reasonably believes there is immediate

7    threat of death or serious bodily injury to themselves or

8    others.

9       Q.    And if there is not a reasonable belief of an

10   imminent threat of death or serious bodily injury, then your

11   training is deadly force should not be used; is that fair?

12      A.    Again, per the policy, yes.

13            Again, you got to take into the -- reasonable

14   officer needs to take in the totality of the circumstances

15   depending on the case.

16      Q.    So do you recall in the academy when you went there

17   being trained about the reverence for human life with respect

18   to the use of deadly force?

19      A.    Yes, sir.

20      Q.    Do you recall in the academy being trained that

21   deadly force should only be used as a last resort?

22      A.    I don't recall anything being, again, anything last

23   resort.  I recall, again, going back to the policy, when --

24   where there is an immediate threat of life to yourself or

25   others or serious bodily injury, if that person has the

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                    Page 22

1    the team to arrive?

2        A.   Yes, sir.

3        Q.   And at some point other team members from your team

4    arrived; is that correct?

5        A.   Yes, sir.

6        Q.   And there was some tactical discussions before you

7    went to the actual area of the garage?

8        A.   That's correct, sir.

9        Q.   And was Sergeant Gaytan taking the supervisory role

10   in leading those discussions?

11       A.   Yes, sir.  He -- he was the overall supervisor for

12   us on-scene and he then delegated as far as roles and

13   responsibilities, but everything was funneled through him.

14       Q.   But everyone has the opportunity like yourself to

15   give your input as well?

16       A.   Yes, sir.

17       Q.   So let's just talk a little bit about the

18   information you knew or didn't know before you approached the

19   garage area.

20            So this would be before you made your approach to

21   replace the patrol officers that were on-scene.

22            Are you with me time-wise?

23       A.   Yes, sir.

24       Q.   I'm trying to ask you some questions about what you

25   knew about the incident and maybe some things you didn't

1   know.  I take it you knew that the person's name was Albert

2   Perez?

3       A.   Yes, sir.  We were able to get his identity while we

4   were staged prior to approaching the garage.

5       Q.   And you had information he was in a garage?

6       A.   Yes, sir.

7       Q.   And sitting on some kind of a chair?

8       A.   Yes, sir.

9       Q.   And had a gun in his hand?

10      A.   Yes, sir.

11      Q.   And was it your understanding that he was the only

12  person in the garage?

13      A.   Yes, sir.

14      Q.   And the door between the garage and the house, did

15  you understand that that door was locked?

16      A.   Yes, sir.  We did have a discussion and didn't know

17  that it was locked.  Again, he still could have either kicked

18  that door, though, and made entry in there if he -- if he

19  chose to do so.

20      Q.   Did you also understand that at least in that unit,

21  I think it was Unit 1, the residence were not in the unit at

22  the time you arrived on-scene?

23      A.   Yes, sir.  We were told the female that lived there

24  was -- was out of that, and the -- the patrol deputies had

25  her.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                    Page 24

1      Q.    Now, did you have any information that Mr. Perez had

2    pointed the gun at anyone?

3      A.    We did not have information that he had pointed the

4    gun at anybody other than he did take the firearm out of his

5    pocket and brandished it at the female who was the reporting

6    party.

7      Q.    But just to be fair, you didn't have any information

8    he pointed the gun at the female; is that true?

9      A.    Excuse me.  Yes, sir.

10     Q.    And you didn't have any information he pointed the

11   gun at any of the officers; is that also true?

12     A.    Yes, sir.

13     Q.    And you certainly didn't have any information he had

14   fired the gun?

15     A.    That's correct.

16     Q.    Did you have specific information as to whether the

17   gun was loaded or not?

18     A.    No, sir.  We did not have that.  He again would not

19   comply with any commands from the patrol deputies to place

20   the gun on the ground.  So we -- we didn't have an

21   opportunity to check.

22     Q.    Did you have any information that he had

23   specifically physically injured anyone such that they needed

24   medical attention?

25     A.    At that specific incident, no, sir.

1   approaches the garage area; is that true?

2       A.   Yes, sir.

3       Q.   **And the BearCat was also approached the area after**

4   **some patrol vehicles were moved?**

5       A.   **Yes, sir.  I don't recall which patrol vehicles were**

6   **moved, but I know we did use the armored rescue vehicle to**

7   **approach.**

8       Q.   There was some contact made with the residence of

9   Unit 2 and was ultimately decided they can stay in that

10  room?

11      A.   Yes, sir.  We contacted an elderly female who had

12  multiple medical issues and had oxygen tubing.  I believe it

13  was her caretaker, and they did not want to leave.

14      Q.   **And there was a van, I think, one of the deputies on**

15  **your team had a van, and part of it was cleared out just in**

16  **case someone had to be brought to the hospital?**

17      A.   **Yes, sir.  Prior to us moving to the garage, I did**

18  **create a medical plan, and that was one of the consideration**

19  **taken into that medical plan.**

20           **A Dodge black caravan would be cleared out and**

21  **parked relatively close to the garage.  We can use that to**

22  **evacuate to either fire department, an AMR personnel, or the**

23  **hospital.  And we also had the Sheriff's rescue in route to**

24  **stage to fly for a faster response time.**

25      Q.   **Where was Mr. Perez when you first saw him?**

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                    Page 27

1      A.   He was towards the back of the garage sitting on

2   what I would describe like it looked like a bar stool, and he

3   had a black semiautomatic handgun in his right hand.

4      Q.   And were there ongoing requests for him to drop that

5   handgun?

6      A.   And I'm sorry, sir.  Just to -- just to clarify, are

7   you talking prior to my approach, or once I arrived and

8   actually was on the side of the garage?

9      Q.   We can break it down.  Prior to your approach, your

10   understanding was they were giving him commands to drop the

11   gun; is that fair?

12      A.   Yes.  Along with I'm sure other -- other verbiage or

13   compliance commands to comply.

14      Q.   And was Deputy Alcala giving some of the commands?

15      A.   Again, sir, if you're talking prior to my arrival, I

16   know that obviously the patrol deputies were.  I know a prior

17   negotiator who is a sergeant for the patrol station attempted

18   to gain rapport as well and gain that peaceful resolution.

19   And then once we received the call, Deputy Alcala who was a

20   negotiator was called to the scene.

21          Once I arrived, he was taking over the whole verbal

22   command portion.

23      Q.   So my questions now, from now going forward is going

24   to be after your arrival on-scene.  So what you actually

25   heard and observed after you got to the scene.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                 Page 28

| | | |
|---|---|---|
| 1 | | Are you with me? |
| 2 | A. | Yes, sir. |
| 3 | Q. | So you initially saw Mr. Perez sitting in a chair on |
| 4 | the far side of the pool table in the garage? |
| 5 | A. | Yes, sir. |
| 6 | Q. | And you saw the handgun in his right hand? |
| 7 | A. | Yes, sir, I did. |
| 8 | Q. | And you heard Deputy Alcala giving him commands to |
| 9 | drop the gun? |
| 10 | A. | I know he was communicating with him.  I don't |
| 11 | recall exactly verbatim.  I know that in my interview he did |
| 12 | say, "father, father, it's not too late to surrender." |
| 13 | | And I believe there were commands to drop the |
| 14 | firearm and, again, peacefully surrender to us. |
| 15 | Q. | And initially, were you positioned more on the right |
| 16 | side as you're looking into the garage? |
| 17 | A. | Yes, sir. |
| 18 | Q. | And was it Deputy Olivas and also Deputy Stone on |
| 19 | the right side initially? |
| 20 | A. | Yes, sir. |
| 21 | Q. | And was Alcala also more on the right side? |
| 22 | A. | Yes, sir, he was. |
| 23 | Q. | And then who was on the left side? |
| 24 | A. | It was Sergeant Gaytan, Deputy Pollick, and Deputy |
| 25 | Moore. |

```
 1    threshold of the open garage door?

 2         A.    I would estimate that distance while he was sitting

 3    on the bar stool for actually -- estimate from four to seven,

 4    maybe four to eight yards.

 5         Q.    I just want to make sure you understand my question.

 6               I understand there was a pool table in the garage;

 7    correct?

 8         A.    Yes, sir.

 9         Q.    And that Mr. Perez was in a chair on the far side of

10    the pool table from your position?

11         A.    Yes, sir.

12         Q.    And the garage door was open, the main garage door;

13    correct?

14         A.    Yes, sir.

15         Q.    And if we call where that garage door open and

16    closes the threshold of the garage, I'm trying to figure out

17    how far from the threshold you were.

18         A.    From myself to the threshold.

19               I apologize.

20         Q.    Yes.

21         A.    I would say probably a two feet off the threshold.

22         Q.    So the threshold would be about two feet in front of

23    you?

24         A.    Yes.

25         Q.    And then where would you be positioned right to left
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                      Page 39

```
 1   perspective?

 2        A.   Yes, sir.

 3        Q.   And at some point did you learn that Mr. Perez

 4   dropped the gun or put the gun down on the ground?

 5        A.   Yes, I did.

 6        Q.   And how did you learn that?

 7        A.   Well, sir, visually I did see him lean forward at

 8   the waist and stay seated in that bar stool, and when he sat

 9   back up he placed his hands towards the side I believe and he

10   did not have the firearm.

11             And then it was communicated over the radio that he

12   did place the gun down which let us know that that was what

13   he placed on the ground at that location.

14        Q.   So if we just stop right there, did you at least

15   look at that at the time as an act of compliance?

16        A.   Yes.  I was hoping that that would lead to a

17   peaceful surrender and then he would walk out to my deputies

18   and be taken into custody.

19        Q.   And did you have an understanding as to where he

20   placed the gun down in relation to the chair he was sitting

21   on?

22        A.   Yes.  I had a good understanding of where he placed

23   it.

24        Q.   And what was your understanding?

25        A.   That he had placed the gun down.
```

```
 1   or a port that I was able to look through.

 2        Q.   And what portion of Mr. Perez could you see from

 3   that perspective?

 4        A.   Well, sir, if you're referring to while he is

 5   sitting on the bar stool, I could see out to waistline or a

 6   little below waist line up to the top of his head.

 7        Q.   Do you know if Alcala every told Mr. Perez to stand

 8   up after he was telling him to put the gun down?

 9        A.   Sir, I don't know exactly what Alcala was telling

10   him.  I knew that he was speaking to him, but I could not

11   make out exactly what he was telling him to do at that

12   time.

13        Q.   Did you see Mr. Perez stand up at some point?

14        A.   Yes, I did.

15        Q.   And when he stood up could you see his hands?

16        A.   Yes.

17        Q.   Did he have anything in his hands at that point?

18        A.   He did not, sir.

19        Q.   And when he stood up did he reach for the gun that

20   was on the ground at the time he initially stood up?

21        A.   He did not.

22        Q.   And did you look at him standing up as another act

23   of compliance?

24        A.   Yes.  As long as he continued to -- as the

25   communication continued to progress and, again, I was hoping
```

1    he would come to where my partners were to peacefully

2    surrender.

3         Q.   Do you know either from listening to your audio or

4    from what you remember at the scene, whether he was asked to

5    step forward towards the officers?

6         A.   Sir, I only listened to my audio, but I knew they

7    were speaking to him again.  I could not make out exactly

8    what they were saying or communicating to him.

9         Q.   When you listened to your audio recently, did you

10   hear those types of commands to step forward?

11        A.   Again, sir, in my audio I don't recall hearing being

12   able to make out anything telling him to step forward.

13        Q.   In any event did you see him walking forward?

14        A.   Yes.

15        Q.   And he would have been walking along one of the

16   sides of the pool table?

17        A.   Yes, sir.

18        Q.   From your perspective, was it the left side of the

19   pool table?

20        A.   Yes, sir, from my perspective it was my left.

21        Q.   And that would be the side, I think, you told me

22   that Gaytan and Pollick was on, and who else, was it Moore?

23        A.   Yes, sir.  It was Deputy Moore, Deputy Pollick, and

24   Sergeant Gaytan.

25        Q.   And I think you indicated in your statement that you

```
 1   was to them at that time.
 2       Q.   Do you have any estimate?  If he was a foot or two
 3   past the pool table, and they were a couple feet from the
 4   threshold, do you have any estimate or a range?
 5       A.   They -- they would be a couple -- several -- several
 6   feet away.
 7       Q.   And do you know if they had their weapons directed
 8   in his direction?
 9       A.   Again, I couldn't speak for them if they did, I
10   couldn't see if they did.
11           Again, I know who was -- Deputy Pollick and Deputy
12   Moore were assigned to lethal cover portion and Sergeant
13   Gaytan was assigned to the 40-millimeter.
14       Q.   Was your weapon directed in his direction?
15       A.   I had it in the low-ready at that time, sir.
16       Q.   And during the time he was standing there, did you
17   see him reaching in his waist band or pockets at that time?
18       A.   No, sir.
19       Q.   And was the tactical plan as you understood it, if
20   he went towards or back towards where the firearm was at,
21   less-lethal would be deployed?
22       A.   Yes, sir.  That was discussed in our prior planning
23   when we were at the library, and that was also put out over
24   the radio again from Sergeant Gaytan so everybody knew.
25       Q.   That if he went back towards the firearm,
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Cory Mccarthy on 11/09/2023                              Page 46

1    less-lethal would be deployed?

2          A.   Yes, sir.

3          Q.   Did anyone put out over the radio that if he went

4    back towards the firearm, that lethal should be deployed?

5          A.   No, sir.

6          Q.   Did Sergeant Gaytan ever tell any of the members on

7    your team that if he went back towards the firearm, deploy

8    lethal?

9          A.   No, sir.

10         Q.   Okay.

11              MR. GALIPO:  We've been going about an hour.

12              Is this a good time to take a ten-minute break for

13   everyone?

14              MS. ANDERSON:  It works.

15              (Recess taken.)

16              MR. GALIPO:  Back on the record.

17   BY MR. GALIPO:

18         Q.   So we're kind of up to the point where he came to

19   this general stop or stationary position or foot or two past

20   the end of the pool table.

21              Are you with me time-wise?

22         A.   Yes, sir.

23         Q.   And I think you estimated he was stopped maybe for a

24   few minutes?

25         A.   Yes, sir.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Cory Mccarthy on 11/09/2023                                    Page 47

1      Q.   And how far would you estimate he was in that

2    stopped position from where that bar stool or chair that he

3    had been sitting on was?

4      A.   I would estimate it to be approximately 10 to 10 to

5    12 feet, 10 to 13 feet.

6      Q.   And what would you estimate your distance to be from

7    Mr. Perez when he was in that stopped position?

8      A.   Sorry, sir.  Just from -- just from me to Perez when

9    he was standing stationary.

10      Q.   Correct.

11      A.   I would estimate him to be approximately 8 to 12

12   yards at that time.

13      Q.   As of the time that Mr. Perez was in that stopped

14   position, do you know if there was a K-9 on-scene?

15      A.   I know that one was requested from Rialto Police

16   Department, and I do believe I heard a dog barking at that

17   time.

18      Q.   Do you know if anyone had been designated with the

19   Taser at that point, up to the point where Mr. Perez came to

20   a stop?

21           And I don't mean with the prior patrol officers.

22           I'm more focused on your team.

23      A.   And I'm -- I'm sorry, sir.

24           What do  you mean by designated as far as --

25      Q.   Well, let me I guess break it down.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Cory Mccarthy on 11/09/2023                                    Page 52

1      Q.    Because part of the training is if it's not

2   announced, that an officer may mistakenly believe it's a

3   lethal-round even potentially coming from the suspect, and

4   then that could lead to sympathetic fire.

5            Is that part of the training?

6      A.    Again, that -- that may be a part, and that's why

7   we, again, discussed that in the planning, and it was

8   communicated over the radio.  So we knew it was -- was or if

9   it look place.

10     Q.    Now, at some point you heard the 40-millimeter go

11  off; is that correct?

12     A.    Yes.  I heard and did see it.

13     Q.    And you were still in the BearCat at that point?

14     A.    Yes, sir.

15     Q.    In the five or ten seconds before the 40-millimeter

16  was deployed, did you hear anybody yell out "40, 40, 40," or

17  words to that effect?

18     A.    No, sir.

19     Q.    You saw Mr. Perez taking a step back with his left

20  foot at some point and started to turn to his left; is that

21  correct?

22     A.    Yes, sir.  I did see Mr. Perez take a step back with

23  his left foot and turn towards the last location of the

24  firearm.

25     Q.    When he took that step back, that's when you heard

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                    Page 53

```
 1   the first 40-millimeter go off; is that true?
 2        A.   Yes.
 3        Q.   And when you heard the first 40-millimeter go off,
 4   what would you estimate Mr. Perez's distance to be from that
 5   chair at that point?
 6        A.   I would estimate it to be approximately 8 to 12 feet
 7   in between that.
 8        Q.   And do you know now who fired that first
 9   40-millimeter?
10        A.   Yes, sir.
11        Q.   And what is your understanding?
12        A.   Deputy Stone.
13        Q.   And Deputy Stone, I think we talked about earlier
14   was on the right side; correct?
15        A.   Yes, sir.
16        Q.   And could you tell if that first 40-millimeter
17   struck Mr. Perez?
18        A.   Yes, I could.
19        Q.   And did it appear to strike him?
20        A.   Yes, it did.
21        Q.   Where did it appear to strike him?
22        A.   It struck him in his abdomen.
23        Q.   And did you see Mr. Perez's hands go to the area
24   that it impacted him after he was struck in the abdomen?
25        A.   Yes, I did.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Cory Mccarthy on 11/09/2023                          Page 56

```
 1      A.   Yes, sir.
 2      Q.   And do you have an estimate as to how many times,
 3  different occasions where you saw 40-millimeter being
 4  deployed and struck and individual?
 5      A.   Yes, sir.  Multiple occasions, an estimate over --
 6  over five.
 7      Q.   Have you ever fired the 40-millimeter and struck an
 8  individual?
 9      A.   I have not, sir.  My times with the 40-millimeter
10  were either to disable cameras or windows if we had to.
11      Q.   And have you seen instances where someone struck by
12  a 40-millimeter got struck and then tried to move or run away
13  from being struck again?
14      A.   Sir, all the ones that I had actually witnessed
15  deployed, the person had actually fell to the ground with
16  that painful compliance and surrendered.
17      Q.   Were you trained that one reaction people could have
18  of being struck by a bean bag shot gun or 40-millimeter could
19  be to run or try to run?
20      A.   That could be, sir, with -- with any less-lethal
21  tool.
22      Q.   And did you hear any additional 40-millimeters other
23  than the first one?
24      A.   I did see multiple 40-millimeters being deployed
25  after the first one, yes.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Cory Mccarthy on 11/09/2023                                      Page 57

1       Q.    How many others?

2       A.    I would estimate approximately I believe it was like

3    three to four.

4       Q.    And how much time passed from the first

5    40-millimeter to the others that you heard and observed?

6       A.    Sir, it was a short time frame.  It was

7    approximately a second or maybe a second and a half.

8       Q.    So would it be fair to say that you heard

9    approximately three to four 40-millimeters being deployed

10   within a second or a second and a half?

11      A.    Yes.

12      Q.    And at the time that you heard those 40-millimeters

13   being deployed, did you see any weapon in Mr. Perez's hands

14   at that point?

15      A.    I did not.

16      Q.    Did you hear any lethal shots being fired before the

17   last 40-millimeter?

18      A.    Before the last -- excuse me -- before the last

19   40-millimeter I did not.

20      Q.    So from your perspective the first three to four

21   rounds fired at Mr. Perez were 40-millimeter rounds?

22      A.    Yes, sir.

23      Q.    And could you tell if the other 40-millimeter rounds

24   struck him?

