LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Shannon J. Leap (Bar No. 339574)
sleap@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Telephone:   (818) 347-3333
Facsimile:   (818) 347-4118

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

A.J.P. and A.M.P., minors, by and through their guardian *ad litem* Cynthia Nunez, individually and as successor in interest to Albert Perez, deceased; and PATRICIA RUIZ, individually,

              Plaintiffs,

     vs.

COUNTY OF SAN BERNARDINO; CORY MCCARTHY; ANDREW POLLICK; DAVID MOORE; and CHRISTINA OLIVAS,

              Defendants.

Case No. 5:22-cv-01291-SSS-SHK

*Hon. Sunshine S. Sykes,*
*Magistrate Shashi H. Kewalramani*

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OR SUMMARY ADJUDICATION; MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT**

[*Filed concurrently with Plaintiffs' Responsive Separate Statement of Facts; Plaintiffs' Objections to Defendants' Evidence; Declaration of Shannon J. Leap and Exhibits thereto; Proposed Order; Declaration of Scott DeFoe; Declaration of Bennet Omalu, M.D.*]

Date: April 19, 2024
Time: 2:00 P.M.
Courtroom: Courtroom 2, 2nd Floor

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES

1

# **TABLE OF CONTENTS**

2

3

MEMORANDUM OF POINTS AND AUTHORITIES.........................................1

I.     INTRODUCTION..................................................................................1

II.    STATEMENT OF FACTS.....................................................................2

III.   LEGAL STANDARD ...........................................................................6

IV.    ARGUMENT .........................................................................................7

       A.  Perez Did Not Pose an Immediate Threat of Death
           or Serious Bodily Injury at the Time of the
           Shooting. ................................................................. 7

       B.  The Deputies are Not Entitled to Qualified
           Immunity............................................................... 11

       C.  Plaintiffs' Fourteenth Amendment Claim Survives16

V.     Plaintiffs' State Law Claims Survive .........................................17

       D.  Battery (Wrongful Death)...................................... 18

       E.  Negligence (Wrongful Death) ............................... 19

       F.  Violation of the Bane Act (Cal. Civ. Code § 52.1)20

       G.  Plaintiffs Are Entitled to Punitive Damages......... 20

VI.    CONCLUSION .........................................................................21

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................6, 7

*Bryan v. McPherson*,
   630 F.3d 805 (9th Cir. 2010)........................................................7, 8, 10

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................7

*Cornell v. City and County of San Francisco*,
   17 Cal. App. 5th 766 (2017)................................................................19

*Curnow v. Ridgecrest Police*,
   952 F.2d 321(9th Cir. 1991) ...............................................................14

*Deorle v. Rutherford*,
   272 F.3d 1272 (9th Cir. 2001)..............................................................10

*Drummond v. City of Anaheim*,
   343 F.3d 1052 (9th Cir. 2004)..............................................................14

*Edson v. City of Anaheim*,
   63 Cal. App. 4th 1269 (1998)...............................................................17

*Egan v. Mut. of Omaha Ins. Co.*,
   24 Cal. 3d 809, 821 (1979)..................................................................20

*Espinosa v. City & Cnty. of San Francisco*,
   598 F.3d 528 (9th Cir. 2010)..................................................................7

*Estate of Lopez v. Gelhaus*,
   871 F.3d 998 (9th Cir. 2017)................................................................13

*Figueroa v. Gates*,
   207 F. Supp. 2d 1085 (C.D. Cal. 2002).................................................14

*Furnace v. Paul Sullivan, Co.*,
   705 F.3d 1021 (9th Cir. 2013)..............................................................15

*George v. Morris*,
   736 F.3d 829 (9th Cir. 2013)................................................................13

*Glenn v. Washington Cnty.*,
   673 F.3d 864 (9th Cir. 2011)...........................................................7, 12

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES

*Gonzalez v. City of Anaheim*,
   747 F.3d 789 (9th Cir. 2014)..................................................................10

*Graham v. Connor*,
   490 U.S. 386 (1989) ...........................................................7, 8, 17

*Greer v. City of Hayward*,
   229 F. Supp. 3d 1091 (N.D. Cal. 2017) ..................................16

*Harris v. Roderick*,
   126 F.3d 1189 (9th Cir. 1997).................................8, 10, 13

*Hayes v. Cnty. of San Diego* ......................................................17

*Headwaters v. County of Humboldt*,
   240 F.3d 1185 (9th Cir. 2000) ..................................................10

*Herrera v. Las Vegas Metropolitan Police Dept.*,
   298 F. Supp. 2d 1043 (D. Nev. 2004) .....................................20

*Hope v. Pelzer*,
   536 U.S. 730 (2002) ..................................................................16

*Hopkins v. Andaya*,
   958 F.2d 881 (9th Cir. 1992)...............................................6, 14

*Mary M. v. City of Los Angeles*,
   54 Cal. 3d 202 (1991)................................................................17

*Munoz v. City of Union City*,
   120 Cal. App. 4th 1077 (2004)..................................................17

*Nelson v. City of Davis*,
   685 F.3d 867 (9th Cir. 2012)....................................................10

