# EXHIBIT 1

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4    A.J.P. and A.M.P., minors, by and      )
     through their guardian ad litem        )
5    Cynthia Nunez, individually and as     )
     successor in interest to Albert Perez,)
6    deceased, and PATRICIA RUIZ,           )
     individually,                          )
7                                           )
                 Plaintiffs,                )
8                                           )
                 vs.                        )Case No.
9                                           )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES     )
10   1-10, inclusive,                       )
                                            )
11               Defendants.                )
     _____   )

12

13

14

15         REMOTE VIDEOCONFERENCE DEPOSITION OF

16                     DAVID MOORE

17                 SEPTEMBER 15, 2023

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  6788

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And to your knowledge, was there one? |
| 3 | A. | Yes.  There was round count conducted by Homicide. |
| 4 | Q. | And did the round count, if you know, indicate that |
| 5 | | five shots had been fired by you? |
| 6 | A. | Yes. |
| 7 | Q. | How long have you been a police officer for? |
| 8 | A. | Little over ten years. |
| 9 | Q. | And how old are you now? |
| 10 | A. | I'm 32-years old. |
| 11 | Q. | How tall are you? |
| 12 | A. | Five-nine. |
| 13 | Q. | How much do you currently weigh? |
| 14 | A. | 225 pounds. |
| 15 | Q. | What was your assignment at the time of this |
| 16 | | incident? |
| 17 | A. | Assigned to the Specialized Enforcement Division. |
| 18 | Q. | And how long had you been assigned to that |
| 19 | | division? |
| 20 | A. | Approximately -- well, I was on Perimeter |
| 21 | | Containment Team for two years and then assigned full -- |
| 22 | | fully staffed there at SED for approximately -- almost three |
| 23 | | years. |
| 24 | Q. | Had you been present before at the scene of an |
| 25 | | officer-involved shooting? |

1   report.

2      Q.    Okay.  Do you have an estimate as to what time of

3   the day it happened?

4      A.    Yes.

5      Q.    What is your estimate?

6      A.    It was approximately around 7:00 p.m.

7      Q.    Do you know the decedent's name now?

8      A.    Yes.

9      Q.    What is his name?

10     A.    It's Albert Perez.

11     Q.    And to your knowledge, had you ever seen Albert

12  Perez before the date of the incident?

13     A.    Never.

14     Q.    And where was Albert Perez when you first saw him on

15  the day of the incident?

16     A.    He was seated in -- on a stool in the back of a

17  garage at a -- at a residence.

18     Q.    And can you give me just time-wise an estimate as to

19  how much time passed from when you first saw him sitting on

20  the stool to when you fired your shots?

21     A.    Yes.  I would say approximately about -- about

22  approximately 30 minutes, a little over 30 minutes.

23     Q.    Okay.  Were you involved in trying to talk to

24  Mr. Perez during any of that 30 minutes?

25     A.    No, sir.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                            Page 10

 1      Q.   Other officers were doing that?

 2      A.   Yes.

 3      Q.   What was your understanding of your assignment

 4   during that 30 minutes?

 5      A.   I was assigned with a shield positioned to the left

 6   side of the garage and provide cover for partners behind me,

 7   and I had lethal coverage.

 8      Q.   And the lethal cover would be the weapon you've

 9   already discussed?

10      A.   Yes.

11      Q.   At some point did you see Mr. Perez get up from that

12   stool?

13      A.   Yes.

14      Q.   And was there as pool table in the area?

15      A.   Yes.

16      Q.   And this was in the garage?

17      A.   Correct.

18      Q.   Was the garage door open?

19      A.   Yes.  The main garage door was open.

20      Q.   And do you know -- strike that.

21           You saw a gun in his lap at some point?

22      A.   Yes.  I saw Mr. Perez holding a gun in his hand with

23   his finger on the trigger.

24      Q.   Okay.  And for how long of a period of time did you

25   see him holding the gun with his hand on the trigger?

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                          Page 11

```
 1      A.    Approximately over 20 minutes before he placed it
 2  down on the floor.
 3      Q.    Did anybody ask him to place it down on the floor,
 4  if you know?
 5      A.    Yes.
 6      Q.    And who was asking him to do that, if you know?
 7      A.    That was our crisis negotiator, Deputy Alcala.
 8      Q.    And where did he put the gun on the floor, if you
 9  know, in relation to that bar stool he was sitting on?
10      A.    He placed it directly in front of him on the floor
11  which would be in front of the stool.
12      Q.    And would it have been somewhere in between the
13  front of the stool and the end of the pool table at that
14  point?
15      A.    Yes.
16      Q.    And would that be on the side of the pool table
17  further from the threshold of the garage, open garage door?
18      A.    Can you explain which garage door?
19            Is it the main?
20      Q.    Yeah.  Sorry about that.
21            The main door that have to open or close for a car
22  to pull in.
23      A.    Yes.  That's correct.
24      Q.    Okay.  And then did he walk towards you at some
25  point?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                          Page 12

1        A.    Yes.

2        Q.    And did he walk towards you after the gun was put

3    down on the floor?

4        A.    Yes.  Once he placed the gun on the floor, then he

5    slowly started walking towards us.

6        Q.    Did anyone tell him, if you know, to walk towards

7    you?

8        A.    Yes.

9        Q.    And would that be Deputy Alcala, also?

10       A.    Correct.

11       Q.    So at least up to that point in time you had two

12   acts of compliance:  One would be putting the gun down, and

13   one would be walking towards you?

14       A.    Well, not necessarily.  He had been given multiple

15   commands, and he wasn't listening to Deputy Alcala.  He

16   continued to hold the firearm in his -- in his lap.

17            We asked multiple times.  And prior to that is -- an

18   hour, more than hour or so for him to place that fire -- that

19   firearm down.

20            And then he eventually listened to us.

21       Q.    Right.  And again, I'm not suggesting he immediately

22   complied because obviously he didn't.

23            But eventually he did put the gun down?

24       A.    Yes.  After numerous requests for him to place it

25   down, he finally put it down.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 13

