# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3

 4  A.J.P. and A.M.P., minors, by and    )
    through their guardian ad litem      )
 5  Cynthia Nunez, individually and as   )
    successor in interest to Albert Perez,)
 6  deceased, and PATRICIA RUIZ,         )
    individually,                        )
 7                                       )
                 Plaintiffs,             )
 8                                       )
                 vs.                     )Case No.
 9                                       )5:22-CV-01291-SSS-SHK
    COUNTY OF SAN BERNARDINO, and DOES   )
10  1-10, inclusive,                     )
                                         )
11                 Defendants.           )
    _____)
12

13

14

15          REMOTE VIDEOCONFERENCE DEPOSITION OF

16                   ANDREW POLLICK

17                 SEPTEMBER 15, 2023

18

19

20

21

22

23  Reported Stenographically By:

24  Jinna Grace Kim, CSR No. 14151

25  Job No.:  6788
```

 1   Mr. Perez?

 2        A.   When I initially arrived there was a period of I

 3   would say around an hour, give or take, where we were

 4   planning, and the garage was visible from where we were

 5   planning away from the location.

 6             And I could see the deputies, and they were like

 7   engaging with Perez trying to negotiate with him in the

 8   garage.  So that happened for around maybe 45 minutes to an

 9   hour before I got actually in to a position at the garage.

10        Q.   About what time do you think you got into your

11   position at the garage?

12        A.   I would estimate it was around 8:00 p.m.

13        Q.   One second, please.

14        A.   Yes, sir.

15        Q.   Thank you for your patience.

16             I'm finishing up a mediation, and they're coming to

17   me with notes and all kinds of stuff.

18        A.   No problem.

19        Q.   So about 8 o'clock approximately is when you got

20   into a position in the area of the garage?

21        A.   Yes, sir.

22        Q.   Prior to that had you been involved in some

23   discussions about using less-lethal options?

24        A.   Yes.

25        Q.   And can you tell me what less-lethal options you

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 7

1    were involved in discussing?

2        A.    Yes.  During the planning phase we discussed with

3    our team leader Sergeant Gaytan at the time.  There was a

4    discussion that if there was to be separation between

5    Mr. Perez and the firearm, that less-lethal would need to be

6    deployed if he was trying to basically close that distance

7    and get access to the firearm.

8            So that was a discussion.  We also discussed the use

9    of chemical agents such as CS gas which we use on the SWAT

10   Team.  There was a chemical agent plan developed for that

11   location, and then that was something we also took into

12   consideration.

13       Q.    With respect to the chemical agents, was it

14   ultimately decided not to go that route?

15       A.    Yes.  It was there in case we needed it, but

16   ultimately the tactical commander on scene which was Sergeant

17   Gaytan decided not to use them.

18       Q.    And the chemical agents would be what,

19   essentially?

20       A.    It's called CS gas.  It's stands for a longer term.

21           I can't recall the specific term.  It's very

22   scientific and has a lot of letters in it.

23           But essentially, it's a chemical irritant that

24   causes involuntary eye closure, tightness in the chest,

25   difficulty breathing, and draining of the mucous membranes of

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                                    Page 8

```
 1   the body.
 2       Q.   And then the less-lethal options apart from that,
 3   what was discussed?
 4            Was it basically the 40-millimeter, or were there
 5   other less-lethal options discussed?
 6       A.   All the deputies in our are issued department-issued
 7   tasers.  I had a Taser with me as well.  That was an option
 8   that I was aware that I had it.  So in addition to the
 9   40-millimeter, I also had a Taser available to me.
10       Q.   And do you know what type of Taser that you had,
11   whether it was an X26 or an X2?
12       A.   The Taser is an X2.
13       Q.   And do you have an understanding as to the maximum
14   distance from which it can be used?
15       A.   I believe it's approximately 15 or so feet.
16       Q.   And was your understanding that many of the
17   officers, not just you, had Tasers on them?
18       A.   Yes.
19       Q.   So have you had a chance to review your transcript
20   of your initial statement?
21       A.   I have, sir, yes.
22       Q.   And do you recall when you gave that statement in
23   relation to the date of the incident?
24       A.   I believe it was around two and a half, maybe three
25   weeks after the incident.
```

```
1        Q.    Do you know why it was so long after the incident

2   that you were giving the statement?

3        A.    I believe it was just planning with the Sheriff's

4   homicide detail getting the schedules of the investigators

5   lined up with mine.  I think that was simply conflict of

6   schedules.  I know that the Homicide Division is very busy.

7        Q.    Did you have a representative present on your behalf

8   for the statement?

9        A.    I did.

10        Q.    And was that an attorney as you understand it?

11        A.    Yes.

12        Q.    I don't want to know what you talked about, of

13   course.  But did you have an opportunity at least consult

14   with your attorney before you gave your statement?

15        A.    I did, yes.

16        Q.    Was the attorney Russel Perry?

17              Does that sound familiar?

18        A.    Yes, that's correct.

19        Q.    So we're going to try to put up a few pages of your

20   statement to try to expedite some this process today.

21              But you eventually fired some rounds; is that

22   correct?

