EXHIBIT 3

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.J.P. and A.M.P., minors, by and      )
     through their guardian ad litem        )
 5   Cynthia Nunez, individually and as     )
     successor in interest to Albert Perez,)
 6   deceased, and PATRICIA RUIZ,           )
     individually,                          )
 7                                          )
                    Plaintiffs,             )
 8                                          )
                    vs.                     )Case No.
 9                                          )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES     )
10   1-10, inclusive,                       )
                                            )
11                  Defendants.             )
     _____)

12

13

14

15          REMOTE VIDEOCONFERENCE DEPOSITION OF

16                   CHRISTINA OLIVAS

17                   OCTOBER 3, 2023

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  6789
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Christina Olivas on 10/03/2023                                    Page 6

```
 1      Q.   Do you recall the month or year?

 2      A.   I want to say it was 2021.

 3      Q.   And do you recall what month it was in?

 4      A.   August.

 5      Q.   Do you recall the day of the week?

 6      A.   No, sir.

 7      Q.   Do you recall the approximate time the shooting

 8   occurred?

 9      A.   The actual shooting it was 21:43 hours.

10      Q.   9:33 in the evening?

11      A.   Yes, sir.  9:43.

12      Q.   Oh, 43.  I'm sorry.

13           And did you fire any shots?

14      A.   Yes, sir.

15      Q.   How many shots did you fire?

16      A.   Three shots.

17      Q.   What type of weapon did you fire the shots from?

18      A.   I had my Glock 45.

19      Q.   Is that a semiautomatic weapon?

20      A.   Yes, sir.

21      Q.   Do you need to press the trigger for each shots?

22      A.   Yes, sir.

23      Q.   So you would have pressed the trigger three times in

24   this shooting?

25      A.   That's correct.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Christina Olivas on 10/03/2023                                    Page 13

```
 1              It was aired over the dispatch, and then from what
 2    we know of the call for service as well.
 3         Q.    Did you ever see him reaching for the gun while he
 4    was seated in the chair?
 5         A.    I do not know because it was -- my vision was
 6    obstructed by the pool table, sir.
 7         Q.    Okay.  At some point did you hear someone tell him
 8    to put the gun down?
 9         A.    Yes.
10         Q.    And do you know who told him that?
11         A.    It was Deputy Alcala.
12         Q.    And do you know if he put the gun down?
13         A.    Yes.  I was advised by Stone that he had put the gun
14    down.
15         Q.    At some point was Mr. Perez asked to stand up?
16         A.    Yes, sir.
17         Q.    And do you know if he did that?
18         A.    Yes, sir.
19         Q.    And did you observe him stand up at some point?
20         A.    Yes, sir.
21         Q.    And when he stood up did you see any weapon in his
22    hands at that point?
23         A.    I could only see his wrist and up when he stood
24    up.
25         Q.    Okay.  Did you ever see him reaching for the gun
```

```
 1    after he stood up from the chair at that time?

 2        A.   What time are we talking about because --

 3        Q.   When he stood up after being asked to do so.

 4        A.   No, sir.

 5        Q.   At some point was he asked to move forward?

 6        A.   Yes, sir.

 7        Q.   And was it Deputy Alcala who asked him to do that?

 8        A.   He asked him to walk forwards.

 9        Q.   Okay.  And did Mr. Perez walk forward?

10        A.   Yes, sir.

11        Q.   And did he walk at some point along one of the sides

12   of the pool table?

13        A.   Yes, sir.

14        Q.   And from your perspective would that be the left

15   side of the pool table?

16        A.   Can you ask that question again?

17             I'm not understanding.

18        Q.   Sure.  It's my understanding as you're looking into

19   the garage, you're more on the right side; is that correct?

20        A.   Yes.  I'm on the right side, that's correct.

21        Q.   And the pool table is kind of in the middle of the

22   garage; is that also a fair statement?

