# EXHIBIT 4

```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.J.P. and A.M.P., minors, by and    )
     through their guardian ad litem      )
 5   Cynthia Nunez, individually and as   )
     successor in interest to Albert Perez,)
 6   deceased, and PATRICIA RUIZ,         )
     individually,                        )
 7                                        )
                 Plaintiffs,              )
 8                                        )
                 vs.                      )Case No.
 9                                        )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES   )
10   1-10, inclusive,                     )
                                          )
11               Defendants.              )
     _____)

12

13

14

15          REMOTE VIDEOCONFERENCE DEPOSITION OF

16                     CORY MCCARTHY

17                   NOVEMBER 9, 2023

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  26304
```

```
 1                        CALIFORNIA

 2                     NOVEMBER 9, 2023

 3                       10:06 A.M.

 4                      CORY MCCARTHY,

 5   called as a witness on behalf of the Plaintiffs, having been

 6   first duly sworn remotely via videoconference, was examined

 7   and testified as follows:

 8                       EXAMINATION

 9   BY MR. GALIPO:

10       Q.   Can you please state your name.

11       A.   Yes, sir.  My first name is Cory, C-o-r-y, last name

12   is M-c-c-a-r-t-h-y.

13       Q.   Have you ever had your deposition taken before?

14       A.   Yes, sir.

15       Q.   Have you been named as a defendant in a lawsuit

16   before to your knowledge?

17       A.   Yes, sir.

18       Q.   And how many prior occasions?

19       A.   I know two.  And I believe there may be been one

20   more earlier on in my career, but I can't speak for certain

21   on that specific one.

22       Q.   In the incident with Mr. Perez did you fire any

23   shots?

24       A.   Yes, I did.

25       Q.   How many shots did you fire?
```

```
 1      A.   I fired 14 shots.
 2      Q.   What type of weapon did you fire the shots from?
 3      A.   I had a rifle.
 4      Q.   Have you been involved in any other officer-involved
 5   shootings?
 6      A.   Yes, sir.
 7      Q.   When was the first one that you were involved in?
 8      A.   I believe it was November of 2019.
 9      Q.   And were you shooting at a person at that time as
10   opposed to an animal?
11      A.   Yes, sir.
12      Q.   And do you know how many shots you fired in that
13   incident?
14      A.   Yes, sir.
15      Q.   How many shots?
16      A.   I fired one shot.
17      Q.   And what type of firearm was involved in that
18   incident?
19      A.   I had a rifle, sir.
20      Q.   Do you know if your shots struck the person?
21      A.   Yes.
22      Q.   Is it your belief that it did?
23      A.   Yes, it did.
24      Q.   Did that person survive, if you know?
25      A.   No.  That person did not.
```

1      A.   Yes, sir.  I do believe we did.

2      Q.   Did you review a transcript of that interview

3   recently?

4      A.   If you're referring to my interview with the

5   homicide detectives, yes, I did.

6      Q.   Yes.  That's what I was referring to.

7           Thank you.  Now, before the date of the incident

8   with Mr. Perez, do you have an estimate as to how many times

9   you have scene a suspect with a gun in their hand?

10     A.   Honestly, I couldn't give you an estimate.

11          There's been several times where I've seen a suspect

12   with a firearm either in their hand on various occasions.

13     Q.   Do you know if it's been more or less than ten

14   times?

15     A.   I would estimate more than ten.

16     Q.   And have there been other occasions where you have

17   seen a gun on their person, but not in their hand?

18     A.   Yes.

19     Q.   Were you trained that you can shoot someone merely

20   for seeing a gun in their hand, that fact alone?

21     A.   No, sir.  Not that fact alone.

22          There are other -- there are other facts to take

23   into account.

24     Q.   Had you ever seen a suspect, for example, with a

25   knife in their hand?

```
 1   force used?

 2        A.   Absolutely.

 3        Q.   Now, in terms of commands, you had some training

 4   with respect to giving commands; correct?

 5        A.   And -- and I apologize, sir.  Can you clarify on

 6   that -- are we talking about de-escalating, or what kind of

 7   commands other than verbal commands are we talking about?

 8        Q.   Verbal commands.  For example, were you generally

 9   trained to try to give commands when they're given, in a loud

10   and clear voice so the person can understand them?

11        A.   Yes, sir.

12        Q.   And were you generally trained to give the person an

13   opportunity to comply with the commands if you can do so

14   safely?

15        A.   Yes, sir.  If we can do so safely and it's feasible,

16   again, for the public safety, the suspect safety, and officer

17   safety.

18        Q.   And you were also trained to avoid conflicting or

19   confusing commands if you can?

20        A.   Yes, if you can, yes.

21        Q.   And the concept of cover, you have some training on

22   that, true?

23        A.   Again, sir, just to clarify, I don't want to get

24   anything in the wrong context.

25             Are you saying as somebody is talking and gaining
```

```
 1        Q.   And that might be like a vehicle stop where it's
 2   high-risk, and then officers take positions of cover, and
 3   then commands are given to the occupant on occupants of the
 4   vehicle?
 5        A.   Yes, sir.
 6        Q.   In terms the less-lethal, you had training on the
 7   40-millimeter?
 8        A.   Yes, sir.
 9        Q.   Have you had training on the bean bag shotgun?
10        A.   Yes, sir.
11        Q.   And have you had training on the Taser?
12        A.   Yes, sir.
13        Q.   And those are all less-lethal options; correct?
14        A.   Yes, sir.
15        Q.   Are the 40-millimeter bean bag shotguns generally
16   pain compliance weapons?
17        A.   Yes, sir.
18        Q.   So the training is that they're likely to cause pain
19   or injury, but the hope is in doing so, they can gain
20   compliance?
21        A.   Yes, sir.  Again, to clarify as well, the deployment
22   or use of those are not going to be used until we kind of
23   employed other options again as far as gaining rapport or
24   talking to that person.  But yes, the ultimate goal when
25   deploying those, there are certain areas that -- that you
```

```
 1   deploy those areas at, and the ultimate goal is to gain
 2   compliance for the suspect to then come to a peaceful
 3   resolution.
 4       Q.   And you were trained that, for example, the bean bag
 5   shotgun could cause injury even serious injury to a person
 6   potentially?
 7       A.   There is that potential, yes, sir.
 8       Q.   And same with the 40-millimeter, that could cause
 9   injury or serious injury potentially to someone?
10       A.   Again, yes, sir, potentially.
11       Q.   And then the Taser, as you are I'm sure aware, can
12   be used from a distance where you can strike a suspect if you
13   get the appropriate spread, the goal is to get the
14   neuromuscular incapacitation to give you an opportunity to
15   take the person into custody?
16       A.   Yes.  There is that, but there is also I mean that
17   also has a potential risk of injury to the person as well.
18       Q.   Correct.  And then let's talk quickly about training
19   on deadly force and then we'll get into the incident.
20            I'm assuming you're trained that deadly force is the
21   highest level of force an officer can use?
22       A.   Yes.
23       Q.   And that deadly force is likely to cause death or
24   serious bodily injury?
25       A.   Yes, sir.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Cory Mccarthy on 11/09/2023                                    Page 19

1    Q.   And I think you alluded to it earlier, but you're

2  generally trained that deadly force can only be used in

3  limited circumstance; is that fair?

4    A.   Again, sir, I don't know if I would classify it as

5  limited circumstances.  I would refer to our policy as when

6  that safety member reasonably believes there is immediate

7  threat of death or serious bodily injury to themselves or

8  others.

9    Q.   And if there is not a reasonable belief of an

10  imminent threat of death or serious bodily injury, then your

11  training is deadly force should not be used; is that fair?

12    A.   Again, per the policy, yes.

13       Again, you got to take into the -- reasonable

14  officer needs to take in the totality of the circumstances

15  depending on the case.

16    Q.   So do you recall in the academy when you went there

17  being trained about the reverence for human life with respect

18  to the use of deadly force?

19    A.   Yes, sir.

20    Q.   Do you recall in the academy being trained that

21  deadly force should only be used as a last resort?

22    A.   I don't recall anything being, again, anything last

23  resort.  I recall, again, going back to the policy, when --

24  where there is an immediate threat of life to yourself or

25  others or serious bodily injury, if that person has the

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**

