# EXHIBIT 5

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   A.J.P. and A.M.P., minors, by and      )
     through their guardian ad litem        )
 5   Cynthia Nunez, individually and as     )
     successor in interest to Albert Perez,)
 6   deceased, and PATRICIA RUIZ,           )
     individually,                          )
 7                                          )
                   Plaintiffs,              )
 8                                          )
                   vs.                      )Case No.
 9                                          )5:22-CV-01291-SSS-SHK
     COUNTY OF SAN BERNARDINO, and DOES     )
10   1-10, inclusive,                       )
                                            )
11                 Defendants.              )
     _____)
12

13

14

15          REMOTE VIDEOCONFERENCE DEPOSITION OF

16                    JOSHUA STONE

17                 DECEMBER 14, 2023

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  30390
```

1    A.   Yes.

2    Q.   On one occasion, or more than one?

3    A.   One occasion, sir.

4    Q.   Now, in your career had you seen suspects with guns

5    in their hands before?

6    A.   I have.

7    Q.   And do you have an estimate as to how many times?

8    A.   Probably six to ten times.

9    Q.   How about a knife, have you seen suspects with a

10   knife in their hand before?

11   A.   I can't remember encountering that.

12   Q.   Obviously, you didn't shoot the six or ten people

13   you saw with guns in their hand; correct?

14        You didn't shoot all of them?

15   A.   No, sir, I did not.

16   Q.   Were you trained that you can shoot someone merely

17   for seeing a gun in their hand?

18   A.   No, I was not.

19   Q.   With respect to deadly force, you did have some

20   training on that at the academy and thereafter?

21   A.   Yes, sir.

22   Q.   Were you generally trained that deadly force is the

23   highest level of force an officer can use?

24   A.   I was, sir.

25   Q.   And were you trained that it should only be used in

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                    Page 11

1   limited circumstances?

2        A.   I was trained in the phrase you probably heard a

3   bunch, totality of the circumstances, if it meets that

4   criteria, then it is authorized.

5        Q.   And the limited time it's authorized would be if

6   there is an imminent or immediate threat of death or serious

7   bodily injury?

8        A.   Yes.  To safety members of the public, correct.

9        Q.   And were you trained that if there is not an

10  imminent threat or immediate threat of death or serious

11  bodily injury, then you should not use deadly force?

12       A.   That's correct.

13       Q.   Were you trained that essentially deadly force

14  should only be used when there are no other reasonable

15  options?

16       A.   Correct.

17       Q.   And were you trained that a verbal warning should be

18  given before using doors when feasible?

19       A.   Correct, when feasible.

20       Q.   And in terms of using deadly force, were you trained

21  that as an officer you have to justify each of your shots?

22       A.   That's correct.

23       Q.   I'm assuming you had some training on the concept of

24  the reverence for human life?

25       A.   That's correct, sir.

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                              Page 12

```
 1      Q.   Now, how about the 40-millimeter, obviously, there
 2   is a slightly different criteria for using the 40-millimeter
 3   as opposed to deadly force; is that true?
 4      A.   Yes, sir, that's correct.
 5      Q.   What is the criteria generally as you understand it
 6   to use the 40-millimeter?
 7      A.   So that tool would fall under or less-lethal
 8   category.  It's considered a less-lethal option, meaning it's
 9   a tool that we would use to subdue a potentially violent
10   individual or dangerous individual to circumvent using deadly
11   force.
12      Q.   And is it intended to cause pain as you understand
13   it?
14      A.   Yes, sir.
15      Q.   And how does it cause pain as you understand it?
16      A.   Well, if the tool is utilized correctly, it hurts
17   and the hope is the -- if it hurts, you gain compliance
18   without having to resort to any other levels of force.
19      Q.   And is there different areas of the body you're
20   trained to fire at and others to try to avoid if possible?
21      A.   Yes.  So we're trained to aim at what we would
22   consider center mass which could be the abdomen or chest area
23   of the front or the back area if the subject is facing away
24   from us.  We're trying to purposely aiming at extremities or
25   the head.
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                    Page 18

1        Q.   Do you know the decedent's name?

2        A.   Albert Perez.

3        Q.   Had you ever seen Mr. Perez before that day?

4        A.   No, sir.

5        Q.   Did you know if he had a criminal history before

6    that day?

7        A.   I got a brief -- I was given brief information about

8    a charge prior, a prior charge, but I didn't look into it

9    personally.

10       Q.   And your understanding it was a charge as opposed to

11   a conviction?

12       A.   That's correct.  We were -- when we receive

13   information their charges, we have to look into another

14   database to see if they were turned into convictions.

15       Q.   Prior to that day, for example, did you have any

16   information that Mr. Perez had ever shot anyone?

17       A.   No, sir.

18       Q.   Any information that he had ever pointed a weapon at

19   anyone?