25      A.    I -- I do believe I did see approximately two

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                    Page 59

```
 1      Q.   So your impression both Deputy Stone and Sergeant

 2   Gaytan were firing the 40-millimeters?

 3      A.   That's what it appeared to me, yes.

 4      Q.   Now, at some point you fired your first shot;

 5   correct?

 6      A.   That's correct.

 7      Q.   And where were you aiming on Mr. Perez's body when

 8   you fired your first shot?

 9      A.   Once -- once he made an attempt to grab reach down

10   where the firearm was, it was -- I aimed at the back of his

11   head is what was presented to me at the time.

12      Q.   And what did you have on your weapon so you were

13   able to aim at the back of his head?

14           Did you use your sights, or did you -- can you

15   explain that?

16      A.   Yes, sir.  Again, I guess an easier term is it's

17   just a red dot sight, just a red dot we have it zero'd at

18   specific distance and it's a red dot.

19      Q.   And at the time -- and you actually fired two

20   rounds, initially?

21      A.   Yes.

22      Q.   And those were both aimed towards the back of his

23   head?

24      A.   Yes, sir.

25      Q.   At anytime before you fired those two rounds, and
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                   Page 60

```
 1    I'm talking about in between the first 40-millimeter round
 2    being fired and in between your first shot, did you see a gun
 3    in Mr. Perez's hand during that time frame?
 4        A.   I did not see gun in his hand.  Again, up to my
 5    first shot is when he -- he leaned forward at the waist and I
 6    could see his right hand go down to where the last known
 7    location where we knew the gun was.
 8        Q.   And could you see the gun from your position in the
 9    BearCat at any time in between the first less-lethal round
10    and the time that you fired your initial two rounds?
11        A.   No, sir, I didn't.  I did not -- I never did see the
12    gun while it was back there, but it was communicated and we
13    knew where he placed the gun down.
14        Q.   And how much time would you estimate passed from you
15    hearing the first 40-millimeter round and you firing your
16    first round?
17        A.   I would estimate probably, sir, a second and a half
18    to two seconds, maybe two and a half seconds.
19        Q.   And was he still on his feet when you fired your
20    first two rounds?
21        A.   It did appear to me he was still on his feet, sir.
22             Again, he -- he bent forward at the waist.  I -- I
23    did see his right hand go towards and motion like he was
24    grabbing the firearm.
25        Q.   And do you know if you were the first officer to
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                    Page 63

```
 1       A.   No, sir, I did not see a gun in his hand.

 2            I knew, again, based off of his actions with his

 3   right hand reaching down, that at that point he had got to

 4   where the gun was and had the gun.

 5       Q.   And then it appears in your statement you fired an

 6   additional fire or six rounds into the pool table?

 7       A.   Yes, sir.

 8       Q.   And what were you trying to accomplish by firing the

 9   rounds into the pool table at that point?

10       A.   Sir, you asked me a question about cover earlier in

11   our interview.  That pool table or a pool table like the hard

12   wood is an example of that.  I knew based on my training you

13   can't just shoot once and it's not going to go through a hard

14   object such as that.

15            So just at the time I believed if I shot a couple or

16   shot through that specific side, it may go through, but after

17   those five to six shots I was able to stop and assess and

18   make the determination that it was not going to do that.

19       Q.   Was your intent with those five or six shots to try

20   to strike Mr. Perez by shooting through the pool table?

21       A.   Yes.  Again, I was trying to stop the threat at that

22   time.

23       Q.   And then there was a slight pause, I think, and you

24   heard some other gunfire during that pause?

25       A.   Excuse me, yes, sir.  I did stop and assess at that
```

1      Q.   But you would at least agree with me now having your

2   knowledge of guns and muzzle flashes that if he didn't fire

3   any guns, the gun at all, then a muzzle flash couldn't have

4   been coming from that gun; is that a fair statement?

5      A.   Yes.  It couldn't have been coming from his gun.

6      Q.   And when you heard these additional two or three

7   handgun shots, was Mr. Perez still on his knees?

8      A.   I was unable to identify exactly what position he

9   was in.  Again, it appeared to me he was using that pool

10   table as cover.  So I was not able to identify what position

11   he had gotten in to use it to the best of his ability to

12   shoot at myself or my partners.

13      Q.   And in terms of cover, in other words, you're saying

14   that he was trying to use the pool table as cover from the

15   shots being fired at him?

16      A.   No, sir.  My belief at that time was he had gotten

17   to that gun, his handgun and he was using that cover to now

18   engage law enforcement, shoot at my partners and I.

19      Q.   Well, it sounds like if I'm understanding your

20   testimony, that he -- there were four 40-millimeter rounds

21   fired at him before he got behind the pool table; is that

22   true?

23      A.   Yes.  I believe it was approximately three, maybe

24   four that were deployed at him, yes.

25      Q.   And you fired two shots with your rifle aiming at

1    officers; is that fair?

2        A.   Yes, sir.

3        Q.   And then you saw him sitting in the chair for some

4    period of time with the gun in his right hand, and you told

5    me that you never saw him shoot the gun, point the gun, or

6    even raise the gun at anybody; is that also true?

7        A.   Yes, sir.

8        Q.   And your understanding was there was a

9    heart-to-heart talk with him, father-to-father about

10   surrendering, and at some point he placed the gun down in

11   front of that chair?

12       A.   Yes, sir.

13       Q.   And then he stood up and walked towards the officers

14   along the side of the pool table ending up about one or two

15   feet beyond the edge?

16       A.   Yes, sir.

17       Q.   And then he took one step back with his left foot,

18   and that's when the 40-millimeter started?

19       A.   Yes, sir.

20       Q.   And you observed the first 40-millimeter strike him

21   in the abdomen and him put his hands there which is something

22   you've probably seen before; correct?

23       A.   It is.

24       Q.   And then he turned away, and he was continued having

25   the 40-millimeter fired at him, and you saw two you believe

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                    Page 68

```
 1   strike him in the back?

 2        A.   Yes, sir.

 3        Q.   And then you from your position, the BearCat, were

 4   aiming at the back of his head for two shots?

 5        A.   Yes, sir.  Again, he was reaching bent forward at

 6   the waist reaching with his right hand to where that firearm

 7   was placed on the ground as if he was retrieving the

 8   firearm.

 9        Q.   Well, he also could have been trying to get out of

10   harms' way from the 40-millimeter rounds and your two shots

11   to the back of his head, don't you think?

12             MS. ANDERSON:  Objection.  Calls for speculation.

13             But you can answer.

14             THE WITNESS:  No, sir, I do not, and because I've

15   seen on multiple occasions when the 40-millimeter has been

16   deployed, an example is on a hostage rescue, a man had taken

17   to mentally disabled people as hostage, he had a knife in his

18   hand.  We deployed the less-lethal 40-millimeter, he then

19   fell to the ground and peacefully surrendered.

20             We had another incident where a suspect came out of

21   the house, was being combative and would not comply, and it

22   was deployed, and he did the same thing where he fell to the

23   ground and immediately surrendered.

24             Unfortunately, Mr. Perez dictated that and ran

25   towards the firearm, again, posing an immediate threat to
```

 1    myself and my partners.

 2    BY MR. GALIPO:

 3        Q.   Well, you told me earlier that you can't shoot

 4    someone merely for seeing a gun in the hand, remember that?

 5        A.   Yes.

 6        Q.   And you, I think, have told me that after he came to

 7    a stop at the end of the pool table, you never saw a gun in

 8    his hand, true?

 9        A.   Again, I saw him reach down bent forward at the

10    waist reaching for where the gun was last placed.

11        Q.   I understand that part.  But you never actually saw

12    a gun in his hand; is that fair?

13        A.   I did not, sir.

14        Q.   So if he had not pointed the gun or tried to shoot

15    the gun before the patrol officers got there and hadn't

16    pointed the gun or try to shoot the gun during the entire

17    time the patrol officers were there, and hadn't pointed the

18    gun or tried to shoot the gun during the time frame you all

19    were watching him, and then put the gun down, stood up and

20    walked forward and only started moving away or running once

21    the 40-millimeter was deployed, why in your mind did you

22    think he suddenly was going to try to grab the gun and have a

23    shoot-out with six officers?

24        MS. ANDERSON:  Objection.  Calls for speculation;

25    lacks foundation.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                    Page 70

```
 1            But you can answer.
 2            THE WITNESS:  Well, sir, he did not begin to go back
 3    first off when the 40-millimeter.  He -- unfortunately,
 4    Mr. Perez dictated that by making the motion that he was
 5    taking a step back towards where the firearm was placed.
 6            And then the less-lethal munitions were deployed.
 7            Again, we were doing that in attempt to gain
 8    compliance so Mr. Perez would peacefully surrender and this
 9    unfortunately this situation would never happen.
10    BY MR. GALIPO:
11        Q.   Was a robot sent in at some point after the shots?
12        A.   Yes, sir.
13        Q.   Did you hear any shots being fired at after your
14    last shot?
15        A.   I don't recall hearing any shots, sir, after mine.
16        Q.   Was it reported that his hands were underneath his
17    body at some point?
18        A.   Yes.  I do believe that was a reported once the
19    robot did get close to him.
20        Q.   And did you do a tactical reload on your magazine?
21        A.   I did, sir.
22        Q.   And you noticed after the shooting when you approach
23    Mr. Perez that he was still breathing; correct?
24        A.   Yes, sir.
25        Q.   And was he eventually handcuffed?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                        Page 71

```
 1        A.    No, sir, he was not.  We -- myself and Deputy

 2    Pollick as we approached began to secure him of any other

 3    weapons on him.  Deputy Stone secured the firearm and then we

 4    just began to provide medical attention to him.

 5        Q.    Did he have any other weapons on him?

 6        A.    Other than the original firearm that we have talked

 7    about, no, he did not.

 8        Q.    And that original firearm, was that a black

 9    semiautomatic handgun?

10        A.    Yes, sir.

11        Q.    And you saw it near his left arm; correct?

12        A.    Yes, sir.

13        Q.    You did not see it specifically in his hand; is that

14    true?

15        A.    I don't recall if I saw it specifically in his hand,

16    sir.  I know it was near his left arm, forearm area.

17        Q.    And then given your background as an EMT, you were

18    looking in part for gunshot wounds; is that correct?

19        A.    Yes, sir.  Myself and Deputy Pollick our main

20    concern at that point was to provide Mr. Perez with medical

21    attention and get him to a higher level of care to obviously

22    preserve -- preserve life as best as we could.

23        Q.    Right.  But at that point you noticed he had been

24    struck by multiple gunshots; correct?

25        A.    Yes, sir.
```

```
 1   at the waist?

 2        A.   Briefly.  He did turn and hunch over at the waist,

 3   yes.

 4        Q.   And you had your rifle on semiautomatic mode?

 5        A.   Yes, sir.

 6        Q.   You remember a pool of blood forming after the

 7   shooting?

 8        A.   I apologize, sir.  What time frame are you

 9   reporting --

10        Q.   At any time frame, do you recall after the shooting

11   do you recall seeing a pool of blood?

12        A.   I did not see one in the while I was in the armored

13   rescue vehicle.  Once I got to the left side of the garage

14   and the robot was deployed, I began to putting my gloves on

15   and was able to look around the corner and did see that right

16   before we moved up to Mr. Perez to secure the firearm and

17   provide medial attention.

18        Q.   Did the paramedics get there at some point?

19        A.   Yes, sir.

20        Q.   And how much time do you think passed before the

21   paramedics got there?

22        A.   Again, just so I'm clear, sir, on that part, as far

23   as from what time?

24             When I initially began to provide medical attention

25   to him?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                    Page 75

```
 1        Q.   Let's take the gunshots end, and I know you were
 2   assisting, and I appreciate that.
 3             But I'm wondering from the end of the gunshots to
 4   where the actual paramedics on duty got to him.
 5        A.   It's hard to tell, sir.  I guess my estimation is 7
 6   to 12 minutes, in between there.
 7        Q.   And was he still breathing when the paramedics got
 8   to him?
 9        A.   Yes, sir.
10        Q.   And how could you tell if he was breathing?
11        A.   Well, sir, we did see his chest rise and fall, and I
12   apologize.  I do believe at one point he did appear that he
13   stopped breathing, but then the paramedics, we did see his
14   chest rise and fall, and then the paramedics hooked him up to
15   the monitor and determined that he was still -- still
16   breathing, and we were going to transport him via ambulance
17   at that point.
18        Q.   All right.
19             MR. GALIPO:  So let's take our last break.
20             I'm just about done.  I feel like I'll finish within
21   5 or 10 minutes of coming back.
22             But is 7 minutes good for everyone?
23             MS. ANDERSON:  Yes.
24             THE WITNESS:  Yes, sir.
25             (Recess taken.)
```

```
 1   BY MR. GALIPO:
 2       Q.   In the ten seconds before the 40-millimeter was
 3   deployed, did you hear any warning that the 40-millimeter was
 4   going to be deployed verbally at that time?
 5       A.   Again, sir, other than the planning over the at the
 6   library and then also on the radio, if he makes a move
 7   towards that firearm again, that less-lethal would be
 8   deployed, nobody -- I do not recall hearing anybody yell out
 9   specifically less-lethal.
10       Q.   And I was including in my question any warning to
11   Mr. Perez that they were going to use less-lethal on him if
12   he did or didn't do something?
13       A.   If they did say that to him, sir, I did not hear
14   that or was out the range where I can hear them say that.
15       Q.   Did you ever give him any commands?
16       A.   I did not.
17       Q.   Did you ever give a verbal warning that you were
18   going to use deadly force to him?
19       A.   I never said anything to Mr. Perez.
20       Q.   Did you ever hear any officer give him a verbal
21   warning that deadly force was going to be used?
22       A.   No, sir.
23       Q.   And at the time that of that first 40-millimeter
24   round, I think you told me you saw Mr. Perez take one step
25   back with his left foot?
```

**Exhibit "E"**

**Exhibit "E"**

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.J.P. and A.M.P., minors, by and      )
     through their guardian ad litem        )
 5   Cynthia Nunez, individually and as     )
     successor in interest to Albert Perez,)
 6   deceased, and PATRICIA RUIZ,           )
     individually,                          )
 7                                          )
                      Plaintiffs,           )
 8                                          )
                      vs.                   )Case No.
 9                                          )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES     )
10   1-10, inclusive,                       )
                                            )
11                    Defendants.           )
     _____)
12

13

14

15            REMOTE VIDEOCONFERENCE DEPOSITION OF

16                        DAVID MOORE

17                    SEPTEMBER 15, 2023

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  6788
```

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.J.P. and A.M.P., minors, by and     )
     through their guardian ad litem       )
 5   Cynthia Nunez, individually and as    )
     successor in interest to Albert Perez,)
 6   deceased, and PATRICIA RUIZ,          )
     individually,                         )
 7                                         )
                  Plaintiffs,              )
 8                                         )
                  vs.                      )Case No.
 9                                         )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES    )
10   1-10, inclusive,                      )
                                           )
11                Defendants.              )
     _____)

12

13

14

15           The remote videoconference deposition of DAVID

16   MOORE, taken on behalf of the Plaintiffs, beginning at 10:20

17   a.m., and ending at 12:25 p.m., on Friday, September 15,

18   2023, before Jinna Grace Kim, Certified Stenographic

19   Shorthand Reporter No. 14151.

20

21

22

23

24

25
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                    Page 3

```
 1    APPEARANCES OF COUNSEL:

 2

      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  SHANNON J. LEAP, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  sleap@galipolaw.com
 8

 9    For the Defendants:

10            MANNING & KAZZ ELLROD, RAMIREZ, TRESTER, LLP
              BY:  LYNN CARPENTER, ESQ.
11            801 South Figueroa Street, 15th Floor
              Los Angeles, California 90017
12            Tel:  213-624-6900
              Fax:  213-624-6999
13            E-mail:  llc@manningllp.com

14

15    Also Present:  Andrew Pollick, Christina Olivas

16

17

18

19

20

21

22

23

24

25
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 10

```
 1        Q.    Other officers were doing that?

 2        A.    Yes.

 3        Q.    What was your understanding of your assignment

 4   during that 30 minutes?

 5        A.    I was assigned with a shield positioned to the left

 6   side of the garage and provide cover for partners behind me,

 7   and I had lethal coverage.

 8        Q.    And the lethal cover would be the weapon you've

 9   already discussed?

10        A.    Yes.

11        Q.    At some point did you see Mr. Perez get up from that

12   stool?

13        A.    Yes.

14        Q.    And was there as pool table in the area?

15        A.    Yes.

16        Q.    And this was in the garage?

17        A.    Correct.

18        Q.    Was the garage door open?

19        A.    Yes.  The main garage door was open.

20        Q.    And do you know -- strike that.

21              You saw a gun in his lap at some point?

22        A.    Yes.  I saw Mr. Perez holding a gun in his hand with

23   his finger on the trigger.

24        Q.    Okay.  And for how long of a period of time did you

25   see him holding the gun with his hand on the trigger?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                    Page 11

```
 1      A.   Approximately over 20 minutes before he placed it
 2  down on the floor.
 3      Q.   Did anybody ask him to place it down on the floor,
 4  if you know?
 5      A.   Yes.
 6      Q.   And who was asking him to do that, if you know?
 7      A.   That was our crisis negotiator, Deputy Alcala.
 8      Q.   And where did he put the gun on the floor, if you
 9  know, in relation to that bar stool he was sitting on?
10      A.   He placed it directly in front of him on the floor
11  which would be in front of the stool.
12      Q.   And would it have been somewhere in between the
13  front of the stool and the end of the pool table at that
14  point?
15      A.   Yes.
16      Q.   And would that be on the side of the pool table
17  further from the threshold of the garage, open garage door?
18      A.   Can you explain which garage door?
19           Is it the main?
20      Q.   Yeah.  Sorry about that.
21           The main door that have to open or close for a car
22  to pull in.
23      A.   Yes.  That's correct.
24      Q.   Okay.  And then did he walk towards you at some
25  point?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                    Page 12

```
 1        A.    Yes.
 2        Q.    And did he walk towards you after the gun was put
 3   down on the floor?
 4        A.    Yes.  Once he placed the gun on the floor, then he
 5   slowly started walking towards us.
 6        Q.    Did anyone tell him, if you know, to walk towards
 7   you?
 8        A.    Yes.
 9        Q.    And would that be Deputy Alcala, also?
10        A.    Correct.
11        Q.    So at least up to that point in time you had two
12   acts of compliance:  One would be putting the gun down, and
13   one would be walking towards you?
14        A.    Well, not necessarily.  He had been given multiple
15   commands, and he wasn't listening to Deputy Alcala.  He
16   continued to hold the firearm in his -- in his lap.
17             We asked multiple times.  And prior to that is -- an
18   hour, more than hour or so for him to place that fire -- that
19   firearm down.
20             And then he eventually listened to us.
21        Q.    Right.  And again, I'm not suggesting he immediately
22   complied because obviously he didn't.
23             But eventually he did put the gun down?
24        A.    Yes.  After numerous requests for him to place it
25   down, he finally put it down.
```

1   of the garage.

2        Q.   And as you're looking into the garage, the pool

3   table would be in between you and where he was?

4        A.   Correct.

5        Q.   And where were you in relation to the pool table?

6             And what I mean by that, were you more on the right

7   side or the left side or dead center?

8        A.   I was on the left side which would be like the left

9   corner of the garage at a kneeling position.

10       Q.   In a kneeling position?

11       A.   Yes, sir.

12       Q.   And just so that I'm clear, when he put the gun down

13   did he first stand up and then put the gun down?

14            Or did he put it down or drop it from being seated

15   in the stool?

16       A.   Mr. Perez placed the gun down first and then he

17   stood up.

18       Q.   And then when he started walking, was he walking

19   towards the threshold of the main garage door?

20       A.   He was walking towards the threshold, but he stopped

21   right at the edge of the front of the pool table.

22       Q.   Okay.  So what side of the pool table did he walk on

23   from your perspective?

24            Would it be the left side that you were closer to,

25   or would be the right side?

```
 1      A.   Yes, sir.

 2      Q.   Were you pointing your firearm in his direction at

 3  that point?

 4      A.   Yes.

 5      Q.   Could you see his hands as he was walking towards

 6  you?

 7      A.   Yeah.  His hands were down at the time.

 8      Q.   Did you see any weapon in his hands at that time?

 9      A.   At that point at that time I did not see the -- any

10  weapons in his hands.

11      Q.   Did you see any weapons on his person at that

12  time?

13      A.   No.  He was wearing heavy clothing, so it was

14  unknown if he was concealing anything, but I couldn't see.

15      Q.   Did you observe him, for example, reaching into a

16  pocket or his waistband as he was walking towards you or when

17  he came to that stop?

18           MS. CARPENTER:  Vague as to time.

19           You can answer.

20  BY MR. GALIPO:

21      Q.   Do you understand the time frame, or did you want me

22  to repeat the question?

23      A.   I'm sorry.  Can you just repeat it one more time,

24  please.

25      Q.   Sure.  So when he was walking along the side of the
```

1   the pool table; correct?

2       Q.   Yes.

3       A.   Yes, correct.  Approximately 15 minutes.

4            That's the time Deputy Alcala was still trying to

5   negotiate with him to turn around and to get on his knees,

6   place his hand -- so we can detain him.

7       Q.   And you maintained your position about five or seven

8   feet from him kneeling?