*Porter v. Osborn*,
   546 F.3d 1131 (9th Cir. 2008)..................................................16

*Reese v. County of Sacramento*,
   888 F.3d 1030 (9th Cir. 2018)..................................................19

*S.B. v. County of San Diego*,
   864 F.3d 1010 (9th Cir. 2017)..................................................13

*Santos v. Gates*,
   287 F.3d 846 (9th Cir. 2012)....................................................11

*Scott v. Harris*,
   550 U.S. 372 (2007) ...................................................................7

-v-

*Smith v. City of Hemet*,
  394 F.3d 689 (9th Cir. 2005)..................................................................10

*Tennessee v. Garner*,
  471 U.S. 1 (1985) ....................................................................................8

*Tennison v. City and Cnty. of San Francisco*,
  570 F.3d 1078, 1089 (9th Cir. 2009)....................................................16

*Ting v. United States*,
  927 F.2d 1504 (9th Cir. 1991)...............................................................14

*United States v. Lanier*,
  520 U.S. 259 (1997)...............................................................................16

*United States v. One Parcel of Real Prop.*,
  904 F.2d 487 (9th Cir. 1990)...................................................................6

*United States v. Reese*,
  2 F. 3d 870 (9th Cir. 1993)....................................................................19

*Vos v. City of Newport Beach*,
  892 F.3d 1024 (9th Cir. 2018)................................................................8

*Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*,
  (C.D. Cal. 1993) 860 F. Supp. 1448........................................................7

*Wilkins v. City of Oakland*,
  350 F.3d 949 (9th Cir. 2003)................................................................11

*Young v. Cty. of Los Angeles*,
  655 F.3d 1156 (9th Cir. 2011)...............................................................10

*Zion v. County of Orange*,
  874 F.3d 1072 (9th Cir. 2017)...............................................................14

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3          This civil rights and state tort lawsuit arises out of the fatal shooting of

4    Albert Perez ("Perez") and the uses of less-lethal force against him on August 29,

5    2021, by deputies working for the San Bernardino County Sheriff's Department.

6    Taking the facts and all reasonable inferences therefrom in the light most

7    favorable to Plaintiffs as the non-moving party, the shooting violated Perez's

8    rights under the Fourth Amendment, and the uses of lethal and less-lethal force

9    violated Perez' rights under California law. It is undisputed that at the time of all

10   the force used against him, Perez was unarmed and moving away from the

11   deputies with his hands visibly empty, the deputies knew that Perez had put the

12   gun down prior to any force being used, and none of the deputies gave Perez a

13   verbal warning that force would be used. This Court should deny summary

14   judgment and qualified immunity as to the lethal shots fired by Deputies Moore,

15   Olivas, Pollick and Corporal McCarthy ("the deputies"), because no reasonable

16   officer in their positions would have had an objectively reasonable belief that

17   Perez posed an immediate threat of death or serious bodily injury justifying the

18   use of deadly force, and the law was clearly established that deadly force would

19   not be justified under the facts of this case. Summary judgment should also be

20   denied as to the 40 mm rounds, or blunt impact projectiles ("BIP") deployed prior

21   to the shooting by Gaytan and Stone, which escalated the situation involving the

22   potentially mentally-ill Perez, and for which the County is vicariously liable on

23   Plaintiffs' state law claims.

24          On the date of the incident, Perez committed no serious crime, did not

25   injure anyone, did not verbally threaten anyone, and did not attempt to attack

26   anyone. As Plaintiffs' police practices expert, Scott DeFoe, states in his

27   declaration filed concurrently herewith, and as supported by Ninth Circuit

28   caselaw, the presence of a gun alone does not justify a use of deadly force. During

-1-

the hours leading up to the shooting, Perez never fired any shots, never pointed the gun at anyone, and never raised the gun. Prior to any force being deployed, Perez complied with the deputies' commands to put the gun down on the ground, stand up, walk slowly toward the deputies, stop and the end of the pool table, and stepped back with his left foot. At that time, Gaytan and Stone fired BIP at Perez, striking him. Perez then ran away from the less-lethal deployments and away from the deputies, Moore, Olivas, McCarthy and Pollick began firing lethal rounds. As confirmed by Plaintiffs' expert Dr. Bennett Omalu, the deputies continued to fire to Perez's backside, as dove to the ground behind the pool table to take cover from the shots, and after Perez was lying bleeding and motionless the ground. For each of these reasons and the reasons set forth below, the uses of force were excessive and unreasonable, and Defendants' motion for summary judgment should be denied.