```
 1      Q.   And when he finally put it down, did you view that

 2   at least at that time as an act of compliance?

 3      A.   Somewhat.  Just due to his demeanor and his facial

 4   expressions, he was at that point he wasn't listening to the

 5   commands.  He was very slow and took him quite some time to

 6   get to us, and he still wasn't listening to what Deputy

 7   Alcala was requesting him to do.

 8      Q.   Did you form the impression that he might be

 9   intoxicated, under the influence of alcohol at the time?

10      A.   I couldn't tell from that distance.  I would have to

11   balance him out, but it was unknown to me at that point.

12      Q.   Okay.  Did you have any information that he might be

13   intoxicated with alcohol prior to the shooting?

14      A.   No.

15      Q.   And when you say at that distance, what distance

16   were you?

17      A.   Can you explain the distance for me?

18           When he was seated or when he approached?

19      Q.   So let me break it down.

20           So when he was on the stool what would you estimate

21   your distance to be from him at that point?

22      A.   I would say approximately 10 to 12 feet.

23      Q.   Were you in the garage or outside the threshold of

24   the door?

25      A.   I was probably a half foot into the threshold of --
```

1   of the garage.

2       Q.   And as you're looking into the garage, the pool

3   table would be in between you and where he was?

4       A.   Correct.

5       Q.   And where were you in relation to the pool table?

6            And what I mean by that, were you more on the right

7   side or the left side or dead center?

8       A.   I was on the left side which would be like the left

9   corner of the garage at a kneeling position.

10      Q.   In a kneeling position?

11      A.   Yes, sir.

12      Q.   And just so that I'm clear, when he put the gun down

13  did he first stand up and then put the gun down?

14           Or did he put it down or drop it from being seated

15  in the stool?

16      A.   Mr. Perez placed the gun down first and then he

17  stood up.

18      Q.   And then when he started walking, was he walking

19  towards the threshold of the main garage door?

20      A.   He was walking towards the threshold, but he stopped

21  right at the edge of the front of the pool table.

22      Q.   Okay.  So what side of the pool table did he walk on

23  from your perspective?

24           Would it be the left side that you were closer to,

25  or would be the right side?

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                    Page 15

1     A.   The left side that I was closer to.

2     Q.   Okay.  And when you say he stopped at the end of the

3   pool table, would it be the end closer to the threshold of

4   the main garage door, or would it be the end closer to the

5   bar stool?

6     A.   The end closer to the threshold.

7     Q.   And when he walked, was he walking slowly?

8     A.   Yes.  Very slowly.

9     Q.   And could you hear him saying anything as he was

10   walking forward?

11     A.   He did not say anything even at the time that he was

12   seated at the stool.  He made a few comments right when he

13   stopped at the front of the pool table, but I couldn't hear

14   exactly what he was saying.

15     Q.   What would you estimate his age to be?

16     A.   He had to be in his 30's, approximately his 30's.

17     Q.   Could you tell what race he was?

18     A.   Yes.

19     Q.   What did it appear?

20     A.   He appeared to be Hispanic.

21     Q.   Any estimate as to his height or weight?

22     A.   He appeared to be approximately maybe my height,

23   five-nine to -- or maybe a little taller.

24     Q.   And how about his weight?

25     A.   Probably approximately like 230, 240, maybe.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                    Page 16

```
 1        Q.   Do you recall what he was wearing?

 2        A.   I remember he was wearing dark clothing.

 3             It was a dark-colored shirt and dark-colored

 4   pants.

 5        Q.   And could you see from your position where he had

 6   put the gun down on the floor?

 7        A.   Yes.

 8        Q.   And when he was walking towards you, were you fairly

 9   confident that the gun was still on the floor where he had

10   put it?

11        A.   Yes.  I could see where he placed the firearm, and

12   yeah, from my position I could still see it.

13        Q.   Okay.  And the firearm, how close was it to that bar

14   stool he was sitting on, if you remember?

15        A.   I would say approximately half a foot in front of

16   it, and I believe it was about maybe a foot and a half behind

17   the pool table.