23        A.    Yes, sir, that's correct.

24        Q.    And do you know how many rounds you fired in

25   total?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Andrew Pollick on 09/15/2023**                                    Page 10

```
1       A.   I would say after conducting the round count with
2   the Scientific Investigations Division representative after
3   the incident, it was approximately 15 or 16 total rounds
4   fired.
5       Q.   And what type of weapon did you fire the rounds
6   from?
7       A.   It would have been a Geissele G-e-i-s-s-e-l-e, M4
8   rifle 5.6 millimeter projectile that's fired by that weapon
9   system.
10      Q.   And when you fired your rounds, was there more than
11  one volley of shots that you fired?
12      A.   There were two volleys of shots that were fired.
13      Q.   When you fired the volley of shots, where were you
14  positioned?
15      A.   When I fired the first volley of shots, I was
16  positioned -- so the opening of the garage, the roll up door
17  would be the south side of the garage.  The back wall of the
18  garage was the north side.  I would have been on the west
19  side which would be left facing the garage from the street
20  where the opening ended, and there was essentially like a
21  pillar there that was part of the structure of the garage.
22      Q.   Were you close to Deputy Moore?
23      A.   Yes.  Deputy Moore was kneeling directly in front of
24  me behind a ballistic shield.  He had a pistol, and then I
25  was standing over him with my rifle as lethal cover.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                          Page 11

```
 1        Q.   And at some point did you observe Mr. Perez sitting
 2   in the chair with a gun in his hand?
 3        A.   I did.
 4        Q.   And was Deputy Alcala talking to him at some
 5   point?
 6        A.   He was.
 7        Q.   And at some point did you see Mr. Perez take the gun
 8   and kind of put it between his legs?
 9        A.   Yes.  At one point while Alcala was attempting to
10   negotiate with Perez, Perez took the pistol and put it
11   between his thigh and the chair that he was sitting on.
12        Q.   And were you in the same general position you were
13   when you observed that --
14        A.   Yes --
15        Q.   -- that you were when you fired your shots?
16        A.   Yes.
17        Q.   And do you have an estimate as to how far that chair
18   that he was sitting in was from where you were positioned
19   when he was holding the gun and then put it between his
20   legs?
21        A.   Yes.  Initially during my interview with Homicide, I
22   just wanted to address this with you before we get to it.
23             The unit of measurement that I said was yards, and I
24   actually meant to say feet.  So the numbers are accurate, but
25   the unit of measurement is feet instead of yards.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 12

1          But from where I was standing to where Perez was

2    behind the pool table, I would estimate between approximately

3    10 and 15 feet.

4        Q.   From where you were standing to where the chair

5    was?

6        A.   To where Perez was sitting in the chair with the gun

7    in his hand to where I was standing was approximately 10 to

8    15 feet.

9        Q.   And then at some point did you see Mr. Perez put the

10   gun down?

11       A.   Yes.   At some point during negotiation phase, Alcala

12   was able to convince Perez to place the gun on the ground.

13   While Perez was seated, he leaned forward and he slowly set

14   the gun on the ground and then sat back up on the chair.

15       Q.   And where was the gun at that point in relation to

16   the chair?

17       A.   It would have been on the south side of the chair

18   just in front of it on the ground.

19       Q.   And I don't think we've talked too much about

20   directions yet, but is going from the chair to the threshold

21   of the garage, the main garage door, is that in a south

22   direction?

23       A.   Yes.

24       Q.   So you essentially were looking north, maybe

25   slightly northeast?

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Andrew Pollick on 09/15/2023**                                    Page 13

```
 1      A.   That's correct, sir.
 2      Q.   And then at some point did you see Mr. Perez stand
 3   up?
 4      A.   Yes.
 5      Q.   And start walking slowly in your direction?
 6      A.   Yes.
 7      Q.   Did he stop fairly close to the end of the pool
 8   table?
 9      A.   Yes.  I would estimate where he stopped was about
10   five feet from where I was.
11      Q.   And would that be close to the end of the pool
12   table?
13      A.   Yes.  It would be around the area of the south side
14   of the pool table.
15      Q.   It was he close to that corner of the pool table?
16      A.   Yes.  I believe that's a fair statement.
17      Q.   And you're estimating that distance is about five
18   feet?
19      A.   That's correct.
20      Q.   So we're going to try to put up a few pages of your
21   statement and look at it together.  So let's first see if we
22   can get up to Page 20 -- I think 20.  Let's try to go to Page
23   20 if we can.
24           Okay so let's go to the bottom of Lines 18 through
25   26.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Andrew Pollick on 09/15/2023**                                    Page 15

```
 1    please.

 2         Q.   Take your time.

 3         A.   Go ahead with your question, sir.

 4         Q.   Sure.  Is this the time frame you're describing

 5    where Mr. Perez was sitting in the chair, Alcala was talking

 6    to him, and he took the gun that was in his hands and put it

 7    between his leg or legs?

 8         A.   Yes.

 9         Q.   And somebody said, and it's quoted here, "Hey, he

10    doesn't have the gun in his hand anymore, just FYI."

11              Do you see that?

12         A.   I do, sir.

13         Q.   Was that Gaytan that said that at the time?

14         A.   No, sir.  That was an observation that I made.

15              Gaytan was standing to my left, and I went ahead and

16    made the observation, and I notified him of my

17    observations.