23        A.   That's correct, sir.

24        Q.   So I'm imagining the two sides of the pool table,

25   the longer sides.  One would be closer to you and one would
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina  Olivas on 10/03/2023**                                    Page 15

```
 1   be further away.
 2        A.   That's correct.
 3        Q.   And from your perspective one would be on the right
 4   side of the garage and one would be on the left side.
 5             In other words, the one further away would be on the
 6   left side; does that make sense?
 7        A.   Yes, sir.
 8        Q.   Was he walking along the side that was further away
 9   from you?
10        A.   Yes, that's correct.
11        Q.   So at least when he was asked to drop the gun or put
12   the gun down, would you agree that he eventually did that?
13        A.   Did what, sir?
14        Q.   Put the gun down.
15        A.   Yes, I agree.
16        Q.   And when he was asked to stand up, would you agree
17   he eventually did that?
18        A.   Yes, sir.
19        Q.   And when he was asked to walk forward, would you
20   agree that he eventually did that?
21        A.   Depending on -- he walked forward until he stopped,
22   and then he was asked to walk forward again, and he did
23   not.
24        Q.   Let me ask you this:  Did anyone, when he walked
25   forward, did anyone ask him to stop?
```

```
 1        A.    Yes, sir.

 2        Q.    Who asked him to stop?

 3        A.    Deputy Alcala.

 4        Q.    And did he stop?

 5        A.    Yes, sir.

 6        Q.    And where was he in relation to the pool table when

 7   he stopped?

 8        A.    I would say midway through the pool table.

 9        Q.    And did he stop before or after he was asked to

10   stop?

11        A.    After he was asked by Deputy Alcala.

12        Q.    So at least at that point when he was told to stop

13   and he stopped, did you look at that as an act of

14   compliance?

15        A.    I would say yes and no because it wasn't the first

16   time that they were giving commands.

17              The commands had to be repeated several times.

18        Q.    I understand.  But it sounds like so far he was

19   asked to put the gun down, and he did; he was asked to stand

20   up, and he did; he was asked to walk forward, and he did; and

21   he was asked to stop, and he did; is that fair?

22              I understand it might have taken multiple commands

23   and some time, but he eventually did those things?

24        A.    Yes, sir, that's correct.

25        Q.    And at any time between the time he stood up and the
```

 1   time that he stopped after being asked to do so, did you see

 2   a weapon in his hands?

 3        A.   I could not see his hands, sir.

 4        Q.   Could you see a weapon on his person?

 5        A.   I would have to search him out, sir, to even see

 6   that, but not -- I could not -- I can't answer that question

 7   because I do not know if he had a weapon behind him or

 8   anything.  I wouldn't be able to see all of him.

 9        Q.   What I'm wondering, I know you couldn't see all of

10   him.  I'm just wondering, of the parts that you could see,

11   did you see like a gun or a knife protruding from his body

12   somewhere?

13        A.   I was still obstructed by the pool table.

14             So from what I could see, he had a sweater on.

15             So it would be hard to see something protruding.

16        Q.   Did anyone yell out that he had a weapon on his

17   person?

18        A.   No, sir.

19        Q.   Did you see him at any time in between the time he

20   stood up to the time he walked forward and stopped reaching

21   for a weapon?

22        A.   I'm sorry.  Can you re-ask that question.

23        Q.   Sure.  From the time he stood up and then walked

24   forward and stopped, during any of that time, did you see him

25   appear to be reaching for a gun?

1      A.    No, sir.

2      Q.    Could you see the gun from where you were?

3      A.    No, sir.

4      Q.    How long did he remain stopped for?

5      A.    I would say approximately maybe two to three

6  minutes.

7      Q.    And were you in the same position during that two or

8  three minutes?

9      A.    Can you -- I don't understand your question.

10      Q.    You told me before where you were positioned at the

11  time you saw him in the chair; correct?

12      A.    Yes, that's correct.

13      Q.    I'm just wondering, when he stood up and walked

14  forward, did you change positions or were you in the same

15  position?

16      A.    Well, I angled myself towards where he was now

17  positioned.

18      Q.    And when he stopped were you still angled?

19      A.    Yes.  When he had stopped midway through the pool

20  table, I was angled in his direction.

21      Q.    And did you point your weapon at him at some point

22  while he was stopped?

23      A.    Stopped when, sir?

24      Q.    The two to three minutes you told me about.

25      A.    Did I point my firearm at him?

```
 1   him into custody?

 2        A.   Yes, that's correct.

 3        Q.   And at some point after Sergeant Gaytan said that,

 4   did you see Mr. Perez take a step back?

 5        A.   Yes, sir.

 6        Q.   And that would be with his left foot?

 7        A.   Yes, sir.  Left leg, yes, sir.

 8        Q.   And after he took the step back, did you hear

 9   less-lethal being deployed?

10        A.   Yes, sir.

11        Q.   And was that the 40-millimeter?

12        A.   Yes, sir.

13        Q.   And that was fired by Deputy Stone?

14        A.   Yes, sir.

15        Q.   And was Deputy Stone still positioned behind you?

16        A.   I do not know where he was positioned, sir, at that

17   time.

18        Q.   Was there any warning that less-lethal was going to

19   be deployed?

20        A.   We were advised that it was going to be deployed

21   prior to him deploying it.

22        Q.   Who advised you of that?

23        A.   It was part of our tactical plan.

24        Q.   And what was the tactical plan as to when

25   less-lethal was going to be deployed?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Christina Olivas on 10/03/2023                                        Page 21