```
 1    intent, the opportunity, and the --

 2         Q.    Ability --

 3         A.    Opportunity to carry it out, yes.

 4         Q.    I think it's the intent, opportunity, and ability;

 5    is that right?

 6         A.    Yes, sir.

 7         Q.    I'm assuming that part of your training is that it

 8    has to be an imminent threat of death or serious bodily

 9    injury; it can't be just a fear of future harm; is that a

10    fair statement?

11         A.    Yes, that's fair.

12         Q.    And were you trained that you're responsible to

13    justify every shot when using deadly force?

14         A.    Yes.  We're -- we are trained, again, that we need

15    to justify the -- the use of force.

16         Q.    And are you trained that you should assess before

17    using deadly force and during the sequence of shots if you

18    can?

19         A.    I apologize, sir.  Just to clarify, that what do you

20    mean by the sequence?

21         Q.    Well, for example, obviously, you are trained to

22    assess before shooting just to make sure there is that

23    imminent threat of death or serious bodily injury, true?

24         A.    That's true.

25         Q.    And what I'm wondering, sometimes you might only
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                    Page 21

```
 1   fire one shot like you did in the one matter, but sometimes
 2   like in this case there might be multiple shots, even pauses
 3   between some of the shots.
 4           And what I'm getting at, are you trained that you
 5   should assess if there is multiple shots being fired during
 6   the shooting sequence if you can?
 7       A.   Sir, if -- if you can, and again, you're -- you're
 8   assessing as you're going through.  Again, you're trained --
 9   we're trained to stop the threat based on, again, the use of
10   force policy and deadly force policy we've covered already.
11       Q.   And you're also trained to consider the background
12   or backdrop when you shoot?
13       A.   Yes, sir.
14       Q.   And are you trained that a verbal warning that
15   deadly force is going to be used should be given when
16   feasible?
17       A.   Just like you said, sir, when -- when feasible.
18       Q.   So let's talk a little bit about this incident.
19           I understand you were at home when you got out text
20   from Sergeant Gaytan?
21       A.   Yes, sir.
22       Q.   And there were other members of your team; is that
23   right?
24       A.   Yes, sir.
25       Q.   And your recollection is you were the first one on
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                           Page 24

```
 1      Q.   Now, did you have any information that Mr. Perez had
 2   pointed the gun at anyone?
 3      A.   We did not have information that he had pointed the
 4   gun at anybody other than he did take the firearm out of his
 5   pocket and brandished it at the female who was the reporting
 6   party.
 7      Q.   But just to be fair, you didn't have any information
 8   he pointed the gun at the female; is that true?
 9      A.   Excuse me.  Yes, sir.
10      Q.   And you didn't have any information he pointed the
11   gun at any of the officers; is that also true?
12      A.   Yes, sir.
13      Q.   And you certainly didn't have any information he had
14   fired the gun?
15      A.   That's correct.
16      Q.   Did you have specific information as to whether the
17   gun was loaded or not?
18      A.   No, sir.  We did not have that.  He again would not
19   comply with any commands from the patrol deputies to place
20   the gun on the ground.  So we -- we didn't have an
21   opportunity to check.
22      Q.   Did you have any information that he had
23   specifically physically injured anyone such that they needed
24   medical attention?
25      A.   At that specific incident, no, sir.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                            Page 25

1      Q.   Do you know if his criminal history was run before

2   you approached the garage area?

3      A.   It was, sir.

4      Q.   And did you have an understanding as to if he had a

5   criminal history or not?

6      A.   Yes, sir, he did.

7      Q.   And what was your understanding of his criminal

8   history?

9      A.   I do recall he had a charge for assault with the

10  deadly weapon that what I believe was dropped later.

11          I don't recall anything or anymore offhand -- trying

12  to remember.

13      Q.   Did you have any specific information as to whether

14  he was under the influence of alcohol or drugs?

15      A.   No, sir.   The only information that we had was he

16  was -- he was acting strangely per the reporting party and he

17  was not following any commands by patrol deputies to drop the

18  firearm and comply with commands.

19      Q.   Now, at some -- you want to take another sip of

20  water?

21      A.   I'm okay, sir.  Go ahead.

22      Q.   Okay.  Please when you want to, let me know and I'll

23  stop, so you can.

24      A.   Will do.  Thank you.

25      Q.   You're welcome.  So at some point your team

1          Shortly after that I had Deputy Olivas who then she

2     pointed her -- she had a handgun at him, and then Deputy

3     Stone with the less-lethal or 40-millimeter.

4          Q.   So at various times there would have been the three

5     weapons on your side, the handgun, the rifle, and the

6     40-millimeter?

7          A.   Yes.  Again, once Deputy Olivas took the initial

8     spot, I was behind them just having visual of him.  I was not

9     pointing the weapon in -- in that direction.

10          It was pointed at the ground.

11          Q.   And you're familiar with the term "low-ready?"

12          A.   Yes, sir.

13          Q.   Do you know if any of the officers on the left side

14     have their weapons either pointed at Mr. Perez or in a

15     low-ready while he was sitting on that chair before you went

16     in that BearCat?

17          A.   I don't recall seeing if they did.  I know that we

18     did have a plan in place of who was providing less-lethal

19     coverage and who was providing lethal coverage, but I did not

20     watch or specifically see them pointing they're weapons.