20       A.   No, sir.

21       Q.   Any information that he had ever seriously injured

22   anyone specifically?

23       A.   No, sir.

24       Q.   On the date of the incident before you got there,

25   did you have any information that he had shot anyone or

1   pointed a weapon at anyone that day?

2       A.   I know that I never received any information that he

3   shot anyone.  So I did not believe that happened.  I was -- I

4   got information of a brandishing of a firearm.  I did not

5   look into whether he actually pointed the firearm at anyone

6   or not.

7       Q.   Did you have any information that he had seriously

8   injured anyone on the date of the incident?

9       A.   No, sir.

10      Q.   Did you ever hear him verbally threaten to harm any

11  of the officers?

12      A.   No, sir.

13      Q.   Did you ever hear him ever verbally threaten to harm

14  any civilians?

15      A.   No, sir.

16      Q.   Was it your understanding that the door between the

17  garage and the residence was locked?

18      A.   I was unaware of the status of the door.

19           I knew it was closed.  I was not sure whether it was

20  locked or not.

21      Q.   Was it your understanding that there was nobody in

22  the residence that was adjacent to or attached to the

23  garage?

24      A.   Yes.  That was my understanding, sir.

25      Q.   Did you have any specific information that Mr. Perez

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                      Page 20

1    was under the influence of alcohol or drugs?

2        A.   No, sir.

3        Q.   Now, when you initially saw him sitting in the

4    chair, at some point did you see a gun in his hand?

5        A.   Not at first.  I received information over the radio

6    and I passed that information on to Deputy Olivas, but I

7    could not see the -- from maybe his mid section down, it was

8    obstructed by the pool table.

9             So not at first, but later I was able to.

10       Q.   Did you receive some information, though, previously

11   that he had a gun in his hand?

12       A.   Yes, sir.

13       Q.   And when did you receive that information in

14   relation to the shooting?

15       A.   That info was given to us prior to me even getting

16   set up in my position, and then it was confirmed again by my

17   partners on my team when we were in position.

18       Q.   And when did you first see the gun in his hand?

19       A.   As he was placing it on the floor, I was able to see

20   where his feet were, and I could see the gun being placed on

21   the floor.

22       Q.   Do you know if someone asked him to put the gun

23   down?

24       A.   I believe so, yes.

25       Q.   Do you know who was giving those commands?

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                    Page 21

1       A.    That would be -- first, it would be Deputy Alcala

2    who was our person negotiating with him for some time.

3       Q.    And when he put the gun down, you were able to see

4    that?

5       A.    Yes, sir.

6       Q.    And where did he put the gun down?

7       A.    Pretty much right in front of him from where he was

8    sitting.

9       Q.    And I take it from your perspective that was an act

10   of compliance, at least potential act of compliance?

11      A.    Yes, sir.

12      Q.    And you understood that he put the gun down after

13   being asked to do so?

14      A.    Yes, sir.

15      Q.    And were you still in the same general position that

16   you previously described when he put the gun down?

17      A.    I was, sir.

18      Q.    And then at some point, if you know, was he told to

19   stand up?

20      A.    He was.  He was told numerous times, and he

21   eventually did that.

22      Q.    Was that another at least act of compliance from

23   your perspective?