9       A.   Yes.

10      Q.   What was the lighting conditions like at the time?

11      A.   Outside light conditions was dark, and then the

12   interior of the garage was somewhat illuminated by the

13   vehicles behind us.

14      Q.   Was there a BearCat nearby?

15      A.   Yes.

16      Q.   Was that providing illumination, if you know?

17      A.   Yes.  It was providing illumination from behind

18   us.

19      Q.   And during that approximate 15 minutes that he had

20   stopped towards the end of the tool table, was he generally

21   in the same area during that time frame?

22      A.   Generally during that time, yes, he was up until he

23   stepped -- took a step back and ran towards the firearm.

24      Q.   I'm going to get to that in just a moment.

25           Up to the time that he was standing in that position

1   he had injured someone in some way physically.

2        MS. CARPENTER:  Objection.  Lacks foundation; vague

3   and ambiguous.

4        You can answer.

5        THE WITNESS:  I'm sorry, sir.  Just that information

6   I provided you.  His criminal history and that -- the fact

7   that he brandished a firearm towards the female.

8   BY MR. GALIPO:

9    Q.   So the distinction that I'm trying to make is

10  someone could brandish a firearm without physically hurting

11  someone else; is that fair?

12       MS. CARPENTER:  Lacks foundation; speculation.

13       You can answer.

14       THE WITNESS:  Yes.

15  BY MR. GALIPO:

16   Q.   Right.  I was just wondering if someone told you if

17  he had, you know, beat someone up really bad, had stabbed

18  someone, had shot someone, something like that?

19       MS. CARPENTER:  Lacks foundation; vague and

20  ambiguous.

21       You can answer.

22       THE WITNESS:  Sir, I just -- due to the fact of his

23  demeanor and the way his facial expressions, at that point

24  based on my training and experience, to me I can't -- to me

25  it felt like he had something else planned, and he wasn't

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                                     Page 22

```
 1    compliant with us.

 2            And based off his criminal history and the crime

 3    that he had committed, I had -- I believed that he was

 4    potentially violent.

 5    BY MR. GALIPO:

 6        Q.   So it sounds like the only information you had was

 7    that he had brandished a weapon at someone and was arrested

 8    once for 245; is that true as far as past conduct?

 9        A.   That's correct.  And just his demeanor when he was

10    seated at the -- at the stool holding the firearm.

11        Q.   Did he point the firearm at anyone while he was

12    sitting on the stool?

13        A.   No.  He just had his finger on the trigger, and it

14    was -- it was on his lap in plain view.

15        Q.   How long do you think he was sitting on the stool --

16    well, you saw him for about 30 minutes; right?

17        A.   Yes, sir.

18        Q.   During that 30 minutes did he point the firearm at

19    anyone?

20            MS. CARPENTER:  Asked and answered.

21    BY MR. GALIPO:

22        Q.   You can answer.

23        A.   No.  He continued just to hold -- he held the

24    firearm on his lap with his finger on the trigger.

25        Q.   So we're up to the time frame that he's about five
```

1    before moving further.

2        A.   At that point, no.

3        Q.   Okay.  And during the 30 minutes that you were

4    observing him including the time frame that he was sitting in

5    the stool with the gun in his hand with his finger on the

6    trigger?

7        A.   Yes.  I observed all that.

8        Q.   Did you have an understanding as to where Deputy

9    Alcala was in relation to you when he was talking to him?

10       A.   I don't have an approximate distance, but I know

11   his -- where his position was from me.

12       Q.   What was your general understanding?

13       A.   He was to the right side of me, not in close

14   proximity, though.

15       Q.   Was there any discussion in terms of tactical plan

16   as to when the less-lethal would be deployed?

17            In other words, if he started walking back towards

18   the gun, was there any discussion in that regards?

19       A.   The only discussion that we had was the fact that if

20   he attempted to walk towards the firearm, less-lethal would

21   be used.

22       Q.   Was that discussion with Sergeant Gaytan?

23       A.   Yes.

24       Q.   And who was part of that discussion, if you know?

25       A.   The -- essentially, the team that was present

1    there.

2    Q.    The individuals that you already mentioned?

3    A.    Yes.

4    Q.    Did anyone indicate that if he starts walking back

5    towards the gun, that lethal should be used?

6    A.    At that time, no.  We just discussed -- referenced

7    the fact that if he moved a little bit close, we would use

8    less-lethal.  And then at that point, though, as he bolted

9    towards the firearm, he became more -- immediate threat to

10   us.

11   Q.    And the garage door, in between the garage and the

12   house, your understanding was that was locked; is that

13   true?

14   A.    Yes.

15   Q.    Now, at some point did you hear less-lethal being

16   fired?

17   A.    Yes, I did.

18   Q.    And you indicated earlier that there were two

19   individuals assigned less-lethal; is that correct?

20   A.    Correct.

21   Q.    That would be Deputy Stone and Sergeant Gaytan?

22   A.    Yes.

23   Q.    And could you tell whether they were both firing

24   less-lethal or was coming from one or the other?

25   A.    I could hear less-lethal being deployed, but I

```
 1      A.   Sympathetic fire?

 2      Q.   Yeah.  Sympathetic fire, sometimes it's referred to

 3   as that.

 4      A.   Yes.

 5      Q.   What is your understanding of what that is?

 6      A.   Basically the fact that an officer might hear a

 7   gunfire.  They might fire themselves thinking that there is

 8   firing, an active shooting going on.

 9           And that wasn't the case -- that this -- this

10   incident.

11           MS. CARPENTER:  It wasn't the case?

12           THE WITNESS:  It wasn't the case.

13   BY MR. GALIPO:

14      Q.   So when you heard the three less-lethal being fired,

15   was that before any lethal shots were fired?

16      A.   Yes.

17      Q.   And how much time do you think passed from the last

18   less-lethal shot to the first lethal shot?

19           MS. CARPENTER:  So objection to the extent you're

20   calling less-lethal deployments shots.

21           But you can answer.

22   BY MR. GALIPO:

23      Q.   Yeah.  I guess I can rephrase it just to be clear so

24   we're not confused.

25           The less-lethal you're talking about were the
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                    Page 35

```
 1   40-millimeter; is that correct?

 2       A.   Yes.  The BIP rounds.

 3       Q.   And by the way, could you tell if those rounds

 4   struck Mr. Perez?

 5       A.   Yes, I could see that.

 6       Q.   They appeared to strike him?

 7       A.   Yes.

 8       Q.   And what part of his body did they appear to strike

 9   him?

10       A.   From my perspective it appeared to struck him on his

11   torso near stomach.

12       Q.   And what did you say that made you believe those

13   40-millimeter rounds struck him in his stomach?

14       A.   I observed the BIP round made contact with him, and

15   that's -- I saw three of them make contact with him, and at

16   that point there's when he turned around, bolted to the

17   firearm immediately.

18       Q.   So was he still in that same general area that he

19   had been standing for 15 minutes when the less-lethal was

20   deployed?

21       A.   No.  He took a step back closer to the firearm.

22       Q.   Okay.  I thought you said that the shots hit him in

23   the stomach?

24       A.   Yeah.  So after the -- sorry -- so once he took a

25   step back, did move closer to the firearm, that's when the
```

```
 1   less-lethal BIP rounds were deployed on Mr. Perez.

 2           And then at that point that's when he bolted to the

 3   firearm.

 4       Q.   So he just -- one step back, but still facing in

 5   your direction?

 6       A.   Yeah.  He was facing us, and then he took a step

 7   back towards the firearm.

 8       Q.   Right.  But what I'm wondering, I thought you told

 9   me that the 40-millimeter rounds hit him in the abdomen.

10       A.   Yeah.  That's correct.  It hit him in the abdomen,

11   but after he stepped back closer to the firearm.

12       Q.   I get that part.  But it sounds like if he took a

13   step back, it would be a step back away from you; is that

14   true, also?

15           MS. CARPENTER:  Objection.  Misstates his testimony;

16   lacks foundation; vague and ambiguous.

17           You can answer.

18           THE WITNESS:  So Mr. Perez wasn't following

19   direction to turn around and kneeling and place his hands

20   behind his head.  Instead, his facial expression changed and

21   became -- he didn't want to listen to us.

22           So he immediately walked back or stepped back

23   towards the firearm, and that's when the less-lethal BIP

24   rounds were deployed.

25   BY MR. GALIPO:
```

```
 1  pool table that was closer to you?

 2       A.   Yeah.  After multiple commands asking him --

 3       Q.   I realize he didn't do things right away.  I'll give

 4  you that.  I get that.  I'm not suggesting he immediately

 5  complied because I realize from listening to the tape and

 6  reviewing your statement he did not.

 7            But at some point you would agree he walked slowly

 8  towards you?

 9       A.   Yeah.  Eventually, he started walking after numerous

10  commands.

11       Q.   Okay.  And when he came to a stop, it was towards

12  the end of the pool table closer to where you were at?

13       A.   Approximately.

14       Q.   And then you said he remained in that position for

15  about 15 minutes?

16       A.   Approximately 15 minutes.

17       Q.   Generally facing towards your direction?

18            MS. CARPENTER:  Objection.  Misstates his testimony

19  and lacks foundation.

20  BY MR. GALIPO:

21       Q.   Let me ask you:  Was he generally facing towards the

22  open main garage door?

23       A.   Correct.

24       Q.   And at that point what would you estimate the

25  distance to be from Mr. Perez to where that gun was on the
```

 1   other side of the pool table?

 2      A.   Sorry.  So when he was running towards the firearm,

 3   or --

 4      Q.   No.  When he was standing stopped for the 15

 5   minutes.

 6           MS. CARPENTER:  Vague and ambiguous as to time.

 7           You can answer.

 8           THE WITNESS:  I would say approximately seven, seven

 9   to eight feet.

10   BY MR. GALIPO:

11      Q.   Do you know how -- where was he in relation to the

12   pool table when he came to a stop?

13           MS. CARPENTER:  At what point, Counsel?

14           MR. GALIPO:  After he walked slowly forward, the

15   only time he says he stopped.

16           MS. CARPENTER:  Okay.

17           THE WITNESS:  He was right at the corner of the --

18   the pool table.

19   BY MR. GALIPO:

20      Q.   Okay.  Go ahead.  I'm sorry.

21      A.   Which was the side closest to me.

22      Q.   Do you know how long that pool table is?

23      A.   I don't recall at this moment.

24      Q.   But you're estimating when he was in that stopped

25   position facing out towards the open main garage door, he was

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                    Page 41

1    approximately seven to eight feet from where the gun was on

2    the floor?

3        A.   Correct.

4        Q.   And when he took the step back you're referring to,

5    was his upper body still facing in the direction of the open

6    main garage door?

7        A.   When he took that step back he was slightly canted

8    to the left in that kind of like a turning motion.

9            That's what I saw.

10       Q.   And it was after he took that step back that you

11   observed the three 40-millimeter rounds hit him in the

12   abdomen area?

13       A.   Yes.  After numerous commands to turn around and to

14   kneel, I could see in his facial expression that he did not

15   want to listen.  He shook his head back and forth, and had a

16   facial expression of resentment, he's resisting.

17           And so that's when he took that step back in a

18   canting motion.  He was canting more towards the opposite

19   direction from me like as if he was going to turn.

20       Q.   Okay.  And that is when the 40-millimeters were

21   deployed?

22       A.   Correct.

23       Q.   And then a split second after the last 40-millimeter

24   that was deployed is when you heard the first lethal round?

25       A.   Yeah.  At that point that's when he started charging

1    towards the firearm.

2        Q.    Did you see him moving or running towards the

3    firearm at any time before the less-lethal was deployed?

4        A.    Sorry.  Just repeat that one more time.

5        Q.    Did you see him running towards the firearm at any

6    time before the less-lethal was deployed?

7        A.    Just that step back when he was turning around

8    towards the firearm.

9        Q.    Yeah.  But it sounds like he was -- he wasn't

10   running at that point; is that correct?

11       A.    It was unknown his intentions at the -- not

12   intention, but just unknown what he was about to do, but he

13   was turning at that point towards that firearm.

14            I know that for sure.

15       Q.    I get that.  But it seem like in your statement you

16   indicate he started running after the 40-millimeter was

17   deployed.

18            MS. CARPENTER:  So objection to the extent that it

19   may misstate his prior testimony or statement.

20            But you can answer.

21            THE WITNESS:  I don't recall stating that, but the

22   fact that he took that step back, that canting motion,

23   turning motion towards the firearm, that's when the

24   less-lethal BIP rounds were deployed on Mr. Perez.

25   BY MR. GALIPO:

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                    Page 43

```
 1        Q.   And then when did you fire your first round in

 2    relation to the last 40-millimeter round?

 3        A.   At that point where he start charging towards the

 4    firearm and slowly -- stretch motion towards the firearm,

 5    approximately three to five feet.  He was three to five feet

 6    away.

 7        Q.   So three to five fight away from what?

 8        A.   The firearm.

 9        Q.   So I guess what I was asking, and maybe you've

10    already answered.

11             How much time passed from you hearing the last

12    40-millimeter round and you firing your first lethal round?

13        A.   It's -- it was like I said, I don't know the exact

14    time, but it was very fast.

15             Again, it would have to be a split seconds.

16             As he got closer to that firearm, like I said, he

17    was about three to five feet away from it and outstretched --

18    it was like he was trying to reach for the gun.

19             That's when I started firing.

20        Q.   And where was he in relation to the pool table when

21    you started firing?

22        A.   He was about to round the corner of the pool

23    table.

24        Q.   Can you say that again.  I'm sorry.

25        A.   He was about to round the pool table with his hands
```

 1   outstretched towards the firearm.

 2        Q.   **Did you indicate in your other statement that his**

 3   **hands were outstretched towards the firearm?**

 4        A.   **I believe so.   I indicated that his -- it was either**

 5   **one of his arms, his or left or right arm that was reaching**

 6   **out towards the firearm as he came around the pool table.**

 7        Q.   **But it sounds like you started firing before he came**

 8   **around the pool table.**

 9        A.   **So I fired like I said, he was about three to five**

10   **feet away from him, and he was lowering his body level, and**

11   **at that point when I saw he was outstretched trying to reach**

12   **for it, that's when I started firing.**

13        Q.   And what part of his body were you aiming for when

14   you fired?

15        A.   Center mass.

16        Q.   **What was center mass from your perspective?**

17        A.   His torso area.

18        Q.   **Which part?**

19             **Was it his front or his back or something else?**

20        A.   I would say probably around his side portion of his

21   torso.

22        Q.   **What side of his torso?**

23        A.   I would say his right side.

24        Q.   **So your center mass from your perspective was his**

25   **right side?**

```
 1      A.    Correct.  His upper torso area which is on his right
 2  side.
 3      Q.    So wouldn't he be facing almost towards the pool
 4  table for his right side to be exposed to you?
 5            MS. CARPENTER:  Objection.  Lacks foundation; vague
 6  and ambiguous.
 7            You can answer.
 8            THE WITNESS:  So as I was aiming for his center
 9  mass, he was -- he was running about -- he was about three to
10  five feet away from that firearm, and he was lowering his
11  position, and he had his arm outstretched -- stretched
12  towards the firearm.
13            That's when I began firing at him aiming for his
14  center mass which his right side would be facing the pool
15  table.
16  BY MR. GALIPO:
17      Q.    His right side would have been facing towards you?
18      A.    Yeah.  Actually, so as he's turning -- turning
19  around, it would be facing a canted position towards me.
20      Q.    And in your statement you indicated that you fired
21  five rounds; is that correct?
22      A.    Yes.
23      Q.    Did you fire them in rapid succession?
24      A.    Yes.
25      Q.    And then you said in your statement you fired the
```

A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
David Moore on 09/15/2023                                          Page 48

```
 1     A.   Yes --

 2     Q.   Do you see where you say that --

 3     A.   Yes.

 4     Q.   Okay.  So would you at least agree with me that in

 5   your original statement you said you fired five shots towards

 6   him and then he cornered the pool table?

 7          MS. CARPENTER:  So objection to the extent you're

 8   misstating his testimony and his statement.  You're taking it

 9   out of context.

10          But you can answer.

11          THE WITNESS:  I stated that I fired five rounds

12   towards him.  So like I said, as he was lowering his

13   position, he was coming around that corner, and I was firing

14   the five round towards him at center mass.

15   BY MR. GALIPO:

16     Q.   Right.  But you would agree that here in this part

17   of the statement in addition to saying you fired five rounds

18   towards him, you said, "And then he cornered the pool table."

19          MS. CARPENTER:  So objection to the extent you're

20   misstating his statement by taking it out of context.

21          You can answer again.

22          THE WITNESS:  Yeah.  Like I said, once he got about

23   three to five feet away from or close to that firearm, I

24   fired at him.  He was at a lowered position coming around

25   that -- that post of the pool table.
```

1        Would you at least agree with that?

2    A.    Yeah.  At that point, that moment, yes.

3    Q.    And did you hear any other shots being fired other

4    than yours as you were firing your lethal rounds?

5    A.    Yes.

6    Q.    Did you give any verbal warning that you were going

7    to fire?

8    A.    No, sir.  Just the fact that it was an immediate

9    threat and it was such a fast event, I didn't have time to

10   say anything.

11   Q.    Did you give him any commands before you fired?

12   A.    No.  I didn't want to interrupt the -- the commands

13   that Deputy Alcala and Sergeant Gaytan were giving him.

14   Q.    Did you ever consider that he might be running from

15   being hit by the three less-lethal rounds?

16        MS. CARPENTER:  Objection.  Lacks foundation;

17   speculation; incomplete hypothetical.

18        You can answer.

19        THE WITNESS:  No, sir.  The reason I don't believe

20   that because there was stack of tires that was to his -- his

21   right.  If he was trying to get away and find cover, he would

22   probably duck, which was closest to him.

23        So I don't see him -- not only that, his hands were

24   outstretched towards the firearm.

25   BY MR. GALIPO:

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                          Page 52

```
 1      Q.   Well, I'm trying to find that reference in your

 2   statement, but hopefully I'll be able to find it at some

 3   point.

 4           So he was upright on his feet when you fired all

 5   your shots?

 6      A.   Sorry.  Can you repeat that?

 7      Q.   Was he on his feet, upright when you fired all five

 8   of your shots?

 9      A.   He was crouching down and lowering his position

10   rounding the pool table with his arm outstretched.

11      Q.   Was he on his feet as opposed to on the ground?

12      A.   Yeah.  He was on his -- he was on his feet in the

13   crouching position.

14      Q.   And do you have an estimate as to how much time

15   passed from your first shot to your last shot?

16           MS. CARPENTER:  Objection to the extent it call for

17   speculation.

18           You can answer.

19           THE WITNESS:  Sir, it was very, very fast.

20           It was a second approximately.

21   BY MR. GALIPO:

22      Q.   About a second?

23      A.   No.  Approximately probably a second or less.

24      Q.   And I think you already told me during your use of

25   lethal force, you heard other shots being fired?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 54

```
 1      A.   Yes.  I'm just reading the lines right now.

 2      Q.   Okay.  "Less-lethal round to his stomach area, and

 3   it takes awhile because he has a multi-launcher, so he has to

 4   rack it each time.  So he -- I thought it was three rounds,

 5   and then he is racking it, and that's when Albert immediately

 6   turned and ran towards the firearm in like a long stride

 7   quick sprint motion."

 8           Do you see that?

 9      A.   Yes.

10      Q.   So it was Deputy Stone who you believe was firing

11   the 40-millimeter BIP rounds?

12      A.   Yes.

13      Q.   And you already told me that it appeared to hit

14   Albert's stomach?

15      A.   Correct.

16      Q.   And then it was after that, that Albert turned and

17   ran towards the firearm?

18      A.   Yes.

19      Q.   So then you're asked in the next question if we

20   could scroll down, "This step back, how far back did he take

21   this step?"

22           And you say at the top of next page to you, "It was

23   like a half foot."

24           Do you see that?

25      A.   Yes, I see that.
```

1   and bolted.  So I feel like it was maybe he got at least

2   another two or three feet away from me."

3       A.  Yes, I see that.

4       Q.  And then what are you explaining there, "Been able

5   to grab the gun or try to the grab the gun, so I mean nine to

6   ten feet away."

7           What is the nine to ten feet away reference to?

8           The gun?

9       A.  Let's see here.  I'm just trying to read it from --

10  sorry.

11      **Q.  Take your time.**

12      A.  Yeah.  That was in reference to how far he was away

13  from me running towards the firearm.

14      **Q.  So you think that he got another two to three feet**

15  **from you, from the position he was in when he took the**

16  **less-lethal to when you fired?**

17      A.  Yes.  So yeah.  He gained more footage away from me

18  to the -- closer to that firearm.