## II.   STATEMENT OF FACTS

Prior to the shooting, the deputies had information that Perez was mentally ill or experiencing a mental health crisis. (PAMF-48). Prior to the shooting, the Deputies had no specific information that Perez verbally threatened to injure or had actually injured anyone, committed an act of violence against another person, committed a felony involving the infliction of injury or death, or was under the influence of any illegal substances. (PAMF-49-53). Perez never pointed the firearm at anyone, including the reporting party. (PAMF-54). Perez never fired any shots from the gun or threatened to fire the gun. (PAMF-55-56). At no point while Perez's finger was on the trigger of the gun did any of the Deputies use force against Perez. (PAMF-57). When Perez was holding the gun when he sat on the stool, he never raised the gun. (PAMF-58). Alcala instructed Perez to put the firearm on the ground, and Perez complied with that command by placing the firearm on the ground between the stool on which he sat and the pool table. (PAMF-59). At the time Perez put the firearm on the ground, Moore, Pollick, and

McCarthy could see the firearm on the ground from their vantage points. (PAMF-60). Prior to the shooting, Pollick communicated to all deputies on scene that Perez had put the firearm on the ground. (PAMF-61). Alcala instructed Perez to stand up, and Perez complied. (PAMF-62). Alcala then instructed Perez to walk toward the deputies, and Perez complied by slowly walking toward the deputies. (PAMF-63). Gaytan instructed Perez to stop when Perez reached the southwest corner of the pool table, and Perez complied by stopping at the corner of the pool table. (PAMF-64). The deputies considered all four of these acts to be acts of compliance by Perez. (PAMF-65). When Perez stopped at the southwest corner of the pool table, he was approximately 7-13 feet from the firearm and 5-7 feet from the deputies. (PAMF-66-67). When Perez stopped at the end of the pool table, the deputies could see that his hands were visibly empty. (PAMF-68). Gaytan then instructed Perez to turn around and get on his knees, and then Perez took an approximately half-foot step back with his left foot and began to turn to his left. (PAMF-69-70).

Before Perez even started turning, Stone fired a 40 millimeter blunt impact projectile ("BIP") less lethal round at Perez. (PAMF-71). Stone perceived that his BIP struck Perez on the right side of his torso. (PAMF-72). Stone deployed two additional BIP rounds. (PAMF-73). Gaytan also deployed one BIP round, striking Perez in his back. (PAMF-74). Perez was struck by two or three BIP's within a 1-2 second timeframe. (PAMF-75). Perez was not advancing or charging at any person, when Stone and Gaytan fired their BIP rounds. (PAMF-77). Stone and Gaytan observed that Perez's hands were empty at the time they deployed their BIP rounds. (PAMF-78). At the time of the second BIP round, Perez was moving away from the first BIP round and away from the deputies and was approximately 6-8 feet from the firearm (PAMF-80-81). Based on police training, a BIP round can cause injury. (PAMF-82). BIP rounds have a recognizably different sound than lethal rounds. (PAMF-83). No deputy issued a verbal warning to Perez that

-3-

they would deploy the BIPs against him prior to deploying less-lethal munitions. (PAMF-84). Perez ran away from the BIP to avoid being struck by additional projectiles and did not start running until the less-lethal started. (PAMF-85). Basic police training provides that a subject's common reaction to being struck by BIPs is to run away from the less-lethal to avoid being struck by additional projectiles. (PAMF-86).

The first lethal round was fired simultaneously or within the same second as the final less-lethal round. (PAMF-87). When the shots started, the deputies could see Mr. Perez's hands and could see that there was nothing in his hands. (PAMF-88). Moore fired five shots. (PAMF-89). Olivas fired three shots. (PAMF-90). McCarthy fired fourteen shots, including shots to the back of Perez's head. (PAMF-91). Pollick fired approximately fifteen shots. (PAMF-92). During Pollick's second volley of shots, he was aiming at Perez's lower legs after Perez was on the ground behind the pool table. (PAMF-93). Perez was moving away from the deputies during all of the shots. (PAMF-94). At the time of all the shots, the deputies knew the firearm was on the ground, behind the pool table. (PAMF-95). The deputies did not see Perez reach for the gun after he placed it on the ground, prior to the shooting. (PAMF-96). Prior to firing their lethal rounds, no deputy issued a verbal warning that deadly force would be used. (PAMF-97). In total, the deputies fired approximately 35 lethal rounds at Perez. (PAMF-98). When the Deputies approached Perez after the shooting, McCarthy observed the gun near Perez's, left arm. (PAMF-99). Perez suffered at least eleven gunshot wounds, including to his head, right upper back/shoulder, and legs. (PAMF-100). The trajectories of these bullet wounds indicate that Perez was falling to the ground or on the ground when he was shot. (PAMF-101).

At the time of this incident, the deputies were trained, pursuant to basic police training, that deadly force can only be used where the officer has an objectively reasonable belief that the subject poses an immediate threat of death

or serious bodily injury to the officers or others. (PAMF-102). The deputies were also trained, pursuant to basic police training, to give a verbal warning before using deadly force, when feasible. (PAMF-103). Under the facts of this case, the Deputies could not justify shooting at Perez simply because Perez was running away or under a fleeing felon theory. (PAMF-107-108). Police officers are trained that they can only justify shooting under the fleeing felon theory where (1) they have information that the suspect has committed an atrocious felony involving the infliction of injury or death, AND (2) the suspect poses an immediate threat of death or serious bodily injury, and neither factor was present here. (PAMF-109).