18        Q.   And when he was walking slowly in your direction,

19   did you maintain your position, or did you reposition

20   yourself?

21        A.   I maintained my position.

22        Q.   How close did he get to you?

23        A.   Approximately, like, I would say five to seven

24   feet.

25        Q.   And you were still kneeling at that point?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 17

```
 1      A.   Yes, sir.

 2      Q.   Were you pointing your firearm in his direction at

 3   that point?

 4      A.   Yes.

 5      Q.   Could you see his hands as he was walking towards

 6   you?

 7      A.   Yeah.  His hands were down at the time.

 8      Q.   Did you see any weapon in his hands at that time?

 9      A.   At that point at that time I did not see the -- any

10   weapons in his hands.

11      Q.   Did you see any weapons on his person at that

12   time?

13      A.   No.  He was wearing heavy clothing, so it was

14   unknown if he was concealing anything, but I couldn't see.

15      Q.   Did you observe him, for example, reaching into a

16   pocket or his waistband as he was walking towards you or when

17   he came to that stop?

18           MS. CARPENTER:  Vague as to time.

19           You can answer.

20   BY MR. GALIPO:

21      Q.   Do you understand the time frame, or did you want me

22   to repeat the question?

23      A.   I'm sorry.  Can you just repeat it one more time,

24   please.

25      Q.   Sure.  So when he was walking along the side of the
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                    Page 22

```
 1   compliant with us.
 2          And based off his criminal history and the crime
 3   that he had committed, I had -- I believed that he was
 4   potentially violent.
 5   BY MR. GALIPO:
 6      Q.   So it sounds like the only information you had was
 7   that he had brandished a weapon at someone and was arrested
 8   once for 245; is that true as far as past conduct?
 9      A.   That's correct.  And just his demeanor when he was
10   seated at the -- at the stool holding the firearm.
11      Q.   Did he point the firearm at anyone while he was
12   sitting on the stool?
13      A.   No.  He just had his finger on the trigger, and it
14   was -- it was on his lap in plain view.
15      Q.   How long do you think he was sitting on the stool --
16   well, you saw him for about 30 minutes; right?
17      A.   Yes, sir.
18      Q.   During that 30 minutes did he point the firearm at
19   anyone?
20          MS. CARPENTER:  Asked and answered.
21   BY MR. GALIPO:
22      Q.   You can answer.
23      A.   No.  He continued just to hold -- he held the
24   firearm on his lap with his finger on the trigger.
25      Q.   So we're up to the time frame that he's about five
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                          Page 28

1       A.    I believe so, yes.

2       Q.    And then do you know Alcala asked Albert to stand

3    up?  Do you remember that?

4       A.    Yes.

5       Q.    And also asked Albert to walk towards us, which

6    would be the officers; correct?

7       A.    Yes.  He eventually asked him.

8       Q.    So he asked him to put the gun down; he asked him to

9    stand up, and you asked him to walk towards you; correct?

10      A.    Yes.  Took multiple commands to ask him to do it.

11            It was very difficult for him to finally listen, but

12   he eventually did, but he did in a slow pace.

13      Q.    Did he seem kind of slowed down to you?

14            MS. CARPENTER:  Vague and ambiguous.

15   BY MR. GALIPO:

16      Q.    In other words, in his motions, did you seem kind of

17   slowed down to you?

18      A.    No.  He appeared to be resistant like he didn't want

19   to follow directions, but he eventually slowly moved to us.

20      Q.    Prior to him being in that standing position that

21   you indicated, based on what you observed up to that point in

22   time, did you think it was appropriate to shoot him?

23      A.    To the point where he stood up?

24      Q.    To the point where he stood up, walked forward, and

25   then was in that standing position for about 15 minutes

1    before moving further.

2         A.    At that point, no.

3         Q.    Okay.  And during the 30 minutes that you were

4    observing him including the time frame that he was sitting in

5    the stool with the gun in his hand with his finger on the

6    trigger?

7         A.    Yes.  I observed all that.

8         Q.    Did you have an understanding as to where Deputy

9    Alcala was in relation to you when he was talking to him?

10        A.    I don't have an approximate distance, but I know

11   his -- where his position was from me.

12        Q.    What was your general understanding?

13        A.    He was to the right side of me, not in close

14   proximity, though.

15        Q.    Was there any discussion in terms of tactical plan

16   as to when the less-lethal would be deployed?

17              In other words, if he started walking back towards

18   the gun, was there any discussion in that regards?

19        A.    The only discussion that we had was the fact that if

20   he attempted to walk towards the firearm, less-lethal would

21   be used.

22        Q.    Was that discussion with Sergeant Gaytan?

23        A.    Yes.

24        Q.    And who was part of that discussion, if you know?

25        A.    The -- essentially, the team that was present

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                          Page 31

1   couldn't determine who was shooting first or shooting first.

2       Q.   Could you tell how many rounds were being

3   deployed?

4       A.   Yes.

5       Q.   What was your impression?

6       A.   The rounds that I heard being deployed were

7   three BIP rounds.

8       Q.   And were they deployed close in time with another

9   with each other?