18         Q.   Okay.  And during the time that he had the gun in

19    his hand, did you ever see him point it at anyone?

20         A.   When he had the gun in his hand, sir, it was resting

21    in his hand with his finger on the trigger.

22              However, it was not pointed at anyone at that

23    time.

24         Q.   Did he ever appear to you at least while he was

25    sitting in the chair that he was trying to shoot anyone with
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Andrew Pollick on 09/15/2023**                                        Page 16

```
 1    the gun?

 2          MS. CARPENTER:  Lacks foundation.

 3          You can answer.

 4          THE WITNESS:  It did not appear to me that he was

 5    actively trying to shoot anybody while he was sitting in the

 6    chair.

 7    BY MR. GALIPO:

 8       Q.   Did you have some information by radio dispatch or

 9    text thread that he might be 5150?

10       A.   There was a discussion.  There was some operational

11    thread that was created by Sergeant Gaytan with the members

12    of Specialized Enforcement Division, and that information was

13    put in the thread, yes.

14       Q.   And have you had some training on dealing with

15    people that might be suffering from mental health crisis?

16       A.   I have, yes.

17       Q.   And some of that involved the concept of

18    de-escalation?

19       A.   That's correct.

20       Q.   Did you have any information on the day of the

21    incident as of the time you saw Mr. Perez sitting in that

22    chair that he had seriously injured or killed someone?

23       A.   I did not have any information indicating that,

24    no.

25       Q.   Were there any paramedics that you were aware of
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 18

```
 1   long.  It was several hours.  It was hours that patrol was

 2   there prior to Specialized Enforcement Division was there.

 3        So that very well could have been the case.

 4   Q.   Okay.  Let's go to the next page, please, the top of

 5   Page 21.

 6        You referenced at the top -- can you see that on

 7   your screen?

 8   A.   Yes.

 9   Q.   "Alcala continued to talk about, you know, him being

10   there for his daughters, doing the right thing to allow us to

11   help him, telling him to put the gun down."

12        Do you see that reference?

13   A.   Yes.  Do you mind if I read the entire passage?

14   Q.   I don't mind at all.  Take your time.

15   A.   Okay.  Go ahead with your question, sir.

16   Q.   Sure.  Do you recall Alcala talking about

17   Mr. Perez's daughters with him?

18   A.   I do recall that, yes.

19   Q.   And asking Mr. Perez to put the gun down?

20   A.   Yes.  I do recall him asking him to put the gun down

21   as well.

22   Q.   And at some point you've already told me that you

23   saw him put the gun down on the floor?

24   A.   That's correct.

25   Q.   That would be by his feet, essentially?
```

1    A.    That's correct.

2    Q.    And your impression at that time was at least he

3    looked like he was starting to listen and obey some commands.

4          Was that generally your hope or impression?

5    A.    That's correct.

6    Q.    I mean putting the gun down, obviously, was a good

7    thing at that point from your perspective?

8    A.    I would say it was a step in the right direction to

9    ending the incident peacefully.  That's what we were

10   hoping.

11   Q.    And then it goes on in the next paragraph that he

12   was given instructions to stand up and walk towards us, and

13   you indicate the 10 or 15 yards away from us.

14         But you're telling me that you were intending to

15   mean feet, but you kept saying yards?

16   A.    So what's your question, sir?

17   Q.    The question is:  Was he given instructions to stand

18   up and walk towards you at some point?

19   A.    Yes.

20   Q.    And did he do that?

21   A.    He did.

22   Q.    And you indicate that he stopped about five yards

23   from your team, but you're telling me that you were intending

24   to say feet?

25   A.    That's correct, sir.  And further on in my

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 20

```
 1   interview, I believe the detectives got some clarification on
 2   that distance in which they were asking me how many feet away
 3   which is consistent with what I'm telling to now, what I'm
 4   testifying to now, is that unit of measurement is feet.
 5        Q.   Okay.  Now, at some point you became aware that
 6   less-lethal had been deployed?
 7        A.   Yes.
 8        Q.   And at the bottom of Page 21 you indicate at some
 9   point that Sergeant Gaytan kind of stepped in and started
10   talking to Perez?
11        A.   Sir, can you give me a second to read the passage --
12        Q.   Yeah.  At the very bottom of the page.
13        A.   Okay.
14        Q.   There we go.  Do you see the last two lines?
15        A.   Yes.  Are those the lines --
16        Q.   Do you recall that happening?
17        A.   Those are the lines you're referring to, the last
18   two?
19        Q.   The last two, right.  Gaytan stepping in and
20   starting to talk to Perez.
21        A.   Yes.  I do recall that.
22        Q.   And then at some point you saw him take a step back
23   with his left foot?
24        A.   Yes.
25        Q.   And that's when you saw Deputy Stone hit him with a
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                  Page 22

1        A.   I saw him take one step back with his left foot.

2        Q.   Was he still generally facing in the same

3   direction?

4        A.   Aside from his left foot now being closer to the

5   firearm, yes, he was generally facing south.

6        Q.   And do you have an estimate as to how much time

7   passed from him taking that step back with his left foot to

8   the less-lethal being deployed?