```
 1        A.    Whenever he made any furtive movements towards the
 2   gun, Deputy Stone would deploy the less-lethal.
 3        Q.    Was there anything in the tactical plan discussed
 4   that if he made a furtive movement towards the gun, lethal
 5   force would be used?
 6        A.    No, sir.
 7        Q.    Did Deputy Stone yell out that he was going to
 8   deploy less-lethal before he did?
 9        A.    No, sir.
10        Q.    Was Mr. Perez given any verbal warning that
11   less-lethal was going to be deployed?
12        A.    No, sir.
13        Q.    Could you tell if the initial 40-millimeter round
14   struck Mr. Perez?
15        A.    No, sir.
16        Q.    Did it appear to strike him?
17        A.    Yes, sir.
18        Q.    And could you tell what part of his body it
19   struck?
20        A.    I believe it was center mass, somewhere in the
21   center mass, sir.
22        Q.    And center mass, would that be the chest-stomach
23   area?
24        A.    Like upper -- can I describe it?
25        Q.    Sure.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina Olivas on 10/03/2023**                                    Page 22

```
 1      A.   Like upper this, and then that's the lower
 2  abdominal, abdomen.
 3      Q.   Somewhere like in between the waist and the top of
 4  the shoulders?
 5      A.   Yes, sir.
 6      Q.   And what did you see that made you think that the
 7  40-millimeter struck him?
 8      A.   He had kind -- he kind of was like caught by
 9  surprise, and then he had leaned a little forward.
10      Q.   Was there a second 40-millimeter fired?
11      A.   Yes, sir.
12      Q.   And how much time passed would you estimate between
13  the first 40-millimeter and the second 40-millimeter?
14      A.   Approximately a second, sir.
15      Q.   And could you tell if the second 40-millimeter
16  struck him?
17      A.   Yes, sir.
18      Q.   And where did that strike him, if you know?
19      A.   I would say center mass again.
20           However, he's angled at this time.
21      Q.   When you say he's angled, did it look like he was
22  starting to rotate to his left?
23      A.   Yes.  He was turning back at this time.
24      Q.   Are you familiar with the terms clockwise and
25  counterclockwise?
```

1      A.   Yes, sir.

2      Q.   So usually, like, if someone's turning to the right,

3   people say it's clockwise because that's the way the clock

4   goes.  And if they're turning to their left, sometimes people

5   say that's counterclockwise because that's against the way

6   the clock goes.

7           Do you generally understand that, or would you

8   rather just stick with left and right?

9      A.   Left and right is fine, sir.

10     Q.   I don't want to confuse you.  I don't want to use a

11  term that you might not be familiar with.

12          That's why I tried to explain it.

13          But you're saying if I understand correctly, that he

14  started to turn to his left; is that correct?

15     A.   Yes, sir --

16     Q.   And -- go ahead.

17     A.   He -- yeah, as he's turning, he's turning to his

18  left.  That's correct.

19     Q.   And so when you say he's angled, you mean he's more

20  angled in your direction now?

21     A.   Yes, sir, that's correct.

22     Q.   And was he angled in your direction at the time of

23  the second 40-millimeter round?

24     A.   Yes, sir.  He's -- yeah, that's correct.

25     Q.   And did that appear to strike him in the upper body

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina Olivas on 10/03/2023**                                    Page 24

1   as well?

2       A.   I believe so.  Yes, sir.

3       Q.   And what did you see that led you to believe that?

4       A.   I believe I saw the projectile fall forward.

5       Q.   Okay.  And you're still in your same position at

6   this point?

7       A.   Yes, sir.

8       Q.   Do you know if there was a third 40-millimeter

9   fired?

10      A.   I do not know, sir.

11      Q.   Did you fire at some point after you heard the

12  second -- strike that.

13          Did you fire at some point after you heard the

14  second 40-millimeter round?

15      A.   Yes, sir.

16      Q.   And how much time would you estimate passed from you

17  hearing the second 40-millimeter round to you firing your

18  first shot?

19      A.   I would say approximately half a second, sir.

20      Q.   And where were you aiming?

21      A.   Center mass, sir.  But at that time he was already

22  angled and moving.  So it was center mass, but the right --

23  the right portion of his center mass.

24      Q.   The right side of his center mass?

25      A.   Yes, sir.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina Olivas on 10/03/2023**

1    Q.   So would that be like the right chest area and right

2    side?

3    A.   Yes, that's correct.

4    Q.   Did you give any commands before firing?

5    A.   No, sir.

6    Q.   Did you give any verbal warning that you were going

7    to use deadly force?

8    A.   No, sir.

9    Q.   Did you hear any other lethal rounds being fired

10   before you fired your first lethal round?

11   A.   I do not believe so.  No, sir.

12   Q.   Did you have your weapon in two hands?

13   A.   I was one-handed, sir.

14   Q.   Okay.

15        MR. GALIPO:  Can we look at Exhibit -- will the next

16   one be 3?

17        Yes.  Let's look at Exhibit 3 quickly if we can.

18        (Exhibit 3 was marked for identification.)

19   BY MR. GALIPO:

20   Q.   Does that look to be a portion of the garage?

21   A.   Yes, sir.

22   Q.   And does this look to be a part of the pool table we

23   can ask see in this photograph?