21          Q.   During this time period whatever it was, three to

22     fifteen minutes that you were on the right side watching

23     Mr. Perez in that chair, did he ever fire that weapon?

24          A.   He did not.

25          Q.   Did he ever point the weapon at anyone?

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                    Page 33

```
 1          A.   He did not.

 2          Q.   Did he ever raise the weapon from where it was in

 3     his hand in the direction of anyone?

 4          A.   He did not.

 5          Q.   Based on your training, did you think it would have

 6     been appropriate to shoot him while he was sitting in that

 7     chair based on what you observed during that time frame?

 8          A.   At that specific time frame, no, sir.

 9               We were, again, that's why we were having the crisis

10     negotiators and we were hoping he would drop the firearm and

11     come to us and we can come to a peaceful resolution.

12          Q.   And if he dropped the firearm and came to you, then

13     you would go hands-on with him and take him into custody?

14          A.   Sir, I guess to specify or expand on that, just

15     because we don't know the weapons that he has on him if he

16     has more weapons.  We have him walk to us and turn away from

17     us and get on his knees again making it safer for us and for

18     him and then place his hands behind his back, or maybe even

19     place him on his stomach so then we can take him into custody

20     safely.

21          Q.   Did you hear him verbally threaten to harm any of

22     the officers?

23          A.   Excuse me.  No, sir, I did not.

24          Q.   Did it appear at some point that he was getting

25     sleepy or tired?
```

1   A.   Again, sir, it's difficult for me to recall exactly

2   what Deputy Alcala said, but I believe he did tell him to put

3   the gun down.  I know he was trying to gain that rapport,

4   telling him that this conversation is from father to father;

5   it's not too late to surrender.

6        Again, gaining that rapport, attempting to

7   de-escalate, and have him place that weapon down to

8   surrender.

9   Q.   When you listened to your audio recently of the

10  incident, did you hear Deputy Alcala's voice on it from time

11  to time?

12  A.   I do believe I hear it from time to time, yes.

13  Q.   And do you recall him saying something to the effect

14  that you're describing, hey, father to father, you have a

15  child, it's not too late to surrender, you know, just put the

16  gun down and walk towards us, or words to that effect?

17  A.   Yes, sir.  Again, I don't recall verbatim, but I do

18  remember the conversation of father to father, it's not too

19  late to surrender.

20  Q.   Okay.  But just so that I'm clear, the entire time

21  that you saw the gun in Mr. Perez's right hand, he never

22  raised it, pointed it, or fired; it that true?

23  A.   That's true.

24  Q.   And did you decide to try to reposition yourself in

25  the BearCat to see if you can get a better view or different

1    perspective?

2          A.    Yes, sir.

3          Q.    And at some point did you learn that Mr. Perez

4    dropped the gun or put the gun down on the ground?

5          A.    Yes, I did.

6          Q.    And how did you learn that?

7          A.    Well, sir, visually I did see him lean forward at

8    the waist and stay seated in that bar stool, and when he sat

9    back up he placed his hands towards the side I believe and he

10   did not have the firearm.

11              And then it was communicated over the radio that he

12   did place the gun down which let us know that that was what

13   he placed on the ground at that location.

14         Q.    So if we just stop right there, did you at least

15   look at that at the time as an act of compliance?

16         A.    Yes.  I was hoping that that would lead to a

17   peaceful surrender and then he would walk out to my deputies

18   and be taken into custody.

19         Q.    And did you have an understanding as to where he

20   placed the gun down in relation to the chair he was sitting

21   on?

22         A.    Yes.  I had a good understanding of where he placed

23   it.

24         Q.    And what was your understanding?

25         A.    That he had placed the gun down.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                          Page 40

```
1              Again, he bent forward slightly at the waist and

2    placed the gun down in front of the bar stool.

3              He was still seated while he did it.

4         Q.   And how far was this bar stool located from the far

5    end of the pool table?

6         A.   It was a couple -- a couple feet.

7         Q.   And could you see the gun from your perspective when

8    he made that movement and put it down?

9         A.   I apologize, sir.  Could I see his hands before he

10   placed it on the ground?

11        Q.   Yeah.  That was probably not a great question.

12             I mean after he put it on the floor and he came up,

13   you know, and you didn't see anything in his hands, could you

14   see the gun on the floor at that time?

15        A.   I could not actually see the gun, no.

16        Q.   And were you at that point in the BearCat or still

17   down on the ground level?

18        A.   I was in the armored rescue vehicle.

19        Q.   And where did you position yourself in the

20   BearCat?

21        A.   I was located in the hatch or refer to as the in the

22   BearCat.

23        Q.   And what was your viewpoint from there?

24        A.   I was a little elevated due to it being a little

25   higher up in that armored rescue vehicle, and it was a hole
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                    Page 41

```
 1    or a port that I was able to look through.

 2        Q.    And what portion of Mr. Perez could you see from

 3    that perspective?

 4        A.    Well, sir, if you're referring to while he is

 5    sitting on the bar stool, I could see out to waistline or a

 6    little below waist line up to the top of his head.

 7        Q.    Do you know if Alcala every told Mr. Perez to stand

 8    up after he was telling him to put the gun down?

 9        A.    Sir, I don't know exactly what Alcala was telling

10    him.  I knew that he was speaking to him, but I could not

11    make out exactly what he was telling him to do at that

12    time.

13        Q.    Did you see Mr. Perez stand up at some point?

14        A.    Yes, I did.

15        Q.    And when he stood up could you see his hands?

16        A.    Yes.

17        Q.    Did he have anything in his hands at that point?

18        A.    He did not, sir.

19        Q.    And when he stood up did he reach for the gun that

20    was on the ground at the time he initially stood up?

21        A.    He did not.

22        Q.    And did you look at him standing up as another act

23    of compliance?