24      A.    It was.

25      Q.    Was he told at some point to walk forward or walk

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                      Page 22

```
 1   towards the officers?

 2        A.   Yes, sir, he was.

 3        Q.   And was it Deputy Alcala who was the primary person

 4   giving him the commands initially?

 5        A.   Yes, initially.

 6        Q.   And at some point Sergeant Gaytan also took over

 7   some of the commands?

 8        A.   That's correct, sir.

 9        Q.   And when he walked forward, how would you describe

10   his pace or gait?

11             Was it fast, or slow, or however you want to

12   describe it?

13        A.   It started out slow.  I wouldn't consider it fast,

14   but it's almost like he was unsure of what he wanted to do.

15   After couple of steps it was turned into maybe like a normal

16   walk.  There wasn't very far to go.  So he didn't walk a

17   great distance before he was instructed to stop.

18        Q.   Who instructed him to stop?

19        A.   Sergeant Gaytan.

20        Q.   And did he stop when he was instructed to?

21        A.   Yes, sir.

22        Q.   So would you at least agree there were at least four

23   acts of compliance, at least initially?

24             Putting the gun down would be one; standing up would

25   be two; walking forward would be three; and stopping would be
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                              Page 23

 1   four?

 2        A.   That's correct, sir.

 3        Q.   And when he was walking forward, could you see his

 4   hands at any point in time?

 5        A.   Once he got to -- I would say like he stopped around

 6   the end of the pool table if I remember correctly, and at

 7   that point I was able to see his hands.

 8        Q.   How long altogether would you estimate he was

 9   sitting in the chair before he got up?

10        A.   Let me think.

11        Q.   And it could be a range if that's more comfortable

12   for you.

13        A.   I do remember it being in my mind a decedent amount

14   of time because I got tired of holding the multiple launcher.

15   So I put it down a few times.  I would guess-estimate maybe

16   15 to 20 minutes sitting in the chair.

17             That feels right in my mind.

18        Q.   And during that time were you observing him to the

19   best of your ability?

20        A.   I was, sir.

21        Q.   And did you ever see him appear to nod off or close

22   his eyes or anything like that?

23        A.   So I never -- I never -- he never did what I

24   considered to be nodding off.  He would look down.

25             One thing I did notice that he was doing was anytime

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                                Page 24

 1   anyone on our team moved, it's looked like he was looking

 2   around kind of taking observations to see where we were at

 3   and see who was there, things of that nature.

 4            So that's what I noticed.  I don't recall him dosing

 5   off or falling asleep, and I don't recall that ever being

 6   relayed over the radio.

 7        Q.   And then during this approximate 15 or 20 minutes

 8   that he was sitting in the chair, did you ever see him raise

 9   the gun at any point?

10        A.   No, sir.

11        Q.   Did you ever see him point the gun at anyone?

12        A.   No, sir.

13        Q.   And I think you already said this, but you never

14   heard him verbally threaten to harm anyone; is that

15   correct?

16        A.   That's correct, sir.

17            MR. GALIPO:  So if we could show Exhibit 2 again,

18   Shannon, which I think is Bates stamp 2238.

19   BY MR. GALIPO:

20        Q.   Are you able to see that on your screen?

21        A.   Yes, sir, I am.

22        Q.   I take it when he walked forward, he walked on one

23   of the sides of the pool table; is that correct?

24        A.   That's correct, sir.

25        Q.   And looking at this photograph, would he have walked

1  on the -- as we're looking at the photograph, the right side

2  of the pool table or the left side?

3      A.   So I'm going to call the left side the side closest

4  to the camera with the big green sticker on the side.

5           So I believe that would be the left side if that

6  works for you, sir.

7      Q.   Yeah, that works for me.

8           If that's the left side with the green sticker on

9  the side, that's the side he walked along?

10     A.   Yes, sir.

11     Q.   And I think you told me he stopped somewhere close

12  to the end of the table?

13     A.   That's correct, sir.

14     Q.   And when you say the end, it would be the end closer

15  or closest to the threshold of the garage?

16     A.   Yes, that's correct.

17     Q.   Okay.

18          MR. GALIPO:  And if we could look at Exhibit 1

19  again, 2278.

20  BY MR. GALIPO:

21     Q.   So this is the side of the pool table with the green

22  sticker from a different angle; is that correct?

23     A.   Yes, sir.

24     Q.   And so he would have walked along the side of the

25  pool table with the green sticker and then walked to the end

```
 1   approximately to the end of the table that we could see in

 2   this photograph?

 3        A.   Yes, sir.

 4        Q.   And would you still have been positioned in the

 5   general area you described previously?

 6        A.   That's correct, sir.

 7             I hope I'm not getting ahead, but I did not move

 8   from my position.

 9        Q.   That's good.  No, you're not getting ahead.

10             That's fine.  Now, you're saying once he got I guess

11   to the end or passed the end of the pool table, you were able

12   to see his hands?

13        A.   That's correct, sir.

14        Q.   And were his hands by his side at that point?

15        A.   Yes, sir.

16        Q.   And did his hands at least at that point appear to

17   be visually empty?

18        A.   That's correct, sir.

19        Q.   And during the time he was stopped, is that when at

20   some point Sergeant Gaytan took over some of the commands?

21        A.   Yes, sir.

22        Q.   When you fired your first 40-millimeter round, would

23   Mr. Perez had been generally at the end of that pool table,

24   but took a step like backwards and slightly rotated his upper

25   body towards you?
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                    Page 27

1        A.   Yes, that's correct.  He -- when I deployed my first

2    round, he had already stepped and turned his body.

3             So he was facing me.

4        Q.   So when you fired your first round, Mr. Perez would

5    have been in the area at the end of the pool table closest to

6    the threshold of the garage, but he kind of would have

7    stepped with his left foot back and rotated his body to his

8    left so now his upper body is more facing in your

9    direction?

10       A.   That's correct, sir.  I can go into more detail if

11   you would like.

12       Q.   Sure.  Go ahead.

13       A.   So when Mr. Perez was in -- well, when Sergeant

14   Gaytan was negotiating with Mr. Perez, he was not facing me.

15            He was facing the team on the left-hand side of the

16   garage.  I did not have a direct line of sight through my

17   multi-launcher to his chest or abdomen which would have been

18   my preferred point of aim.