19      **Q.  Did you think it was appropriate from your**

20  **perspective to shoot at him once he was laying on the**

21  **ground?**

22      A.  He was still posing an immediate threat.

23          I couldn't tell where his hands were.  He was still

24  breathing.  So during that time I think it was appropriate.

25          He was an imminent threat to us.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 65

```
 1      Q.   Did you -- you told me you saw him with a gun in his

 2   hand earlier when he was sitting on the stool with his finger

 3   on the trigger; correct?

 4      A.   Yes.

 5      Q.   Prior to that day had you ever seen --

 6           MR. GALIPO:  That's good, Shannon.

 7           We can take the statement down.

 8   BY MR. GALIPO:

 9      Q.   Prior to that day had you ever seen a suspect with a

10   gun in their hand before?

11      A.   I don't recall.

12      Q.   Were you trained that you could shoot someone just

13   for seeing a gun in their hand, that fact alone?

14      A.   Fact -- he wasn't an imminent threat at that

15   point.

16      Q.   No.  I'm just talking generally.

17           Were you trained that you could shoot someone merely

18   for seeing a gun in their hand?

19           MS. CARPENTER:  Objection to the extent it misstates

20   the policy in the training on use of deadly firearm force.

21           But you can answer.

22           THE WITNESS:  Sir, it's just based on the totality

23   of the circumstances.  If he's presenting a threat to me and

24   threat to us, then we have the ability to use lethal force.

25   BY MR. GALIPO:
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                                 Page 66

```
 1      Q.   I understand that part.

 2           What I'm trying to say, obviously, you're not

 3   trained to shoot someone only for seeing a gun in their hand

 4   because you saw him for some period of time with gun in his

 5   hand, and you didn't shoot him, true?

 6      A.   Yeah.  We did not shoot him at that time.

 7      Q.   So your training is a gun in the hand is not enough;

 8   right?  It has to be based on the totality of the

 9   circumstances and immediate threat of death or serious bodily

10   injury?

11           MS. CARPENTER:  Objection to the extent it misstates

12   the policy and the training.

13           But you can answer.

14           THE WITNESS:  Yes.  Basically, it's based off the

15   fact that if he presented an immediate threat, and at that

16   point he was still -- he had the gun.  We were still a little

17   stressed at that moment, but at that point he wasn't posing

18   that threat up until he charged back towards the firearm.

19   BY MR. GALIPO:

20      Q.   Because initially, he had the gun in his hand and

21   the finger on the trigger, but he wasn't pointing it anyone,

22   true?

23      A.   When he was initially seated at the stool,

24   correct.

25      Q.   And you would agree when you fired your shots, he
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 67

```
 1   did not have a gun in his hand.

 2            Would you agree with that?

 3      A.   Well, the fact that he was running towards the

 4   firearm outstretched and he was very angered, it was an

 5   imminent threat to me.  I felt he was going to be retaliation

 6   with him gabbing that firearm.

 7      Q.   Okay.  My question's a little bit different.

 8            I'm not asking you what you felt.

 9            I'm asking what you saw.

10            Did he have a gun in his hand when you fired?

11            MS. CARPENTER:  Objection.  Asked and answered.

12            THE WITNESS:  So he was running towards the firearm

13   trying to obtain the gun.

14   BY MR. GALIPO:

15      Q.   Did you see a gun in his hand when you fired?

16            That's what I'm asking.

17            MS. CARPENTER:  Objection.  Asked and answered.

18            You can answer again.

19            THE WITNESS:  So like I said, sir, he was posing

20   that immediate threat.  He was going after the firearm, and

21   at that point that's when I felt a danger from him.

22   BY MR. GALIPO:

23      Q.   How far was he from the firearm when you fired?

24      A.   Three to five feet.

25      Q.   Could you see both of his hands when you fired?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 81

```
 1        Q.    Is that where he was seated?

 2        A.    He wasn't seated there at the time.

 3              That stool was actually a lot closer to the pool

 4   table.

 5        Q.    Okay.  But that's the stool?

 6        A.    Yes.  That's the stool that he was seated at

 7   originally.

 8        Q.    And when you said that the gun was placed on the

 9   ground in front of the stool, that's the stool you're

10   speaking of?

11        A.    Yeah.  When that chair -- that stool was closer to

12   the pool table.  It was between that foot post that we're

13   currently looking at the corner and that stool.

14        Q.    And then we see the gun in this picture close to the

15   door; right?

16        A.    Correct.

17        Q.    Do you know how it got there?

18        A.    During life-saving measures the medics had to move

19   the firearm away from him just in case he was going to -- he

20   might grab it.  So it was placed at that location.

21        Q.    You saw the medics move the gun there?

22        A.    I couldn't tell who moved it, but that's what --

23   yes, it was -- yeah, I couldn't tell who, which person moved

24   the firearm, but it was moved during the time of the

25   life-saving measures.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                    Page 82

1       Q.   But you saw the gun move there at some point?

2       A.   Correct.  It was underneath Mr. Perez, and it was

3    moved.

4       Q.   Is there any video or photo of the gun being

5    underneath him?

6       A.   No, sir, not to my knowledge.

7       Q.   Did you see the gun at some point after you shot

8    him?

9       A.   So I saw it right before he landed on top of it, and

10   then his arms were tucked underneath his body.

11          So I believe that he had his hands on it.

12          That's what I thought.

13      Q.   Let me show you one more exhibit.

14          This will be our last exhibit and next in order.

15          MR. GALIPO:  I'm not sure what number we're up to.

16          Do you know, Jinna?

17          COURT REPORTER:  This would be 11.

18          MR. GALIPO:  Thank you, Jinna.

19          (Exhibit 11 was marked for identification.)

20   BY MR. GALIPO:

21      Q.   This would be a photograph of after the incident,

22   obviously.  The end of the pool table, that would have been

23   furthest away from the open large garage door; is that

24   correct?

25      A.   That's correct.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                      Page 83

```
 1      Q.   Okay.  One moment, please.

 2           I'll be right back.

 3           (Brief pause in the proceeding.)

 4   BY MR. GALIPO:

 5      Q.   Okay.  Just one last question.

 6           Out of curiosity, do you know if the gun that you

 7   say he was laying on top of had blood on it after the

 8   shooting?

 9      A.   Sorry, sir.  I wasn't the medic that was providing

10   the life-saving measures.  So I couldn't confirm it or not if

11   there was blood on it or -- yeah, that's -- I can't confirm

12   that.

13      Q.   But you're saying he was laying on the gun after the

14   shooting?

15      A.   Yes.  So like I said, he rounded the corner and with

16   his arm outstretched.  After the shooting he landed on top of

17   the firearm, and his arms were tucked underneath his body.

18      Q.   Did you actually see the gun underneath his body

19   when you approached him?

20      A.   Well, the firearm was covered by his body, so I

21   couldn't see it.

22           But I did see him land on top of his firearm.

23      Q.   And you're saying you saw the gun removed from that

24   location at some point; you just don't recall who did it?

25      A.   Yeah.  That's -- when I provided cover for the
```

Exhibit "F"

Exhibit "F"

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.J.P. and A.M.P., minors, by and      )
     through their guardian ad litem        )
 5   Cynthia Nunez, individually and as     )
     successor in interest to Albert Perez,)
 6   deceased, and PATRICIA RUIZ,           )
     individually,                          )
 7                                          )
                   Plaintiffs,              )
 8                                          )
                   vs.                      )Case No.
 9                                          )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES     )
10   1-10, inclusive,                       )
                                            )
11                 Defendants.              )
     _____)
12

13

14

15         REMOTE VIDEOCONFERENCE DEPOSITION OF

16                   CHRISTINA OLIVAS

17                   OCTOBER 3, 2023

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  6789
```

1                     UNITED STATES DISTRICT COURT

2                     CENTRAL DISTRICT OF CALIFORNIA

3

4    A.J.P. and A.M.P., minors, by and      )
     through their guardian ad litem        )
5    Cynthia Nunez, individually and as     )
     successor in interest to Albert Perez,)
6    deceased, and PATRICIA RUIZ,           )
     individually,                          )
7                                           )
                     Plaintiffs,            )
8                                           )
                     vs.                    )Case No.
9                                           )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES     )
10   1-10, inclusive,                       )
                                            )
11                   Defendants.            )
     _____    )

12

13

14

15          The remote videoconference deposition of CHRISTINA

16   OLIVAS, taken on behalf of the Plaintiffs, beginning at 10:04

17   a.m., and ending at 11:59 a.m., on Tuesday, October 3, 2023,

18   before Jinna Grace Kim, Certified Stenographic Shorthand

19   Reporter No. 14151.

20

21

22

23

24

25

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Christina  Olivas on 10/03/2023                                       Page 3

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  SHANNON J. LEAP, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  sleap@galipolaw.com
 8

 9    For the Defendants:

10            MANNING & KAZZ ELLROD, RAMIREZ, TRESTER, LLP
              BY:  KAYLEIGH ANDERSON, ESQ.
11            801 South Figueroa Street, 15th Floor
              Los Angeles, California 90017
12            Tel:  213-624-6900
              Fax:  213-624-6999
13            E-mail:  kaa@manningllp.com

14

15

16

17

18

19

20

21

22

23

24

25
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina  Olivas on 10/03/2023**                                    Page 10

 1   sergeant.  And I -- I believe I understood that incorrectly.

 2          So initially, when I had got to the scene, I was

 3   later than everyone else because I'm coming from down the

 4   hill.  So it took me a little bit longer.

 5          Gaytan didn't relay the information.  It was his

 6   alternate team leader which is Cory McCarthy who relayed the

 7   information to me.

 8      Q.   Was there anything else when you reviewed it that

 9   you noticed to be inaccurate other than what you told me so

10   far?

11      A.   No, sir.

12      Q.   Do you know the name of the decedent?

13      A.   Albert Perez.

14      Q.   To your knowledge, had you ever seen him before that

15   day?

16      A.   No, sir.

17      Q.   Where was he when you first saw him on the day of

18   the incident?

19      A.   When I actually saw him or a photograph?

20      Q.   When you actually saw him.

21      A.   He was inside the garage.

22      Q.   And where was he inside the garage?

23      A.   He was on the -- near the north wall of the

24   garage.

25      Q.   And was he standing, sitting, or doing something

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina Olivas on 10/03/2023**                                          Page 11

1   else?

2          A.    He was seated.

3          Q.    Was he seated in a chair?

4          A.    Yes, sir.

5          Q.    And would that be at one end of the pool table?

6          A.    Yes, that's correct.

7          Q.    And how long approximately did you see him seated in

8    that chair?

9          A.    I would say approximately 20 minutes.

10         Q.    And where were you generally positioned when you

11   were watching him seated in the chair?

12         A.    I was on the right side of the garage opening,

13   sir.

14         Q.    And did you have any weapon in your hand at that

15   time?

16         A.    Yes, sir.

17         Q.    And what weapon did you have in your hand?

18         A.    I had my handgun, my Glock 45.

19         Q.    The one that we had looked at a picture of?

20         A.    Yes, that's correct.

21         Q.    Did you have your weapon pointed at him or at

22   low-ready?  How would you describe it?

23         A.    At what point are we talking about?

24         Q.    During the time he's sitting in the chair.

25         A.    There was times where I had it at -- pointed at

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Christina  Olivas on 10/03/2023                                    Page 13

```
 1                It was aired over the dispatch, and then from what
 2     we know of the call for service as well.
 3          Q.    Did you ever see him reaching for the gun while he
 4     was seated in the chair?
 5          A.    I do not know because it was -- my vision was
 6     obstructed by the pool table, sir.
 7          Q.    Okay.  At some point did you hear someone tell him
 8     to put the gun down?
 9          A.    Yes.
10          Q.    And do you know who told him that?
11          A.    It was Deputy Alcala.
12          Q.    And do you know if he put the gun down?
13          A.    Yes.  I was advised by Stone that he had put the gun
14     down.
15          Q.    At some point was Mr. Perez asked to stand up?
16          A.    Yes, sir.
17          Q.    And do you know if he did that?
18          A.    Yes, sir.
19          Q.    And did you observe him stand up at some point?
20          A.    Yes, sir.
21          Q.    And when he stood up did you see any weapon in his
22     hands at that point?
23          A.    I could only see his wrist and up when he stood
24     up.
25          Q.    Okay.  Did you ever see him reaching for the gun
```

1    after he stood up from the chair at that time?

2        A.    What time are we talking about because --

3        Q.    When he stood up after being asked to do so.

4        A.    No, sir.

5        Q.    At some point was he asked to move forward?

6        A.    Yes, sir.

7        Q.    And was it Deputy Alcala who asked him to do that?

8        A.    He asked him to walk forwards.

9        Q.    Okay.  And did Mr. Perez walk forward?

10       A.    Yes, sir.

11       Q.    And did he walk at some point along one of the sides

12   of the pool table?

13       A.    Yes, sir.

14       Q.    And from your perspective would that be the left

15   side of the pool table?

16       A.    Can you ask that question again?

17             I'm not understanding.

18       Q.    Sure.  It's my understanding as you're looking into

19   the garage, you're more on the right side; is that correct?

20       A.    Yes.  I'm on the right side, that's correct.

21       Q.    And the pool table is kind of in the middle of the

22   garage; is that also a fair statement?

23       A.    That's correct, sir.

24       Q.    So I'm imagining the two sides of the pool table,

25   the longer sides.  One would be closer to you and one would

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Christina  Olivas on 10/03/2023                                    Page 19

1        Q.   Yes.

2        A.   Yes, sir.

3        Q.   Do you know if any other officers were pointing

4    their firearms at him at that point other than you?

5        A.   I did not know.  I was hyper-focused on Perez.

6        Q.   And was your firearm pointed center mass at that

7    point?

8        A.   Depends on -- I need you to re-ask that question

9    because two to three minutes is a long time.

10       Q.   I see.  So sometime it might have been pointed

11   center mass and other times maybe not?

12       A.   Yes, sir.  Low-ready.

13       Q.   Other time it was at low-ready?

14       A.   Yes, sir.

15       Q.   At some point was Sergeant Gaytan talking to

16   Mr. Perez?

17       A.   Yes, sir.

18       Q.   And did Sergeant Gaytan indicate words to the effect

19   that they were going to have to take him into custody?

20       A.   I can't say that's verbatim.

21       Q.   That's why I said words to the effect.

22            I'm not asking for verbatim.

23       A.   Can you re-ask that question?

24       Q.   Sure.  ==Did Sergeant Gaytan say something to==

25   ==Mr. Perez along the lines of they were going to have to take==

```
 1   him into custody?

 2        A.   Yes, that's correct.

 3        Q.   And at some point after Sergeant Gaytan said that,

 4   did you see Mr. Perez take a step back?

 5        A.   Yes, sir.

 6        Q.   And that would be with his left foot?

 7        A.   Yes, sir.  Left leg, yes, sir.

 8        Q.   And after he took the step back, did you hear

 9   less-lethal being deployed?

10        A.   Yes, sir.

11        Q.   And was that the 40-millimeter?

12        A.   Yes, sir.

13        Q.   And that was fired by Deputy Stone?

14        A.   Yes, sir.

15        Q.   And was Deputy Stone still positioned behind you?

16        A.   I do not know where he was positioned, sir, at that

17   time.

18        Q.   Was there any warning that less-lethal was going to

19   be deployed?

20        A.   We were advised that it was going to be deployed

21   prior to him deploying it.

22        Q.   Who advised you of that?

23        A.   It was part of our tactical plan.

24        Q.   And what was the tactical plan as to when

25   less-lethal was going to be deployed?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Christina  Olivas on 10/03/2023                                    Page 21

```
 1        A.    Whenever he made any furtive movements towards the
 2   gun, Deputy Stone would deploy the less-lethal.
 3        Q.    Was there anything in the tactical plan discussed
 4   that if he made a furtive movement towards the gun, lethal
 5   force would be used?
 6        A.    No, sir.
 7        Q.    Did Deputy Stone yell out that he was going to
 8   deploy less-lethal before he did?
 9        A.    No, sir.
10        Q.    Was Mr. Perez given any verbal warning that
11   less-lethal was going to be deployed?
12        A.    No, sir.
13        Q.    Could you tell if the initial 40-millimeter round
14   struck Mr. Perez?
15        A.    No, sir.
16        Q.    Did it appear to strike him?
17        A.    Yes, sir.
18        Q.    And could you tell what part of his body it
19   struck?
20        A.    I believe it was center mass, somewhere in the
21   center mass, sir.
22        Q.    And center mass, would that be the chest-stomach
23   area?
24        A.    Like upper -- can I describe it?
25        Q.    Sure.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina Olivas on 10/03/2023**                                    Page 22

```
 1        A.   Like upper this, and then that's the lower
 2    abdominal, abdomen.
 3        Q.   Somewhere like in between the waist and the top of
 4    the shoulders?
 5        A.   Yes, sir.
 6        Q.   And what did you see that made you think that the
 7    40-millimeter struck him?
 8        A.   He had kind -- he kind of was like caught by
 9    surprise, and then he had leaned a little forward.
10        Q.   Was there a second 40-millimeter fired?
11        A.   Yes, sir.
12        Q.   And how much time passed would you estimate between
13    the first 40-millimeter and the second 40-millimeter?
14        A.   Approximately a second, sir.
15        Q.   And could you tell if the second 40-millimeter
16    struck him?
17        A.   Yes, sir.
18        Q.   And where did that strike him, if you know?
19        A.   I would say center mass again.
20             However, he's angled at this time.
21        Q.   When you say he's angled, did it look like he was
22    starting to rotate to his left?
23        A.   Yes.  He was turning back at this time.
24        Q.   Are you familiar with the terms clockwise and
25    counterclockwise?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina Olivas on 10/03/2023**                    Page 24

```
 1   as well?

 2        A.   I believe so.  Yes, sir.

 3        Q.   And what did you see that led you to believe that?

 4        A.   I believe I saw the projectile fall forward.

 5        Q.   Okay.  And you're still in your same position at

 6   this point?

 7        A.   Yes, sir.

 8        Q.   Do you know if there was a third 40-millimeter

 9   fired?

10        A.   I do not know, sir.

11        Q.   Did you fire at some point after you heard the

12   second -- strike that.

13             Did you fire at some point after you heard the

14   second 40-millimeter round?

15        A.   Yes, sir.

16        Q.   And how much time would you estimate passed from you

17   hearing the second 40-millimeter round to you firing your

18   first shot?

19        A.   I would say approximately half a second, sir.

20        Q.   And where were you aiming?

21        A.   Center mass, sir.  But at that time he was already

22   angled and moving.  So it was center mass, but the right --

23   the right portion of his center mass.

24        Q.   The right side of his center mass?

25        A.   Yes, sir.
```

```
 1      A.   He's leaning at this point.  So I don't know what

 2  he's doing with his feet, sir.

 3      Q.   So your first shot, he was standing.

 4           The second shot, he was on his feet, but leaning

 5  forward; is that correct?

 6      A.   Yes.

 7      Q.   And the third shot, it sounds like he's leaning

 8  forward, but you're not sure about his feet?

 9      A.   I'm not sure if it's bent.  I'm not sure exactly

10  what they're doing because the pool table is right there.

11      Q.   At some point do you see him diving behind the pool

12  table?

13      A.   Yes, sir.  The front of the pool table.

14      Q.   That would be the side of the pool table furthest

15  from you?

16      A.   Yes, sir.  The north -- north end of the pool

17  table.

18      Q.   Did you see him diving behind the pool table before

19  or after your last shot?

20      A.   It was during my second and third shot that he was

21  leaning forward, diving.

22      Q.   At least in my mind, when I think of leaning forward

23  and someone diving, it could be different because diving I'm

24  kind of envisioning someone like in mid air diving behind

25  something.
```

1        So when you say diving, what do you mean?

2    A.   I mean he's running forward and jumping towards the

3    area in front of the pool table, going down.

4    Q.   So you're saying you would have observed that at

5    some point after your first shot?

6    A.   Yes, sir.

7    Q.   So what you characterize as a diving motion would

8    have been at some point after Deputy Stone fired the two

9    40-millimeter rounds and you fired your first round?

10   A.   When he starts -- can you ask that question one more

11   time?

12   Q.   Sure.  This leaning forward that you described and

13   diving motion would have been after Deputy Stone fired his

14   two 40-millimeter rounds and after you fired your first

15   round?

16   A.   Yes, sir.

17   Q.   And when you were firing your rounds, do you know if

18   any other officers were also firing rounds at that point?