Basic police training instructs, and the deputies were trained that they cannot shoot someone merely because they see a gun in that person's hands. (PAMF-111). When the Deputies fired their shots, there was no immediate threat of death or serious bodily injury. (PAMF-112). From the standpoint of police practices and basic police training, the Defendant Deputies' use of deadly force was contrary to Peace Officer Standards and Training ("POST"), improper, inappropriate, excessive, and unreasonable for the following reasons, *inter alia*:

- There was no immediate threat of death or serious bodily injury at the time of any of the shots;
- Perez was unarmed during all of the shots, and the deputies knew that Perez had placed the gun on the ground before any force was deployed;
- Perez was compliant during this incident;
- At the time of the shooting, Perez was moving away from the 40 mm rounds and away from the deputies;
- The Deputies could not shoot Mr. Perez for fleeing;
- Perez never threatened to use the firearm, never raised the firearm and never pointed the firearm at anyone;
- Officers are required to justify every shot they fire, and here, all 35 shots were unjustified;

-5-

- The deputies fired shots as Perez was going to the ground and after he was on the ground;

- The deputies overreacted when they fired, and an overreaction in using deadly force can be excessive force;

- The deputies engaged in contagious shooting;

- Subjective fear, or fear of a potential future threat, is insufficient to justify a use of deadly force;

- The deputies did not give a verbal warning that they were prepared to use deadly force prior to shooting, despite it being feasible to do so. (PAMF-115).

The deputies failed to employ appropriate situational awareness and appropriate tactics in this incident. (PAMF-116). The deputies failed to avoid contagious fire. (PAMF-117). The deputies escalated the situation by deploying less lethal rounds against a person who they had information may be experiencing a mental health crisis. (PAMF-118). The deputies failed to give Perez time to comply with commands prior to deploying the BIP and failed to give Perez time to comply with the BIP prior to shooting. (PAMF-119). Law enforcement officers are trained that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident.  In this case, there was no rush, as there was no crime in progress.  (PAMF-120). The deputies failed to respond appropriately, given that they had information Perez may have been experiencing a mental health crisis or was mentally ill. (PAMF-121).

## III.   LEGAL STANDARD

On a motion for summary judgment, the Court must view the evidence in the light most favorable to non-moving party. Summary judgment cannot be granted where a genuine dispute exists as to "material facts." Fed. R. Civ. P. 56(c). A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). All reasonable inferences must be drawn in the opposing party's favor both where the underlying facts are undisputed *and* where they are in controversy. Even entirely circumstantial evidence is sufficient to create a triable issue of fact. *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992). The court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *United States v. One Parcel of Real Prop.*, 904 F.2d 487, 491–92 (9th Cir. 1990). Further, Rule 56 must be construed "with due regard" for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried by a jury. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). Summary judgment is a drastic remedy and therefore trial courts should act "with caution" in granting summary judgment. *Anderson*, 477 U.S. at 255.

## IV.   ARGUMENT

### A. Perez Did Not Pose an Immediate Threat of Death or Serious Bodily Injury at the Time of the Shooting.

Summary judgment should be denied as to Plaintiff's Fourth Amendment excessive force claim. "Fourth Amendment claims of excessive force are analyzed under an objective reasonableness standard." *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)). When evaluating a claim of excessive force, the inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "This inquiry requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Glenn*, 673 F.3d at 871 (quoting *Graham*, 490 U.S. at 396). Governmental interest to balance against the type of force used include the following factors

identified by the Supreme Court in *Graham*: (1) the severity of the crime; (2) whether the suspect posed an immediate threat of death or serious bodily injury to the officer or others; and (3) whether the suspect was resisting arrest or attempting to escape. *Espinosa*, 598 F.3d at 537.

In determining the objective reasonableness of the deputies' uses of deadly force, this Court "must assess the severity of the intrusion on [Perez's] Fourth Amendment rights by evaluating the type and amount of force inflicted." *Espinosa*, 598 F.3d at 537; *Bryan v. McPherson*, 630 F.3d 805, 823-24 (9th Cir. 2010). Because the deputies' lethal shots constitute the greatest possible amount of force, they require the highest justification. *Tennessee v. Garner*, 471 U.S. 1, 9 (1985); *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997). Courts do "recognize that 'police officers are often forced to make split-second judgments . . .'" *Id.* at 1124 (quoting *Graham*, 490 U.S. at 397). "Not all errors in perception or judgment, however, are reasonable," and while courts "do not judge the reasonableness of an officer's actions 'with the 20/20 vision of hindsight,' nor does the Constitution forgive an officer's every mistake." *Id.* (quoting *Graham*, 490 U.S. at 396). As set forth below, the *Graham* analysis heavily favors Plaintiffs.

As to the first *Graham* factor, the severity of the crime at issue, it is undisputed that the deputies had no specific information that Perez had injured or threatened to injure anyone or was wanted for any violent crime. Perez was only potentially in violation of PC 602 (trespassing), a misdemeanor. During this incident, Perez never fired any shots, never pointed the gun at anyone, never raised the gun, never threatened anyone with the gun, and never attacked or attempted to attack anyone. A reasonable deputy would have recognized that Perez may have been experiencing a mental health crisis, especially because the deputies here had specific information that Perez was "possibly 5150." The Ninth Circuit has emphasized that when police engage with persons whom they know or

-8-

should know to be mentally ill, the calculus for reasonable force is different. *See, e.g.*, *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018) ("indications of mental illness create a genuine issue of material fact about whether the government's interest in using deadly force was diminished.").