10           In other words, all within a second or two?

11           MS. CARPENTER:  Vague and ambiguous.

12           You can answer.

13           THE WITNESS:  They were very quick.

14   BY MR. GALIPO:

15       Q.   When you say very quick, are you meaning like within

16   a second, or what do you have in mind?

17           MS. CARPENTER:  Objection.  May call for

18   speculation.

19           You can answer.

20           THE WITNESS:  Approximately maybe a second.

21   BY MR. GALIPO:

22       Q.   Did you hear any warning that less-lethal was going

23   to be deployed immediately prior to its deployment?

24       A.   A warning from?

25       Q.   From the person shooting the less-lethal either

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 33

1    fired just as bean bag rounds, the person firing should

2    indicate that, if they can, verbally so that the other

3    officers know it's less-lethal, not less-lethal?

4              MS. CARPENTER:  Objection to the extent it misstates

5    the policy in the training.

6              You can answer.

7              THE WITNESS:  Normally, we do say that, but just due

8    to the circumstance how it rapidly evolved with Mr. Perez,

9    immediately turning and running back to the firearm, I

10   couldn't -- I couldn't hear if that was said or not from

11   Stone.

12   BY MR. GALIPO:

13        Q.   And do you know why in the training that's suggested

14   to be said?

15             MS. CARPENTER:  Same objection to the extent it

16   misstates the policy and the training.

17             You can answer.

18             THE WITNESS:  Just -- just for the fact like I

19   stated that less-lethal is only being deployed and not

20   firearms.

21   BY MR. GALIPO:

22        Q.   Okay.  You've heard of the term before "contagious

23   fire?"

24        A.   Contagious fire?

25        Q.   Have you heard that term before in training?

```
 1        A.    Sympathetic fire?

 2        Q.    Yeah.  Sympathetic fire, sometimes it's referred to

 3    as that.

 4        A.    Yes.

 5        Q.    What is your understanding of what that is?

 6        A.    Basically the fact that an officer might hear a

 7    gunfire.  They might fire themselves thinking that there is

 8    firing, an active shooting going on.

 9              And that wasn't the case -- that this -- this

10    incident.

11              MS. CARPENTER:  It wasn't the case?

12              THE WITNESS:  It wasn't the case.

13    BY MR. GALIPO:

14        Q.    So when you heard the three less-lethal being fired,

15    was that before any lethal shots were fired?

16        A.    Yes.

17        Q.    And how much time do you think passed from the last

18    less-lethal shot to the first lethal shot?

19              MS. CARPENTER:  So objection to the extent you're

20    calling less-lethal deployments shots.

21              But you can answer.

22    BY MR. GALIPO:

23        Q.    Yeah.  I guess I can rephrase it just to be clear so

24    we're not confused.

25              The less-lethal you're talking about were the
```

```
 1   BY MR. GALIPO:

 2        Q.   When you say very quick, what time frame do you have

 3   in mind?

 4             MS. CARPENTER:  Same objection.

 5             You can answer.

 6             THE WITNESS:  Sorry.  I'm just trying to put

 7   together.

 8             When he's stepping back closer to the firearm, then

 9   the -- it had to -- it had to have been really, really -- I

10   mean split seconds, just really fast.

11   BY MR. GALIPO:

12        Q.   So you think it was a split second between the last

13   40-millimeter round and the first lethal round?

14        A.   Yeah.  I would say approximately.

15        Q.   So this is the part that I just want to make sure

16   I'm getting correctly, and I apologize.

17             But I wasn't there, and I want to make sure I'm

18   understanding your testimony correctly.

19             The bar stool that he was sitting on initially, I

20   think you told me he put the gun down in front of the bar

21   stool closer to the bar tool, maybe within a half of foot and

22   about a foot and a half from the end of the pool table.

23             Do I have that part right?

24        A.   Yes.

25        Q.   Okay.  He stood up and walked along the side of the
```

```
 1   pool table that was closer to you?

 2       A.   Yeah.  After multiple commands asking him --

 3       Q.   I realize he didn't do things right away.  I'll give

 4   you that.  I get that.  I'm not suggesting he immediately

 5   complied because I realize from listening to the tape and

 6   reviewing your statement he did not.

 7            But at some point you would agree he walked slowly

 8   towards you?

 9       A.   Yeah.  Eventually, he started walking after numerous

10   commands.

11       Q.   Okay.  And when he came to a stop, it was towards

12   the end of the pool table closer to where you were at?

13       A.   Approximately.

14       Q.   And then you said he remained in that position for

15   about 15 minutes?

16       A.   Approximately 15 minutes.

17       Q.   Generally facing towards your direction?

18            MS. CARPENTER:  Objection.  Misstates his testimony

19   and lacks foundation.

20   BY MR. GALIPO:

21       Q.   Let me ask you:  Was he generally facing towards the

22   open main garage door?

23       A.   Correct.

24       Q.   And at that point what would you estimate the

25   distance to be from Mr. Perez to where that gun was on the
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                          Page 40

 1   other side of the pool table?

 2        A.   Sorry.  So when he was running towards the firearm,

 3   or --

 4        Q.   No.  When he was standing stopped for the 15

 5   minutes.

 6             MS. CARPENTER:  Vague and ambiguous as to time.

 7             You can answer.

 8             THE WITNESS:  I would say approximately seven, seven

 9   to eight feet.

10   BY MR. GALIPO:

11        Q.   Do you know how -- where was he in relation to the

12   pool table when he came to a stop?

13             MS. CARPENTER:  At what point, Counsel?

14             MR. GALIPO:  After he walked slowly forward, the

15   only time he says he stopped.

16             MS. CARPENTER:  Okay.

17             THE WITNESS:  He was right at the corner of the --

18   the pool table.

19   BY MR. GALIPO:

20        Q.   Okay.  Go ahead.  I'm sorry.

21        A.   Which was the side closest to me.

22        Q.   Do you know how long that pool table is?

23        A.   I don't recall at this moment.

24        Q.   But you're estimating when he was in that stopped

25   position facing out towards the open main garage door, he was

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 41

1    approximately seven to eight feet from where the gun was on

2    the floor?

3         A.   Correct.

4         Q.   And when he took the step back you're referring to,

5    was his upper body still facing in the direction of the open

6    main garage door?

7         A.   When he took that step back he was slightly canted

8    to the left in that kind of like a turning motion.

9              That's what I saw.

10        Q.   And it was after he took that step back that you

11   observed the three 40-millimeter rounds hit him in the

12   abdomen area?

13        A.   Yes.  After numerous commands to turn around and to

14   kneel, I could see in his facial expression that he did not

15   want to listen.  He shook his head back and forth, and had a

16   facial expression of resentment, he's resisting.

17             And so that's when he took that step back in a

18   canting motion.  He was canting more towards the opposite

19   direction from me like as if he was going to turn.

20        Q.   Okay.  And that is when the 40-millimeters were

21   deployed?

22        A.   Correct.

23        Q.   And then a split second after the last 40-millimeter

24   that was deployed is when you heard the first lethal round?

25        A.   Yeah.  At that point that's when he started charging

A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.
David Moore on 09/15/2023                                    Page 42