9        A.   I would say it was several seconds, a couple seconds

10   approximately.

11       Q.   Was there any verbal announcement that less-lethal

12   was going to be deployed?

13       A.   I did not hear a verbal announcement that

14   less-lethal was being deployed.

15       Q.   Could you see Mr. Perez's hands when he took that

16   step back?

17       A.   I could see Mr. Perez's hands were down on his side

18   when had he took that step back.

19       Q.   And when the less-lethal was deployed, were his

20   hands also at his side?

21       A.   I don't recall specifically what his hands did after

22   the less-lethal hit him.  It appeared to stun him and catch

23   him off guard, but I don't recall specifically what his hands

24   were doing at that time.

25       Q.   What did you see that gave you the impression that

1    it stunned him and caught him off guard?

2        A.   I saw his shoulders kind of rise up above his ears

3    or to his ear level.  It appeared to startle him.

4        Q.   And could you tell if it struck him?

5        A.   Yes.  It appeared to hit him in the left shoulder

6    when he was hit the 40-millimeter less-lethal round.

7        Q.   Was that the first round?

8        A.   To my understanding, yes.

9        Q.   Were there additional 40-millimeter rounds fired, if

10   you know?

11       A.   I believe so, yes.

12       Q.   And what was your observation or impression in that

13   regard?

14       A.   My observations were Perez took a step back.

15            He was struck in the left shoulder by a

16   40-millimeter round.  He immediately turned full sprint, ran

17   back to where the gun was on the floor, and I believe Gaytan

18   and Stone both fired additional rounds.

19            I don't know specifically how many they fired as

20   Perez was making his way to where the gun was.

21       Q.   Did you see Mr. Perez turn in the direction of the

22   gun after the first 40-millimeter round was fired?

23       A.   Yes.  I believe Mr. Perez turned in the direction

24   after that first round was fired from the less-lethal.