24   A.   Yes, sir.

25   Q.   And I'm assuming the garage door was open at the

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina  Olivas on 10/03/2023**                                    Page 28

```
 1      Q.   Like your perspective when you were looking into the
 2   garage, was this kind of the angle you were looking at?
 3      A.   It depends on what time frame you're talking
 4   about.
 5      Q.   Well, at any time frame did you have this general
 6   angle?
 7      A.   I believe it was further back.
 8           It seems pretty close to me.
 9      Q.   Okay.  This might have been the angle generally, but
10   you would have been further back?
11      A.   Yes.
12      Q.   Okay.
13           MR. GALIPO:  That's fine.  Thank you.
14   BY MR. GALIPO:
15      Q.   And so how much time passed between your first shot
16   and your second shot?
17      A.   I would say a second, maybe, sir.
18      Q.   And how about between your second shot and your
19   third shot?
20      A.   Altogether, all three shots, less than three
21   seconds, sir.
22      Q.   And you told me where you're aiming for your first
23   shot.
24           Where were you aiming for your second shot?
25      A.   Right shoulders, sir.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Christina Olivas on 10/03/2023                                    Page 29

1      Q.   Was his right shoulder to you at the time of your

2   second shot?

3      A.   It was what was exposed at that time, yes, sir.

4      Q.   So he was still in the process of rotating to his

5   left at that point?

6      A.   That's not correct, sir.

7      Q.   Pardon?

8      A.   That's not correct, sir.

9      Q.   Were you firing your shots at his back?

10      A.   No, sir.  That's not correct.

11      Q.   So you were firing at his right shoulder from your

12   perspective?

13      A.   Yes, sir.

14      Q.   How about your third shot?

15      A.   Right shoulder, sir.

16      Q.   Also right shoulder; is that correct?

17      A.   Yes, sir.

18      Q.   So your first shot would have been more towards his

19   front right side, and your second and third shot would have

20   been directed at his right shoulder?

21      A.   Yes, sir.

22      Q.   When Mr. Perez took the one step back, was he facing

23   generally in your direction?

24      A.   He was angled towards my direction, yes, sir.

25      Q.   Could you see his hands when you fired your first

```
 1        Q.   Did you hear any officer giving him any commands
 2   immediately before the 40-millimeter was deployed?
 3        A.   No, sir.
 4        Q.   Did you hear any officer giving him any commands in
 5   between the time the 40-millimeter was deployed and the time
 6   the shots all stopped?
 7        A.   I'm sorry.  Can you rephrase that question?
 8        Q.   Sure.  In between the time the first 40-millimeter
 9   was deployed and the time all the shots stopped, did you hear
10   anyone giving any commands during the shots?
11        A.   No, sir.
12        Q.   When you fired your first shot, was Mr. Perez still
13   on his feet?
14        A.   Was he standing, sir; is that what you're asking?
15        Q.   Yes.
16        A.   Yes, sir.
17        Q.   When you fired your second shot, was he standing?
18        A.   He was starting to lower his center of gravity, sir.
19             He's leaning in at that point.
20        Q.   I'm sorry.  I didn't hear the end of your response.
21        A.   He's leaning, he's leaning forward.
22        Q.   Okay.  But was he still on his feet?
23        A.   I believe so, yes, sir.
24        Q.   When you fired your third shot, was he still on his
25   feet?
```

```
 1      A.   He's leaning at this point.  So I don't know what
 2  he's doing with his feet, sir.
 3      Q.   So your first shot, he was standing.
 4           The second shot, he was on his feet, but leaning
 5  forward; is that correct?
 6      A.   Yes.
 7      Q.   And the third shot, it sounds like he's leaning
 8  forward, but you're not sure about his feet?
 9      A.   I'm not sure if it's bent.  I'm not sure exactly
10  what they're doing because the pool table is right there.
11      Q.   At some point do you see him diving behind the pool
12  table?
13      A.   Yes, sir.  The front of the pool table.
14      Q.   That would be the side of the pool table furthest
15  from you?
16      A.   Yes, sir.  The north -- north end of the pool
17  table.
18      Q.   Did you see him diving behind the pool table before
19  or after your last shot?
20      A.   It was during my second and third shot that he was
21  leaning forward, diving.
22      Q.   At least in my mind, when I think of leaning forward
23  and someone diving, it could be different because diving I'm
24  kind of envisioning someone like in mid air diving behind
25  something.
```

1          So when you say diving, what do you mean?

2     A.    I mean he's running forward and jumping towards the

3     area in front of the pool table, going down.

4     Q.    So you're saying you would have observed that at

5     some point after your first shot?

6     A.    Yes, sir.

7     Q.    So what you characterize as a diving motion would

8     have been at some point after Deputy Stone fired the two

9     40-millimeter rounds and you fired your first round?

10    A.    When he starts -- can you ask that question one more

11    time?

12    Q.    Sure.  This leaning forward that you described and

13    diving motion would have been after Deputy Stone fired his

14    two 40-millimeter rounds and after you fired your first

15    round?

16    A.    Yes, sir.

17    Q.    And when you were firing your rounds, do you know if

18    any other officers were also firing rounds at that point?

19    A.    I do not know, sir.  I was focused on the threat.

20    Q.    Did you have any training on the 40-millimeter?

21    A.    Yes, sir.

22    Q.    Have you ever fired it before in training?

23    A.    Yes, sir.

24    Q.    Have you ever fired in the line of duty?

25    A.    Yes, sir.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina Olivas on 10/03/2023**                                    Page 34

| | | |
|---|---|---|
| 1 | Q. | And is it essentially a pain compliance tool? |
| 2 | A. | Yes, sir. |
| 3 | Q. | And how does it cause pain, if you know? |
| 4 | A. | By striking it with a collapsible gel round, sir. |
| 5 | Q. | And have you seen it deployed by other deputies at |
| 6 | various times when you were present at scene? |
| 7 | A. | Yes, sir. |
| 8 | Q. | And would it be fair to say that different people |
| 9 | react differently to it? |
| 10 | A. | Yes, sir. |
| 11 | Q. | And have you seen some individuals run when they're |
| 12 | being fired at? |
| 13 | A. | By the 40-millimeter? |
| 14 | Q. | Yeah.  Like if someone's starts shooting |
| 15 | 40-millimeters at a person, have you seen them like run or |
| 16 | try to get away from it? |
| 17 | A. | No, sir.  I generally see them fall to the floor. |
| 18 | Q. | What was in your background as you were firing your |
| 19 | shots? |
| 20 | A. | The north wall, sir. |
| 21 | Q. | What was it? |
| 22 | A. | North garage wall. |
| 23 | Q. | The garage wall. |
| 24 | | MR. GALIPO:  Can we pull up Page 60 of the deputy's |
| 25 | statement? |

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Christina Olivas on 10/03/2023                                    Page 36