24        A.    Yes.  As long as he continued to -- as the

25    communication continued to progress and, again, I was hoping
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                           Page 42

```
 1   he would come to where my partners were to peacefully
 2   surrender.
 3       Q.   Do you know either from listening to your audio or
 4   from what you remember at the scene, whether he was asked to
 5   step forward towards the officers?
 6       A.   Sir, I only listened to my audio, but I knew they
 7   were speaking to him again.  I could not make out exactly
 8   what they were saying or communicating to him.
 9       Q.   When you listened to your audio recently, did you
10   hear those types of commands to step forward?
11       A.   Again, sir, in my audio I don't recall hearing being
12   able to make out anything telling him to step forward.
13       Q.   In any event did you see him walking forward?
14       A.   Yes.
15       Q.   And he would have been walking along one of the
16   sides of the pool table?
17       A.   Yes, sir.
18       Q.   From your perspective, was it the left side of the
19   pool table?
20       A.   Yes, sir, from my perspective it was my left.
21       Q.   And that would be the side, I think, you told me
22   that Gaytan and Pollick was on, and who else, was it Moore?
23       A.   Yes, sir.  It was Deputy Moore, Deputy Pollick, and
24   Sergeant Gaytan.
25       Q.   And I think you indicated in your statement that you
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Cory Mccarthy on 11/09/2023                                    Page 43

1    observed Mr. Perez walking along the side of the pool table

2    and maybe went a foot or two past it; is that your

3    recollection?

4        A.   Yes.  If your -- I believe it was like a foot or two

5    past the edge, yes.

6        Q.   And then came to a stop?

7        A.   Yes, yes, sir.

8        Q.   You would have still been up in your position you

9    described in the BearCat?

10       A.   Yes, sir.

11       Q.   And while he was walking forward, did you see him

12   reaching in any of his pockets?

13       A.   I don't recall him reaching pockets.  I believe he

14   had his hands down by his side, and on a couple occasions he

15   would cross his hands in front of him.

16       Q.   You could at least see his hands from your point of

17   view?

18       A.   Yes, sir.

19       Q.   And at least at that time you can see he had no

20   weapons in his hands; is that true?

21       A.   Yes.  In his hands, yes.  On his person, obviously,

22   we -- we did not know at that time.

23       Q.   Did you see at least from your point of view

24   anything that looked like a weapon protruding from his

25   person?

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                    Page 44

1      A.   No, sir.  We didn't see a weapon protruding, but

2   again, he could have had a weapon in his pockets, in his

3   waist band, at his lower back, and we would -- we would not

4   have known.

5      Q.   Because you had not had an opportunity to search him

6   yet; is that fair?

7      A.   Yes, sir.

8      Q.   But I'm just getting at and I think you've answered

9   it; it's not like you saw the butt of a handgun sticking out

10   of his waistband or a big bulge in his pocket that you

11   thought was a weapon?

12           You didn't see that, would you agree?

13      A.   No, sir.  We couldn't -- we couldn't see -- see

14   that.

15      Q.   Now, do you have an estimate as to how long he was

16   in a stopped position when he went a foot or two past the

17   pool table before he took that step backwards which we'll get

18   into in a moment?

19      A.   I don't -- I don't recall as far as the time frames,

20   sir.  I would estimate it a short, maybe a couple of

21   minutes.

22      Q.   And how close would he have been when he was in that

23   stopped position from the Officers Gaytan, Pollick, and Moore

24   on the left side?

25      A.   I don't know the exact distance, sir, how close he

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                        Page 45

```
 1   was to them at that time.
 2       Q.   Do you have any estimate?  If he was a foot or two
 3   past the pool table, and they were a couple feet from the
 4   threshold, do you have any estimate or a range?
 5       A.   They -- they would be a couple -- several -- several
 6   feet away.
 7       Q.   And do you know if they had their weapons directed
 8   in his direction?
 9       A.   Again, I couldn't speak for them if they did, I
10   couldn't see if they did.
11           Again, I know who was -- Deputy Pollick and Deputy
12   Moore were assigned to lethal cover portion and Sergeant
13   Gaytan was assigned to the 40-millimeter.
14       Q.   Was your weapon directed in his direction?
15       A.   I had it in the low-ready at that time, sir.
16       Q.   And during the time he was standing there, did you
17   see him reaching in his waist band or pockets at that time?
18       A.   No, sir.
19       Q.   And was the tactical plan as you understood it, if
20   he went towards or back towards where the firearm was at,
21   less-lethal would be deployed?
22       A.   Yes, sir.  That was discussed in our prior planning
23   when we were at the library, and that was also put out over
24   the radio again from Sergeant Gaytan so everybody knew.
25       Q.   That if he went back towards the firearm,
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                    Page 47

1        Q.   And how far would you estimate he was in that

2    stopped position from where that bar stool or chair that he

3    had been sitting on was?

4        A.   I would estimate it to be approximately 10 to 10 to

5    12 feet, 10 to 13 feet.

6        Q.   And what would you estimate your distance to be from

7    Mr. Perez when he was in that stopped position?

8        A.   Sorry, sir.  Just from -- just from me to Perez when

9    he was standing stationary.

10       Q.   Correct.

11       A.   I would estimate him to be approximately 8 to 12

12   yards at that time.

13       Q.   As of the time that Mr. Perez was in that stopped

14   position, do you know if there was a K-9 on-scene?

15       A.   I know that one was requested from Rialto Police

16   Department, and I do believe I heard a dog barking at that

17   time.

18       Q.   Do you know if anyone had been designated with the

19   Taser at that point, up to the point where Mr. Perez came to

20   a stop?

21            And I don't mean with the prior patrol officers.

22            I'm more focused on your team.

23       A.   And I'm -- I'm sorry, sir.

24            What do  you mean by designated as far as --

25       Q.   Well, let me I guess break it down.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
Cory Mccarthy on 11/09/2023                                    Page 48

```
 1              First of all, do you know if anyone on your team had
 2   a Taser?
 3       A.    I do believe some of the them do.  I -- I couldn't
 4   say for certain, though, who -- who did.
 5       Q.    But some of your team members generally carry
 6   Tasers?
 7       A.    Yes, sir.
 8       Q.    And do you know if there was any discussion in the
 9   tactical plan that anyone would be designated Taser?
10              In other words, you know, officer one, you're
11   40-millimeter, officer two, you're Taser if he comes close
12   enough.
13              Do you recall anything like that?
14       A.    No, sir.  I do not recall the -- anything brought up
15   about the Taser.  It was the 40-millimeter there was chemical
16   agents that were brought up as well and the light sound
17   diversionary device that was also talked about.
18       Q.    Let me ask you about the -- was that a flash bang
19   essentially?
20       A.    If you're referring to the light sound diversionary
21   device, then, yes, sir.
22       Q.    How does that work, generally?
23       A.    Sorry, sir.  As far as what -- what part?
24       Q.    Flash bang.  In other words, how is it deployed and
25   what is the intended effect?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                         Page 50

1    Q.   So you indicated before we took a break that at some
2    point you heard over the radio that if he goes for the gun,
3    less-lethal from Stone and Gaytan would be deployed.
4         Do you recall talking about that?
5    A.   Yes, sir.
6    Q.   When did you hear that over the radio in relation to
7    the time frame that Mr. Perez was standing a little bit
8    beyond the end of pool table?
9    A.   And I'm sorry, sir.  Again, just to clarify, I know
10   he was standing at the end of the pool table, and that was
11   what was communicated over the radio.  As far as the time
12   frame I -- I -- I don't know if I could answer that.
13   Q.   So you don't remember if that was communicated
14   during the time frame he was standing or some other time?
15   A.   No, sir.  I -- I apologize.  Just so I can
16   understand the question, he was standing at the end of the
17   pool table when that was communicated and that  was put over
18   the radio and it was also communicated in our prior planning
19   while we were at the library as well.
20   Q.   Are you trained on the concept of contagious fire?
21   A.   And I'm sorry, sir.  Just to understand that as
22   well, are you talking about like a sympathetic fire or?
23   Q.   Yes.  Have you heard those terms either sympathetic
24   fire or contagious fire before in your training?
25   A.   Yes, sir, I have.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                    Page 51

```
 1        Q.   And if you're more comfortable with sympathetic

 2   fire, what do you understand that to mean?