19            My direct impact area of his body would have been

20   his shoulder, arm, or leg based off of the direction he was

21   facing as he was at the end of the pool table.

22            When I fired my -- I'm sorry -- when I deployed my

23   first round, he hit -- he had presented his torso and chest

24   area to me as he was turning around.  It was at that time I

25   deployed the round, and he -- it was a pretty decedent size

A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL
Joshua Stone on 12/14/2023                                           Page 28

1    step back.  So he was kind of -- so we're looking at the

2    picture right now.  He was in between the end the of the pool

3    table and the end of the green sticker when I deployed my

4    first round if that makes sense.

5              If you need me to elaborate, I can, sir.

6              I hope it's not confusing you.

7         Q.   No.  That's helpful.  Thank you for that.

8              So where were you aiming when you fired your first

9    round?

10        A.   I was aiming the upper abdomen area.

11        Q.   And do you -- could you tell whether your first

12   round struck him or not?

13        A.   I was pretty confident that the first round struck

14   him, yes, sir.

15        Q.   And where did it appear to strike Mr. Perez?

16        A.   It was pretty close to where I was aiming, but he

17   was a moving target.  So I feel like the rounds might have

18   struck him in his chest area instead of his abdomen.

19        Q.   And prior to that had Sergeant Gaytan told you that

20   if he makes any movements backwards, to deploy less-lethal?

21        A.   That's correct, sir.  It was discussed in our brief

22   prior to us taking our positions, and it was also reiterated

23   on our radios during the incident while we were in our

24   positions.

25        Q.   So are you saying that there was a discussion about

1      Q.   Yeah.  I mean one of the goals in any tactical

2   operation is to safely take the person into custody; is that

3   fair?

4      A.   That's correct, sir.

5      Q.   And one of the goals is to use the minimal amount of

6   force if you can?

7      A.   Yes, sir.

8      Q.   Because the safety of the suspect is also part of

9   the training?

10      A.   Absolutely.

11      Q.   So when you fired your first 40-millimeter, what

12   would you estimate the distance to be between yourself and

13   Mr. Perez?

14           And I have the photos pulled up if that helps you.

15      A.   I appreciate that because that does help.

16           I would guess-estimate -- I don't -- I'm sorry to

17   use the word guess-estimate.  I would estimate probably

18   around 15 feet.

19      Q.   Okay.  And I'm assuming that the chair was still in

20   the same position it was he was sitting on when he got up?

21      A.   Yes, yes, sir.  I believe that's to be correct.

22      Q.   And the gun was somewhere close to the chair on the

23   floor?

24      A.   Yes, sir.

25      Q.   And how far do you think Mr. Perez was from the

 1   chair when you fired your first round?

 2        A.   My opinion was a few steps because it look him a few

 3   steps to get to the end of the pool table.

 4        Q.   I'm looking for feet.

 5        A.   I'm sorry.

 6        Q.   You gave me 15 feet that you were, and I'm just

 7   looking at this pool table imagining where you described him.

 8             And I'm wondering how many feet do you think he was

 9   from the chair when you fired your first round.

10        A.   I would say six to eight feet.

11        Q.   Now, would you agree that as soon as you hit him

12   with the first round, he immediately started moving towards

13   the back of the pool table?

14        A.   Actually, not to be disrespectful, sir, but I would

15   not agree in my opinion.  He already made that movement prior

16   to me deploying my first round.

17        Q.   Okay.  Let's see.

18             MR. GALIPO:  Shannon, could we put up Page 13 of the

19   officer's transcribed statement.

20             MS. LEAP:  Yeah.  One moment.

21             Having some technical difficulties.  It will take

22   just a minute.