19   A.   I do not know, sir.  I was focused on the threat.

20   Q.   Did you have any training on the 40-millimeter?

21   A.   Yes, sir.

22   Q.   Have you ever fired it before in training?

23   A.   Yes, sir.

24   Q.   Have you ever fired in the line of duty?

25   A.   Yes, sir.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina Olivas on 10/03/2023**                                    Page 49

```
 1    him verbally threaten anyone?

 2        A.   No, sir.

 3        Q.   Did you hear him say anything at all during the 20

 4    minutes you were there?

 5        A.   Yes, sir.

 6        Q.   What did you hear him say?

 7        A.   It was responses to the negotiation, sir.

 8        Q.   Do you recall anything generally that he said?

 9        A.   Yes.  He asked what he was going to jail for.

10        Q.   And what was the response, if you remember?

11        A.   Depends on who we're speaking in reference to.

12             Because Alcala had a response and Gaytan had a

13    response, sir.

14        Q.   What was Alcala's response?

15        A.   Alcala's response was, "Hey, it's just a -- it's

16    just a misdemeanor.  It's for trespassing.  However, you did

17    have a gun on you."

18        Q.   And what was Gaytan's response?

19        A.   It was very similar, "It's just a misdemeanor, let

20    us sit you down, search you out, make sure you have no other

21    weapons.  We can talk about it."  And then he can't promise

22    that he wasn't going to go home tonight or go to jail, but it

23    wasn't the end of the world.

24        Q.   And is that about the time he took that step back?

25        A.   Yes, sir.
```

1       Q.   And then almost immediately after he took the step

2   back, you heard the 40-millimeter being deployed?

3       A.   Yes, sir.

4       Q.   Did you have a sense when he was sitting down on

5   that bar stool, how close it was to the end of the pool table

6   on the three side?

7       A.   I don't understand your question, sir.

8       Q.   Yeah.  So remember we did the one, two, and three

9   side?

10          I'm trying to figure out if you could tell how close

11  the bar stool was to the end of the pool table when he was

12  sitting down.

13      A.   Just where he was.  I don't -- I could approximate a

14  distance from how close he was to the table.

15      Q.   Yeah.  Just give me an estimate.

16      A.   I would say two feet, sir.

17      Q.   Okay.

18          MR. GALIPO:  Could you hear that, Jinna?

19          COURT REPORTER:  Yes.  Two feet.

20          MR. GALIPO:  Okay.  Great.

21  BY MR. GALIPO:

22      Q.   What did you do immediately after you fired your

23  last shot?

24      A.   Kind of vague.  I did a lot, sir, afterwards.

25      Q.   No.  I said immediately afterwards.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina Olivas on 10/03/2023**                    Page 52

```
 1      A.   I could hear it, sir.

 2      Q.   How long was he breathing for?

 3           Was it the whole time until the officers

 4   approached?

 5      A.   Yes, sir.

 6      Q.   Can you describe the sound that you heard?

 7           Was it like -- how would you describe it?

 8           Heavy breathing?

 9      A.   I'll trying to mimic it.  It was -- like that.

10      Q.   Okay.

11           MR. GALIPO:  You don't have to take that down,

12   Jinna.

13   BY MR. GALIPO:

14      Q.   Did you see anybody move the gun at any point after

15   the shooting?

16      A.   Deputy Stone had kicked the gun, sir.

17      Q.   Kicked it where?

18      A.   Away from Perez, sir.

19      Q.   Do you know where it ended up?

20      A.   No, sir, I did not.

21      Q.   Was that the first time you actually saw the gun

22   after the shooting?

23      A.   Yes.  As we were -- as I was approaching, yes, sir,

24   that was the first time.

25      Q.   Do you know if the agency that you worked for at the
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Christina Olivas on 10/03/2023                                    Page 57

```
 1      Q.   I'm sorry?

 2      A.   I approached Perez and my team, yes.

 3      Q.   Okay.  When you finally approached him, was he still

 4  breathing?  Could you hear breathing?

 5      A.   I'm not sure.  I was listening to voices, and they

 6  had -- they were asking me questions and stuff.

 7           So I'm not sure.

 8      Q.   And do you know how long it was before the

 9  paramedics got to Mr. Perez?

10      A.   I would estimate -- what are we referring to?

11           What time?

12      Q.   So from the time of the shooting, do you know how

13  much time passed until the paramedics got to him?

14           It sounds like you said it was four or five minutes

15  before the officers approached; is that right?

16      A.   Yes.  Once we rendered or when my team rendered

17  Perez safe and handcuffed him, AMR was immediately told to

18  respond to the team from -- I mean, respond to the scene from

19  the command post.

20      Q.   And do you know how much time after he was

21  handcuffed it took the paramedics to get to him?

22      A.   I would estimate under a minute.

23           They were half a block away.

24      Q.   And at the point he was handcuffed, Mr. Perez, do

25  you know if he was still breathing?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina  Olivas on 10/03/2023**                                    Page 58

```
 1      A.   I believe he was still breathing, sir.

 2      Q.   Did you hear him say anything after he was shot?

 3      A.   No, sir.

 4      Q.   Did you have an understanding as to where his family

 5  members were at the time of the shooting?

 6      A.   No, sir.

 7      Q.   So with respect to your training on deadly force,

 8  were you trained that deadly force is the highest level of

 9  force an officer can use?

10      A.   Yes, sir.

11      Q.   And were you trained it should only be used if there

12  is an immediate or imminent threat of death or serious bodily

13  injury to the officer or others?

14      A.   Yes, sir.

15      Q.   Were you trained about the reverence for human

16  life?

17      A.   I don't understand that question.

18      Q.   Do you recall being trained that deadly force should

19  only be used when no other reasonable options are

20  available?

21      A.   I still don't understand.  Can you repeat that?

22      Q.   Sure.  Do you recall being trained at the academy

23  that deadly force should only be used when no other

24  reasonable options are available?

25      A.   We don't have to refer to other options if there is
```

Exhibit "G"

Exhibit "G"

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    A.J.P. and A.M.P., minors, by and      )
     through their guardian ad litem        )
5    Cynthia Nunez, individually and as     )
     successor in interest to Albert Perez,)
6    deceased, and PATRICIA RUIZ,           )
     individually,                          )
7                                           )
                    Plaintiffs,             )
8                                           )
                    vs.                     )Case No.
9                                           )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES     )
10   1-10, inclusive,                       )
                                            )
11                  Defendants.             )
     _____)
12

13

14

15            REMOTE VIDEOCONFERENCE DEPOSITION OF

16                         JOSHUA STONE

17                     DECEMBER 14, 2023

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  30390

```
 1                UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.J.P. and A.M.P., minors, by and    )
     through their guardian ad litem      )
 5   Cynthia Nunez, individually and as   )
     successor in interest to Albert Perez,)
 6   deceased, and PATRICIA RUIZ,         )
     individually,                        )
 7                                        )
                   Plaintiffs,            )
 8                                        )
                   vs.                    )Case No.
 9                                        )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES   )
10   1-10, inclusive,                     )
                                          )
11                 Defendants.            )
     _____)
12

13

14

15          The remote videoconference deposition of JOSHUA

16   STONE, taken on behalf of the Plaintiffs, beginning at 10:05

17   a.m., and ending at 11:40 a.m., on December 14, 2023, before

18   Jinna Grace Kim, Certified Stenographic Shorthand Reporter

19   No. 14151.

20

21

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  SHANNON J. LEAP, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  sleap@galipolaw.com
 8

 9    For the Defendants:

10            MANNING & KAZZ ELLROD, RAMIREZ, TRESTER, LLP
              BY:  KAYLEIGH ANDERSON, ESQ.
11            801 South Figueroa Street, 15th Floor
              Los Angeles, California 90017
12            Tel:  213-624-6900
              Fax:  213-624-6999
13            E-mail:  kaa@manningllp.com

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   was under the influence of alcohol or drugs?

 2       A.   No, sir.

 3       Q.   Now, when you initially saw him sitting in the

 4   chair, at some point did you see a gun in his hand?

 5       A.   Not at first.  I received information over the radio

 6   and I passed that information on to Deputy Olivas, but I

 7   could not see the -- from maybe his mid section down, it was

 8   obstructed by the pool table.

 9            So not at first, but later I was able to.

10       Q.   Did you receive some information, though, previously

11   that he had a gun in his hand?

12       A.   Yes, sir.

13       Q.   And when did you receive that information in

14   relation to the shooting?

15       A.   That info was given to us prior to me even getting

16   set up in my position, and then it was confirmed again by my

17   partners on my team when we were in position.

18       Q.   And when did you first see the gun in his hand?

19       A.   As he was placing it on the floor, I was able to see

20   where his feet were, and I could see the gun being placed on

21   the floor.

22       Q.   Do you know if someone asked him to put the gun

23   down?

24       A.   I believe so, yes.

25       Q.   Do you know who was giving those commands?
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                              Page 21

```
 1      A.   That would be -- first, it would be Deputy Alcala
 2   who was our person negotiating with him for some time.
 3      Q.   And when he put the gun down, you were able to see
 4   that?
 5      A.   Yes, sir.
 6      Q.   And where did he put the gun down?
 7      A.   Pretty much right in front of him from where he was
 8   sitting.
 9      Q.   And I take it from your perspective that was an act
10   of compliance, at least potential act of compliance?
11      A.   Yes, sir.
12      Q.   And you understood that he put the gun down after
13   being asked to do so?
14      A.   Yes, sir.
15      Q.   And were you still in the same general position that
16   you previously described when he put the gun down?
17      A.   I was, sir.
18      Q.   And then at some point, if you know, was he told to
19   stand up?
20      A.   He was.  He was told numerous times, and he
21   eventually did that.
22      Q.   Was that another at least act of compliance from
23   your perspective?
24      A.   It was.
25      Q.   Was he told at some point to walk forward or walk
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                                    Page 22

```
 1    towards the officers?

 2         A.    Yes, sir, he was.

 3         Q.    And was it Deputy Alcala who was the primary person

 4    giving him the commands initially?

 5         A.    Yes, initially.

 6         Q.    And at some point Sergeant Gaytan also took over

 7    some of the commands?

 8         A.    That's correct, sir.

 9         Q.    And when he walked forward, how would you describe

10    his pace or gait?

11              Was it fast, or slow, or however you want to

12    describe it?

13         A.    It started out slow.  I wouldn't consider it fast,

14    but it's almost like he was unsure of what he wanted to do.

15    After couple of steps it was turned into maybe like a normal

16    walk.  There wasn't very far to go.  So he didn't walk a

17    great distance before he was instructed to stop.

18         Q.    Who instructed him to stop?

19         A.    Sergeant Gaytan.

20         Q.    And did he stop when he was instructed to?

21         A.    Yes, sir.

22         Q.    So would you at least agree there were at least four

23    acts of compliance, at least initially?

24              Putting the gun down would be one; standing up would

25    be two; walking forward would be three; and stopping would be
```

```
1    approximately to the end of the table that we could see in

2    this photograph?

3         A.   Yes, sir.

4         Q.   And would you still have been positioned in the

5    general area you described previously?

6         A.   That's correct, sir.

7              I hope I'm not getting ahead, but I did not move

8    from my position.

9         Q.   That's good.  No, you're not getting ahead.

10             That's fine.  Now, you're saying once he got I guess

11   to the end or passed the end of the pool table, you were able

12   to see his hands?

13        A.   That's correct, sir.

14        Q.   And were his hands by his side at that point?

15        A.   Yes, sir.

16        Q.   And did his hands at least at that point appear to

17   be visually empty?

18        A.   That's correct, sir.

19        Q.   And during the time he was stopped, is that when at

20   some point Sergeant Gaytan took over some of the commands?

21        A.   Yes, sir.

22        Q.   When you fired your first 40-millimeter round, would

23   Mr. Perez had been generally at the end of that pool table,

24   but took a step like backwards and slightly rotated his upper

25   body towards you?
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                          **Page 27**

1      A.    Yes, that's correct.  He -- when I deployed my first

2   round, he had already stepped and turned his body.

3          So he was facing me.

4      Q.    So when you fired your first round, Mr. Perez would

5   have been in the area at the end of the pool table closest to

6   the threshold of the garage, but he kind of would have

7   stepped with his left foot back and rotated his body to his

8   left so now his upper body is more facing in your

9   direction?

10     A.    That's correct, sir.  I can go into more detail if

11  you would like.

12     Q.    Sure.  Go ahead.

13     A.    So when Mr. Perez was in -- well, when Sergeant

14  Gaytan was negotiating with Mr. Perez, he was not facing me.

15         He was facing the team on the left-hand side of the

16  garage.  I did not have a direct line of sight through my

17  multi-launcher to his chest or abdomen which would have been

18  my preferred point of aim.

19         My direct impact area of his body would have been

20  his shoulder, arm, or leg based off of the direction he was

21  facing as he was at the end of the pool table.

22         When I fired my -- I'm sorry -- when I deployed my

23  first round, he hit -- he had presented his torso and chest

24  area to me as he was turning around.  It was at that time I

25  deployed the round, and he -- it was a pretty decedent size

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                    Page 28

1    step back.  So he was kind of -- so we're looking at the

2    picture right now.  He was in between the end the of the pool

3    table and the end of the green sticker when I deployed my

4    first round if that makes sense.

5              If you need me to elaborate, I can, sir.

6              I hope it's not confusing you.

7    Q.    No.  That's helpful.  Thank you for that.

8              So where were you aiming when you fired your first

9    round?

10        A.    I was aiming the upper abdomen area.

11        Q.    And do you -- could you tell whether your first

12   round struck him or not?

13        A.    I was pretty confident that the first round struck

14   him, yes, sir.

15        Q.    And where did it appear to strike Mr. Perez?

16        A.    It was pretty close to where I was aiming, but he

17   was a moving target.  So I feel like the rounds might have

18   struck him in his chest area instead of his abdomen.

19        Q.    And prior to that had Sergeant Gaytan told you that

20   if he makes any movements backwards, to deploy less-lethal?

21        A.    That's correct, sir.  It was discussed in our brief

22   prior to us taking our positions, and it was also reiterated

23   on our radios during the incident while we were in our

24   positions.

25        Q.    So are you saying that there was a discussion about

1  him stepping backwards or to use less-lethal even before he

2  got out of the chair?

3      A.   No.  The discussion during our briefing was if we

4  were able to get separation with him and the firearm, we were

5  going to continue with negotiations hoping that we don't need

6  to use any sort of force.  Once that separation occurs, if he

7  was to make a motion back towards the firearm, we were going

8  to immediately deploy less-lethal.

9      Q.   Okay --

10     A.   Go ahead, sir.

11     Q.   I didn't mean to cut you off.  Go ahead.

12     A.   Yes.  So it was relayed again over the air over the

13  radio for all of us to hear is because of that separation

14  that we had.  He had separated himself from the firearm, but

15  he was still in a close proximity to it.

16          So Sergeant Gaytan readvised if he makes a motion

17  towards the firearm, to deploy less-lethal.

18     Q.   Was there anything ever discussed in the briefing

19  that if he steps backwards or makes a motion towards the

20  firearm, to use less-lethal on him?

21     A.   No, sir, not that I can remember.  That's not

22  something -- we don't -- we generally don't talk about using

23  lethal force in a briefing because it's not usually part of

24  our primary plan.  If we can avoid it, obviously.

25          Hopefully, that makes sense.

```
 1       Q.    Yeah.  I mean one of the goals in any tactical

 2   operation is to safely take the person into custody; is that

 3   fair?

 4       A.    That's correct, sir.

 5       Q.    And one of the goals is to use the minimal amount of

 6   force if you can?

 7       A.    Yes, sir.

 8       Q.    Because the safety of the suspect is also part of

 9   the training?

10       A.    Absolutely.

11       Q.    So when you fired your first 40-millimeter, what

12   would you estimate the distance to be between yourself and

13   Mr. Perez?

14             And I have the photos pulled up if that helps you.

15       A.    I appreciate that because that does help.

16             I would guess-estimate -- I don't -- I'm sorry to

17   use the word guess-estimate.  I would estimate probably

18   around 15 feet.

19       Q.    Okay.  And I'm assuming that the chair was still in

20   the same position it was he was sitting on when he got up?

21       A.    Yes, yes, sir.  I believe that's to be correct.

22       Q.    And the gun was somewhere close to the chair on the

23   floor?

24       A.    Yes, sir.

25       Q.    And how far do you think Mr. Perez was from the
```

1    chair when you fired your first round?

2        A.    My opinion was a few steps because it look him a few

3    steps to get to the end of the pool table.

4        Q.    **I'm looking for feet.**

5        A.    I'm sorry.

6        Q.    **You gave me 15 feet that you were, and I'm just**

7    **looking at this pool table imagining where you described him.**

8              **And I'm wondering how many feet do you think he was**

9    **from the chair when you fired your first round.**

10       A.    I would say six to eight feet.

11       Q.    **Now, would you agree that as soon as you hit him**

12   **with the first round, he immediately started moving towards**

13   **the back of the pool table?**

14       A.    Actually, not to be disrespectful, sir, but I would

15   not agree in my opinion.  He already made that movement prior

16   to me deploying my first round.

17       Q.    **Okay.  Let's see.**

18             MR. GALIPO:  Shannon, could we put up Page 13 of the

19   officer's transcribed statement.

20             MS. LEAP:  Yeah.  One moment.

21             Having some technical difficulties.  It will take

22   just a minute.

23             MR. GALIPO:  Okay.  I'll keep talking.

24   BY MR. GALIPO:

25       Q.    **Do you recall in your statement saying that the**

```
 1   shots being fired at about the same time as your third

 2   40-millimeter?

 3        A.   That would be accurate; right around that time.

 4        Q.   And was Mr. Perez still on his feet at least at that

 5   point?

 6        A.   That's a -- I believed him to be still on his feet,

 7   but it would be hard for me to tell you 100 percent because

 8   he was going downward towards the ground.

 9        Q.   But you would agree you did not see a gun in his

10   hand after he got up and moved forward prior to your third

11   round; is that correct?

12        A.   That's correct, sir.

13        Q.   And could you see where the gun was on the ground

14   from your perspective?

15        A.   Would that be during the deployment of the

16   less-lethal?

17        Q.   No.  Before the deployment.

18        A.   Yes, I did see where it was on the floor.

19        Q.   And did you ever see him grab that gun again, you

20   yourself see his hand come in contact with it?

21        A.   No, sir.

22        Q.   And did you feel that when Mr. Perez was moving

23   towards the end of the pool table, he maybe was going to use

24   the pool table as cover?

25        A.   If you're asking me what I felt, I felt that he was
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                        Page 46

1   going back towards the weapon; he was going to grab the

2   weapon and use the pool table as cover and engage us.

3           That's -- I'm sorry, sir.  That's what I felt.

4       Q.   Okay.  So you went to cover to protect yourself from

5   being shot essentially?

6       A.   Yes, sir.

7       Q.   And your impression was that Mr. Perez was also

8   moving towards cover?

9       A.   I actually think he was moving towards the weapon,

10  and the weapon happened to be behind cover.

11      Q.   Okay.  And you saw him making those movements to the

12  end of the pool table -- I think you indicated in your

13  statement that after your first shot is when he darted

14  towards the back of the pool table; correct?

15      A.   He was moving, turning during right before my first

16  slot, and then after my first shot, it was a very, very

17  overt -- he turned all the way around and was moving

18  quicker.

19      Q.   Did you hear him say, "Ahh" or "Ouch" at some point

20  when you fired your less-lethal?

21      A.   I heard -- I'm sorry -- I heard a noise.

22          I don't feel comfortable saying exactly what the

23  noise was, but I believed it was coming from Mr. Perez.

24      Q.   Was that essentially the only sound you heard from

25  him the whole time?

```
 1   trigger, they never fired at him?

 2        A.   That's correct.

 3        Q.   Even though he had a gun in his hand?

 4        A.   That's correct, sir.

 5        Q.   And then when you got there your understanding was

 6   the gun was either in his hand or somewhere in his lap?

 7        A.   Yes, sir.

 8        Q.   And nobody ever fired during that time frame?

 9        A.   That's correct, sir.

10        Q.   And at some point as we discussed, he put the gun

11   down after being requested to do so, stands up after being

12   requested to do so, walks forward after being requested to do

13   so, and stops after being requested to do so; is that

14   correct?

15        A.   Yes, sir.

16        Q.   And when he was in that stopped position, he is

17   having some conversation with Sergeant Gaytan?

18        A.   Yes, sir.

19        Q.   And at some point he takes a step back with his left

20   foot and rotated his upper body in your direction?

21        A.   Yes.  So we were making what I considered to be good

22   progress.  I felt prior to the deployment that we were headed

23   towards a peaceful resolution.

24             Sergeant Gaytan actually did have some communication

25   with Mr. Perez, but Mr. Perez did ask if he was going to be
```

 1   going to jail, and Sergeant Gaytan told him, not verbatim,

 2   but told him, yes, at this time you'll be going to jail.