The second and "most important" *Graham* factor is whether Perez posed an immediate threat of death or serious bodily injury to the deputies or others at the time of the shooting. *Bryan*, 630 F.3d at 826. A reasonable jury could determine that he did not. It is undisputed that at the time of the shooting, Perez was unarmed, and the deputies knew that Perez had put the gun down on the ground approximately ten feet away from Perez's position when the shots started. Defendants agree that Perez was compliant prior to the shooting, including complying with commands to put the gun down on the ground, stand up, and walk slowly toward the deputies.  Immediately prior to the 40 mm deployment, Perez took a step back and started turning toward his left, and the reasonable inference is that he did so in compliance with Gaytan's command to turn around.

Rather than give Perez time to comply with Gaytan's command or the less-lethal deployment, the deputies immediately resorted to deadly force, firing the first lethal shot almost simultaneous with the last 40 mm round.  When the shots started, the deputies knew Perez had been struck by BIP, could see that Perez had nothing in his hands, and the deputies never saw Perez reach for the gun after the shots started. During all of the shots, Perez was moving away from the deputies and away from the BIP. Perez did not start running until after the BIP deployment. As discussed in the declaration of Dr. Omalu, filed concurrently herewith, McCarthy fired shots to the back of Perez's head, and the deputies continued to fire as Perez dove behind the pool table, after he had already been struck by shots, and after Perez was on the ground. Officers are required to justify every shot they fire. Here, all 35 lethal rounds were unjustified, and the rounds fired as Perez was going to the ground and after he was on the ground were particularly egregious. Pollick fired 14 lethal shots,

including shots fired after Perez was injured on the ground, and did not stop firing until Gaytan yelled "ceasefire."

Given that Perez never fired, raised or pointed the gun during the hours that he held it prior to the shooting, given that he never injured anyone and never verbally threatened to harm anyone, and given that he voluntarily put the gun down on the ground prior to the shooting, it was not objectively reasonable for the deputies to believe that Perez was running toward the gun or would fire the gun if he did retrieve it. Even when Perez had his finger on the trigger for hours prior to putting the gun down, it did not appear to the deputies that Perez was going to shoot anyone, and the deputies agreed that it would not have been reasonable to shoot him at that time. Even if Perez had grabbed the gun, deputies are trained that a gun in a subject's hand, alone, is not sufficient to justify a use of deadly force. "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).

Under the third *Graham* factor, Perez was not actively resisting arrest. By contrast, Perez complied with the deputies' commands prior to the shooting when he put the gun down, walked toward the deputies, and turned around. Perez was moving away from the BIP when the lethal shots started, and a properly trained deputy would know that being struck with BIP would cause Perez to run away to avoid being stuck by additional projectiles. *See Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1164 (9th Cir. 2011) (recognizing "that an officer's 'provocative conduct' can trigger an individual's limited right to offer reasonable resistance'"). A reasonable jury could find that Perez dove behind the pool table not to resist arrest but to take cover from the lethal shots, including shots fired when Perez was going to the ground and shots fired after he was lying motionless and bleeding on the ground.

Other significant factors to consider are the availability of reasonable alternative measures and whether the officer gave a warning that deadly force would be used. *Harris*, 126 F.3d at 1201; *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005); *see also Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014) ("A rational jury may find . . . a warning was practicable and the failure to give one might weigh against reasonableness"); *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012); *Bryan,* 630 F.3d at 831; *Headwaters v. County of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000) ("[P]olice are 'required to consider what other tactics if any were available to effect the arrest.'"). Here, it is undisputed that no deputy gave Perez a verbal warning that deadly force would be used prior to shooting. Additionally, the deputies had reasonable alternative measures other than shooting. Multiple deputies were present on scene, outnumbering Perez, and the deputies had less-lethal options available, including the 40 mm launchers and giving further commands and warnings.

Finally, as Mr. DeFoe explains in his declaration, the deputies could not shoot Perez under the fleeing felon theory under this set of facts. To justify using deadly force under the fleeing felon theory, the deputies would need (1) information prior to the shooting that Perez had committed a felony involving the infliction of death or serious bodily injury and (2) Perez still would need to pose an immediate threat of death or serious bodily injury at the time of the shots. Neither of these factors were present here.

## B. The Deputies are Not Entitled to Qualified Immunity

The deputies are not entitled to qualified immunity for three reasons. First, disputed issues of material fact preclude granting qualified immunity on summary judgment. *See Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2012) (declining to decide qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom"); *Wilkins v. City of Oakland*,

350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate."); *Brosseau v. Haugen*, 543 U.S. 194, 206 (2004) (Stevens J., dissenting) (the reasonableness of an officer's belief "...is a quintessentially 'fact-specific' question, not a question that judges should try to answer 'as a matter of law...'"). Here, there are material factual disputes bearing on the reasonableness of the deputies' uses of lethal force, including but not limited to: whether Perez was complying with Gaytan's command when he took a step back and turned around prior to the 40 mm deployment; whether Perez started moving toward the back of the pool table in in response to being struck by BIP; whether it was reasonable for the deputies to believe that Perez was running to get the gun; whether the deputies engaged in contagious fire; whether it was feasible for the deputies to give Perez further commands and time to comply with commands; whether it was feasible for the deputies to give Perez a verbal warning before shooting. On the basis of these material factual disputes alone, this case should go to a jury.