```
 1    towards the firearm.
 2        Q.   Did you see him moving or running towards the
 3    firearm at any time before the less-lethal was deployed?
 4        A.   Sorry.  Just repeat that one more time.
 5        Q.   Did you see him running towards the firearm at any
 6    time before the less-lethal was deployed?
 7        A.   Just that step back when he was turning around
 8    towards the firearm.
 9        Q.   Yeah.  But it sounds like he was -- he wasn't
10    running at that point; is that correct?
11        A.   It was unknown his intentions at the -- not
12    intention, but just unknown what he was about to do, but he
13    was turning at that point towards that firearm.
14             I know that for sure.
15        Q.   I get that.  But it seem like in your statement you
16    indicate he started running after the 40-millimeter was
17    deployed.
18             MS. CARPENTER:  So objection to the extent that it
19    may misstate his prior testimony or statement.
20             But you can answer.
21             THE WITNESS:  I don't recall stating that, but the
22    fact that he took that step back, that canting motion,
23    turning motion towards the firearm, that's when the
24    less-lethal BIP rounds were deployed on Mr. Perez.
25    BY MR. GALIPO:
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 43

1      Q.   And then when did you fire your first round in

2   relation to the last 40-millimeter round?

3      A.   At that point where he start charging towards the

4   firearm and slowly -- stretch motion towards the firearm,

5   approximately three to five feet.  He was three to five feet

6   away.

7      Q.   So three to five fight away from what?

8      A.   The firearm.

9      Q.   So I guess what I was asking, and maybe you've

10  already answered.

11          How much time passed from you hearing the last

12  40-millimeter round and you firing your first lethal round?

13     A.   It's -- it was like I said, I don't know the exact

14  time, but it was very fast.

15          Again, it would have to be a split seconds.

16          As he got closer to that firearm, like I said, he

17  was about three to five feet away from it and outstretched --

18  it was like he was trying to reach for the gun.

19          That's when I started firing.

20     Q.   And where was he in relation to the pool table when

21  you started firing?

22     A.   He was about to round the corner of the pool

23  table.

24     Q.   Can you say that again.  I'm sorry.

25     A.   He was about to round the pool table with his hands

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                          Page 44

1    outstretched towards the firearm.

2        Q.    Did you indicate in your other statement that his

3    hands were outstretched towards the firearm?

4        A.    I believe so.  I indicated that his -- it was either

5    one of his arms, his or left or right arm that was reaching

6    out towards the firearm as he came around the pool table.

7        Q.    But it sounds like you started firing before he came

8    around the pool table.

9        A.    So I fired like I said, he was about three to five

10   feet away from him, and he was lowering his body level, and

11   at that point when I saw he was outstretched trying to reach

12   for it, that's when I started firing.

13       Q.    And what part of his body were you aiming for when

14   you fired?

15       A.    Center mass.

16       Q.    What was center mass from your perspective?

17       A.    His torso area.

18       Q.    Which part?

19             Was it his front or his back or something else?

20       A.    I would say probably around his side portion of his

21   torso.