25       Q.   Do you know if any other 40-millimeter rounds were

```
 1  lethal rounds, or you believe they were only non-lethal?

 2      A.   The 40-millimeter launcher makes a very distinct

 3  noise when it is fired.  I described it in the past as being

 4  similar to someone firing a T-shirt cannon at a baseball

 5  game.

 6          It doesn't sound like gunfire.  It's very distinct.

 7          And so I heard those additional noises consistent

 8  with a 40-millimeter being fired after Perez turned and he

 9  was running.  And so that's what I can testify to today,

10  sir.

11      Q.   And would you at least agree that in your statement

12  at least in one portion of your statement, you said that at

13  the time you started firing, Mr. Perez was a couple of yards

14  from the gun?

15      A.   Yes.  And I believe I testified today as well that

16  that unit of measurement would be feet.

17      Q.   Do you have a general understanding that yards are

18  essentially three feet to a yard?

19      A.   Yes.

20      Q.   So your initial volley of shots, you believe was

21  five to eight?

22      A.   That's correct, yes.  A volley of around five to

23  eight rounds fired.

24      Q.   And do you have any estimate as to how much time

25  passed from the first shot to the last shot in the first
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                      Page 27

 1   commands to Perez.

 2       Q.   When you were firing, what part of his body were you

 3   firing at in the first volley?

 4       A.   First volley or rounds as Perez was making his way

 5   to where the gun was, I would say he was about ten feet away

 6   from me.  My sight picture was center mass of his upper torso

 7   as he was facing away from me.  He was beginning to crouch

 8   down, lowering to where that firearm was on the floor.

 9       Q.   So his center torso as he is facing away from you,

10   would that be his back?

11       A.   That's correct, yes.

12       Q.   And when you obtained your sight picture, you would

13   have essentially been aiming towards his back?

14       A.   As he was running towards where the firearm was on

15   the floor, he would have been facing away from me.  So that

16   was the only target that I had was him facing me.

17       Q.   How much time would you say passed from the initial

18   less-lethal round you heard, the one that struck him in the

19   left shoulder and you firing your first shot?

20       A.   I would estimate the time from when he was struck

21   with the less-lethal round to me firing that first shot to be

22   approximately a couple of seconds.

23       Q.   And you indicated that after he was struck with that

24   first round, he appeared startled, and he turned and started

25   to run.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 28

1              Do I have that right?

2     A.    Yes.  When he was struck with that first round, it

3  did catch him off guard, but it was ineffective because he

4  ran toward where the firearm was on the floor.

5     Q.    And how much time do you think passed from when he

6  turned and started to run to when you fired your first

7  shot?

8     A.    It was maybe a half a second, three quarters of a

9  second.  This is all approximate.

10     Q.    And how far do you think he got in that half a

11  second to three quarters of a second?

12     A.    From which time frame are you referring to?

13     Q.    From when he turned and started to run to when you

14  fired your first shot.

15     A.    I believe he was able to cover maybe approximately

16  five to ten feet in that time frame.  It was very fast.

17     Q.    Now, you indicate in your statement that Perez had

18  dove behind the pool table.

19              Do you remember?

20     A.    I do remember saying that he dove behind the pool

21  table, yes.

22     Q.    Is that something that you observed?

23     A.    Yes.

24     Q.    And when he was on the ground after diving behind

25  the pool table, could you still see a portion of his body?

1    A.   Are you referring to after my first volley; correct?

2    Q.   Correct.

3    A.   Yes.  After I fired my first volley, Perez had dove

4    behind the pool table, and his lower extremities were

5    exposed.

6    Q.   So I know you told me that before he went to the

7    ground behind the pool table you heard other less-lethal

8    rounds being fired.

9         Could you tell if other lethal rounds were being

10   fired including by Deputy Moore right in front of you before

11   Mr. Perez went to the ground?

12   A.   Sorry.  There was a lot to that question.

13        Can you rephrase that, please.

14   Q.   There was.  I'm sorry about that.

15        Let me try to break that down.

16        I think you told me that as he was moving towards

17   the rear of the pool table where the gun was located, you

18   heard other rounds being fired other than your rounds.

19   A.   I believe I testified to hearing additional

20   less-lethal rounds fired before I fired, yes.

21   Q.   My question was -- and maybe you've already answered

22   it:  Did you hear any lethal rounds being fired other than

23   yours including from Deputy Moore who was kneeled right in

24   front of you?

25   A.   When I initiated my first volley of fire, all that I

 1   where I last saw the firearm.  I believe he was in possession
 2   of it and trying to use it against us.
 3       Q.   My specific question is:  Did you see the firearm in
 4   his hand?
 5            MS. CARPENTER:  Objection.  Lacks foundation;
 6   assumes facts.
 7            You can answer.
 8            THE WITNESS:  I could see Perez in the vicinity of
 9   where the firearm was, sir.
10   BY MR. GALIPO:
11       Q.   Could you see it in his hand?
12       A.   I couldn't --
13            MS. CARPENTER:  Asked and answered.
14            You can answer again.
15            THE WITNESS:  I couldn't see Perez's hands.
16            I could see lower extremities as I testified to
17   before.
18   BY MR. GALIPO:
19       Q.   Did you see any muzzle flash coming from him?
20       A.   I don't recall seeing any muzzle flash.
21       Q.   Could you see anywhere on his body from his waste
22   up?
23       A.   No.  The area that I had visible to me were Perez's
24   lower extremities during my second volley of fire.
25       Q.   What part of his lower extremities?

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Andrew Pollick on 09/15/2023**                                    Page 33

1          Do you know if it was from the knees down or the

2   thighs down?

3          A.   I would estimate around his mid thigh to his feet

4   were exposed.

5          Q.   So in your second volley of shots, you were aiming

6   at his legs?

7          A.   Yes.   Before -- when we were briefing with the team,

8   there was a discussion about a pool table being present in

9   the room.

10          So knowing that the pool table was there and Perez

11   was behind it, I know pool tables are particularly thick and

12   a good means of cover and concealment.   I wasn't confident

13   that my rounds would penetrate the pool table to engage Perez

14   in center mass.

15          The only target of opportunity that I had was his

16   legs which were exposed.   So I went ahead and targeted his

17   legs center mass for my second volley.

18          Q.   Did you give any commands or warnings before firing

19   your second volley of shots?

20          A.   Sir, as I testified before, the situation was very

21   dynamic, uncertain, and rapidly evolving.   I didn't have the

22   opportunity to give commands.   I was simply reacting to what

23   I perceived as a threat at that time.

24          Q.   How much time passed between your first volley of

25   shots and your second volley of shots?

1       A.   Maybe a half a second to a second and a half,

2   approximately.  It was a brief pause.

3       Q.   When you fired your first volley of shots, you said

4   you were using your sights?

5       A.   Yes.  When I fired both of my volleys of shots, I

6   utilized my optic that was on my weapon system which is a red

7   dot optic.

8       Q.   And you were aiming at his back for the first volley

9   of shots?

10          MS. CARPENTER:  Objection to the extent it misstates

11  his testimony.

12          You can answer.

13          THE WITNESS:  During my first volley of shots, I

14  identified center mass on Perez which would have been his

15  torso while he was facing away from me running to where the

16  gun was.

17  BY MR. GALIPO:

18      Q.   Which would be his back.

19          MS. CARPENTER:  To the extent it misstates his

20  testimony, objection.

21          You can answer again.

22          THE WITNESS:  As I said before, sir, he was running

23  towards where the firearm was.  Center mass would have been

24  his back as he was running away from me to where the firearm

25  was.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 35