```
 1        A.   Yes, sir.

 2        Q.   So would you at least agree with me in your

 3   statement or interview you said that you believe your first

 4   round and your second round struck Mr. Perez?

 5        A.   Yes, sir.  I would agree that I believed it -- it

 6   struck.

 7        Q.   Okay.  And how far was he from you when you fired

 8   your first round?

 9        A.   Approximately eight to ten feet, sir.

10        Q.   And how far was he from you when you fired your

11   second round?

12        A.   I would give the same approximation, approximately

13   ten feet.

14        Q.   And how far was he when you fired your third

15   round?

16        A.   I would estimate ten feet.

17             MR. GALIPO:  Can we go to the bottom of Page 62,

18   please.

19   BY MR. GALIPO:

20        Q.   And then you're asked, you say, "He was reaching

21   down, and do you know if that third round struck Perez?"

22             And you say, "I believe it did, sir."

23             Do you see that?

24        A.   Yes, sir.

25        Q.   And then the detective says, "Okay.  And then what
```

1    happens next?"

2              And you say, "He's -- he -- he's on the ground."

3              Do you see that question and answer?

4        A.   Yes, sir.

5        Q.   And the detective says, "Okay.  And what is

6    happening with him on the ground?"

7              And you say, "There is -- he -- I see blood all

8    around his head, and then he's breathing.  He's making like a

9    gargling -- gargling noise."

10             Do you see that?

11       A.   Yes, sir.

12             MR. GALIPO:  Can we go back to Exhibit 5, please,

13   Shannon.

14   BY MR. GALIPO:

15       Q.   Is that some of the blood that you saw on the scene

16   shown in this photograph?

17       A.   I believe so.

18       Q.   And after your third shot and after he was on the

19   ground and after you saw the blood, did you hear any further

20   shots being fired?

21       A.   Can you rephrase that question, sir?

22       Q.   Sure.  After he went to the ground, did you hear any

23   additional shots being fired?

24       A.   After I shot my last round, I had heard that there

25   was a few rounds fired.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina  Olivas on 10/03/2023**                                    Page 39

```
 1            MS. ANDERSON:  Objection.  Incomplete

 2   hypothetical.

 3   BY MR. GALIPO:

 4       Q.   You may answer.

 5       A.   Sir, like I said, I heard the rounds after I shot my

 6   last round, not when he was already on the ground.

 7       Q.   I'm asking you a different question now.

 8            You're basically telling me you didn't fire any

 9   shots after he went to the ground; correct?

10       A.   Yes, that's correct.

11       Q.   Was that based in part on your training?

12       A.   That's based on what I saw in front of me, sir.

13       Q.   Why didn't you shoot anymore shots after he was on

14   the ground?

15       A.   Because I did not see any more movement from his

16   head or his shoulders, sir.

17       Q.   And I guess what I'm asking you, based on your

18   training and your observations, did you think in your mind,

19   it would have been inappropriate to keep firing at him?