 3        A.   My understanding of that is whether a specific

 4   person hears either a loud noise, a gunshot, anything that

 5   would indicate to them that either a gunshot has been taken

 6   place towards the person, they will then begin to shoot as

 7   well or they could.

 8        Q.   And with respect to using the 40-millimeter, is part

 9   of the training to announce to the other officers you're

10   going to use the 40 so they know it's less-lethal being

11   fired, and not lethal?

12        A.   When -- when feasible, sir.  That is in policy.

13             It's when feasible, and it is also discussed, again,

14   that's why it was discussed also in the prior planning as

15   well so everybody knew that that was going to take place if

16   that happened.

17        Q.   And what is the purpose of that in the training and

18   policy to announce even to the other officers that

19   less-lethal like a 40-millimeter's going to be used?

20        A.   Well, sir, again, you want to announce what is

21   happening so everybody whether it be patrol deputies and SED

22   personnel know what -- what is taken place and that

23   less-lethal is being deployed, and also as you indicated,

24   just to negate any type of sympathetic fire if that was to

25   arise.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                                    Page 52

```
 1        Q.   Because part of the training is if it's not
 2   announced, that an officer may mistakenly believe it's a
 3   lethal-round even potentially coming from the suspect, and
 4   then that could lead to sympathetic fire.
 5             Is that part of the training?
 6        A.   Again, that -- that may be a part, and that's why
 7   we, again, discussed that in the planning, and it was
 8   communicated over the radio.  So we knew it was -- was or if
 9   it look place.
10        Q.   Now, at some point you heard the 40-millimeter go
11   off; is that correct?
12        A.   Yes.  I heard and did see it.
13        Q.   And you were still in the BearCat at that point?
14        A.   Yes, sir.
15        Q.   In the five or ten seconds before the 40-millimeter
16   was deployed, did you hear anybody yell out "40, 40, 40," or
17   words to that effect?
18        A.   No, sir.
19        Q.   You saw Mr. Perez taking a step back with his left
20   foot at some point and started to turn to his left; is that
21   correct?
22        A.   Yes, sir.  I did see Mr. Perez take a step back with
23   his left foot and turn towards the last location of the
24   firearm.
25        Q.   When he took that step back, that's when you heard
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                    Page 53

1   the first 40-millimeter go off; is that true?

2        A.   Yes.

3        Q.   And when you heard the first 40-millimeter go off,

4   what would you estimate Mr. Perez's distance to be from that

5   chair at that point?

6        A.   I would estimate it to be approximately 8 to 12 feet

7   in between that.

8        Q.   And do you know now who fired that first

9   40-millimeter?

10       A.   Yes, sir.

11       Q.   And what is your understanding?

12       A.   Deputy Stone.

13       Q.   And Deputy Stone, I think we talked about earlier

14   was on the right side; correct?

15       A.   Yes, sir.

16       Q.   And could you tell if that first 40-millimeter

17   struck Mr. Perez?

18       A.   Yes, I could.

19       Q.   And did it appear to strike him?

20       A.   Yes, it did.

21       Q.   Where did it appear to strike him?

22       A.   It struck him in his abdomen.

23       Q.   And did you see Mr. Perez's hands go to the area

24   that it impacted him after he was struck in the abdomen?

25       A.   Yes, I did.

1    Q.   And did you see anything in his hands at that

2    point?

3    A.   Excuse me.  No, I did not, sir.

4    Q.   And I think you told me earlier that the

5    40-millimeter is intended to cause pain?

6    A.   It's -- it is used for a pain compliance, yes.

7    Q.   And I think you told me earlier that it may cause

8    injury even potentially serious injury?

9    A.   It could.

10   Q.   Do you know if a lay person, so a non-law

11   enforcement person would know the difference between a

12   40-millimeter launcher and a firearm of some kind?

13        MS. ANDERSON:  Objection to the extent that calls

14   for speculation.

15        But you can answer.

16        MR. GALIPO:  It may.  That's a good objection,

17   Kayleigh.

18   BY MR. GALIPO:

19   Q.   But I'm just wondering whether you have any thoughts

20   on that.

21   A.   And I'm sorry, sir.  Could you specify on that as

22   far as are you -- are you referring to the looks of it if you

23   were to place a live firearm next to the 40-millimeter, if

24   somebody would be able to tell the difference?

25   Q.   No.  More like let's just say I'm sure you have

1  friends or family members that know nothing about law

2  enforcement or very little or very little about weapons.

3          You know, maybe some neighbors down the street,

4  maybe some friends or family members, do you think the

5  average person if they saw a 40-millimeter launcher would

6  automatically know, oh, that's not a real firearm, that's a

7  less-lethal firearm.

8          Or you think they wouldn't know the difference?

9  A.   Sorry.  I think that's a kind of a broad statement.

10         I -- it's hard to tell.  I think that there would be

11  people that would be able to put two and two together, and

12  there may be people that may not.

13  Q.   Okay.  That's fair enough.

14         Now, prior to hearing that 40-millimeter go off, did

15  you hear any lethal shots being fired?

16  A.   No, sir.

17  Q.   And where were Mr. Perez's hands, if you know,

18  immediately prior to that 40-millimeter being fired?

19  A.   I don't recall exactly.  I do believe they were down

20  by the sides.

21  Q.   And then you saw them immediately come to his

22  stomach area?

23  A.   After the 40-millimeter was deployed, yes.

24  Q.   Had you been present before when 40-millimeters had

25  been deployed and struck individuals?

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                    Page 56

```
 1       A.   Yes, sir.

 2       Q.   And do you have an estimate as to how many times,

 3   different occasions where you saw 40-millimeter being

 4   deployed and struck and individual?

 5       A.   Yes, sir.  Multiple occasions, an estimate over --

 6   over five.

 7       Q.   Have you ever fired the 40-millimeter and struck an

 8   individual?

 9       A.   I have not, sir.  My times with the 40-millimeter

10   were either to disable cameras or windows if we had to.

11       Q.   And have you seen instances where someone struck by

12   a 40-millimeter got struck and then tried to move or run away

13   from being struck again?

14       A.   Sir, all the ones that I had actually witnessed

15   deployed, the person had actually fell to the ground with

16   that painful compliance and surrendered.

17       Q.   Were you trained that one reaction people could have

18   of being struck by a bean bag shot gun or 40-millimeter could

19   be to run or try to run?

20       A.   That could be, sir, with -- with any less-lethal

21   tool.