23             MR. GALIPO:  Okay.  I'll keep talking.

24   BY MR. GALIPO:

25        Q.   Do you recall in your statement saying that the

```
 1   second I hit him with the first round, he immediately started

 2   darting back towards the back of the pool table?

 3       A.   Yes, sir.

 4       Q.   Is that accurate?

 5       A.   Yes, sir.

 6       Q.   Now, you had four rounds altogether in your

 7   weapon?

 8       A.   So the multi-launcher had four blunt impact

 9   projectile or BIP rounds.  40-millimeter loaded into that,

10   into it.

11       Q.   And how much time do you think passed between your

12   first round and your second round?

13       A.   Probably a half a second.  It was pretty quick.

14       Q.   Where was he when you fired your second round at

15   about the same position?

16       A.   He was -- my recollection, I think he was a little

17   bit further back towards the -- oh, man, the picture.

18       Q.   Yeah.

19            MR. GALIPO:  Put the picture back up, Shannon.

20            THE WITNESS:  I'm sorry --

21   BY MR. GALIPO:

22       Q.   That's okay.  She was trying to be helpful and

23   didn't realize we were looking at the picture.

24            Go ahead.

25       A.   Second round, I would estimate he was more in the
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                         Page 33

 1    vicinity of the green sticker, middle, maybe more towards the

 2    middle of the green sticker if that makes sense.

 3          Q.    So kind of at the middle of the pool table on that

 4    side?

 5          A.    Yes, sir.

 6          Q.    And then how about the third round?

 7          A.    The third round, by the time I got that one off he

 8    was already going down towards the floor, and he was further

 9    back I would say he was past the green sticker at that

10    point.

11          Q.    Where were you aiming when you fired the second

12    round?

13          A.    Same place.  It was the -- I really do believe both

14    rounds were deployed within a half second.  So I was just

15    trying to follow Mr. Perez as he was moving, and I was trying

16    to keep my red dot in the optic in the same position.  We're

17    trained to use less-lethal on the center mass or at chest

18    area of an individuals for their safety as well.

19          Q.    So one second, please.

20          A.    Uh-huh.

21          Q.    So are you saying you fired your third shot just as

22    he was rounding the corner of the pool table?

23          A.    I -- don't I wouldn't say necessarily rounding the

24    corner.  Towards the back part of the pool table is when he

25    started like leaning over, and I wasn't able to see as much

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                              Page 37

1    Q.    When were you getting off the three more rounds?

2          What are you referring to?

3    A.    Well, that as a discrepancy that was cleared up

4    later on in my interview.  I corrected myself.

5          I only deployed three rounds total.

6    Q.    So it would have been two more rounds?

7    A.    Yes, sir.  I don't remember exactly what page in and

8    line number it was, but it's in there because that statement

9    on Line 12 is not accurate.  It was cleared up later.

10   Q.    But when you fired your third round, was he still

11   visible to you?

12   A.    I felt like he was.

13   Q.    And were you aiming at his upper body?

14   A.    Yes, sir.

15   Q.    Were any of your rounds fired at his back?

16   A.    I don't remember ever seeing his back.

17         Just the -- his the front side of him and the side

18   of him.  He -- for him to expose his back, he would have to

19   be facing the opposite direction from where I was.

20   Q.    Did you hear any lethal shots being fired before

21   your third less-lethal round?

22   A.    Not before.  It was right around the -- right around

23   when I was ploying the third round or shortly after.

24   Q.    And how many shots did you hear from lethal fire?

25   A.    I could not tell you how many shots because it was a

 1    simultaneous thing.  I was unaware of who was firing how many

 2    rounds.

 3         Q.   Did it sound like multiple people were firing?

 4         A.   It did, sir.

 5         Q.   Did you ever give a verbal warning to Mr. Perez that

 6    you were going to use less-lethal?

 7         A.   No, sir.

 8         Q.   Did you ever hear any officers give him a verbal

 9    warning that they were going to use deadly force?

10         A.   No, sir.

11         Q.   When you heard some of these lethal rounds going

12    off, could you see Mr. Perez?

13         A.   I could not, sir.  I -- once the lethal rounds

14    started going off, I took cover behind the pillar, and my

15    back was facing where Mr. Perez would have been.

16              I did not know if he was firing rounds at my

17    direction, and I did not have lethal capabilities, so I took

18    cover, and I did not see what transpired after that.

19         Q.   You just heard a lot of shots; is that fair?

20         A.   That's correct, sir.

21              MR. GALIPO:  Okay.  Could we go to Page 25,

22    please.

23    BY MR. GALIPO:

24         Q.   So if we can go to the top, I think this is the part

25    you were talking about where you clarified the number of

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                              Page 39

```
 1   shots.

 2          So the detective is saying, "You fired one hitting

 3   him in the upper left shoulder area."

 4          I think that's an agreement by you.

 5          And then you fired three additional, and you said,

 6   "I'm sorry, two additional."

 7          Do you see that?

 8   A.   Yes, Sir.

 9   Q.   And is that where you clarified it was two

10   additional shots, three total?

11   A.   That's correct, sir.

12   Q.   Now, going to Line 14 on the same page, you're asked

13   by the detective, "All right.  Do you recall where those

14   rounds struck the suspect."

15          And you say, "If they struck him, they would have

16   been in his back because by that time he was turned all the

17   way around and going towards the gun."

18          Do you see that?

19   A.   I do, sir.

20   Q.   And then you were asked, "Was he still standing."

21          And you said yes.

22          Do you see that?

23   A.   Yes, sir.

24   Q.   Does that in any way refresh your recollection that

25   some of your shots were fired at his back?
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                        Page 40

1      A.   Like I said earlier, sir, that picture really made

2   it easier for me to piece the -- like visualize what happened

3   because everything in the picture is like the angles and

4   whatnot really helped me a lot.

5            So my interview with Homicide was my recollection,

6   but looking at that picture that you put up really helped me

7   out.