 3          And that's when Mr. Perez's demeanor changed.

 4          I could see the look on his face.  He shook his face

 5   no, and it was shortly after that that he took a step back.

 6          And that's when I deployed my rounds.

 7     Q.   And you already indicated the position he was in at

 8   the time you fired your first and second rounds?

 9     A.   Yes, sir.

10     Q.   Which came very close in time the first and second

11   round?

12     A.   Yes, sir.

13     Q.   And I think you indicated at the time of your second

14   round, he might have been more in the middle of the pool

15   table on that side?

16     A.   Yes, sir.

17     Q.   And by the time of your third round, he was more

18   towards the corner of the pool table closer to where the

19   chair and the gun were?

20     A.   Yeah.  To be a little more accurate, maybe from the

21   middle to the rear, that portion of the pool table if that

22   helps.

23     Q.   That's helpful.  And that's when you heard the

24   lethal rounds starting?

25     A.   That's correct, sir.

```
 1      Q.   So have you heard the term before "situational

 2  awareness?"

 3      A.   Yes, sir.

 4      Q.   Were you aware that some of those lethal rounds at

 5  the time that Mr. Perez was in between the middle and the end

 6  of the pool table were being fired by the other officers?

 7      A.   Yes.  I heard them.

 8      Q.   And did you realize they were other officers that

 9  were firing at that time?

10      A.   I assumed so, yes.

11      Q.   Because, obviously, Mr. Perez had not gotten to the

12  area of the gun yet; correct?

13      A.   In my opinion he -- by the time he -- the lethal

14  rounds started going off, he was in arms' reach of the

15  firearm.

16      Q.   But you hadn't seen him grab the gun?

17      A.   Oh, no.  I could not confirm if he grabbed it.

18           I did not see that myself.

19      Q.   Okay.  And I take it you heard some gunshots being

20  fired after you went to a position of additional cover; is

21  that fair?

22      A.   That's correct, sir.

23      Q.   Do you now know that those additional shots were

24  being fired by other officers?

25      A.   I do now, sir.
```

Exhibit "H"

Exhibit "H"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


A.J.P. and A.M.P., minors,      ) Case No. 5:22-cv-01291-
by and through their guardian   )        SSS-SHK
ad litem Cynthia Nunez,         )
individually and as successor   )
in interest to Albert Perez,    )
deceased; and PATRICIA RUIZ,    )
individually                    )
                                )
              Plaintiffs,       )
                                )
      vs.                       )
                                )
COUNTY OF SAN BERNARDINO; and   )
DOES 1-10, inclusive,           )
                                )
              Defendants.       )
_____ )


DEPOSITION OF DEPUTY ANTHONY ALCALA

APPEARING REMOTELY FROM SAN BERNARDINO, CALIFORNIA

THURSDAY, DECEMBER 28, 2023


REPORTED BY:

JOHANNA MANGUAL LEDESMA, RPR, CSR 6951

APPEARING REMOTELY FROM VENTURA COUNTY, CALIFORNIA

```
 1   REMOTE VIDEO CONFERENCE DEPOSITION OF DEPUTY ANTHONY

 2   ALCALA, TAKEN PURSUANT TO NOTICE ON BEHALF OF THE

 3   PLAINTIFFS, ON THURSDAY, DECEMBER 28, 2023, AT 10:02 A.M.,

 4   SAN BERNARDINO, CALIFORNIA, BY JOHANNA MANGUAL LEDESMA,

 5   CERTIFIED SHORTHAND REPORTER NO. 6951.

 6

 7

 8                        REMOTE APPEARANCES

 9

10   FOR THE PLAINTIFFS:

11           LAW OFFICES OF DALE K. GALIPO
             BY:  SHANNON J. LEAP, ATTORNEY AT LAW
12           21800 BURBANK BOULEVARD, SUITE 310
             WOODLAND HILLS, CALIFORNIA 91367
13           (818) 347-333
             Sleap@galipolaw.com
14

15
     FOR THE DEFENDANT COUNTY OF SAN BERNARDINO:
16
             MANNING & KASS
17           ELLROD, RAMIREZ, TRESTER LLP
             BY:  KAYLEIGH ANDERSEN, ATTORNEY AT LAW
18           801 SO. FIGUEROA STREET, 15TH FLOOR
             LOS ANGELES, CALIFORNIA 90017
19           (213) 624-6900
             Kaa@manningllp.com
20

21

22

23

24

25
```

```
 1       Q.    Sure.  So the unit that was attached to the

 2   garage, was it your understanding at the time that you

 3   responded that that unit did not have the residents inside

 4   of it?

 5       A.    I did not have any information on that, no.

 6       Q.    Okay.  Where was Mr. Perez when you first saw

 7   him?

 8       A.    He was inside the garage sitting down.  I don't

 9   know if it was a chair or stool.  It looked like a chair

10   to me.  He was sitting -- so if we're talking about

11   looking inside a garage, he was sitting in the middle of

12   the garage, and there was a pool table separating him from

13   the roll-up door to where he was sitting.  So he was kind

14   of sitting, I would say, the head of the pool table.

15            So he was sitting at the head of the pool table

16   with his back against, not against, but his back was

17   towards the door from the garage into the apartment.

18       Q.    So his, the front of his body was facing you?

19       A.    Yes.

20       Q.    Okay.  And facing the inside of the garage,

21   where were you when you first saw Mr. Perez?

22       A.    I approached the east side of the garage.  So if

23   you're looking at the garage, it would be the right-hand

24   side.

25       Q.    Okay.  And if you can approximate, how many feet
```

```
 1      A.     And that's when the SED got there?

 2      Q.     Right.  So you estimated that you were with the

 3   initially responding patrol deputies for an hour.  And

 4   then I'm curious how long you were there from after the

 5   SED deputies responded.

 6      A.     To my recollection, it was 10 to 15 minutes.

 7      Q.     Okay.  So would you estimate that you were at

 8   the garage for about an hour and 15 minutes or so before

 9   the shooting?

10      A.     Yes, approximately.

11      Q.     And in that hour and 15 minutes, did you ever

12   see Mr. Perez point the gun at any of the officers?

13      A.     No, I did not.

14      Q.     And during that hour and 15 minutes, did you

15   ever see Mr. Perez fire the gun at anyone or anything?

16      A.     No, I did not.

17      Q.     During that hour and 15 minutes, did you ever

18   see Mr. Perez raise the weapon from where it was in his

19   hand at the direction of anyone?

20      A.     I did not see him raise the weapon, no.

21      Q.     Did you hear him verbally threaten to harm any

22   of the deputies during that time period?

23      A.     No, I did not.

24      Q.     Did you give Mr. Perez any orders to put the gun

25   down?
```

**A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Deputy Anthony Alcala on 12/28/2023                                    Page 33

```
 1       A.     I did.

 2       Q.     And at some point did you learn that Mr. Perez

 3    did put the gun down?

 4       A.     Yes.

 5       Q.     And how did you learn that?

 6       A.     Deputy Stone relayed that information based on

 7    his observations of watching Mr. Perez put the gun down.

 8    So he relayed that to myself and Olivas that were on the

 9    same side of the garage together.

10       Q.     Okay.  Did he relay that, if you know, over the

11    radio or did he just tell you verbally in person?

12       A.     I do not know if he relayed that on the radio or

13    not.

14       Q.     So you heard him just from him verbally telling

15    you?

16       A.     He did say it out loud, yes.

17       Q.     Okay.  And did you consider the active

18    putting-the-gun-on-the-ground an act of compliance?

19       A.     Initially, yes.

20       Q.     And did you have an understanding as to where he

21    placed the gun, Mr. Perez placed the gun in relation to

22    the chair he was sitting on?

23       A.     I did not see where he put the gun down, no.

24       Q.     Okay.  Did you receive any information from

25    Mr. -- from Deputy Stone as to where the gun was when he
```

**A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Deputy Anthony Alcala on 12/28/2023                                    Page 34

```
 1    placed it down?

 2        A.    I'm sorry.  He said he put the gun down.

 3    Deputy Stone said Perez put the gun down and I'm not sure

 4    if he said on the ground or where he exactly put it.

 5        Q.    Okay.  Thank you for clarifying.

 6              And were you able to see Mr. Perez at that point

 7    when he -- when you received the information that he put

 8    the gun down?

 9        A.    Yes.

10        Q.    Okay.  And was he still in the same position in

11    the chair when you received that information?

12        A.    Yes.

13        Q.    Once Mr. Perez put the gun down, were you still

14    the primary deputy on scene communicating with him?

15        A.    Yes.  I was still the primary negotiator, yes.

16        Q.    Okay.  Did you give him any additional commands

17    after he put the gun down?

18        A.    Yes.  I continued to communicate and negotiate

19    with Mr. Perez, yes.

20        Q.    And do you remember what those communications

21    entailed?

22        A.    Yes.

23        Q.    And what do you remember?

24        A.    I remember him -- I remember praising him,

25    applauding him for putting the gun down, for complying
```

**A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Deputy Anthony Alcala on 12/28/2023                                         Page 35

```
 1    with that.  Then I just continued to speak to him, you

 2    know, reassuring him that, you know, we did not want any

 3    violence.  We wanted to end the situation peacefully.

 4              You know, I tried to encourage him to stand up,

 5    walk, walk towards us so we can, so the SWAT operators

 6    could detain him, handcuff him and in hopes that he would

 7    continue to want to or start to talk to me and we can talk

 8    in person without any weapons or violence.  So that was

 9    what I was working towards as far as negotiating with him,

10    just trying to get him to surrender peacefully and

11    encourage him to do that.

12        Q.    So did the communications that you had with

13    Mr. Perez include commands that he stand up?

14        A.    I did -- I did ask him.  I did encourage him to

15    stand up and walk towards us.  Yes.

16        Q.    Okay.  And at some point do you know if

17    Mr. Perez did stand up from the chair?

18        A.    He did.

19        Q.    And did you consider that an act of compliance?

20        A.    Yes.

21              MS. LEAP:  I think this might be a good point to

22    take a break if that works for everyone.  We've been going

23    for about an hour.

24              MS. ANDERSEN:  Yes.

25              MS. LEAP:  Okay.  We can go off the record.
```

**A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Deputy Anthony Alcala on 12/28/2023                                    Page 41

```
 1      Q.    And when he rose them up, did he have anything
 2   in his hands --
 3      A.    No.
 4      Q.    -- that you could see I mean?
 5      A.    No, he did not.
 6      Q.    And before our break, we were at the point in
 7   time where Mr. Perez stood up from the chair.  And were
 8   there additional commands given to Mr. Perez once he stood
 9   up?
10      A.    Yes.
11      Q.    And were you still the primary or the only
12   deputy giving him commands at that point?
13      A.    I was primary until he got to a certain point
14   after he stood up.  Once he started to comply with walking
15   forward towards the SWAT operators on the left side, the
16   west side of the garage, Deputy Gaytan took over giving
17   him comprehension commands.
18      Q.    Okay.  Prior to him beginning to walk forward,
19   did you give him a command to walk forward?
20      A.    Yes.
21      Q.    Okay.  And did he start walking forward?
22      A.    Yes.
23      Q.    And did you also consider that act of walking
24   forward an act of compliance?
25      A.    Yes.
```

```
 1        Q.    Sure.
 2        A.    I would say from the time he stopped to when the
 3   less lethal rounds were deployed, I would say less than a
 4   minute.  And then when the lethal rounds were deployed,
 5   that's probably just around the same time, about a minute,
 6   a minute, couple of seconds if that.
 7        Q.    Okay.  And were you still in that same position
 8   near the deputies and near the, sort of the passenger side
 9   of that silver vehicle when Mr. Perez stopped?
10        A.    When he stopped, yes.
11        Q.    Okay.  So at this point when Mr. Perez had
12   stopped, would you agree that he'd made several acts of
13   compliance including dropping the gun, getting up,
14   walking, stopping?
15        A.    Yes.
16        Q.    And did sergeant -- or strike that.
17              Would you identify any other acts of compliance
18   that I did not list?
19        A.    No.  That's -- that pretty much summarizes it.
20        Q.    Did Sergeant Gaytan begin to give Mr. Perez some
21   commands at some point?
22        A.    Yes.
23        Q.    Was that when Mr. Perez stopped?
24        A.    Yes.
25        Q.    Okay.  And could you hear Sergeant Gaytan's
```

A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL
Deputy Anthony Alcala on 12/28/2023                          Page 48

```
 1   commands?
 2       A.    Yes.
 3       Q.    And can you remind me if he was on the same side
 4   of the garage as you were or was he on the other side of
 5   the garage?
 6       A.    The other side.
 7       Q.    Okay.  And did it look like at some point
 8   Mr. Perez took a step back with his left foot?
 9       A.    Yes, it did.
10       Q.    And did it appear that he started to turn to his
11   left at that point as well?
12       A.    Simultaneously, yes.
13       Q.    Okay.  And is that when you saw that the
14   40 millimeter was fired?
15       A.    Yes.  I heard it more than I saw it, yes.
16       Q.    Okay.  And the 40 millimeter, was that -- do you
17   know if that was fired from your side of the garage or
18   from the other side of the garage?
19       A.    From my side of the garage.
20       Q.    Okay.  So that would have been Deputy Stone?
21       A.    Yes.
22       Q.    Okay.  And did you see that the 40 millimeter
23   round struck him, Mr. Perez?
24       A.    I believe it did because after it was deployed,
25   when I heard the 40 millimeter deployment, Mr. Perez kind
```

A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL
Deputy Anthony Alcala on 12/28/2023                                    Page 49

1   of bent over to his left side which, based on my training

2   and experience, indicated that it did impact.

3        Q.   Okay.  And did you see if he, if Mr. Perez

4   continued to turn after the 40 millimeter appeared to

5   strike him?

6        A.   I do not know because I moved out of the way for

7   cover on the next driveway over.

8        Q.   Okay.  Could you hear the second less -- sorry.

9   Strike that.

10            Could you hear a second less lethal round fired?

11       A.   I did.

12       Q.   And could you approximate about how long after

13  the first less lethal round was fired, the second one was

14  fired?

15       A.   I couldn't put a timeline on it, but it was very

16  fast.  It was very quickly after the first deployment.

17       Q.   Okay.  Did you hear any other less lethal rounds

18  fired?

19       A.   In total, I believe I heard two to three total

20  of the 40 millimeter less lethal rounds deployed.

21       Q.   Okay.  And in your training and experience, do

22  less lethal rounds generally sound different from lethal

23  rounds?

24       A.   Yes.

25       Q.   Can you describe how they sound different from

Exhibit "I"

Exhibit "I"

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.J.P. and A.M.P., minors, by and     )
     through their guardian ad litem       )
 5   Cynthia Nunez, individually and as    )
     successor in interest to Albert Perez,)
 6   deceased, and PATRICIA RUIZ,          )
     individually,                         )
 7                                         )
                   Plaintiffs,             )
 8                                         )
                   vs.                     )Case No.
 9                                         )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES    )
10   1-10, inclusive,                      )
                                           )
11                 Defendants.             )
     _____)
12

13

14

15          REMOTE VIDEOCONFERENCE DEPOSITION OF

16                      LUKE GAYTAN

17                  DECEMBER 14, 2023

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  30390
```

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.J.P. and A.M.P., minors, by and      )
     through their guardian ad litem        )
 5   Cynthia Nunez, individually and as     )
     successor in interest to Albert Perez,)
 6   deceased, and PATRICIA RUIZ,           )
     individually,                          )
 7                                          )
                     Plaintiffs,            )
 8                                          )
                     vs.                    )Case No.
 9                                          )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES     )
10   1-10, inclusive,                       )
                                            )
11                   Defendants.            )
     _____)
12

13

14

15            The remote videoconference deposition of LUKE

16   GAYTAN, taken on behalf of the Plaintiffs, beginning at 1:26

17   p.m., and ending at 2:59 p.m., on December 14, 2023, before

18   Jinna Grace Kim, Certified Stenographic Shorthand Reporter

19   No. 14151.

20

21

22

23

24

25
```

1  was the daughter of home owner which is that caused the call

2  for service where he brandished the firearm to her.

3         And I believe she asked him what are you going to

4  do, shoot me?  And his response was "and?"  He didn't tell

5  her no or hey, you're safe.

6         That caused her to fear for her safety, and she ran

7  inside and locked the door behind her.

8     Q.   Did you have an understanding whether he verbally

9  threatened to harm any of the patrol officers?

10    A.   I'm sorry.  Can you rephrase the question?

11    Q.   Sure.  The patrol officers that were there before

12 you got there, were you told that he had verbally threatened

13 to harm any of them?

14    A.   No, sir.

15    Q.   And so when you first observed Mr. Perez, was he

16 sitting in the chair in the garage?

17    A.   Yes, sir.

18    Q.   And we have seen photographs in the other

19 depositions.

20         There was a pool table in this garage?

21    A.   Yes, sir.

22    Q.   And he would have been on the far end of the pool

23 table in the chair?

24    A.   Yes, sir.  He was -- the pool table was between him

25 and the deputies and then eventually him and us.

```
 1              Were you present when that happened?
 2       A.   Yes.
 3       Q.   And had anyone asked him, if you know, to put the
 4  gun down?
 5       A.   I'm sorry.  Can you re-ask the question?
 6       Q.   Did someone request him to put the gun down before
 7  he put it down?
 8       A.   I believe he at that point he had been asked --
 9  negotiations had been attempting for I believe at that time
10  three-plus hours, and during multiple times during that
11  negotiation, he was asked the to put the gun down.
12       Q.   It was Deputy Alcala doing some of the communicating
13  when you got there?
14       A.   Yes.  He is assigned or was at time assigned
15  negotiator with the Specialized Enforcement Division.
16       Q.   And did you actually see Mr. Perez put the gun
17  down?
18       A.   No, sir.
19       Q.   Were you present when that occurred, if you know?
20       A.   Yes, sir.
21       Q.   How did you learn that he had put the gun down?
22       A.   I believe Deputy Pollick brought my attention to
23  it.
24       Q.   And do you have an estimate as to how long you were
25  observing Mr. Perez before he put the gun down?
```

```
 1      A.   Yes, sir.

 2      Q.   And did he walk along one of the side of the pool

 3  table?

 4      A.   Yes, sir.  He walked along the east side.

 5           I apologize.  I misspoke.  He walked along the west

 6  side of the table which  was closest to my side.

 7      Q.   Okay.  So as you're looking into the open garage,

 8  the east side would be on the right, and the west side would

 9  be on the left?

10      A.   From our position facing the garage, that's

11  correct.

12      Q.   So as you're looking at the pool table, he would be

13  walking towards you along the left side of the pool table?

14      A.   That's correct.

15      Q.   And you at least in your statement have him stopping

16  just slightly past the pool table?

17      A.   That's correct.

18      Q.   And how far past it would you estimate he stopped?

19      A.   I would estimate less than five feet.

20      Q.   And did anyone request him to stop?

21      A.   Yes, I did.

22      Q.   And when you requested him to stop, at some point

23  after that request he did stop?

24      A.   That's correct.

25      Q.   Would you at least agree that in the few minutes
```

```
 1      A.   Yes, sir.

 2      Q.   Was anybody on your team assigned to Taser?

 3      A.   Everybody in the Division is assigned a Taser.

 4      Q.   Did they have them on their persons, if you know, at

 5   the time that he ended up walking forward and coming to a

 6   stop?

 7      A.   I believe we had one, possibly two.

 8      Q.   And who do you believe had Tasers on them?

 9      A.   I believe Deputy Pollick and Deputy Stone --

10      Q.   Was that part -- go ahead.

11      A.   Sorry.  I don't recall specifically.

12      Q.   Was that part of the tactical plan, that if he walks

13   forward without the gun, that maybe we can tase him?

14      A.   No, sir.

15      Q.   Now, did you tell Deputy Stone that if Mr. Perez did

16   not comply with commands, he could deploy the 40-millimter?

17      A.   No.  I don't believe I told him that.

18      Q.   What do you believe you told him with respect to the

19   deployment of the 40-millimeter?

20      A.   So I believe Deputy Stone knows when it's

21   appropriate to use less-lethal munition because he is the one

22   responsible for shooting the munition.

23           However, I did tell them -- I did tell him once

24   Mr. Perez got to the threshold or about the threshold where

25   you're talking about past the pool table and above the
```

1    threshold of the garage, and I noticed that he was not

2    complying.  So he was complying for a bit, and then he

3    stopped complying.