Second, at the time of the shooting, it was clearly established that shooting Perez under the above set of facts would violate Perez's constitutional right to be free from excessive force. Resolving the factual disputes in Plaintiffs' favor, this Court must assume for the purposes of summary judgment that: when Perez took a step back and turned around prior to the 40 mm deployment, he was complying with Gaytan's commands; at the time of the shots, Perez was moving toward the back of the pool table in response to being struck by BIP and not to get the gun; and Perez was visibly unarmed at the time of all the shots.

*Glenn v. Washington Cnty*. is instructive. In *Glenn*, officers struck the decedent, who was armed with a knife, with beanbag rounds, causing him to move away from the less-lethal deployments, when officers fired lethal shots, killing him. The *Glenn* court held that "material questions of fact . . . preclude a

-12-

conclusion that the officers' rapid resort to deadly force was reasonable as a matter of law. . . the disputed facts and inferences could support a verdict for either party, and the jury must resolve these factual disputes." 673 F.3d at 879-80. The *Glenn* court considered that the decedent's "movement in reaction to the beanbag fire—which a jury could conclude was a predictable consequence of using the beanbag shotgun—prompted the officers' lethal force." *Id*. As in *Glenn*, a reasonable jury could conclude that Perez was moving toward the back of the pool table as a consequence of the 40 mm deployment and not to retrieve the gun. Even if Perez had grabbed the gun, which he did not, the shooting still would have been unjustified. In denying summary judgment, the *Glenn* court found that the decedent's possession of a weapon was not dispositive. 673 F.3d 872. This is consistent with the opinion of Mr. DeFoe, and the deputies' own training that they could not shoot Perez simply for having a gun. Perez's case is even stronger than *Glenn* because Perez was unarmed at the time of the shooting, and he had not threatened to harm anyone.

In *S.B. v. County of San Diego*, 864 F.3d 1010 (9th Cir. 2017), the Ninth Circuit found that the deputy's use of deadly force violated the Fourth Amendment where the decedent was acting aggressively at the time of the shooting, grabbed a knife from his back pocket when he was six to eight feet away from a deputy, the officers did not issue a verbal warning that deadly force would be used, and the officers had less-lethal options available to them. 864 F.3d at 1014. The instant case is even stronger than *S.B.* because Perez was not acting aggressively – rather, he was compliant – and Perez was unarmed at the time of the shooting. Whereas the decedent in *S.B.* actually grabbed a weapon, here, none of the deputies saw Perez with the gun prior to or during any of the shots.

Although Perez was clearly unarmed at the time of the shooting, courts have even found that an officer's use of deadly force can violate the Fourth Amendment in cases where the subject had a gun at the time of the shooting. *See,*

*e.g., Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1020-21 (9th Cir. 2017) (denying summary judgment where, viewing the facts in the light most favorable to the Plaintiffs, the barrel of the decedent's gun began to rise as a result of the momentum of the decedent's turn); *George v. Morris*, 736 F.3d 829 (9th Cir. 2013) ("'the fact that a suspect was armed with a deadly weapon' does *not* render the officers' response per se reasonable under the Fourth Amendment"); *Harris*, 126 F.3d at 1203 (finding the shooting unreasonable and denying qualified immunity "even though the suspect had engaged in a shoot-out with law enforcement officers on the previous day and may have been the person responsible for the death of one of the officers"); *Ting v. United States*, 927 F.2d 1504, 1510 (9th Cir. 1991) (holding that the use of deadly force was excessive where the suspect, who was previously armed, was unarmed at the time of the shots); *Curnow v. Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir. 1991) (finding that the defendants were not entitled to qualified immunity where, in one witness' version of the shooting, "Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time"). *See also Figueroa v. Gates*, 207 F. Supp. 2d 1085, 1093 (C.D. Cal. 2002) (holding that the fact that subjects might have been armed previously is "largely irrelevant," if they did not pose a danger to the officers at the time they were shot).

  *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017) is instructive as to the shots fired as Perez was going to the ground and shots fired after he was struck by bullets and lying motionless the ground. In *Zion*, an officer shot the decedent nine times, and then the decedent dropped to the ground. *Id.* at 1075-76.  The defendant officer then fired nine more rounds at the unarmed decedent while the decedent was on the ground. *Id.* The Ninth Circuit held that a "reasonable jury could find that [the decedent] was no longer an immediate threat, and that [the defendant officer] should have held his fire unless and until [the decedent] showed signs of danger or flight." *See also Hopkins v. Andaya*, 958 F.2d 881, 886-87 (9th

Cir. 1992 (finding the officer's second use of lethal force excessive and unreasonable where the suspect was wounded and unarmed). This case is even stronger than *Zion* because Perez was unarmed and posed no immediate threat of death or serious bodily injury during all 35 of the shots.