22       Q.    What side of his torso?

23       A.    I would say his right side.

24       Q.    So your center mass from your perspective was his

25   right side?

1      A.   Correct.  His upper torso area which is on his right

2    side.

3      Q.   So wouldn't he be facing almost towards the pool

4    table for his right side to be exposed to you?

5           MS. CARPENTER:  Objection.  Lacks foundation; vague

6    and ambiguous.

7           You can answer.

8           THE WITNESS:  So as I was aiming for his center

9    mass, he was -- he was running about -- he was about three to

10   five feet away from that firearm, and he was lowering his

11   position, and he had his arm outstretched -- stretched

12   towards the firearm.

13          That's when I began firing at him aiming for his

14   center mass which his right side would be facing the pool

15   table.

16   BY MR. GALIPO:

17     Q.   His right side would have been facing towards you?

18     A.   Yeah.  Actually, so as he's turning -- turning

19   around, it would be facing a canted position towards me.

20     Q.   And in your statement you indicated that you fired

21   five rounds; is that correct?

22     A.   Yes.

23     Q.   Did you fire them in rapid succession?

24     A.   Yes.

25     Q.   And then you said in your statement you fired the

```
 1   five rounds towards him, and then he cornered the pool table.

 2           Do you remember saying that?

 3     A.   I don't recall, but I did -- as he was running

 4   towards that firearm, he was moving, his body lowering down,

 5   he was about to round the table.

 6           So I began firing at him, one, two, three, and then

 7   reassess as he came around the corner, and four, five, aiming

 8   for center mass.

 9     Q.   Would you at least agree what you just told me, your

10   first three shots were before he went around the corner of

11   the pool table?

12           MS. CARPENTER:  Objection to the extent it misstates

13   his testimony.

14           You can answer.

15           THE WITNESS:  I mean it's possibility, but like I

16   said, he -- I was firing at center mass, and he -- he was

17   only three to five feet away from that gun.  His arms were

18   outstretched towards the firearm while I was shooting.

19   BY MR. GALIPO:

20     Q.   Well, in your statement you say, "I, with my 911 I

21   shot five rounds towards him, and then he cornered the pool

22   table."

23           That's what you said in your original statement.

24           Do you recall saying that?

25           MS. CARPENTER:  Counsel, what page are you on on the
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 48

```
 1      A.   Yes --

 2      Q.   Do you see where you say that --

 3      A.   Yes.

 4      Q.   Okay.  So would you at least agree with me that in

 5    your original statement you said you fired five shots towards

 6    him and then he cornered the pool table?

 7           MS. CARPENTER:  So objection to the extent you're

 8    misstating his testimony and his statement.  You're taking it

 9    out of context.

10           But you can answer.

11           THE WITNESS:  I stated that I fired five rounds

12    towards him.  So like I said, as he was lowering his

13    position, he was coming around that corner, and I was firing

14    the five round towards him at center mass.

15    BY MR. GALIPO:

16      Q.   Right.  But you would agree that here in this part

17    of the statement in addition to saying you fired five rounds

18    towards him, you said, "And then he cornered the pool table."

19           MS. CARPENTER:  So objection to the extent you're

20    misstating his statement by taking it out of context.

21           You can answer again.

22           THE WITNESS:  Yeah.  Like I said, once he got about

23    three to five feet away from or close to that firearm, I

24    fired at him.  He was at a lowered position coming around

25    that -- that post of the pool table.
```

 1   me earlier, but I thought you said that you fired three

 2   rounds before he got to the corner of the table.

 3              Did I misunderstand that?

 4      A.   So like I said, as he was rounding the corner, he

 5   was basically running towards it and going at a lowered

 6   position, and so he was approximately three to five feet away

 7   from the firearm with his hands outstretched.

 8              That's when I began firing my five rounds towards

 9   him.  So I fired three, and then I had to track him down as

10   he was moving close to the gun or get to his gun, and then I

11   fired my -- my last two.

12      Q.   I just want to make sure.

13              You're agreeing today that you fired three rounds

14   before he got to the corner of the pool table; is that

15   true?

16              MS. CARPENTER:  Objection to the extent it misstates

17   his testimony; asked and answered.

18              You may answer again.

19              THE WITNESS:  Sir, like I said, it was very fast and

20   rapid moving.  I fired when he was at three to five feet away

21   with his arms outstretched, rounding the corner of the -- of

22   the pool table.

23   BY MR. GALIPO:

24      Q.   So you would agree you did not see a gun in his hand

25   when you were firing.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                                    Page 51