```
 1   BY MR. GALIPO:
 2       Q.   What would you estimate the distance he was from you
 3   when you started to fire your first volley of shots?
 4       A.   I would estimate the distance when I fired my first
 5   volley to be approximately 10 to 12 feet or so.
 6       Q.   Do you consider yourself to be a pretty good shot?
 7            MS. CARPENTER:  That's an argumentative form.
 8            You can answer.
 9            THE WITNESS:  There are high standards to be
10   selected for a division such as the Specialized Enforcement
11   Division.  There's a very high shooting standards.
12            I would -- I would say I'm proficient with firing
13   firearms, yes.
14   BY MR. GALIPO:
15       Q.   So if you fired five to eight shots using your red
16   dot system from 10 to 12 feet away aiming at his back, did
17   you have the impression that you struck him with at least
18   some of those shots?
19       A.   When I engaged Mr. Perez with my first volley, my
20   sight picture was -- the dot was in the center of his back as
21   he's making his way to the firearm.
22            And I would hope that my shots were accurate and on
23   target, but he continued to move, so I continued to engage
24   with those rounds.
25       Q.   So was it your impression when he went to the ground
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    **Page 41**

```
 1   have to look through his body.  But he was where the firearm

 2   was last seen.

 3   BY MR. GALIPO:

 4       Q.   So are you saying that your view would have been

 5   blocked if he had picked up the firearm?

 6           MS. CARPENTER:  Misstates his testimony.

 7           You can answer.

 8           THE WITNESS:  I'm saying that when I fired that

 9   second volley, I could see his legs, and I knew that he was

10   where the firearm was last.

11   BY MR. GALIPO:

12       Q.   Let me just try to break this down.

13           Before he dove to the ground behind the pool table,

14   did you see him pick the gun up?

15       A.   Say that one more time?

16       Q.   Before you saw him dive behind the pool table, did

17   you see him pick the gun up?

18       A.   Before he dove behind the pool table, I saw him

19   sprint running to where the firearm was, lowering his center

20   of gravity to where the firearm was.

21       Q.   I get all that.  I'm wondering if you saw him pick

22   it up.

23           MS. CARPENTER:  Asked and answered; lacks

24   foundation.

25           You can answer again.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Andrew Pollick on 09/15/2023**                                    Page 42

```
 1    BY MR. GALIPO:
 2        Q.   I take it it's a no; you didn't see him pick it up,
 3    but maybe --
 4        A.   I --
 5        Q.   Go ahead.
 6        A.   I saw him running to where it was, sir.
 7             Like I said before, he was between me and the
 8    firearm.  And so I would have to look through him.  I'm not
 9    saying that I saw him pick it up.  I don't know if he picked
10    it up, but I believed that he was going to where the firearm
11    was at that point.
12        Q.   Okay.  And then did you have the impression that
13    your second volley of shots struck him in the leg as he was
14    in that position you described?
15        A.   When I engaged with my second volley on Mr. Perez, I
16    believed I had a good sight picture when I was targeting his
17    legs, and I believe that the rounds were hitting him.
18        Q.   Have you ever looked at the autopsy report?
19        A.   I have.
20        Q.   And did you note when you looked at it various shots
21    that struck him in the legs?
22        A.   I'm aware of the injuries to Mr. Perez from the
23    shots that hit him in the legs.
24        Q.   Including the shots to the legs?
25        A.   Yes.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 43

1     Q.   Did you note when you reviewed the autopsy report if

2   there were any shots to the back?

3     A.   I believe when reviewing the autopsy report, there

4   was numerous gunshots wounds to Mr. Perez.

5     Q.   Including to his back?

6     A.   I don't recall specifically to his back, but I know

7   that there were multiple gunshot wounds.

8     Q.   Do you know how many shots in total you actually

9   fired?

10    A.   I believe I testified before that it was

11  approximately 15 to 16 total rounds fired.

12    Q.   What type of ammunition does that weapon have?

13    A.   It's a 5.56 millimeter projectile that's fired from

14  that weapon.

15    Q.   Did you hear any shots being fired after your last

16  shot?

17    A.   After my last shot from my last volley; is that what

18  you're asking, sir?

19    Q.   Yes.

20    A.   I believe that I did hear additional gunfire after I

21  fired my last shot.

22    Q.   Did you know who was firing those shots?

23    A.   I do not.

24    Q.   Could you tell if it was a firearm versus a rifle?

25    A.   I could not tell.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 51

1      Q.   During the time that Mr. Perez was sitting in the

2   chair with the gun in his hand, were officers pointing

3   weapons at him?

4      A.   Yes.  There were deputies pointing weapons at him

5   when he had a gun in his hand.

6      Q.   And I think you already told me he never pointed it

7   at anyone during that time?

8      A.   Right.  He had the firearm in his hand.  I could see

9   it clearly in his hand and his finger was on the trigger.

10          However, he was not point it at anyone at that

11   point.

12      Q.   And you didn't know if the gun was loaded or not at

13   the time; is that fair?

14      A.   I think that's a fair statement.  I would have no

15   way of knowing if that firearm is loaded or not.

16      Q.   And when he put the gun between his legs, were

17   officers still pointing their firearms at him?

18      A.   The situation as I testified before developed over a

19   time frame of hours.  So there were times where officers were

20   pointing their weapons at him.  Fatigue would start to set in

21   and maybe he would lower slightly.

22          Perez would periodically shift and do different

23   things, and we would come back on our sights and we would

24   lower.  I mean it was over period of time.