20            MS. ANDERSON:  Objection.  Incomplete hypothetical.

21            You can answer.

22            THE WITNESS:  As I stated, sir, he was already on

23   the ground.  Based on my training and experience, I did not

24   see movement from my end.  So I didn't -- I no longer

25   fired.
```

1    Q.   Had you been involved in any other shootings other
2    than this one where you actually fired?
3    A.   No, sir.
4    Q.   How tall are you?
5    A.   Five-three, five-four, I would like to say, but
6    five-three.
7    Q.   Now, before you got into your position in front of
8    the garage, I'm assuming you had some information about the
9    call?
10   A.   Yes, sir.
11   Q.   Did you have any information that Mr. Perez was
12   injured and needed medical attention?
13   A.   No, sir.
14   Q.   Did you have any information that anyone else at the
15   residence was injured and needed medical attention?
16   A.   No, sir.
17   Q.   Did you have information that Mr. Perez had caused
18   serious injury or death to any person?
19   A.   He had a prior 245 conviction or charge.
20   Q.   Right.  That actually was an arrest, not a
21   conviction; correct?
22   A.   Correct.
23   Q.   And that indicated it did not involve a firearm; is
24   that also correct?
25   A.   The charge, yes, it did.  That's correct.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Christina Olivas on 10/03/2023                                    Page 47

1        Q.   So my question was a little bit different.

2             I'm not asking about an arrest.

3             I'm asking if you had information that he had ever

4    seriously injured or killed someone.

5        A.   I apologize, sir.

6             No, I did not have that information.

7        Q.   Did you have any information that he had ever been

8    convicted of a crime?

9        A.   No.   Just the one we talked about, just the charge.

10       Q.   Now, did anybody tell you at any time before you

11   fired, that during some of the time frame he was sitting on

12   the chair, he had a gun in his hand?

13       A.   It was on his lap.

14            That's all the information that was given to me --

15       Q.   Your voice is really trailing off for me.

16            COURT REPORTER:  Could you repeat?

17            MR. GALIPO:  Is there something we can do, Kayleigh,

18   to get her closer to the mic?

19            MS. ANDERSON:  Yeah.  I'm trying to avoid

20   interference between the computer that's here, but let me

21   move my laptop closer to her.

22            MR. GALIPO:  Okay.

23            MS. ANDERSON:  If you don't mind the camera.

24            MR. GALIPO:  I don't mind at all.

25   BY MR. GALIPO:

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina  Olivas on 10/03/2023**                                    Page 48

```
 1        Q.   And I'm sorry.  It may also be my hearing too.
 2             So did you say someone had told you that at some
 3    point when he was sitting on the chair, he had a gun in his
 4    hand?
 5        A.   That was on the call history, but only Stone had
 6    told me that it was on his lap.
 7        Q.   And you already told me you couldn't see that;
 8    correct?
 9        A.   That's correct, sir.
10        Q.   Did you have any information that he had fired that
11    weapon?
12        A.   No, sir.
13        Q.   Any information he had pointed the weapon at
14    anyone?
15        A.   No, sir.
16        Q.   Any information that he had verbally threatened to
17    kill the officers?
18        A.   Verbal?
19        Q.   Verbal.
20        A.   No, sir.
21        Q.   Did you ever hear him verbally threaten the
22    officers?
23        A.   I wasn't there.  I wasn't present when patrol was
24    present.  We just relieved him, sir.
25        Q.   During the 20 minutes you were there, did you hear
```

1    him verbally threaten anyone?

2         A.   No, sir.

3         Q.   Did you hear him say anything at all during the 20

4    minutes you were there?

5         A.   Yes, sir.

6         Q.   What did you hear him say?

7         A.   It was responses to the negotiation, sir.

8         Q.   Do you recall anything generally that he said?

9         A.   Yes.  He asked what he was going to jail for.

10        Q.   And what was the response, if you remember?

11        A.   Depends on who we're speaking in reference to.

12             Because Alcala had a response and Gaytan had a

13    response, sir.

14        Q.   What was Alcala's response?

15        A.   Alcala's response was, "Hey, it's just a -- it's

16    just a misdemeanor.  It's for trespassing.  However, you did

17    have a gun on you."

18        Q.   And what was Gaytan's response?

19        A.   It was very similar, "It's just a misdemeanor, let

20    us sit you down, search you out, make sure you have no other

21    weapons.  We can talk about it."  And then he can't promise

22    that he wasn't going to go home tonight or go to jail, but it

23    wasn't the end of the world.

24        Q.   And is that about the time he took that step back?

25        A.   Yes, sir.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina  Olivas on 10/03/2023**                              Page 50

1      Q.   And then almost immediately after he took the step

2   back, you heard the 40-millimeter being deployed?

3      A.   Yes, sir.

4      Q.   Did you have a sense when he was sitting down on

5   that bar stool, how close it was to the end of the pool table

6   on the three side?

7      A.   I don't understand your question, sir.

8      Q.   Yeah.  So remember we did the one, two, and three

9   side?

10          I'm trying to figure out if you could tell how close

11   the bar stool was to the end of the pool table when he was

12   sitting down.

13      A.   Just where he was.  I don't -- I could approximate a

14   distance from how close he was to the table.

15      Q.   Yeah.  Just give me an estimate.

16      A.   I would say two feet, sir.

17      Q.   Okay.

18          MR. GALIPO:  Could you hear that, Jinna?

19          COURT REPORTER:  Yes.  Two feet.

20          MR. GALIPO:  Okay.  Great.

21   BY MR. GALIPO:

22      Q.   What did you do immediately after you fired your

23   last shot?

24      A.   Kind of vague.  I did a lot, sir, afterwards.

25      Q.   No.  I said immediately afterwards.

1      A.    I was still looking to see what was going on.

2            I was focused on Perez.

3      Q.    How much time passed between your last shot and the

4   officers approaching Mr. Perez?

5      A.    I think I estimated one to two minutes.

6            However, when I did look back on the call history,

7   it was more like five minutes.

8      Q.    Were you one of the officers that approached him?

9      A.    Initially, no.  However, afterwards, yes, sir.

10     Q.    And when you approached afterwards, did you notice a

11  lot of blood?

12     A.    No.  Just from what I saw initially when he was on

13  the ground, sir.

14     Q.    Could you tell where he was injured?

15     A.    No.  Because I wasn't doing medical.

16           I was more, hey, we're going to go clear the

17  residence.  I was given the assignment that we were going to

18  clear the residence.

19     Q.    Once he went to the ground after your three shots,

20  did you see Mr. Perez moving at all?

21     A.    I did not see any movement.

22           I saw him breathing, though.  He was breathing.

23     Q.    I'm sorry?

24     A.    No movement.  However, he was breathing.

25     Q.    How do you know he was breathing?

1        A.    I could hear it, sir.

2        Q.    How long was he breathing for?

3              Was it the whole time until the officers

4    approached?

5        A.    Yes, sir.

6        Q.    Can you describe the sound that you heard?

7              Was it like -- how would you describe it?

8              Heavy breathing?

9        A.    I'll trying to mimic it.  It was -- like that.

10       Q.    Okay.

11             MR. GALIPO:  You don't have to take that down,

12   Jinna.

13   BY MR. GALIPO:

14       Q.    Did you see anybody move the gun at any point after

15   the shooting?

16       A.    Deputy Stone had kicked the gun, sir.

17       Q.    Kicked it where?

18       A.    Away from Perez, sir.

19       Q.    Do you know where it ended up?

20       A.    No, sir, I did not.

21       Q.    Was that the first time you actually saw the gun

22   after the shooting?

23       A.    Yes.  As we were -- as I was approaching, yes, sir,

24   that was the first time.

25       Q.    Do you know if the agency that you worked for at the

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Christina Olivas on 10/03/2023                                    Page 55