22       Q.   And did you hear any additional 40-millimeters other

23   than the first one?

24       A.   I did see multiple 40-millimeters being deployed

25   after the first one, yes.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                  Page 57

1      Q.    How many others?

2      A.    I would estimate approximately I believe it was like

3  three to four.

4      Q.    And how much time passed from the first

5  40-millimeter to the others that you heard and observed?

6      A.    Sir, it was a short time frame.  It was

7  approximately a second or maybe a second and a half.

8      Q.    So would it be fair to say that you heard

9  approximately three to four 40-millimeters being deployed

10  within a second or a second and a half?

11      A.    Yes.

12      Q.    And at the time that you heard those 40-millimeters

13  being deployed, did you see any weapon in Mr. Perez's hands

14  at that point?

15      A.    I did not.

16      Q.    Did you hear any lethal shots being fired before the

17  last 40-millimeter?

18      A.    Before the last -- excuse me -- before the last

19  40-millimeter I did not.

20      Q.    So from your perspective the first three to four

21  rounds fired at Mr. Perez were 40-millimeter rounds?

22      A.    Yes, sir.

23      Q.    And could you tell if the other 40-millimeter rounds

24  struck him?

25      A.    I -- I do believe I did see approximately two

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                    Page 58

```
 1    strikes across -- across Mr. Perez's back.
 2        Q.   And one you saw to the abdomen and stomach and two
 3    to the back?
 4        A.   Yes.  I believe one was in the back and one was on
 5    the backside.
 6        Q.   You're indicating like the back of the right arm
 7    area?
 8        A.   Yes, sir.  More towards in line with his back.
 9        Q.   So would it be fair to say you saw one strike him in
10    the front which would be the stomach or abdomen and two to
11    the backside?
12        A.   Yes, sir.
13        Q.   And you believe those 40-millimeters were deployed
14    and struck him before any lethal rounds were fired?
15        A.   Yes, sir.
16        Q.   I'm looking down from time to time and I apologize.
17             But I'm looking at your statement just so that you
18    know the transcription and some of the stuff we covered
19    already.
20             Did you know who was firing those additional
21    40-millimeters?  In other words, did you believe it was all
22    Deputy Stone or some of them may have been Sergeant Gaytan?
23        A.   I knew that it was both of them, sir, because you're
24    able to see some of those 40-millimeters in mid air, and you
25    were able to see the direction they were traveling.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                Page 59

```
 1      Q.    So your impression both Deputy Stone and Sergeant

 2   Gaytan were firing the 40-millimeters?

 3      A.    That's what it appeared to me, yes.

 4      Q.    Now, at some point you fired your first shot;

 5   correct?

 6      A.    That's correct.

 7      Q.    And where were you aiming on Mr. Perez's body when

 8   you fired your first shot?

 9      A.    Once -- once he made an attempt to grab reach down

10   where the firearm was, it was -- I aimed at the back of his

11   head is what was presented to me at the time.

12      Q.    And what did you have on your weapon so you were

13   able to aim at the back of his head?

14            Did you use your sights, or did you -- can you

15   explain that?

16      A.    Yes, sir.  Again, I guess an easier term is it's

17   just a red dot sight, just a red dot we have it zero'd at

18   specific distance and it's a red dot.

19      Q.    And at the time -- and you actually fired two

20   rounds, initially?

21      A.    Yes.

22      Q.    And those were both aimed towards the back of his

23   head?

24      A.    Yes, sir.

25      Q.    At anytime before you fired those two rounds, and
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                    Page 60

```
 1    I'm talking about in between the first 40-millimeter round

 2    being fired and in between your first shot, did you see a gun

 3    in Mr. Perez's hand during that time frame?

 4        A.   I did not see gun in his hand.  Again, up to my

 5    first shot is when he -- he leaned forward at the waist and I

 6    could see his right hand go down to where the last known

 7    location where we knew the gun was.

 8        Q.   And could you see the gun from your position in the

 9    BearCat at any time in between the first less-lethal round

10    and the time that you fired your initial two rounds?

11        A.   No, sir, I didn't.  I did not -- I never did see the

12    gun while it was back there, but it was communicated and we

13    knew where he placed the gun down.

14        Q.   And how much time would you estimate passed from you

15    hearing the first 40-millimeter round and you firing your

16    first round?

17        A.   I would estimate probably, sir, a second and a half

18    to two seconds, maybe two and a half seconds.

19        Q.   And was he still on his feet when you fired your

20    first two rounds?

21        A.   It did appear to me he was still on his feet, sir.

22             Again, he -- he bent forward at the waist.  I -- I

23    did see his right hand go towards and motion like he was

24    grabbing the firearm.

25        Q.   And do you know if you were the first officer to
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                      Page 61