8      Q.   So are you saying that even if you said in your

9   interview that you shot him in the back, you think that may

10  be inaccurate?

11     A.   I don't think it's inaccurate.  It's the general

12  area.  Side -- I don't think -- what I was trying to tell you

13  earlier, hopefully, I'm not confusing you, is when you said

14  did you shoot him in the back, I was taking it as his back

15  was faced towards me, and he was facing away, and that is not

16  my recollection of it.

17     Q.   Okay.  Going to Page 27, Lines 8 through 10, I think

18  you were asked how your stress level was during the incident,

19  and you said it was fine.

20           Do you see that?

21     A.   Yes, sir.

22     Q.   Did you have the impression that your second shot

23  also struck him?

24     A.   I believe that it did, but I couldn't confirm.

25     Q.   Your impression was that it did, you're saying, but

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                              Page 41

```
 1   you can't be a 100 percent positive?

 2        A.   That's correct, sir.

 3        Q.   Going to the bottom of Page 32, I'm just going to go

 4   for about five more minutes and then we'll take a break so

 5   everyone knows.

 6             At the bottom of Page 32, you're being asked about

 7   how much time between the rounds.  And the question here is

 8   directed to your first and second round, about how much time

 9   had passed, and going to the top of Page 33, you say the

10   first and second was immediate.

11             Do you see that response?

12        A.   Yes.

13        Q.   And is it fair to say those shots were very close in

14   time?

15        A.   That's correct, sir.

16        Q.   And then going further down, Page 33, you estimated

17   that you got the three rounds off at about four seconds

18   on Line 20.

19             Do you see that?

20        A.   Yes, sir.

21        Q.   Does that sound about right?

22        A.   At the time, yes, I feel like the estimate might be

23   a little long, but it's not inaccurate.

24        Q.   You had indicated earlier you were close to another

25   officer in your position?
```

1    Q.   Did you at any time after he stood up and moved

2    forward see him with a gun in his hand?

3    A.   No, sir.

4    Q.   And when he went to the ground, was it your

5    impression that he went face-down?

6    A.   I believe so, sir.

7    Q.   With his head more towards the right side of the

8    garage from your perspective?

9    A.   I -- the right side being the side that I was on?

10   Q.   Yes.  You're not sure?

11   A.   No, sir.  I don't feel comfortable saying that.

12   Q.   That's okay.

13        MR. GALIPO:  I think this is a good time --

14   thank you, Shannon.

15        Is this a good time everyone for a ten-minute break?

16        MS. ANDERSON:  Yes.  That works.

17        (Recess taken.)

18   BY MR. GALIPO:

19   Q.   So it sounds like at some point you decided to take

20   additional cover?

21   A.   That's correct, sir.

22   Q.   Did you have prior cover -- sorry.

23        Did you have partial cover, initially?

24   A.   Yes, that's correct, sir.

25   Q.   And was it partial because part of your body was

 1   covered and part was exposed?

 2       A.   That's correct.  We had a shield that was staged in

 3   front of myself and Deputy Olivas, but I was standing.

 4            And the shield only goes up to maybe about my waist.

 5            So the upper portion of my body was exposed.  So I

 6   tried to circumvent that to the best I could with the side of

 7   the garage while still maintaining a visual of Mr. Perez.

 8       Q.   But in that position was part of your body still

 9   exposed?

10       A.   Yes, sir.  I'm sorry.  It was.

11       Q.   Okay.  So then when you started hearing the shots,

12   did you try to take additional cover?

13       A.   Yes, sir.

14       Q.   And what did you do?

15            Did you move completely to the side of that garage?

16            Can you explain that?

17       A.   So I feel like I moved completely out of what

18   would -- I would consider the line of fire from Mr. Perez.

19            I bent over, and I was also looking for Deputy

20   Alcala to make sure he was out of line of fire while I was

21   putting for 40-millimeter rounds into the multi-launcher.

22       Q.   And the purpose of taking cover when shots are being

23   fired is obviously for self protection?

24       A.   Yes, sir.

25       Q.   And did you say that you first heard the lethal

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                              Page 45

1   shots being fired at about the same time as your third

2   40-millimeter?

3        A.   That would be accurate; right around that time.

4        Q.   And was Mr. Perez still on his feet at least at that

5   point?

6        A.   That's a -- I believed him to be still on his feet,

7   but it would be hard for me to tell you 100 percent because

8   he was going downward towards the ground.

9        Q.   But you would agree you did not see a gun in his

10  hand after he got up and moved forward prior to your third

11  round; is that correct?

12       A.   That's correct, sir.

13       Q.   And could you see where the gun was on the ground

14  from your perspective?

15       A.   Would that be during the deployment of the

16  less-lethal?

17       Q.   No.  Before the deployment.

18       A.   Yes, I did see where it was on the floor.

19       Q.   And did you ever see him grab that gun again, you

20  yourself see his hand come in contact with it?