4          I made sure that Stone -- I told Stone, and it was

5    on the radio so everybody heard or I believe everybody heard,

6    not to let him get back to the firearm.

7          I was concerned with his demeanor and the change in

8    his demeanor that he was contemplating going back to the

9    gun.

10   Q.   Do you recall a time period where when he was

11   standing past the end of the pool table by the threshold of

12   the garage where he was told to put his hands up, and he kind

13   of threw his hands out kind of showing you I don't have

14   anything?

15   A.   Yes, yes, sir.

16        MR. GALIPO:  And then can we go to Page 33 of the

17   sergeant's statements, please.

18   BY MR. GALIPO:

19   Q.   So I think this is the part we were just discussing

20   on Lines 14.  This would be Page 33.

21        So I think you say -- it's kind of a long sentence,

22   but, "So I told the team --" I'm on Line 14 -- "over the

23   radio don't let him get back to that gun, and if he does

24   anything other than what we're telling him to do, deploy

25   less-lethal like immediately."

 1      A.    That's correct.

 2      Q.    But as far as where he was, he was close to the

 3   threshold of the that open garage door?

 4      A.    Correct.

 5      Q.    And how far do you think you were from Mr. Perez

 6   when he was in that standing position?

 7      A.    Again, I would have to estimate maybe between seven

 8   and ten feet, approximately.

 9      Q.    Okay.  And how about your deputies that you had on

10   the west side, how far were they positioned approximately

11   from Mr. Perez when he was in that standing position by the

12   threshold?

13      A.    The same, give or take a foot or two.

14            We were all pretty close together, my team.

15      Q.    If we can go to Page 42, please, of the interview.

16            Now, on Lines 21 through 24, this is part of your

17   response which is a relatively long response.

18            You say on Line 21 after a parenthesis, "But he took

19   a step back and mind you, up to this point I told -- I told

20   everybody, hey, if he does anything to go back towards the

21   gun or anything other than movements than what we're telling

22   him to do, hit him with less-lethal."

23            Do you see that?

24      A.    Yes.

25      Q.    And again, are you referring to your radio

1    communication of telling them if he does anything that we're

2    not telling him to do or make some move towards the gun, to

3    hit him with less-lethal?

4         A.   Yes, sir.

5         Q.   So going to the top of Page 43, the next page, I

6    think this is the time frame when you're discussing the first

7    deployment by Deputy Stone.

8              I'll let you take a sip of your water.

9         A.   Thank you.  Did you say the top, what line?

10        Q.   So we're looking at the top of Page 43, and I

11   believe this is when you're discussing the first BIP round

12   from Deputy Stone.

13             You say, and I'm starting on Line 1, "He took a step

14   back and Deputy Stone hit him with a BIP round and hit him

15   center mass."

16             Do you see that sentence?

17        A.   Yes, sir.

18        Q.   And the step back you're referring to, was that with

19   the left foot, if you remember?

20        A.   I don't -- I don't recall which foot he stepped back

21   with.  I just recall watching him take a step back.

22             And when I say back, it was back towards the

23   direction that he had come.

24        Q.   But are you saying that he took the step back from

25   the area of the open threshold of the garage?

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
**Luke Gaytan on 12/14/2023**                                     **Page 33**

1    A.    Yes.  Which was back towards the direction of where
2    the gun was put down.
3    Q.    Right.  And back towards the pool table?
4    A.    Yeah.  The pool table was behind him, so yes.
5    Q.    I mean the pool table as I understand it was in
6    between where he was at the threshold of the garage and the
7    gun?
8    A.    Yes.  But he was off -- the way I remember, if I
9    remember correctly, he was off to the left side.
10          So it wasn't like he was standing in front of the
11   pool table.
12   Q.    Okay.
13   A.    And the pool table was between him and the gun.
14   Q.    Okay.
15   A.    If that makes sense.
16   Q.    Yes.  So you say it hit him center mass.
17          You thought it was somewhere in the stomach; is that
18   correct?
19   A.    I believe so.
20   Q.    And you say you watched it bounce off, and he
21   continued turning?
22   A.    Correct.
23   Q.    And then he took a step like he started to run.
24          Do you see that?
25   A.    Yes.

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                              Page 34

1      Q.   So am I understanding this correctly, that the front

2   of Mr. Perez had to be directed towards Deputy Stone when

3   Deputy Stone fired the first round in order for it to hit him

4   in the stomach?

5      A.   Yes.  I mean it could be off a little bit to an

6   angle, but for it to him in the front of the stomach, you

7   would have to have a general -- Stone would have had to been

8   generally in front of him, yes.

9      Q.   And then you're saying after it struck him, he

10   continued turning and took a step like he started to run.

11        Was that what you observed?

12      A.   Yes.

13      Q.   And then you deployed a BIP round, but as you

14   described, you only had the one round?

15      A.   That's correct.

16      Q.   And where do you believe you were aiming when you

17   struck him about the BIP round?

18      A.   Center mass in the back, somewhere in the back.

19      Q.   Okay.  And then you heard Stone or you say you heard

20   Stone hit him twice again.

21        Did you hear two more rounds being fired by Deputy

22   Stone?

23      A.   I believe so.

24      Q.   You reference the first one I heard a "uhh."

25        Was the "uhh" I'm taking it from Mr. Perez as

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                          Page 38

```
 1        Q.   And did you hear any shots being fired after he went

 2   out of your view?

 3        A.   So when I say he went out of my view, I lost

 4   observation of the upper part of his body.  As the rounds

 5   were being fired, it appeared to me that he dove behind the

 6   pool table where the firearm was and just -- I forgot to say

 7   this, but as the lethal rounds were being fired, he was

 8   running, but he wasn't just running upright.  He was running

 9   and it appeared that he dropped his center of gravity and he

10   was getting ready to go around to where that firearm was.

11             So he was preparing himself to get closer to the

12   ground and which caused me to believe he was trying to get to

13   the firearm.

14        Q.   Did you ever consider that he might have been

15   running to try to avoid from being shot?

16        A.   No.  That did cross my mind.

17             Given everything that led up to that situation, that

18   did not cross my mind because he had every opportunity in the

19   world to give up peacefully and not put himself in that

20   situation.  He had been there for several hours with the gun

21   in his hand.

22             In my mind there was zero chance that he was doing

23   anything other than trying to get back to that firearm.

24        Q.   Well, do you think that it's illogical for someone

25   who is being fired at, let's say lethal rounds, let's take a
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                    Page 40

```
 1   a negative response from us when he was complying.

 2           It wasn't until he decided not to comply that the

 3   less-lethal was deployed and ultimately lethal force had to

 4   be used.

 5       Q.   When you say the less-lethal was deployed when he

 6   decided not to comply, you're talking about the one step he

 7   took?

 8       A.   Yes.  There was -- the negotiations and the

 9   non-compliance had deteriorated up to that point.  So he was

10   complying, and then while he was stopped, there is a lot more

11   to the interview that we didn't talk about in my interview

12   that was in between that wasn't discussed, that negotiations

13   were deteriorating.

14       Q.   Let me ask -- sorry.  Let me ask you this.

15           Do you think it would have been appropriate to use

16   less-lethal on him when he was standing there if he had not

17   taken a step back?

18       A.   Your question is, do I believe it would have been

19   appropriate?

20       Q.   Yes.

21       A.   I believe at that point it would have been

22   appropriate, yes.

23       Q.   But it sounds like he didn't run or move swiftly

24   towards the area where the gun was until after the first

25   less-lethal was deployed.
```

1      A.    So there was many more -- there was many more things

2    that led to that decision than just what we talked about.

3    The totality of the circumstances was not just that he took a

4    step back.  While we were attempting negotiations and

5    attempting to get him down on his knees so that we can do

6    what we're trained to do and do a moderate level of detention

7    his knees and search him out and make sure he didn't have any

8    other firearms on him, he failed to comply.

9            He was making subtle shaking of his head no, which

10   led me to believe that he wasn't going to do or he was

11   telling himself we wasn't going to follow the directions that

12   we were giving him.  He even verbally and I believe you can

13   here it in the audio when he was given directions on what he

14   needed to do, he was saying, "no, no," like, no, I'm not

15   going to.

16           So there was more circumstances than just what we're

17   talk being that led to the non-compliance and my decision to

18   say, hey, if he is not complying with the orders, then we're

19   going to have to use less-lethal.

20     Q.    So what you're saying is that, that's why I asked

21   you, do you think just based on his non-compliance, even

22   without taking a step back, it would have been appropriate to

23   use the 40-millimeter?

24           MS. ANDERSON:  Objection.  Incomplete hypothetical.

25           You can answer.

```
 1      A.   Yes, sir.

 2      Q.   And do you know how many shots were fired

 3   approximately during that time frame?

 4      A.   I do not.

 5      Q.   Would it be multiple shots?

 6      A.   Yes.

 7      Q.   And could you tell if they were coming from one

 8   officer or more than one?

 9      A.   I don't -- I don't recall.

10      Q.   Now, at some point you actually yelled out words to

11   that effect "cease fire" or "stop shooting?"

12      A.   Correct.

13      Q.   And why did you do that?

14      A.   So when he went down, and I heard -- I continued

15   hearing gunfire, it appeared to me that he was trying to move

16   his body.  It appeared to me that he hit the ground before he

17   was all the way behind the pool table, and it looked to me

18   that he was trying to get the rest of his body behind the

19   pool table.