Police training is also an important factor to consider in the context of qualified immunity. An officer who makes a conscious decision to violate basic training guidelines should be permitted to subsequently claim to have made a reasonable mistake or to have reasonably believed their decision to be lawful. *See Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2004). The deputies in this case were trained, prior to the shooting, that deadly force can only be used when the officer has an objectively reasonable belief that the subject poses an immediate threat of death or serious bodily injury. In violation of that training, the deputies deployed 35 lethal rounds at the unarmed Perez when he was moving away from the deputies and away from the BIP. The deputies' speculation that Perez may pose a future potential threat if he were to retrieve the gun does not constitute an immediate threat justifying the use of deadly force. When they immediately resorted to lethal force, the deputies failed to consider their training that a common reaction to being struck by less-lethal rounds is to run away from those rounds to avoid being struck by additional projectiles. The deputies also failed to follow their training with respect to de-escalating situations with persons who may be experiencing a mental health crisis. Although the deputies were trained to give a verbal warning prior to using deadly force, and even though it would have been feasible to give Perez a warning in this case, the deputies failed to verbally warn Perez before shooting him. Furthermore, police officers have a duty to continually assess and reassess the level of threat posed by an individual when deciding whether to employ lethal force. Here, there is no indication that the deputies reassessed during their 34-35 shots, including Pollick, who fired

shots at Perez when he was on the ground and already struck by shots and did not stop firing until Gaytan called, "ceasefire."

Finally, although Plaintiffs believe that the prior cases cited herein put the deputies sufficiently on notice that shooting Perez under this set of facts would be excessive and unreasonable, the Supreme Court "has firmly rejected the notion that 'an official action is protected by qualified immunity unless the very action in question has previously been held unlawful.'" *Brosseau*, 543 U.S. at 205 (Stevens, J., dissenting) ("The Court's search for relevant case law applying the *Garner* standard to materially similar facts is both unnecessary and ill advised"); *see also Furnace v. Paul Sullivan, Co*., 705 F.3d 1021, 1029 (9th Cir. 2013) ("To determine that the law was clearly established, we need not look to a case with identical or even 'materially similar' facts."); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *United States v. Lanier*, 520 U.S. 259, 271 (1997) (holding that in some circumstances, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.").

## C. Plaintiffs' Fourteenth Amendment Claim Survives

Plaintiffs' Fourteenth Amendment claim for interference with their familial relationship with Perez survives no matter which standard is applied. Where the facts regarding practical deliberation are disputed, only the jury can determine which of the two "shocks the conscience" standards apply. *Greer v. City of Hayward*, 229 F. Supp. 3d 1091 (N.D. Cal. 2017). In *Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009), the Ninth Circuit made clear that acting with "deliberate indifference to or reckless disregard for [a person's] rights" was "consistent with the standard imposed in the substantive due process context, in which government action may violate due process if it 'shocks the conscience.'" The Ninth Circuit has indicated that a standard higher than "deliberate indifference" should apply only in situations "that escalate so quickly

-16-

that the officer must make a snap judgment." *Porter v. Osborn*, 546 F.3d 1131, 1137-40 (9th Cir. 2008). The "snap judgment" to use deadly force must be a reaction to an "unforeseen" escalation by the subject. *Porter v. Osborn*, 546 F.3d 1131, 1230 (9th Cir. 2008).

This case does not support application of the "purpose to harm" standard. The deputies escalated the situation when they deployed BIP against Perez, foreseeably causing him to run away from the BIP and away from the deputies. The deputies had time to deliberate before resorting to deadly force. Perez was complying with Gaytan's command to turn around when the BIP started, and the deputies should have given Perez time to comply with the commands and the BIP or deployed additional less-lethal rather than shooting. There was no legitimate law enforcement objective in shooting Perez without warning when he was unarmed, running away, had not injured anyone, had not verbally threatened anyone, and had made no indication that he would fire the gun if he retrieved it. The deputies also had time to reassess and deliberate during their collective 35 shots but failed to do so, and the shots fired as Perez was going to the ground, after he was shot in the back of the head, and after he was already on the ground in particular highlight the deputies' reckless disregard for Perez's life.

## V.    Plaintiffs' State Law Claims Survive

Plaintiffs are entitled to a jury trial on their state law claims for battery, negligence, and violation of the Bane Act, and the County is vicariously liable for the misconduct of each of its deputies, including Gaytan and Stone, for the deputies' uses of both less-lethal and lethal force. In California, public entities are generally responsible for the conduct of their police officers acting under color of law, and California courts have pointed to strong policy reasons favoring this rule. Cal. Gov. Code 815(a); *see Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 216-17 (1991).  Qualified immunity does not apply to Plaintiffs' state law claims.

///

### D. Battery (Wrongful Death)

This Court should deny Defendants' request for summary judgment with respect to Plaintiffs' battery claim for the reasons discussed above in connection with Plaintiffs' excessive force claim. Under California law, battery and negligence claims arising out of excessive force by a peace officer are evaluated by way of traditional Fourth Amendment analysis under *Graham*, *supra*. *See Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1121 n.6 (2004) ("Federal civil rights claims of excessive force are the federal counterpart to state battery and wrongful death claims; in both, the plaintiff must prove the unreasonableness of the officer's conduct. Accordingly, federal cases are instructive."); *see also Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013); *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1274 (1998).