```
 1              Would you at least agree with that?
 2      A.    Yeah.  At that point, that moment, yes.
 3      Q.    And did you hear any other shots being fired other
 4  than yours as you were firing your lethal rounds?
 5      A.    Yes.
 6      Q.    Did you give any verbal warning that you were going
 7  to fire?
 8      A.    No, sir.  Just the fact that it was an immediate
 9  threat and it was such a fast event, I didn't have time to
10  say anything.
11      Q.    Did you give him any commands before you fired?
12      A.    No.  I didn't want to interrupt the -- the commands
13  that Deputy Alcala and Sergeant Gaytan were giving him.
14      Q.    Did you ever consider that he might be running from
15  being hit by the three less-lethal rounds?
16          MS. CARPENTER:  Objection.  Lacks foundation;
17  speculation; incomplete hypothetical.
18          You can answer.
19          THE WITNESS:  No, sir.  The reason I don't believe
20  that because there was stack of tires that was to his -- his
21  right.  If he was trying to get away and find cover, he would
22  probably duck, which was closest to him.
23          So I don't see him -- not only that, his hands were
24  outstretched towards the firearm.
25  BY MR. GALIPO:
```

1      Q.   Is that about how far the step back was, about a

2   half foot?

3      A.   Yeah.  Approximately half foot.

4      Q.   And so when he took the step back, it took a second

5   or so for the 40-millimeter rounds to be deployed; is that

6   fair?

7      A.   I'm sorry.  You said --

8      Q.   It took a second or so for the 40-millimeter rounds

9   to be deployed after he took that step back?

10     A.   Approximately.  I think it was faster.

11     Q.   Well, looking at Page 52, if you could look at Lines

12  15 through 20, the detective is asking you how long did it

13  take from him taking that half step back to Stone deploying

14  the BIP round.

15          And you're estimating about two seconds, I think.

16     A.   I see that.  Approximately.

17     Q.   And then at the bottom of Page 52 of your statement,

18  you say, "It looked like a continuos, like it was going to be

19  a continuos motion.  But however, that less-lethal round

20  stopped him from continuing, and so he kind of like turning

21  back, and like oh, oh, oh, and that's when he takes off

22  darting towards the gun."

23          Do you see that?

24     A.   Yes.

25     Q.   So this "oh, oh, oh," was that coming from

1      Q.    Yeah.  Charging it and pumping it, what are you

2    referring to?

3      A.    I'm just referring to Stone actually racking the

4    40-millimeter launcher.

5      Q.    And then going to Page 54, you're being asked

6    on Lines 13 to 18 where you think they impacted him, the

7    40-millimeter rounds.

8            And you're saying, and I'm paraphrasing here, The

9    first one above the stomach right near the sternum area, the

10   second one towards the center, and the third one maybe to the

11   left of the stomach.

12           Do you see that general response?

13     A.    Yes.

14     Q.    So from your perspective he would have went to the

15   ground after your five shots?

16     A.    Yeah.  So after my five shots when he was rounding

17   that corner and his hand was outstretched to the firearm, he

18   made it on top of the gun.

19     Q.    Did you hear any shots being fired after Mr. Perez

20   went to the ground?

21     A.    Yes.

22     Q.    Did you fire any of those shots after he went to the

23   ground?

24     A.    No.  Just the fact that once he started lowering his

25   position -- sorry -- so then when he was running towards the

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                    Page 58

1   firearm when he was lowering himself, I fired three rounds as

2   he was rounding the corner, and I dropped -- reassessed, and

3   fired two additional rounds.

4        Q.   Who fired two additional rounds?

5        A.   That was me.  So I -- first three as he's lowering

6   his position rounding I had to reassess, and then fired two

7   additional rounds as he made it around the post on top --

8        Q.   That's what I was trying to get at before.

9             So are you saying that your first three rounds, he

10  was on the side of the pool table, and the last two was after

11  he rounded the corner of the pool table?

12       A.   No.  I'm basically saying that he -- as he is

13  running towards the back, he's rounding simultaneously as

14  he's lowering himself.  And that's when I fired the first

15  three rounds, and then like I said, reassess, as he made it

16  around, additional two rounds.

17            And that's when he landed on top of the firearm.

18       Q.   So the additional two rounds would have been as he

19  rounded the corner?

20       A.   As he continued, correct.

21       Q.   How much of a pause do you think there was in

22  between your first three shots and your assessing and the

23  last two shots?

24       A.   It was very fast, sir.  I couldn't put a number on

25  it.  It was just very quick.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 66