25          So there were periods, yes, where we had our weapons

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 53

```
 1   walked towards us?

 2        Q.    That's right.

 3        A.    I would estimate it was maybe five to ten minutes.

 4        Q.    During that time frame was your gun pointed at

 5   him?

 6        A.    Yes.  For that time period it was.  Like I said

 7   before, there would be a period of five or ten minutes.

 8              Fatigue may set in, and you may have to lower and

 9   adjust, and then come back on target.

10              And that's what I did.

11        Q.    So I guess what I'm wondering, you had some

12   information that this could be a 5150 call; correct?

13        A.    Yes.  As I testified before, Sergeant Gaytan did

14   include some information in the operational thread that it

15   may be 5150-related.

16        Q.    And you saw him sitting in a chair with a gun in his

17   hand, but never pointed it at anyone; correct?

18        A.    I'm sorry.  What's your question?

19        Q.    I'm just trying to take it piece by piece.

20              You saw him with a gun in his hand, but not pointed

21   at anyone?

22              MS. CARPENTER:  Objection.  Asked and answered.

23              You can answer again.

24              MR. GALIPO:  It is.  I know it is, but I'm trying to

25   ask a non-compound question.
```

```
 1   BY MR. GALIPO:

 2       Q.   But you told me about that already; correct?

 3       A.   Yes.  I testified to the fact that Perez was sitting

 4   in the garage with a firearm in his hand when we made contact

 5   with him.

 6       Q.   Here's what I'm kind of getting at.

 7            If you had seen him with a gun in his hand for a

 8   period of time not pointed at anyone; and then at some point

 9   he put the gun down; at some point he stood up; at some point

10   he walked towards the officers after being requested to do

11   so; and then for a period of time he's just standing there

12   visually unarmed; and he doesn't move or run towards the back

13   of the pool table where the gun is until after he's shot with

14   less-lethal, you thought that he suddenly was going to grab

15   this gun that he had in his hand before and never pointed at

16   anyone and start shooting at people?

17            MS. CARPENTER:  Lacks foundation; incomplete

18   hypothetical; speculation.

19            You can answer.

20            THE WITNESS:  I apologize, sir.  That was a very

21   long statement.  I'm not sure exactly what your question

22   is.

23   BY MR. GALIPO:

24       Q.   My question is:  Before you used deadly force, did

25   you consider the fact that he had never pointed the gun at
```

1    anyone before?

2        A.    Prior to my use of deadly force, like I said before,

3    Perez was sitting with the gun armed in his hand.  I had a

4    responsibility.  The tactical team a had possibility to

5    safeguard lives and property, and that was why we were there.

6            We were there because of the actions of Perez.

7            If Perez hadn't been there with a firearm, we

8    wouldn't have been there.

9        Q.    No.  I understand.  I guess in the totality of the

10   circumstances, you've heard that term before; right?

11       A.    I have.

12       Q.    Part of the totality of the circumstances here was

13   that he had never pointed the gun at anyone; had put it down;

14   had stood up; had walked towards you; was more or less

15   stationary for five or ten minutes; then was shot with

16   less-lethal; then started moving in the direction of the gun.

17           Would that be part, not all of the circumstances,

18   but part of it?

19           MS. CARPENTER:  Objection to the extent it misstates

20   the testimony and the record evidence; lacks foundation.

21           You can answer.

22           THE WITNESS:  I would say based on the totality of

23   the circumstances, there was a lot happening in the scene,

24   but at one point Perez made a run to where the gun was, and I

25   believed he was an immediate threat, and I decided to use

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                            Page 56

```
 1   lethal force against that threat.

 2   BY MR. GALIPO:

 3       Q.   And you obviously had training with respect to the

 4   use of deadly force; correct?

 5       A.   Correct.

 6       Q.   And was part of your training that officers are

 7   responsible to justify every shot?

 8       A.   Yes.

 9       Q.   And obviously, part of your training was in order to

10   use deadly force, there has to be an immediate or imminent

11   threat of death or serious bodily injury?

12       A.   Yes.  That's correct.

13       Q.   And was your training on the converse, that if there

14   is not an imminent threat of death or serious bodily injury,

15   you should not use deadly force?

16       A.   The department policy says that a safety member may

17   use deadly force to protect himself or others from what he

18   reasonably believes to be a threat of death or serious bodily

19   injury.

20            And when I used deadly force, I was under that

21   impression, that there was an immediate threat of death or

22   serious bodily injury that had Perez got ahold of that gun.

23       Q.   Right.  And is it your understanding from the policy

24   and training that if there is not a reasonable belief of an

25   immediate threat of death or serious bodily injury, you
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Andrew Pollick on 09/15/2023**                           Page 57

```
 1    should not use deadly force?

 2        A.    I would say that's accurate, yes.

 3              If there is not an immediate threat, then you should

 4    not use deadly force.

 5        Q.    Okay.

 6              MR. GALIPO:  Let's take our last break.

 7              We'll do ten minutes, and I'll come back and I'll

 8    finish up if that's okay with everybody.

 9              MS. CARPENTER:  Yes.  Thank you.

10              THE WITNESS:  Thank you, sir.

11              (Recess taken.)

12    BY MR. GALIPO:

13        Q.    Did you have an understanding whether there was

14    anybody in the house immediately before the shooting?

15        A.    I'm sorry.  Are referring to the location that

16    belonged to the garage that Perez was in?

17        Q.    Yes.

18        A.    So that location is a duplex.  So I think I

19    testified earlier that there was some neighbors in another

20    unit next door.  They kind of share the same roof.  So two of

21    those neighbors were still in the building, but they were

22    instructed to shelter in place I believe on the northwest of

23    his bedroom.