```
 1        Q.   Now, you had some training with respect to
 2    tactics?
 3        A.   Yes, sir.
 4        Q.   And one of them would include de-escalation?
 5        A.   Yes, sir.
 6        Q.   Also you had training with dealing with someone with
 7    a mental illness or in a mental health crisis?
 8        A.   Yes, sir.
 9        Q.   You had some training with respect to commands?
10        A.   Yes, sir.
11        Q.   And part of the training was to give loud, clear
12    commands when you can?
13        A.   In reference to what, sir?
14        Q.   To giving someone commands in a critical incident.
15        A.   Yes, sir.  When it's reasonable and feasible, yes,
16    sir.
17        Q.   Right.  And when feasible, you should give the
18    person an opportunity to comply with the commands?
19        A.   If it's safe to do so, yes, sir.
20        Q.   And try to avoid conflicting or confusing
21    commands?
22        A.   Yes, sir.
23        Q.   You had training with respect to cover?
24        A.   Yes, sir.
25        Q.   From the time that you got in your position to the
```

```
 1      A.   I believe he was still breathing, sir.

 2      Q.   Did you hear him say anything after he was shot?

 3      A.   No, sir.

 4      Q.   Did you have an understanding as to where his family

 5   members were at the time of the shooting?

 6      A.   No, sir.

 7      Q.   So with respect to your training on deadly force,

 8   were you trained that deadly force is the highest level of

 9   force an officer can use?

10      A.   Yes, sir.

11      Q.   And were you trained it should only be used if there

12   is an immediate or imminent threat of death or serious bodily

13   injury to the officer or others?

14      A.   Yes, sir.

15      Q.   Were you trained about the reverence for human

16   life?

17      A.   I don't understand that question.

18      Q.   Do you recall being trained that deadly force should

19   only be used when no other reasonable options are

20   available?

21      A.   I still don't understand.  Can you repeat that?

22      Q.   Sure.  Do you recall being trained at the academy

23   that deadly force should only be used when no other

24   reasonable options are available?