```
 1   fire lethal or whether other officers were all also firing at
 2   the same time?
 3        A.   I don't know, sir, if I was the -- if I was the
 4   first one to fire if that's your specific question.  I do
 5   know that all other officers did shoot now again after --
 6   after the fact I knew that.
 7        Q.   And so after your first two rounds where you were
 8   aiming at the back of his head, did you see him go behind the
 9   pool table or the far end of the pool table?
10        A.   Yes, sir.  It did appear to me that he almost looked
11   like he took a kneeling position, was using the pool table as
12   almost a piece of cover like you described earlier that you
13   were asking me.
14        Q.   And when he was in that kneeling position, did you
15   fire any additional rounds at him?
16        A.   Yes, sir, I did.
17        Q.   How many additional rounds did you fire at Mr. Perez
18   when he was in a kneeling position?
19        A.   Sir, I fired a total of 14.  So if we're not talking
20   about the first two, that would be 12 more shots, sir.
21        Q.   And how much time do you think passed between your
22   first two shots and then your next volley of shots?
23        A.   I would estimate less than a second, sir.
24        Q.   Did you see any gun in his hand when you fired your
25   second volley of shots?
```

1    A.   Again, sir, I -- I apologize.  Just so I understand,

2    when you're talking about volleys, I know you talked about

3    the first two shots.  You're just talking directly about the

4    shots thereafter?

5    Q.   Yeah.  I mean I'm just going by your description in

6    your statement, and you seem to describe, like I fired two

7    shots, and then you're explaining your next group and your

8    next group.

9         So I'm just thinking of them as volley of shots.

10        Does that make sense?

11   A.   Yes, sir.  Again, I'm just asking for clarification

12   so I understand.

13   Q.   Sure.  So I'm thinking of your first two shots when

14   he was still on his feet as your first volley.  It sounds

15   like your second volley of shots he was on his knees; is that

16   correct?

17   A.   It did appear to me that he had, again, made it to

18   the pool table and took cover behind the pool table.  It -- I

19   would describe it as a kneeling position almost it seemed

20   like he got into.

21   Q.   And you indicate in your statement you fired an

22   additional three shots initially; is that correct?

23   A.   Yes, sir.

24   Q.   And I was wondering when you fired those three

25   shots, could you see a gun in his hand?

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                          Page 63

1      A.   No, sir, I did not see a gun in his hand.

2           I knew, again, based off of his actions with his

3    right hand reaching down, that at that point he had got to

4    where the gun was and had the gun.

5      Q.   And then it appears in your statement you fired an

6    additional fire or six rounds into the pool table?

7      A.   Yes, sir.

8      Q.   And what were you trying to accomplish by firing the

9    rounds into the pool table at that point?

10     A.   Sir, you asked me a question about cover earlier in

11   our interview.  That pool table or a pool table like the hard

12   wood is an example of that.  I knew based on my training you

13   can't just shoot once and it's not going to go through a hard

14   object such as that.

15          So just at the time I believed if I shot a couple or

16   shot through that specific side, it may go through, but after

17   those five to six shots I was able to stop and assess and

18   make the determination that it was not going to do that.

19     Q.   Was your intent with those five or six shots to try

20   to strike Mr. Perez by shooting through the pool table?

21     A.   Yes.  Again, I was trying to stop the threat at that

22   time.

23     Q.   And then there was a slight pause, I think, and you

24   heard some other gunfire during that pause?

25     A.   Excuse me, yes, sir.  I did stop and assess at that

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                    Page 66

1    the back of his head while he was still on his feet; is that

2    correct?

3        A.   Yes, sir.

4        Q.   Did you hear any other rifle shots going off other

5    than yours during the shooting sequence?

6        A.   I don't recall hearing another rifle, sir, while I

7    was -- during this time.

8        Q.   And then after you heard the two or three rounds

9    from the handgun, you fired more additional shots?

10       A.   Yes, sir.

11       Q.   How many additional shots did you fire?

12       A.   I believe I fired three shots, sir.

13       Q.   And where were you aiming when you fired those three

14   shots?

15       A.   Well, sir, because of that pool table and the place

16   of cover that it -- that it was, I aimed for the concrete

17   below that knowing based off my training that you would be

18   able to skip the rounds again to stop the threat.

19       Q.   Let me you ask you this:  You knew that Mr. Perez

20   had been sitting in that chair for some period of time with

21   that gun in his hand while patrol officers were there before

22   you replace them; is that true?

23       A.   Yes, sir.

24       Q.   And to your knowledge, he never fired the gun,

25   pointed the gun, or even raised the gun at any patrol

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                      Page 67

```
 1    officers; is that fair?

 2         A.   Yes, sir.

 3         Q.   And then you saw him sitting in the chair for some

 4    period of time with the gun in his right hand, and you told

 5    me that you never saw him shoot the gun, point the gun, or

 6    even raise the gun at anybody; is that also true?

 7         A.   Yes, sir.

 8         Q.   And your understanding was there was a

 9    heart-to-heart talk with him, father-to-father about

10    surrendering, and at some point he placed the gun down in

11    front of that chair?

12         A.   Yes, sir.

13         Q.   And then he stood up and walked towards the officers

14    along the side of the pool table ending up about one or two

15    feet beyond the edge?

16         A.   Yes, sir.

17         Q.   And then he took one step back with his left foot,

18    and that's when the 40-millimeter started?

19         A.   Yes, sir.

20         Q.   And you observed the first 40-millimeter strike him

21    in the abdomen and him put his hands there which is something

22    you've probably seen before; correct?

23         A.   It is.

24         Q.   And then he turned away, and he was continued having

25    the 40-millimeter fired at him, and you saw two you believe
```

 1   strike him in the back?

 2        A.    Yes, sir.

 3        Q.    And then you from your position, the BearCat, were

 4   aiming at the back of his head for two shots?

 5        A.    Yes, sir.  Again, he was reaching bent forward at

 6   the waist reaching with his right hand to where that firearm

 7   was placed on the ground as if he was retrieving the

 8   firearm.

 9        Q.    Well, he also could have been trying to get out of

10   harms' way from the 40-millimeter rounds and your two shots

11   to the back of his head, don't you think?

12             MS. ANDERSON:  Objection.  Calls for speculation.

13             But you can answer.

14             THE WITNESS:  No, sir, I do not, and because I've

15   seen on multiple occasions when the 40-millimeter has been

16   deployed, an example is on a hostage rescue, a man had taken

17   to mentally disabled people as hostage, he had a knife in his

18   hand.  We deployed the less-lethal 40-millimeter, he then

19   fell to the ground and peacefully surrendered.

20             We had another incident where a suspect came out of

21   the house, was being combative and would not comply, and it

22   was deployed, and he did the same thing where he fell to the

23   ground and immediately surrendered.

24             Unfortunately, Mr. Perez dictated that and ran

25   towards the firearm, again, posing an immediate threat to

```
 1   myself and my partners.

 2   BY MR. GALIPO:

 3        Q.   Well, you told me earlier that you can't shoot

 4   someone merely for seeing a gun in the hand, remember that?

 5        A.   Yes.

 6        Q.   And you, I think, have told me that after he came to

 7   a stop at the end of the pool table, you never saw a gun in

 8   his hand, true?

 9        A.   Again, I saw him reach down bent forward at the

10   waist reaching for where the gun was last placed.

11        Q.   I understand that part.  But you never actually saw

12   a gun in his hand; is that fair?

13        A.   I did not, sir.

14        Q.   So if he had not pointed the gun or tried to shoot

15   the gun before the patrol officers got there and hadn't

16   pointed the gun or try to shoot the gun during the entire

17   time the patrol officers were there, and hadn't pointed the

18   gun or tried to shoot the gun during the time frame you all

19   were watching him, and then put the gun down, stood up and

20   walked forward and only started moving away or running once

21   the 40-millimeter was deployed, why in your mind did you

22   think he suddenly was going to try to grab the gun and have a

23   shoot-out with six officers?