21       A.   No, sir.

22       Q.   And did you feel that when Mr. Perez was moving

23  towards the end of the pool table, he maybe was going to use

24  the pool table as cover?

25       A.   If you're asking me what I felt, I felt that he was

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                    Page 47

1    A.    No.  I did hear him communicate with Sergeant Gaytan

2    prior to the deployment of less-lethal.

3        Q.    Would that be when he had come to a stop?

4        A.    Yes, sir.

5        Q.    So is it correct that before you got into your

6    position that you described, you had information that

7    Mr. Perez had been sitting in a chair for some period of time

8    with a gun in his hand?

9        A.    That's correct, sir.

10       Q.    And you had information at times his finger was at

11   or near the trigger?

12       A.    That's information I was given, yes, sir.

13       Q.    And you had information that that went on for some

14   period of time?

15       A.    Yes, sir.

16       Q.    And based on the information you had, that would

17   have been initially when patrol officers were there?

18       A.    Yes, sir.

19       Q.    And your information was during that time frame that

20   the patrol officers were there, Mr. Perez never pointed the

21   gun at anyone?

22       A.    That's correct, sir.

23       Q.    And during this time frame the patrol officers were

24   there, although Mr. Perez, according to the information you

25   had, had a gun in his hand with his finger at or near the

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                    Page 48

1    trigger, they never fired at him?

2        A.   That's correct.

3        Q.   Even though he had a gun in his hand?

4        A.   That's correct, sir.

5        Q.   And then when you got there your understanding was

6    the gun was either in his hand or somewhere in his lap?

7        A.   Yes, sir.

8        Q.   And nobody ever fired during that time frame?

9        A.   That's correct, sir.

10       Q.   And at some point as we discussed, he put the gun

11   down after being requested to do so, stands up after being

12   requested to do so, walks forward after being requested to do

13   so, and stops after being requested to do so; is that

14   correct?

15       A.   Yes, sir.

16       Q.   And when he was in that stopped position, he is

17   having some conversation with Sergeant Gaytan?

18       A.   Yes, sir.

19       Q.   And at some point he takes a step back with his left

20   foot and rotated his upper body in your direction?

21       A.   Yes.  So we were making what I considered to be good

22   progress.  I felt prior to the deployment that we were headed

23   towards a peaceful resolution.

24            Sergeant Gaytan actually did have some communication

25   with Mr. Perez, but Mr. Perez did ask if he was going to be

1   going to jail, and Sergeant Gaytan told him, not verbatim,

2   but told him, yes, at this time you'll be going to jail.

3            And that's when Mr. Perez's demeanor changed.

4            I could see the look on his face.  He shook his face

5   no, and it was shortly after that that he took a step back.

6            And that's when I deployed my rounds.

7       Q.   And you already indicated the position he was in at

8   the time you fired your first and second rounds?

9       A.   Yes, sir.

10       Q.   Which came very close in time the first and second

11   round?

12       A.   Yes, sir.

13       Q.   And I think you indicated at the time of your second

14   round, he might have been more in the middle of the pool

15   table on that side?

16       A.   Yes, sir.

17       Q.   And by the time of your third round, he was more

18   towards the corner of the pool table closer to where the

19   chair and the gun were?

20       A.   Yeah.  To be a little more accurate, maybe from the

21   middle to the rear, that portion of the pool table if that

22   helps.

23       Q.   That's helpful.  And that's when you heard the

24   lethal rounds starting?

25       A.   That's correct, sir.

A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL
Joshua Stone on 12/14/2023                                              Page 50

```
 1        Q.   So have you heard the term before "situational
 2    awareness?"
 3        A.   Yes, sir.
 4        Q.   Were you aware that some of those lethal rounds at
 5    the time that Mr. Perez was in between the middle and the end
 6    of the pool table were being fired by the other officers?
 7        A.   Yes.  I heard them.
 8        Q.   And did you realize they were other officers that
 9    were firing at that time?
10        A.   I assumed so, yes.
11        Q.   Because, obviously, Mr. Perez had not gotten to the
12    area of the gun yet; correct?
13        A.   In my opinion he -- by the time he -- the lethal
14    rounds started going off, he was in arms' reach of the
15    firearm.
16        Q.   But you hadn't seen him grab the gun?
17        A.   Oh, no.  I could not confirm if he grabbed it.
18             I did not see that myself.
19        Q.   Okay.  And I take it you heard some gunshots being
20    fired after you went to a position of additional cover; is
21    that fair?
22        A.   That's correct, sir.
23        Q.   Do you now know that those additional shots were
24    being fired by other officers?
25        A.   I do now, sir.
```

1      Q.   And you approach Mr. Perez at some point after the

2   shooting?