20           I perceived he got ahold of the gun, and he was

21   going to take cover behind the pool table, and he was going

22   to start firing upon us.  When I saw his legs stop moving and

23   I saw a blood start to pool, so what I had to do was at that

24   point, the less-lethal after I shot my less-lethal round, I

25   kind of detached myself from the situation and start to
```

1   maneuver myself to get a different perspective on the side of

2   the garage.

3              And this is when I'm seeing this.  As I start to

4   see -- and when I started to see his leg stop moving and the

5   blood start to pool, it appeared to me that he was -- at

6   least from at my position, that he might not be a threat any

7   longer, and that's when I believed I called "Hold, hold," and

8   I was telling my team not to move forward into the garage.

9              I didn't believe that they were going to, but again,

10  as the leader of the team, I wanted to make sure that

11  everybody was on the same page and we were all communicating

12  all on the same page.  That was not on the radio.

13             I believe that was outload.  It was audible, not on

14  the radio.  And then I called cease fire.  That was my way of

15  telling my team that I believed that the threat was no longer

16  a threat.  I was very aware that if anybody on my team still

17  saw a deadly threat, I believed they would still -- they

18  would still do what they needed to do, whether it was lethal

19  force or not.

20             So it was more of a communication thing for my team

21  to get everybody on the same page than anything.

22       Q.   Did you see him at some point make a motion that you

23  thought was like a diving-type motion?

24       A.   Yes.

25       Q.   And how many shots do you think you heard before you

**Exhibit "J"**

https://www.manningkass.com/manning/index.cfm/newsroom/video-details/?pkid=2530

**Exhibit "J"**

Exhibit "K"

Exhibit "K"



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

Exhibit "L"

Exhibit "L"



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



EXHIBIT
StoneJ 2
12/14/2023
Huseby.com

Exhibit "M"

Exhibit "M"



# DEPARTMENT
# MANUAL

## SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER          COSB 002568



# Sheriff's Department Manual –

# Table of Contents

| Volume 1 | Philosophy and Organization | 1 |
|----------|------------------------------|------|
| Volume 2 | Administration and Management | 173 |
| Volume 3 | Field Operations and Activities | 408 |
| Volume 4 | Property and Evidence | 765 |
| Volume 5 | Uniforms | 802 |
| Volume 6 | Volunteer Units and Members | 936 |

Note: Please see the Comprehensive Table of Contents for a detailed listing of all Department Manual sections.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER        COSB 002569

Safety members shall use de-escalation techniques, crisis intervention tactics and other alternatives to force, as per their training, when feasible. Alternatives to force are not required by a member when the member reasonably believes that immediate action must be taken to prevent injury to themselves, another member or the public.

It is necessary for members to utilize crisis intervention tactics when applicable to a situation. If a member, based on their training and experience, determines a subject might be experiencing a crisis, the member shall consider crisis intervention tactics as an available means of de-escalation.

De-escalation techniques may include:

- Creating distance and a buffer zone between the officer and the subject;
- Establishing an effective line of communication with the subject, considering factors such as mental illness, possible intoxication, and potential medical or physical conditions; and
- Considering other available resources, including specialized units, psychiatric emergency response team clinicians, and negotiators.

New: 8-24-20

## 3.606.20 Use of Carotid Neck Restraint and Lateral Vascular Neck Restraint (LVNR)

Pursuant to Government Code 7286.5, the San Bernardino County Sheriff's Department policy does not authorize the use of a Carotid Neck Restraint or the Lateral Vascular Neck Restraint (LVNR) as an approved use of force option.

New: 1-4-21

## 3.608.  The Use of Lethal Force

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

The use of lethal force is justified in the following circumstances:

- o   A safety member may use lethal force to protect himself or others from what he reasonably believes to be an immediate threat of death or serious bodily injury.
- o   A safety member may use lethal force to accomplish the arrest or prevent the escape of a suspected felon, when the member has probable cause to believe that the suspect poses a significant threat of death or serious bodily injury to the deputy or others.

Safety members shall not use lethal force to protect themselves from assaults that are perceived by the member to not likely have serious results.

A safety member shall not fire at a person who is called upon to halt on mere suspicion and who simply runs away to avoid arrest. Nor should a deputy fire at a "fleeing felon" if the member has any doubt whether the person to be fired at is in fact the person against whom the use of lethal force is permitted under this policy.

The use of lethal force cannot be justified solely by stating that it was initiated due to an order or authorization given by another department member. Safety members must be able to articulate a justified and appropriate use of lethal force, based on information available to them at the time it is used. There may be times when an authorization to use lethal force has been communicated, and yet circumstances have changed to the point that lethal force is no longer reasonable. Using an occupied vehicle to barricade a roadway, or ramming a vehicle is generally not recommended, but there may be certain limited situations where these techniques are necessary and appropriate.

Firearms should not be discharged from or at a moving vehicle except in exigent circumstances.  In these situations, a safety

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

member must have articulable reason(s) for this use of lethal force, which include, but are not limited to the following:

- A person in the vehicle is threatening the safety member or another person with lethal force by means other than the vehicle; or

- The vehicle is operated in a manner which is likely to result in great bodily injury or death to a safety member or another person, and other reasonable means of defense have been exhausted, or are not available or practical.   This may include, if time and circumstances allow, moving out of the path of the vehicle.

## 3.610.  Reporting the Use of Force

A supervisor's use of force investigation shall be completed if circumstances involved in an incident fall under the guidelines set forth in this policy section. In such instances the investigating supervisor shall complete the BlueTeam Use of Force Report.

The term "use of force" is defined as any physical effort used to control, restrain, or overcome resistance by another.

The following requirements apply to any use of force incidents involving the application of open hand strikes, fists, feet, canines, impact weapons, Taser, or chemical agents or as directed by a supervisor:

1. All members involved make an oral report to their supervisor as soon as practicable after the incident.
2. At the direction of the incident supervisor, the initiating member shall complete a related crime report containing a detailed description of the facts involved including, but not limited to:
   1. The threat perceived by the member.

Exhibit "N"

Exhibit "N"

STEVEN D. MANNING
DENNIS B. KASS
ANTHONY J. ELLROD
EUGENE P. RAMIREZ
FREDRIC W. TRESTER
LAWRENCE D. ESTEN
MILDRED K. O'LINN *
ALFRED M. DE LA CRUZ
ERWIN A. NEPOMUCENO *
BRIAN T. MOSS †
JEFFREY M. LENKOV
MARGUERITE L. JONAK *
MICHAEL L. SMITH
LOUIS W. PAPPAS
EUGENE J. EGAN
CLIFFORD A. CLANCEY
R. ADAM ELLISON
SCOTT WM. DAVENPORT
JASON J. MOLNAR *
DAVID V. ROTH
JENNIFER L. SUPMAN
JEANETTE L. DIXON
DAVID R. REEDER*
ANTHONY CANNIZZO
DANIEL B. HERBERT *
MARK A. HAGOPIAN
DONALD R. DAY *
JOHN M. HOCHHAUSLER
CHRISTOPHER DATOMI
ROLAND TONG
STEVEN W. DELATEUR
WILLIAM KELSBERG
KATHLEEN A. HUNT *
STEVEN J. RENICK
D. HIEP TRUONG
JANET D. JOHN *
SHARON S. JEFFREY
RICHARD G. GARCIA
KENNETH S. KAWABATA
STEVEN AMUNDSON*
LALO GARCIA
JONATHAN J. LABRUM *
KAREN LIAO
JONATHON D. SAYRE
MATTHEW E. KEARL

RODRIGO J. BOZOGHLIAN
GRETHCHEN COLLIN
LYNN CARPENTER *
CHRISTOPHER KANJO
ROBERT E. MURPHY *
JASON J. DOSHI
EMILY EDWARDS
DAVID R.RUIZ
SCOTT A. ALLES †
DANIEL SULLIVAN
ANDREA KORNBLAU
NATALYA VASYUK
MARK WILSON
CRAIG SMITH
KELSEY NICOLAISEN
KIRSTEN BROWN
TIFFANY HENDERSON
JONATHAN HACK*
EMLY ELLSE
ERIC WAHRBURG
JOSHUA FERGUSON
SALLY FREEMAN*
CHRISTINE LA VORGNA
LIZETTE ALVARADO
ELLEN BURACH-ZION
EVGENIA JANSEN
LILLIT SHAMIRYAN
ANTOINETTE MARINO*
GLENN JOHNSTON
ELISE DVOROCHKIN
RICHARD McKIE
NICOLE DYER
DANE CUMMARO
SHANE ABERGEL
GARROS CHAN
CHRISTINA TAPIA
ALICIA D. MASSIDAS*
S. CHRISTIAN ANDERSON
JOSEPH GORDON
COURTNEY NAKATANI
SEAN DOWSING
KIRK EDSON
MARK SENIOR
MIRIAM ORTIZ
JENNIFER GATEB

KRISTINE RIZZO
JOANA COLOMA
RICHARD MOJICA
LOAN DAO
CHANDRA CARR
ROGER BRACKEN
MICHELLE MARTIN
DEANN RIVARD
HENRY ENENMOH
DEREK G. BREDEFELD
OLESYA MIKHAYLOVA
ROYA FOHRER
SOPHIE O. LAFRANCHI
KAYLEIGH ANDERSEN
POLINA POLONSKY
LINNA LOANGKOTE
JAMIE COOPERMAN
MORGAN TRENARY
JAMES A. HARRIS
JARED M. KAYE
MICHAEL BRAVE
ANDREI DUMITRESCU
SARAH RAOOF
GABRIELLA PEDONE
CHRISTOPHER BAUER
ERNEST MARTZ
TIFFANY SOHRABIAN
STEPHANIE NATHANIEL
JESSICA BECERRA
DAVID ALPERN
NATALIE FORTONE
ELISSA BALLEW
ANDREW RAZMA
MARCY GRIBIN-SANCHEZ
LISA IVERSEN
MARISA ZARATE
DANIEL KNIERIM
HANNAH ELLENHORN
WENDY SKILLMAN
ERIC HITCHCOCK*
JONATHAN AVRAHAM
ANGELA ZUGMAN
RYANNE HANKLA
LACEY SIPSEY
SABIRA SHERMAN

BRYANNA McGUIRK
JONATHAN KOEHLE
TANYA PROUTY
DORIS Y. YOUMARA
NIDA MAGSOOD
AVA TOWHIDIAN
RONALD ROUNDY
ADAM AFSAR
BRANDON AFLAK
ANNA KARTOSHKINA
KRISTINA ROSS
CHARLES STRUBLE
JODI LI
JOSEPH ESCAREZ
NICOLE JONES
BRADLEY ANDERSON
JASON CHOU
AMANDA WILBUR
JAMES GIACCHETTI
ANGELA DAILEY
TANNER LONDON
FIONA MILLER
STEVEN SOBERAJ

OF COUNSEL
JOHN D. MARINO*
ARI MARKOW
TRISHA NEWMAN
MICHAEL A. WEISMANTEL
CAROL ROHR
KRISTOFER BUNDY
CHARLES MOLLIS

*   Admitted in Multiple
    Jurisdiction
†   Admitted to Practice Law in
    Arizona only

**MK**

**MANNING | KASS**

15TH FLOOR AT 801 TOWER
801 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3012
Tel:  (213) 624-6900
Fax:  (213) 624-6999
ManningKass.com

February 15, 2024

**VIA E-MAIL AND U.S. MAIL**

Dale K. Galipo, Esq.
Shannon Leap, Esq.
LAW OFFICES OF DALE K. GALIPO
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
E-Mail: dalekgalipo@yahoo.com
        sleap@galipolaw.com

Re:   **A.J.P. et al. v. County of San Bernardino, et al.**
      Case No.:      2:22-cv-01291-SSS-SHK
      Our File No.:  900-059297

Dear Counsels:

Pursuant to L.R. 7-3 and Judge Sykes Civil Standing Order, we are writing to meet and confer with you prior to our office filing a motion for summary judgment or summary adjudication in this in this action on behalf of Defendants County of San Bernardino and Deputy Cory McCarthy, Deputy Andrew Pollick, Deputy David Moore, and Deputy Cristina Olivas ("Defendant Deputies" and collectively "Defendants").  Please be advised that Defendants intend to move for summary judgment or adjudication on the following grounds:

1.    **Defendant Deputies Used Force that was Objectively Reasonable Under the Totality of The Circumstances.**

Defendant Deputies are entitled to judgment on all of plaintiffs' force-based claims, including the first claim for excessive force, third claim for substantive due process violation, and the state law claims for battery, negligence, and violation of the Bane Act.  *See Hayes v. County of San Diego*, 57 Cal. 4th 622, 637-39 (2013) (adopting *Graham* reasonableness standard for seizure-related negligence claims against officers but clarifying that scope of liability may extend to pre-seizure conduct under certain circumstances); *Archibald v. Cty. of San Bernardino*, 2018 U.S. Dist. LEXIS 171243, at *22 (C.D. Cal. Oct. 2, 2018) (acknowledging

**DALLAS**
901 Main Street, Ste 6530
Dallas, TX 75202
(214) 953-7669

**NEW YORK**
100 Wall Street, Ste 700
New York, NY 10005
(212) 858-7769

**ORANGE COUNTY**
695 Town Center Dr., Ste 400
Costa Mesa, CA 92626
(949) 440-6690

**PHOENIX**
2700 N. Central Ave., Ste 870
Phoenix, AZ 85012
(602) 313-5469

**SAN DIEGO**
225 Broadway, Ste 1200
San Diego, CA 92101
(619) 515-0269

**SAN FRANCISCO**
One California Street, Ste 900
San Francisco, CA 94111
(415) 217-6990

Re: **A.J.P. et al. v. County of San Bernardino, et al.**
Case No.: 2:22-cv-01291-SSS-SHK
Our File No.: 900-059297
February 15, 2024
Page 2

that Plaintiffs' battery, negligence, and Bane Act claims are governed by the same inquiry that governs their excessive force claims); *Martinez v. County of Los Angeles*, 47 Cal. App. 4th 334, 349-50 (1996) (citing Cal. Penal Code § 196 and holding that where officers used reasonable force under the Fourth Amendment standards, there could be no liability under comparable state-law torts).

Under the uncontroverted evidence, Defendant Deputies used only objectively reasonable force during the incident.  In *Graham v. Connor*, 490 U.S. 386, 388 (1989), the Supreme Court held that an excessive force claim is properly analyzed under the Fourth Amendment's objective reasonableness standard.  The *Graham* Court set forth a non-exhaustive list of factors to be considered in evaluating whether the force used to effect a particular seizure is reasonable: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists detention or attempts to escape.  *Id.* at 394-95.  The test is an objective one, viewed from the vantage of a reasonable officer at the scene, and is highly deferential to the police officer's need to protect himself or others.  *Id.* at 396-97.

In analyzing an incident under the *Graham* criteria, the "most important single element of the three specified factors: ***whether the suspect poses an immediate threat to the safety of the officers or others,*** " is the starting point. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (emphasis added). "[W]here a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Id.* at 704;  *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996).

Here, under the undisputed facts, deputies from the County of San Bernardino Sheriff's Department were dispatched to a disturbance call, regarding a man, later identified as Albert Perez ("Perez") in the garage armed with a handgun and under the influence of alcohol. Deputies arrived on scene and observed Perez in the garage armed with a handgun. Deputies gave commands to Perez to drop the gun and surrender.  Perez refused to comply with deputies' commands.  Thereafter, deputies established a perimeter around the residence and continued to give Perez verbal commands. Perez did not comply with commands and did not verbally engage with the deputies.  Deputies maintained the perimeter and continued attempts to obtain compliance from Perez for several hours.  Subsequently, Specialized Enforcement Division deputies arrived on scene and took control of the scene from the patrol deputies. Additionally, a crisis negotiator made ongoing attempts to gain compliance with Perez.  However, Perez remained armed with a handgun and did not comply with orders.  At some point in time Perez stood up, placed his firearm on the ground and began walking toward the front of the garage, slowly complying with commands.  Suddenly, Perez stepped back and proceeded toward the firearm.  Deputies deployed less lethal munitions which appeared ineffective.  Perez quickly moved to the firearm, and at that moment, Defendant Deputies fired their service weapons necessarily to stop the immediate, deadly threat from Perez's actions.

Further, other *Graham* factors weigh in favor of Defendant Deputies as well, including that Mr. Perez was holding the gun in his hand and sitting in the chair in the garage, violating

Re: **A.J.P. et al. v. County of San Bernardino, et al.**
Case No.: 2:22-cv-01291-SSS-SHK
Our File No.: 900-059297
February 15, 2024
Page 3



Cal. Penal Code §417(a).[1] Further, Defendant Deputies only fired at Perez when he suddenly sprinted to the gun, which he placed behind the pool table, after he was told he was going to be arrested.

Accordingly, under the uncontroverted evidence, it was objectively reasonable for a deputy on scene to believe that Perez's actions constituted an immediate, deadly threat and respond with deadly force. *See Reynolds v. County of San Diego*, 858 F. Supp. 1064, 1072 (S.D. Cal. 1994) (citing cases that "support the general principle that an officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack"), remanded on other grounds, 84 F.3d 1162 (9th Cir. 1996).

Lastly, there is no evidence that Defendant Deputies violated Perez's clearly established constitutional rights at the time of the incident, which entitles them to qualified immunity.

**2.    Plaintiffs' Second Claim for Denial of Medical Care under 42 U.S.C. § 1983 Against Defendant Deputies Fails Because the Evidence Does Not Support Plaintiff's Claim.**

"Claims of denial of medical care during and immediately following an arrest are analyzed under the Fourth Amendment and its 'objective reasonableness' standard." *Estate of Adomako*, 2018 U.S. Dist. LEXIS 15018, 2018 WL 587146, at *5 (*citing Borges v. City of Eureka*, 2017 U.S. Dist. LEXIS 10721, 2017 WL 363212, at *6 (N.D. Cal. Jan. 25, 2017)); *see also Holcomb v. Ramar*, 2013 U.S. Dist. LEXIS 157833, 2013 WL 5947621, at *4 (E.D. Cal. Nov. 4, 2013) ("[C]laims regarding deficient medical care during and immediately following an arrest are governed by the Fourth Amendment."). "An officer fulfills this [Fourth Amendment] obligation by promptly summoning the necessary medical help or taking the injured detainee to a hospital." *Bordegaray v. Cty. of Santa Barbara*, 2016 U.S. Dist. LEXIS 172269, 2016 WL 7223254, at *8 (C.D. Cal. Dec. 12, 2016) (emphasis added); *see also B.P. v. Cty. of San Bernardino*, 2019 U.S. Dist. LEXIS 226921, 2019 WL 7865177, at *3 (C.D. Cal. Nov. 14, 2019) ("The Fourth Amendment requires the arresting officer to 'promptly summon[ ] the necessary medical assistance' — whether that is promptly bringing the arrestee to the hospital or promptly summoning some other type of care.") (*quoting Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006)) (emphasis removed).

Here, there is no evidence of denial of medical care by Defendant Deputies, rather the evidence shows that after the scene was secured and the gun that was in Perez's possession during the subject incident was moved away from Perez, Deputy Cory McCarthy and Deputy Andrew Pollick began providing medical care to Perez within minutes and he was still alive when paramedics arrived.  Thus, there is no evidence that there was a delay in timely medical treatment to Perez, nor is there evidence that Defendant Deputies "consciously disregarded a substantial risk of serious harm" to Perez's health or safety.

---

[1] "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel is guilty of a misdemeanor, punishable by imprisonment in a county jail for not less than 30 days."

Re: **A.J.P. et al. v. County of San Bernardino, et al.**
Case No.: 2:22-cv-01291-SSS-SHK
Our File No.: 900-059297
February 15, 2024
Page 4



**3.      Defendant Deputies are Entitled to Qualified Immunity For Each of Plaintiffs'
Federal Claims.**

Although Defendant Deputies stand by their position that the uncontroverted evidence demonstrated that their actions were reasonable, even if the Court were to disagree, Defendant Deputies would nonetheless be entitled to summary judgment under the doctrine of qualified immunity.

It is well–settled that qualified immunity protects government officials from suit under federal law claims if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 230.

To evaluate qualified immunity, a court must first decide whether the facts show that the governmental official's conduct violated a constitutional right. *Jackson v. County of Bremerton*, 268 F.3d 646 (9th Cir 2001). Second, a court decides whether the governmental official could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly established right. *Id.* However, the court may skip the first step and proceed to the second. *Pearson*, 555 U.S. at 227.

The U.S. Supreme Court has recently clarified that a governmental official is entitled to qualified immunity from suit/liability where, at the time of the conduct, there was no prior precedent or case law with facts specifically and substantially identical to the facts of the incident at issue which would have put the defendant on notice that his or her conduct was unconstitutional. *White v. Pauly*, 580 U.S. 73, 79 (2017) ("clearly established law" should not be defined "at a high level of generality" but must be "particularized" to the facts of the case). The Supreme Court has emphasized this point again and again because qualified immunity is important to society as a whole and because the immunity from suit is effectively lost if a case is erroneously permitted to go to trial. *Id.* at 79.

Under the doctrine of qualified immunity, if a government official's mistake as to what the law requires is reasonable, the government official is entitled to qualified immunity. *Davis v. Scherer*, 468 U.S. 183, 205 (1984). Moreover, this doctrine is sweeping in scope and designed to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Finally, although law enforcement officers must be aware of constitutional developments, they are not expected to do so to the same extent as law professors. Indeed, a "reasonable person" standard applies. *Ward v. San Diego County*, 791 F.2d 1329, 1332 (9th Cir. 1986).

Applying the two-pronged qualified immunity analysis, the Court must first look to whether Defendant Deputies' conduct violated Perez's constitutional rights. *See Jackson*, 268 F.3d at 651.

In this case, there is no relevant case authority which would put Defendant Deputies on notice that their conduct was unconstitutional. Thus, since there is no relevant case authority which would put the officers on notice that they could not engage in these activities (even if

Re: **A.J.P. et al. v. County of San Bernardino, et al.**
Case No.: 2:22-cv-01291-SSS-SHK
Our File No.: 900-059297
February 15, 2024
Page 5



one *could* assume that they were improper), Defendant Deputies are entitled to qualified immunity as a matter of law.  *Jackson*, 268 F.3d at 646.

In addition, even if this Court were to conclude that such relevant authority did exist at the time of Perez's death, Defendant Deputies would still be entitled to qualified immunity under the second prong, as any mistakes which arguably may have been made were reasonable.  *Pearson*, 555 U.S. at 230.

Therefore, Defendant Deputies are entitled to qualified immunity in this matter, and Plaintiffs' federal claims are barred as a matter of law.

**4.     Plaintiffs' Fourth and Fifth Claims for Monell Liability - Inadequate Training, and Unconstitutional Custom, Practice, and Policy under 42 U.S.C. § 1983 against Defendant County of San Bernardino Fails Because the Evidence Does Not Support Plaintiffs' Claim.**

A local governing body may be liable under § 1983 only when "action pursuant to official municipal policy of some nature caused a constitutional tort."  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Municipalities can be held liable only for their own illegal acts, not on the basis of *respondeat superior*.  *Id.*  "Rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bryan County v. Brown*, 520 U.S. 397, 405 (1997).

In order to adequately plead a *Monell* claim "the allegations in a complaint or counterclaim may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).  "Plausible facts supporting [the alleged] policy or custom" are required.  *See Id.*  Further there must be some causal connection between the alleged policy or custom and the violation of plaintiff's constitutional rights.  *See Ottovich v. Alameda Cty.*, No. C 98-1178 SI, 1999 U.S. Dist. LEXIS 4244, at *8 (N.D. Cal. Mar. 26, 1999) (emphasis added).

Here, Defendant County of San Bernardino is entitled to judgment on plaintiffs' fourth and fifth cause of action for Monell Liability – inadequate training, and unconstitutional custom, practice, and policy under 42 U.S.C. § 1983 because Defendant Deputies used only objectively reasonable force under the totality of the circumstances.  Additionally, there is no evidence that the County had an unlawful custom, practice or policy, failed to train its deputies.

**5.     Plaintiffs' Eighth Claim for Violation of the Bane Act against Defendant Deputies Fails Because the Evidence Does Not Support Plaintiffs' Claim.**

In order to establish a violation of Civil Code § 52.1, a plaintiff must show that the employee interfered or attempted to interfere with plaintiff's legal rights by the use of threats, intimidation or coercion.  *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998).  Most importantly, to show defendants violated § 52.1, plaintiff must show coercion independent from the coercion inherent in the violation of the constitutional right.  *Shoyoye v. Cnty. of L.A.*, 203 Cal.App.4th 947, 959-960 (2012).  For example, in a claim alleging excessive force, plaintiff

Re: **A.J.P. et al. v. County of San Bernardino, et al.**
Case No.: 2:22-cv-01291-SSS-SHK
Our File No.: 900-059297
February 15, 2024
Page 6



must show a § 52.1 coercion independent from the coercion already inherent in the use of force. *Gant v. Cnty. of L.A.*, 765 F.Supp.2d 1238, 1253 (C.D. Cal. 2011) (when use of force is intrinsic to the alleged constitutional violation, it cannot also satisfy the additional "coercion" element of § 52.1) (overruled on other grounds).

Moreover, plaintiff must prove the officer had a specific intent to violate his right to be free from unreasonable seizure. *See Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043-44 (9th Cir. 2018) (emphasis added). Evidence simply showing the officer's conduct amounted to a constitutional violation under an objectively reasonable standard is insufficient. *Id.* at 1045. Rather, plaintiff must show the officers intended not only the force, but its unreasonableness, its character as more than necessary under the circumstances. *Id.*

Here, there is no evidence to establish that Defendant Deputies interfered with Perez's legal rights by the use of threats, intimidation or coercion. And, there is no evidence that Defendant Deputies had the specific intent to violate Perez's rights when they engaged in the conduct at issue.

**6.      The County Cannot be Liable For Any of Plaintiffs' State Law Claims.**

To the extent that plaintiffs' are attempting to hold the County liable under Government Code § 815.2(a), plaintiffs have not presented any evidence that Defendant Deputies or any County employee is liable to Plaintiffs, thus the County cannot be held liable. *See Strong v. State*, 201 Cal. App. 4th 1439, 1448 (2011) (Pursuant to Government Code § 815.2, "[A] public entity's liability hinges on the liability of its employee"). Defendant County of San Bernardino is entitled to judgment for each of plaintiffs' state law claims, as Defendant Deputies are not liable and there is no basis for respondeat superior liability against the County. Cal. Gov. Code § 815.2(a).

Further, regarding plaintiffs' claim for punitive damages against Defendant Deputies there is no evidence that the conduct of the Defendant Deputies during the incident was malicious, oppressive, or in reckless disregard of Perez's rights.

Defendants reserve the right to supplement the foregoing legal arguments and authority in support.

For these reasons, Defendants intend to file a motion for summary judgment. Please contact our office to discuss the issues raised in this letter on or before February 23, 2024. We look forward to hearing from you to meet and confer on these issues.

Very truly yours,

**MANNING KASS**

Kayleigh Andersen, Esq.

KAA/jlb

Exhibit "O"

Exhibit "O"

**Jessica L. Becerra**

| | |
|---|---|
| **From:** | Shannon Leap <sleap@galipolaw.com> |
| **Sent:** | Tuesday, February 20, 2024 3:25 PM |
| **To:** | Maria Tarin Castro; dalekgalipo@yahoo.com |
| **Cc:** | Clifford Clancey; Eugene P. Ramirez; Jessica L. Becerra; Kayleigh Andersen; Delia Flores; Sylvia Hernandez |
| **Subject:** | RE: A.J.P. (Plaintiff) Meet and Confer re Motion for Summary Judgment |

Good afternoon counsel,

It is our position that a Motion for Summary Judgment Plaintiffs' claims for excessive force under the Fourth Amendment (Claim #1 in the SAC), Plaintiff's claim for Interference with Familial Relationship under the Fourteenth Amendment (Claim #3), and Plaintiffs' state law claims (Claims #6-8) would be frivolous.  We would consider dismissing Plaintiffs' *Monell* claims (Claims 4 and 5), Plaintiff's Delay in Medical Care (Claim #2), as well as Plaintiffs' claims for punitive damages against the individual defendants if Defendants agree not to file the motion at all.

Please let me know.

Thank you,

**Shannon Leap, Associate Attorney** | **The Law Offices of Dale K. Galipo** | 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367 | Office: +1.818.347.3333 | Fax: +1.818.347.4118 | Email: sleap@galipolaw.com  www.GalipoLaw.com

THIS EMAIL MESSAGE IS FOR THE SOLE USE OF THE INTENDED RECIPIENT AND MAY CONTAIN CONFIDENTIAL, AND PRIVILEGED INFORMATION.  ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE OR DISTRIBUTION IS PROHIBITED.  IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE CONTACT THE SENDER BY REPLY EMAIL AND DESTROY ALL COPIES OF THE ORIGINAL MESSAGE.

**From:** Maria Tarin Castro <Maria.Castro@manningkass.com>
**Sent:** Thursday, February 15, 2024 8:57 AM
**To:** dalekgalipo@yahoo.com; Shannon Leap <sleap@galipolaw.com>
**Cc:** Clifford Clancey <Cliff.Clancey@manningkass.com>; Eugene P. Ramirez <Eugene.Ramirez@manningkass.com>; Jessica L. Becerra <Jessica.Becerra@manningkass.com>; Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>; Delia Flores <Delia.Flores@manningkass.com>; Sylvia Hernandez <Sylvia.Hernandez@manningkass.com>
**Subject:** A.J.P. (Plaintiff) Meet and Confer re Motion for Summary Judgment

Good morning, Counsel:

Attached hereto, please find a letter of today's date concerning the above-referenced matter.  Should you have any questions, or wish to discuss this matter further, please do not hesitate to contact Kayleigh Andersen of our office.

Thank you,

**Maria Tarin Castro**
Legal Assistant

1



801 S. Figueroa St., 15th Floor
Los Angeles, CA 90017
Main: (213) 624-6900 | Ext.: 2552
Direct: (213) 406-2552
Maria.Castro@manningkass.com | manningkass.com

Dallas | Los Angeles | New York | Orange County | Phoenix | San Diego | San Francisco

Note: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. The information transmitted in or with this message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material and is protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any retransmission, dissemination, distribution, copying or other use of, or the taking of any action in reliance upon, this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting the material from your computer. Thank you. Manning & Kass, Ellrod, Ramirez, Trester, LLP

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 801 S. Figueroa St, 15th Floor, Los Angeles, CA 90017-3012.

On March 1, 2024, I served true copies of the following document(s) described as **DECLARATION OF KAYLEIGH ANDERSEN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** on the interested parties in this action as follows:

LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq.
Shannon Leap, Esq.
21800 Burbank Blvd., Suite 310
Woodland Hills, CA  91367
Tel: (818) 347-3333
Fax: (818) 347-4118
Email:  dalekgalipo@yahoo.com;
sleap@galipolaw.com;
slaurel@galipolaw.com

*ATTORNEYS FOR PLAINTIFFS, A.J.P., AND A.M.P.. ET AL.*

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 1, 2024, at Los Angeles, California.

*Maria T. Castro*
_____
Maria T. Castro

MK MANNING | KASS

1

**DECLARATION OF KAYLEIGH ANDERSEN ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**