As set forth in detail above, the facts bearing on the reasonableness of the uses of less-lethal force and lethal force against Perez are disputed, making the question whether the uses of force were unreasonable under state law a question of fact for the jury. These factual disputes include, but are not limited to: whether Perez was complying with Gaytan's command to turn around when the BIP started; whether Perez was moving away from the deputies in response to the BIP; whether the deputies escalated the situation when they deployed the BIP; whether it would have been feasible for the deputies to verbally warn Perez that he would be struck by BIP and/or verbally warn him that deadly force would be used prior to shooting; whether the deputies failed to give Perez time to comply with commands before deploying the BIP and/or time to comply with the BIP before resorting to deadly force; the distance between Perez and the firearm when the shots started. On Plaintiffs' facts, the unarmed Perez was in the process of complying with Gaytan's commands when the deputies escalated the situation by pelting him with BIP, causing him to run away from the deputies to avoid being struck by additional rounds. When the BIP started, Perez had just completed four

-18-

successive acts of compliance with the deputies' commands, the deputies knew that Perez had put the gun down on the ground, and could see that his hands were empty. Therefore, it was unreasonable for the deputies to use any force against Perez.

### E. Negligence (Wrongful Death)

With respect to Plaintiffs' negligence claim, the California Supreme Court has clarified that in police shooting cases, the negligence analysis is even broader than a typical Fourth Amendment analysis because state law specifically considers negligent "pre-shooting" tactics as part of the "totality of the circumstances" evaluation. *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 639 (2013) (an officer's tactical conduct and decisions preceding the use of deadly force are relevant considerations in determining whether the use of deadly force gives rise to negligence liability, which "can arise, for example, if the tactical conduct and decisions show, as part of the totality of circumstances, that the use of deadly force was unreasonable"). The deputies engaged in negligent tactics prior to the less-lethal and lethal deployments, which supports a denial of summary judgment. For example, the deputies negligently failed to allow Perez time to comply with Gaytan's command before deploying the BIP and negligently failed to give Perez time to comply with the less-lethal deployment before shooting. The deputies' deployment of BIP against Perez prior to the shooting was negligent and escalated the situation. The deputies knew that Perez was "possibly 5150," and a reasonably well-trained deputy would have recognized that Perez was mentally ill or experiencing a mental health crisis. Deputies are trained that deploying less-lethal munitions against a person who is experiencing a mental health crisis can escalate the situation and cause the person to run away from the less-lethal munitions.

///

///

**F. Violation of the Bane Act (Cal. Civ. Code § 52.1)**

Plaintiffs are also entitled to a jury trial with respect to their claim for violation of the Bane Act under California law. The Ninth Circuit in interpreting *Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766, 798 (2017) stated, "it is not necessary for the defendants to have been 'thinking in constitutional *or legal terms* at the time of the incident[], because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights.'" *Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) (quoting *United States v. Reese*, 2 F. 3d 870 (9th Cir. 1993). Here, the deputies shot Perez with BIP and lethal rounds without first issuing a verbal warning, when the deputies knew Perez was unarmed and when Perez was moving away from the deputies, had not injured anyone, had not verbally threatened to injure anyone, had not tried to attack anyone, and had never raised, fired or pointed the gun when he held it prior to putting it down. This certainly indicates that the deputies acted with a reckless disregard for Perez's constitutional right to be free from excessive force when they shot Perez.

**G. Plaintiffs Are Entitled to Punitive Damages**

Based on the above facts, a reasonable jury could determine that Plaintiffs are entitled to punitive damages. Further, Plaintiffs' request for punitive damages, whether Plaintiffs are entitled to punitive damages is a question for the jury to consider after the presentation of all the evidence at trial. *Herrera v. Las Vegas Metropolitan Police Dept.*, 298 F. Supp. 2d 1043, 1055-56 (D. Nev. 2004) (the appropriateness of punitive damages must be determined after the presentation of all the evidence at trial); *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 821 (1979) ("Determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury.") Because there are disputed issues of fact bearing on whether the use of lethal force against Perez constituted excessive force in violation of the Fourth Amendment and state law, there is a

question of fact whether the officers' shooting of Perez was motivated by evil or was in reckless or callous indifference to his constitutional rights.  Thus, the Court cannot find that Plaintiffs are not entitled to punitive damages as a matter of law.

## VI.   CONCLUSION

In light of the above, Plaintiffs respectfully request that this Court deny Defendants' motion for summary judgment.


Dated: March 15, 2024,                LAW OFFICES OF DALE K. GALIPO


                                   By:   /s/ Shannon J. Leap
                                         Dale K. Galipo
                                         Shannon J. Leap
                                         Attorneys for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2</u>

The undersigned, counsel of record for Plaintiffs, **A.J.P.** and **A.M.P**., minors, by and through their guardian ad litem Cynthia Nunez, and **PATRICIA RUIZ**, certifies that this brief contains 6,990 words, which complies with the word limit of L.R. 11-6.1.

By:     */s/ Shannon J. Leap*
         Shannon J. Leap
         Attorneys for Plaintiffs