```
 1      Q.   I understand that part.
 2           What I'm trying to say, obviously, you're not
 3  trained to shoot someone only for seeing a gun in their hand
 4  because you saw him for some period of time with gun in his
 5  hand, and you didn't shoot him, true?
 6      A.   Yeah.  We did not shoot him at that time.
 7      Q.   So your training is a gun in the hand is not enough;
 8  right?  It has to be based on the totality of the
 9  circumstances and immediate threat of death or serious bodily
10  injury?
11           MS. CARPENTER:  Objection to the extent it misstates
12  the policy and the training.
13           But you can answer.
14           THE WITNESS:  Yes.  Basically, it's based off the
15  fact that if he presented an immediate threat, and at that
16  point he was still -- he had the gun.  We were still a little
17  stressed at that moment, but at that point he wasn't posing
18  that threat up until he charged back towards the firearm.
19  BY MR. GALIPO:
20      Q.   Because initially, he had the gun in his hand and
21  the finger on the trigger, but he wasn't pointing it anyone,
22  true?
23      A.   When he was initially seated at the stool,
24  correct.
25      Q.   And you would agree when you fired your shots, he
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 67

```
1    did not have a gun in his hand.

2             Would you agree with that?

3        A.   Well, the fact that he was running towards the

4    firearm outstretched and he was very angered, it was an

5    imminent threat to me.  I felt he was going to be retaliation

6    with him gabbing that firearm.

7        Q.   Okay.  My question's a little bit different.

8             I'm not asking you what you felt.

9             I'm asking what you saw.

10            Did he have a gun in his hand when you fired?

11            MS. CARPENTER:  Objection.  Asked and answered.

12            THE WITNESS:  So he was running towards the firearm

13   trying to obtain the gun.

14   BY MR. GALIPO:

15       Q.   Did you see a gun in his hand when you fired?

16            That's what I'm asking.

17            MS. CARPENTER:  Objection.  Asked and answered.

18            You can answer again.

19            THE WITNESS:  So like I said, sir, he was posing

20   that immediate threat.  He was going after the firearm, and

21   at that point that's when I felt a danger from him.

22   BY MR. GALIPO:

23       Q.   How far was he from the firearm when you fired?

24       A.   Three to five feet.

25       Q.   Could you see both of his hands when you fired?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                   Page 68

```
1       A.   It was difficult up until he had his hand
2   outstretched towards the firearm when he was rounding the
3   pool table.
4       Q.   Do you have an estimate as to how many shots had
5   been fired before you saw his hand outstretched?
6       A.   I don't, sir.
7       Q.   Did you fire any shots before you saw his arm
8   outstretched?
9       A.   At the -- just the fact that he was kneeling forward
10  and rounding the corner, that's when I began shooting, his
11  arm was outstretched after.
12      Q.   Arm was outstretched after you started shooting?
13      A.   So he was kneeling forward in a running motion.
14           I couldn't see his arm because he was swinging side
15  to side, and when he was at three to five feet rounding the
16  corner of the pool table, that's when I began firing, and
17  then his arms was outstretched.
18      Q.   Could you see the gun on the ground at the time you
19  fired?
20      A.   Yes, sir.
21      Q.   And you're saying it was three to five feet from him
22  when you fired?
23      A.   Approximately.
24      Q.   And your training on deadly force, you received that
25  I'm assuming at the academy and through your work with the
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                    Page 69

1    department?

2         A.   Yes, sir.

3         Q.   Were you trained that deadly force is the highest

4    level of force an officer can use?

5         A.   Yes.

6         Q.   Were you trained that it should only be used in

7    limited circumstances?

8         A.   Based on the totality of the circumstances.

9         Q.   And were you trained that shooting someone center

10   mass was likely to cause death or serious bodily injury?

11        A.   Yes.

12        Q.   And were you trained that deadly force should only

13   be used if there is based on the totality of the

14   circumstances, an imminent threat of death or serious bodily

15   injury to yourself or others?

16        A.   That's correct.

17        Q.   And were you trained if there is not based on the

18   totality of the circumstances, an imminent threat of death or

19   serious bodily injury, you should not use deadly force?

20        A.   Yes, sir.  Based on totality of the circumstances.

21        Q.   Were you trained that deadly force should only be

22   used when no other reasonable options are available?

23             MS. CARPENTER:  Objection to the extent it misstates

24   the policy in the training.

25             You can answer.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
David Moore on 09/15/2023                                    Page 70

1           THE WITNESS:  I'm sorry, sir.  Can you repeat that

2   one more time.

3   BY MR. GALIPO:

4       Q.   Were you trained that deadly force should only be

5   used when no other reasonable options are available?

6           MS. CARPENTER:  Objection.  Misstates the policy and

7   the training.

8           You can answer.

9           THE WITNESS:  Again, just depending on the totality

10  of the circumstances, yes.  We are trained that, again, based

11  on the circumstances.

12          And these circumstances are different.

13  BY MR. GALIPO:

14      Q.   Were you trained that a verbal warning should be

15  given when feasible before using deadly force?

16          MS. CARPENTER:  Safe and feasible.

17          THE WITNESS:  Yes.  Again, depending on the

18  circumstance when safe and feasible.

19  BY MR. GALIPO:

20      Q.   Were you trained that you're responsible to justify

21  every shot when you use deadly force?

22      A.   Yes.  Based on like I said, the totality of

23  circumstances and the perspective of the officer.

24      Q.   Were you trained that you should take into

25  consideration the background or backdrop when using deadly

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**David Moore on 09/15/2023**                                    **Page 85**

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3   Case Name:  A.J.P., et al. Vs. County of San Bernardino, et

 4   al.

 5   Date of Deposition:  September 15, 2023

 6   Job No.:  6788

 7

 8          I, _____, hereby certify

 9   under penalty of perjury under the laws of the State of

10   California that the foregoing is true and correct.

11          Executed this _____ day of _____.

12   20____, at _____, California.

13

14

15

16

17

18          _____

19                       DAVID MOORE

20

21

22

23

24

25
```