24              But in the specific location where Perez was at, the

25    information was relayed to me that there was nobody else in
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                         Page 58

 1    the house.

 2         Q.   Did you have any information as to whether the door

 3    between the garbage and the house was locked or not?

 4         A.   Yes.  Sergeant Gaytan informed me that the door

 5    leading from the garage into the house was locked.

 6         Q.   Do you have some training with respect to the

 7    40-millimeter?

 8         A.   Yes.  Everybody in the Specialized Enforcement

 9    Division has training regarding the 40-millimeter.

10         Q.   Can you describe to me what essentially it shoots

11    out.

12         A.   Yes, I can.  So the 40-millimeter launcher, there is

13    several different variations.  There's multi-launcher which

14    holds four of the rounds, and there is a single launcher

15    which holds just one.

16              So when the launcher fires a projectile, the

17    specific projectile that was used during this incident was

18    referring to as a blunt impact projectile.

19              The projectile has a foam exterior, and then the

20    interior is sort of a gelatin material, and it has within

21    that a plastic piston that's designed to deliver blunt force

22    and then stop the projectile from bouncing off of the

23    target.

24         Q.   And is it intended to cause pain?

25         A.   I would say that the part of the use of a

 1   less-lethal launcher like the 40-millimeter or bean bags for

 2   that matter, it does involve pain.

 3      Q.   And have you been present before when those have

 4   been deployed?

 5      A.   Yes.  Many times.

 6      Q.   Do you have an estimate or range of how many

 7   times?

 8      A.   I would say a specific incidents themselves, it

 9   would be a hard to put a number on it.  I would say probably

10   more than ten times.

11      Q.   Had you ever seen anybody run before after being

12   struck with a 40-millimeter?

13           MS. CARPENTER:  Vague and ambiguous; lacks

14   foundation.

15           You can answer.

16           THE WITNESS:  Sir, I have been present for multiple

17   deployments with that less-lethal weapon system, and it

18   depends on the person.  Some people react differently than

19   others.  Sometimes people when they're struck with the

20   less-lethal will immediately put their hands up, and say,

21   stop, stop, please stop.

22           There are different reactions to it.  I couldn't

23   give you a specific expected reaction because everybody's

24   different.

25   BY MR. GALIPO:

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Andrew Pollick on 09/15/2023                                    Page 61

1          I was designated as lethal cover.  However, I did

2   have a Taser.  The tactical plan is ultimately up to the

3   tactical commander to decide which avenue to take.

4          At that point there were directives given that if

5   there was separation from the firearm and less-lethal like

6   the 40-millimeter would be used to prevent him from getting

7   access to the firearm.

8          However, I did have a Taser with me, yes.

9      Q.   And the tactical advisor, was that Sergeant

10  Gaytan?

11     A.   Yes.  Sergeant Gaytan was the tactical commander

12  on-scene.

13     Q.   Did you ever hear Mr. Perez verbally threaten to

14  harm anyone?

15     A.   I did not specifically myself hear him say any

16  threats.  However, there was information relayed to me that

17  when the initial call for service was entered, that Perez

18  contacted a female that we got the location.

19          Perez did not live there.  He displayed the firearm

20  to her, and the information that was relayed to me was that

21  she asked him, "What are you going to do, shoot me," and

22  while showing her the firearm, he said, "And."

23          And then that was the end of the encounter.  So that

24  could be interpreted as a threat for all I know.

25     Q.   Yeah.  I guess I was wondering whether you heard him

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Andrew Pollick on 09/15/2023**                                    Page 62

 1    verbally threaten any of the law enforcement officers.

 2          MS. CARPENTER:  Vague and ambiguous; lacks

 3    foundation.

 4          You can answer.

 5          THE WITNESS:  Sir, during my time on-scene I did not

 6    hear him make any threats towards law enforcement officers.

 7    BY MR. GALIPO:

 8       Q.    Did you hear him use any profanity?

 9       A.    I don't recall him using any profanity during my

10    contact with him.

11       Q.    Okay.  So we're going to just look at a few

12    additional exhibits.  Maybe I'll go chronological.

13          MR. GALIPO:  Do you remember, Jinna, were we up to

14    11 or 12?

15          COURT REPORTER:  We got up to 11.

16          MR. GALIPO:  So this next one will be Exhibit 12.

17          We'll try to share the screen.

18          THE WITNESS:  Okay.

19          (Exhibit 12 was marked for identification.)

20    BY MR. GALIPO:

21       Q.    Do you recognize the person in this image?

22          And I'm not talking about the person on the wall in

23    the framing.

24          I'm talking about the one standing up.

25       A.    Give us one second.  The windows are taking out the

1         DECLARATION UNDER PENALTY OF PERJURY

2

3    Case Name:  A.J.P., et al. vs. County of San Bernardino, et

4    al.

5    Date of Deposition:  September 15, 2023

6    Job No.:  6788

7

8        I, _____, hereby certify

9    under penalty of perjury under the laws of the State of

10   California that the foregoing is true and correct.

11        Executed this _____ day of _____,

12   20____, at _____, California.

13

14

15

16

17

18              _____

19              ANDREW POLLICK

20

21

22

23

24

25