25      A.   We don't have to refer to other options if there is
```

1    an immediate threat, sir.

2         Q.   Were you trained that if there is not an immediate

3    threat of death or serious bodily injury, deadly force should

4    not be used?

5         A.   It all depends on what the officer perceives as a

6    threat, sir, and the totality of the circumstances.

7         Q.   Were you trained that under the totality of the

8    circumstances, if there is not a reasonable belief of an

9    immediate threat of death or serious bodily injury, then the

10   officer should not use deadly force?

11        A.   Yes, sir.

12        Q.   And you were trained to give a warning that deadly

13   force was going to be used when feasible?

14        A.   When reasonable, yes, sir.

15        Q.   Were you trained that you need to assess before

16   using deadly force?

17        A.   Yes, sir.

18        Q.   Were you trained to assess between the shots if you

19   can?

20        A.   Yes, sir.

21        Q.   Were you assessing between your shots?

22        A.   Yes.  As he was moving towards the gun, yes, sir.

23        Q.   And were you assessing after your last shot?

24        A.   Yes, sir.

25        Q.   And were you trained that you're responsible to

 1     justify each of your shots?

 2          A.   Yes, sir.

 3          Q.   Had you in your experience as a law enforcement

 4     officer, had you ever seen a suspect with a gun in their

 5     hand?

 6          A.   No, sir.

 7          Q.   Had you ever seen a suspect with a knife in their

 8     hand?

 9          A.   No, sir, I haven't.

10          Q.   Had you ever seen a suspect with any type of weapon

11     in their hand?

12          A.   Yes, sir.

13          Q.   What type of weapons have you seen in the suspect's

14     hands?

15          A.   A stick, a bat.

16          Q.   Were you trained as a police officer you can shoot

17     someone merely for seeing a weapon in their hand, that fact

18     alone?

19          A.   No, sir.

20          Q.   What is that?

21          A.   No, sir.

22          MR. GALIPO:  Kayleigh, are you going to have

23     questions today of the officer?

24          MS. ANDERSON:  I don't.

25          MR. GALIPO:  Okay.  Let's take our last break.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina  Olivas on 10/03/2023**                                   **Page 62**

1              So that's what was communicated to me.

2        Q.    Did you think it was appropriate to shoot him at

3    that point even though he had a gun on his lap?

4        A.    I did not perceive a threat at that time, sir.

5        Q.    Did you ever perceive that he was reaching for the

6    gun on his lap at that point?

7        A.    I did not see any furtive movement.

8              So no, sir.

9        Q.    And when he stood up after being commanded to do so,

10   did he appear to be reaching for the gun at that point?

11       A.    When the gun was on the ground?

12       Q.    Yes.  When he first stood up.

13       A.    No.  It did not appear he was reaching for the

14   gun.

15       Q.    And during the time he was walking forward, did he

16   make any movements for the gun that you saw before he was

17   told to stop?

18       A.    No, sir.

19       Q.    And you thought he took about five steps forward; is

20   that correct?

21       A.    Yeah.  I estimated five steps, sir.

22       Q.    Before you heard the first less-lethal round, the

23   first 40-millimeter, did you see him make any reaching

24   movements towards the gun at any time before the first

25   40-millimeter round?

1      A.    No, sir.

2      Q.    And I think you told me you fired your first shot

3   after you heard the second 40-millimeter round; is that

4   correct?

5      A.    Not -- a half a second after, sir.

6      Q.    A half a second after the second 40-millimeter

7   round?

8      A.    Yes, sir.

9      Q.    And at that point could you see part of his chest?

10     A.    Yeah.  When he was near the three-four corner of the

11  picture that you showed me, he was angled in a easterly

12  direction.

13          So yeah.  I could see partial of his right side of

14  his chest.

15     Q.    I think you indicated he was facing east at the time

16  of your first shot; is that correct?

17     A.    Yeah, correct, sir.

18     Q.    One second, please.

19          I think you said -- was it your second and third

20  shots that you were aiming for towards the right shoulder?

21     A.    Yes, sir.

22     Q.    Could you see his chest area at the time of your

23  second shot?

24     A.    It was what was exposed to me at the time was more

25  of his right shoulder, sir.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Christina Olivas on 10/03/2023**                                        Page 64

```
 1            So that's what I was aiming for.
 2      Q.    I understand that.  I'm just wondering whether you
 3   could see his chest at that point.
 4      A.    I believe it was angled.  So yeah.
 5            This was the -- I couldn't see a lot of his chest,
 6   no.
 7      Q.    And is that the same with the third shot?
 8      A.    Yes, it's the same.
 9      Q.    And the second 40-millimeter round was fired how
10   much time after the first 40-millimeter?
11            Was that like within a second?
12      A.    It was quick.
13      Q.    It was quick?
14      A.    One second.  I estimated one second.
15      Q.    Okay.  So he would have a been like where?
16            In the middle of the side of the pool table at the
17   time of the second millimeter round?
18      A.    No.  He had taken a few steps back already, sir.
19      Q.    Okay.  I think that's all I have.
20            MR. GALIPO:  Kayleigh, did you have any additional
21   or follow-up?
22            MS. ANDERSON:  One thing I just want to clarify.
23            I'll try to do it very briefly.
24            In one of the questions that Mr. Galipo asked you,
25   you said that he was rounding the three-four corner?
```

1      DECLARATION UNDER PENALTY OF PERJURY

2

3   Case Name:  A.J.P., et al. Vs. County of San Bernardino, et

4   al.

5   Date of Deposition:  October 3, 2023

6   Job No.:  6789

7

8            I, _____, hereby certify

9   under penalty of perjury under the laws of the State of

10  California that the foregoing is true and correct.

11           Executed this _____ day of _____.

12  20____, at _____, California.

13

14

15

16

17

18            _____

19                      CHRISTINA OLIVAS

20

21

22

23

24

25