24        MS. ANDERSON:  Objection.  Calls for speculation;

25   lacks foundation.
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                    Page 70

```
 1          But you can answer.
 2          THE WITNESS:  Well, sir, he did not begin to go back
 3   first off when the 40-millimeter.  He -- unfortunately,
 4   Mr. Perez dictated that by making the motion that he was
 5   taking a step back towards where the firearm was placed.
 6          And then the less-lethal munitions were deployed.
 7          Again, we were doing that in attempt to gain
 8   compliance so Mr. Perez would peacefully surrender and this
 9   unfortunately this situation would never happen.
10   BY MR. GALIPO:
11      Q.   Was a robot sent in at some point after the shots?
12      A.   Yes, sir.
13      Q.   Did you hear any shots being fired at after your
14   last shot?
15      A.   I don't recall hearing any shots, sir, after mine.
16      Q.   Was it reported that his hands were underneath his
17   body at some point?
18      A.   Yes.  I do believe that was a reported once the
19   robot did get close to him.
20      Q.   And did you do a tactical reload on your magazine?
21      A.   I did, sir.
22      Q.   And you noticed after the shooting when you approach
23   Mr. Perez that he was still breathing; correct?
24      A.   Yes, sir.
25      Q.   And was he eventually handcuffed?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                        Page 71

1      A.   No, sir, he was not.  We -- myself and Deputy

2   Pollick as we approached began to secure him of any other

3   weapons on him.  Deputy Stone secured the firearm and then we

4   just began to provide medical attention to him.

5      Q.   Did he have any other weapons on him?

6      A.   Other than the original firearm that we have talked

7   about, no, he did not.

8      Q.   And that original firearm, was that a black

9   semiautomatic handgun?

10     A.   Yes, sir.

11     Q.   And you saw it near his left arm; correct?

12     A.   Yes, sir.

13     Q.   You did not see it specifically in his hand; is that

14   true?

15     A.   I don't recall if I saw it specifically in his hand,

16   sir.  I know it was near his left arm, forearm area.

17     Q.   And then given your background as an EMT, you were

18   looking in part for gunshot wounds; is that correct?

19     A.   Yes, sir.  Myself and Deputy Pollick our main

20   concern at that point was to provide Mr. Perez with medical

21   attention and get him to a higher level of care to obviously

22   preserve -- preserve life as best as we could.

23     Q.   Right.  But at that point you noticed he had been

24   struck by multiple gunshots; correct?

25     A.   Yes, sir.

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                          Page 72

1       Q.    I think in your statement you talk about two gunshot

2    wounds to his back, three to his upper right side of his

3    back, and right shoulder, the back of the right shoulder.

4              Do you recall him having multiple gunshot wounds?

5       A.    Yes, sir.

6       Q.    Do you recall if he was also struck in the head?

7       A.    Yes, he was.  I know Deputy Pollick the way we

8    approached the medical -- medial service part down is I took

9    the lower half and Deputy Pollick took the upper half, and I

10   do recall Deputy Pollick said he did have a gunshot wound to

11   his head.

12      Q.    And you were aiming for his head when you fired your

13   two shots?

14      A.    Yes, sir.

15      Q.    And your assessment was even with all these gunshot

16   wounds, at least when you were assessing with Deputy Pollick,

17   Mr. Perez was still alive and breathing; is that correct?

18      A.    Yes, he was.

19      Q.    Do you have an understanding now from reviewing

20   materials, I don't want to know what the lawyers told you,

21   how many gunshots were fired altogether?

22      A.    You know what, sorry.  I didn't look at that

23   specifically as far as how many gunshots.  I referred to my

24   material and my statements.

25      Q.    How did you determine that you fired 14 shots?

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                         Page 74

```
 1   at the waist?

 2        A.    Briefly.  He did turn and hunch over at the waist,

 3   yes.

 4        Q.    And you had your rifle on semiautomatic mode?

 5        A.    Yes, sir.

 6        Q.    You remember a pool of blood forming after the

 7   shooting?

 8        A.    I apologize, sir.  What time frame are you

 9   reporting --

10        Q.    At any time frame, do you recall after the shooting

11   do you recall seeing a pool of blood?

12        A.    I did not see one in the while I was in the armored

13   rescue vehicle.  Once I got to the left side of the garage

14   and the robot was deployed, I began to putting my gloves on

15   and was able to look around the corner and did see that right

16   before we moved up to Mr. Perez to secure the firearm and

17   provide medial attention.

18        Q.    Did the paramedics get there at some point?

19        A.    Yes, sir.

20        Q.    And how much time do you think passed before the

21   paramedics got there?

22        A.    Again, just so I'm clear, sir, on that part, as far

23   as from what time?

24              When I initially began to provide medical attention

25   to him?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                              Page 76

```
 1   BY MR. GALIPO:
 2        Q.   In the ten seconds before the 40-millimeter was
 3   deployed, did you hear any warning that the 40-millimeter was
 4   going to be deployed verbally at that time?
 5        A.   Again, sir, other than the planning over the at the
 6   library and then also on the radio, if he makes a move
 7   towards that firearm again, that less-lethal would be
 8   deployed, nobody -- I do not recall hearing anybody yell out
 9   specifically less-lethal.
10        Q.   And I was including in my question any warning to
11   Mr. Perez that they were going to use less-lethal on him if
12   he did or didn't do something?
13        A.   If they did say that to him, sir, I did not hear
14   that or was out the range where I can hear them say that.
15        Q.   Did you ever give him any commands?
16        A.   I did not.
17        Q.   Did you ever give a verbal warning that you were
18   going to use deadly force to him?
19        A.   I never said anything to Mr. Perez.
20        Q.   Did you ever hear any officer give him a verbal
21   warning that deadly force was going to be used?
22        A.   No, sir.
23        Q.   And at the time that of that first 40-millimeter
24   round, I think you told me you saw Mr. Perez take one step
25   back with his left foot?
```

**A.J.P., ET AL. vs COUNTY OF SAN BERNARDINO, ET AL.**
**Cory Mccarthy on 11/09/2023**                                    Page 78

 1   could see was the back of his head and it looked like the

 2   back of his upper right shoulder, upper right side of his

 3   back.

 4       Q.   And then when you fired your next three rounds, what

 5   parts of his body, if any, could you see?

 6       A.   I could not see any part of his body, sir.

 7       Q.   What were you aiming for, where you thought his

 8   upper body was?

 9       A.   Yes.  I believe at that time that's, again, he was

10   kneeling behind that pool table with that firearm.  So I

11   believed his upper body was around either the crowing of the

12   pool table.

13       Q.   And when you fired your next five or six rounds,

14   could you see any part of his body at that time?

15       A.   I could not, sir.

16       Q.   And when you fired your last three rounds, could you

17   see any part of his body at that time?

18       A.   No, sir.

19       Q.   So after your first two rounds where you were aiming

20   for the back of his head, were all your other rounds you were

21   intending to strike him in his upper body or center mass?

22       A.   Yes, sir.  Again, I was more focused on stopping the

23   threat at -- at that time.

24       Q.   And why did you stop firing if you couldn't see him

25   for your second volley or third volley or fourth volley, why

```
 1               DECLARATION UNDER PENALTY OF PERJURY

 2

 3   Case Name:  A.J.P., et al. Vs. County of San Bernardino, et

 4   al.

 5   Date of Deposition:  November 9, 2023

 6   Job No.:  26304

 7

 8            I, _____, hereby certify

 9   under penalty of perjury under the laws of the State of

10   California that the foregoing is true and correct.

11            Executed this _____ day of _____.

12   20____, at _____, California.

13

14

15

16

17

18            _____

19                      CORY MCCARTHY

20

21

22

23

24

25
```