3      A.   I did, sir.

4      Q.   And if you know, was he still alive when you

5   approached him?

6      A.   I believed him to be alive because I could hear him

7   breathing.

8      Q.   Did you see any blood either on him or on the ground

9   at the time you approached?

10      A.   I did, sir.

11      Q.   What do you recall seeing with respect to blood?

12      A.   There was blood underneath his body.

13          To me a lot of blood is very subjective, so what

14   might be a lot of blood to me might not be very much blood to

15   somebody else, but it seemed like he had been shot in more

16   than one area from what I can remember.

17      Q.   Would it be fair to say to you it seemed like a lot

18   of blood?

19      A.   Yes, sir.

20      Q.   And there was a lot of blood on the ground at least

21   from your perspective?

22      A.   Yes, sir.

23      Q.   Could you tell where he had been shot?

24      A.   I could not, sir.

25      Q.   Was your backdrop when you were firing the back wall

1    of the garage?

2        A.   When I was deploying my less-lethal, my backdrop

3    would have been more of the -- we'll call it left side wall

4    if that helps you, sir -- that's the direction I was

5    facing.

6        Q.   Okay.  When Mr. Perez was walking towards the

7    threshold of the garage from, your position you could see the

8    gun on the ground; correct?

9        A.   I did, sir.

10       Q.   I take it you had probably been present in other

11   incidents where less-lethal was deployed?

12       A.   I have, sir.

13       Q.   I mean that could include anything like we talked

14   about, bean bag rounds, Tasers, things of that nature?

15       A.   Yes, sir, that's correct.

16       Q.   Have you also been involved in incidents where

17   people have run or tried to get away from law enforcement?

18       A.   Yes, sir, I have.

19       Q.   And have you seen situations where people --

20   less-lethal was used or attempted to be used against them,

21   and they tried to get away or run away?

22       A.   I have seen that numerous times with a Taser not

23   being effective, and not being very helpful with the

24   situation and causing the subject to run.

25            I have personally seen and experienced that bean bag

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                              Page 54

```
 1       A.    It's all black, sir.

 2       Q.    It is all black?

 3       A.    Uh-huh.

 4       Q.    And the sound that it makes, does it make a sound

 5    when it's discharged?

 6       A.    Yes.  So I'm glad you asked.

 7             It's a very different sound than other firearms.

 8             It's actually even different than our bean bag.

 9             So when you fire or deploy a 40-millimeter out of

10    this multi-launcher, it is very quiet, and it sounds very

11    hollow when the round is being sent through the tube because

12    the tube is so large, so much longer and larger than a

13    regular barrel say a handgun or a rifle.

14             It's very distinct, and it's a lot quieter.  I could

15    deploy a 40-millimeter next to your ear and have zero effect.

16    If I were to let off a handgun next to your ear, your ear

17    would be ringing for probably the next ten minutes.

18             So I'm hoping that puts it in perspective the

19    difference of the sounds between the two.

20       Q.    So you believe fellow officers should have been

21    aware that what you're firing was not lethal rounds; it's

22    clearly the 40-millimeter?

23       A.    Yes.  I felt comfortable deploying those rounds in

24    the manner that I did because few reasons.

25             Number one, it was spoken about twice prior to, and
```

1      Q.   But you believe if you were able to listen to it,

2   you would be able to distinguish the 40-millimeter shots from

3   other shots just by the sound?

4      A.   I do.

5      Q.   Do you have an understanding now as to how many

6   lethal rounds were fired in this incident?

7      A.   I don't know an exact round, sir.

8           It would be more of an estimate if I were to give

9   you an answer.

10     Q.   What is your estimate?

11     A.   35.

12     Q.   35 rounds.  And your understanding now is all those

13   rounds were fired by law enforcement?

14     A.   Now, yes, sir, that's correct.

15     Q.   Do you have an understanding as to how many of the

16   rounds struck Mr. Perez?

17     A.   I do not.

18     Q.   But your impression at least was your three rounds

19   struck him; is that fair?

20     A.   I'm really confident in the first two.

21          I'm less confident in the third, but it was in very,

22   very rapid succession.  So I was hopeful that all three

23   rounds made contact with him.

24     Q.   Okay.  I think that's all the questions I have

25   today.

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Joshua Stone on 12/14/2023                                              Page 58

```
 1               DECLARATION UNDER PENALTY OF PERJURY

 2

 3   Case Name:  A.J.P., et al. Vs. County of San Bernardino, et

 4   al.

 5   Date of Deposition:  December 14, 2023

 6   Job No.:  30390

 7

 8            I, _____, hereby certify

 9   under penalty of perjury under the laws of the State of

10   California that the foregoing is true and correct.

11            Executed this _____ day of _____.

12   20____, at _____, California.

13

14

15

16

17

18               _____

19                         JOSHUA STONE

20

21

22

23

24

25
```