# EXHIBIT 6

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4  A.J.P. and A.M.P., minors, by and     )
    through their guardian ad litem       )
 5  Cynthia Nunez, individually and as    )
    successor in interest to Albert Perez,)
 6  deceased, and PATRICIA RUIZ,          )
    individually,                         )
 7                                        )
                Plaintiffs,               )
 8                                        )
                vs.                       )Case No.
 9                                        )5:22-CV-01291-SSS-SHK
    COUNTY OF SAN BERNARDINO, and DOES    )
10  1-10, inclusive,                      )
                                          )
11              Defendants.               )
    _____)

12

13

14

15          REMOTE VIDEOCONFERENCE DEPOSITION OF

16                    LUKE GAYTAN

17                 DECEMBER 14, 2023

18

19

20

21

22

23  Reported Stenographically By:

24  Jinna Grace Kim, CSR No. 14151

25  Job No.:  30390
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                                    Page 9

```
 1    itself, but to the location generally speaking.

 2         A.   I would say approximately -- do you prefer -- I use

 3    a.m. or p.m. times instead of --

 4         Q.   Whatever you're comfortable with is okay with me.

 5         A.   I believe it was approximately 7:30 p.m.

 6         Q.   And you had obtained some information before getting

 7    to the scene?

 8         A.   Yes, sir.

 9         Q.   And then you obtained additional information once at

10    the scene?

11         A.   That's correct.

12         Q.   At some point did you have a briefing with your

13    team?

14         A.   Yes, sir.

15         Q.   And was some of the information that you had, did

16    that include someone with a gun in their hand, possibly

17    finger on the trigger sitting in a chair in a garage?

18         A.   Yes.

19         Q.   Is that some of the information?

20         A.   Yes, sir.  Not possibly that his finger was on the

21    trigger, but that his finger was on the trigger.

22         Q.   Okay.  Finger on the trigger.

23              And you understood that patrol had been there for

24    some period of time?

25         A.   Yes, sir.
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                          Page 10

```
 1      Q.   Did you have any information prior to the shooting
 2   that Mr. Perez had any felonies on his record?
 3      A.   I had information that he had previous arrest for a
 4   felony assault with a deadly weapon, but not a conviction.
 5      Q.   To your knowledge, had he ever been convicted of a
 6   felony at any time before the shooting?
 7      A.   No, sir.
 8      Q.   Did you have any information that he had ever shot
 9   at anyone with a firearm?
10      A.   Just the information of the previous arrest for
11   assault with a deadly weapon depending on what the
12   circumstances were, it was possible that he shot somebody,
13   but I didn't have specific information that he did.
14      Q.   Any specific information like he pointed a weapon at
15   anyone, for example?
16      A.   No, sir.
17      Q.   And during the time the patrol was there before you
18   got there, I understand they said his the gun was in his hand
19   and his finger was on the trigger.
20           Did any of them say that he pointed the weapon at
21   anyone?
22      A.   No, sir.
23      Q.   Did anyone say he verbally threatened to harm
24   anyone?
25      A.   There was a conversation between he and I believe it
```

1   was the daughter of home owner which is that caused the call

2   for service where he brandished the firearm to her.

3          And I believe she asked him what are you going to

4   do, shoot me?  And his response was "and?"  He didn't tell

5   her no or hey, you're safe.

6          That caused her to fear for her safety, and she ran

7   inside and locked the door behind her.

8   Q.   Did you have an understanding whether he verbally

9   threatened to harm any of the patrol officers?

10   A.   I'm sorry.  Can you rephrase the question?

11   Q.   Sure.  The patrol officers that were there before

12   you got there, were you told that he had verbally threatened

13   to harm any of them?

14   A.   No, sir.

15   Q.   And so when you first observed Mr. Perez, was he

16   sitting in the chair in the garage?

17   A.   Yes, sir.

18   Q.   And we have seen photographs in the other

19   depositions.

20          There was a pool table in this garage?

21   A.   Yes, sir.

22   Q.   And he would have been on the far end of the pool

23   table in the chair?

24   A.   Yes, sir.  He was -- the pool table was between him

25   and the deputies and then eventually him and us.

1   without looking at it for a little while.

2          MS. ANDERSON:  Okay.

3   BY MR. GALIPO:

4      Q.   And then there were some deputies on left side; is

5   that correct?

6      A.   That's correct.

7      Q.   And would that include Deputy Moore and Deputy

8   Pollick?

9      A.   Yes, sir.

10     Q.   And other than Deputy Stone being assigned to the

11  less-lethal, were you also self-assigned to less-lethal?

12     A.   Yes, sir.

13     Q.   And did you also have the 40-millimeter launcher?

14     A.   Yes, sir.  I had a different type of 40-millimeter

15  launcher.  I had what we call a single launcher.  So it fired

16  a single projectile and then it had to be reloaded before you

17  could fire another projectile.

18          Deputy Stone at the time had what we call a

19  multi-launcher, and that multi-launcher carried four

20  projectiles at one time before it had to be reloaded.

21     Q.   Okay.  And then I read through your statement

22  briefly, and it looks like earlier on there were discussions

23  about maybe using a bean bag, perhaps?

24     A.   I believe that was discussed.

25     Q.   And I think chemical agents were discussed?

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                          Page 16

```
 1        A.    Yes, sir.

 2        Q.    And some discussion about potentially getting a

 3    K-9?

 4        A.    Yes, sir.

 5        Q.    When you first saw Mr. Perez, I take it he was

 6    sitting in the chair on the far side of the pool table with

 7    the pool table in between essentially where you were and

 8    where he was; is that correct?

 9        A.    That's correct.

10        Q.    And your understanding was the door between the

11    garage and the residence was locked?

12        A.    That's correct.

13        Q.    And your understanding was there was nobody in that

14    immediate residence?

15        A.    Correct.

16        Q.    I saw there was some discussion about an elderly

17    resident in the adjacent unit, but it was decided ultimately

18    that she would just stay there?

19        A.    Yeah.  I believe we attempted to evacuate her, but

20    her family member who was with her told Deputy Pollick and

21    Corporal McCarthy that she was not mobile, and they

22    essentially were forced to shelter in place.

23              So stay inside the location.

24        Q.    So at some point it's my understanding that

25    Mr. Perez put the gun down.
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                           Page 17

```
 1              Were you present when that happened?
 2       A.    Yes.
 3       Q.    And had anyone asked him, if you know, to put the
 4  gun down?
 5       A.    I'm sorry.  Can you re-ask the question?
 6       Q.    Did someone request him to put the gun down before
 7  he put it down?
 8       A.    I believe he at that point he had been asked --
 9  negotiations had been attempting for I believe at that time
10  three-plus hours, and during multiple times during that
11  negotiation, he was asked the to put the gun down.
12       Q.    It was Deputy Alcala doing some of the communicating
13  when you got there?
14       A.    Yes.  He is assigned or was at time assigned
15  negotiator with the Specialized Enforcement Division.
16       Q.    And did you actually see Mr. Perez put the gun
17  down?
18       A.    No, sir.
19       Q.    Were you present when that occurred, if you know?
20       A.    Yes, sir.
21       Q.    How did you learn that he had put the gun down?
22       A.    I believe Deputy Pollick brought my attention to
23  it.
24       Q.    And do you have an estimate as to how long you were
25  observing Mr. Perez before he put the gun down?
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                                    Page 19

```
 1      A.   Yes.

 2      Q.   And are you six-foot-four?

 3      A.   Yes, sir.

 4      Q.   And were you able to see over the pool table at

 5   times and observe the gun?

 6      A.   Yes.

 7      Q.   Where was the gun when you first observed it

 8   relative to Mr. Perez?

 9           In other words, was it in his hand or in his lap

10   whatever you saw?

11      A.   It was in his hand.

12      Q.   And during the time you were watching him, did he

13   ever point the gun at anyone?

14      A.   No, sir.

15      Q.   Did he ever raise the gun at anyone?

16      A.   No, sir.

17      Q.   After you put the gun down was he requested to stand

18   up?

19      A.   Yes, sir.

20      Q.   Did he at some point stand up?

21      A.   Yes, sir.

22      Q.   And after he stood up was he requested to walk

23   forward?

24      A.   Yes, sir.

25      Q.   And did he at some point walk forward?
```

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                              Page 20

1        A.   Yes, sir.

2        Q.   And did he walk along one of the side of the pool

3    table?

4        A.   Yes, sir.  He walked along the east side.

5             I apologize.  I misspoke.  He walked along the west

6    side of the table which  was closest to my side.

7        Q.   Okay.  So as you're looking into the open garage,

8    the east side would be on the right, and the west side would

9    be on the left?

10       A.   From our position facing the garage, that's

11   correct.

12       Q.   So as you're looking at the pool table, he would be

13   walking towards you along the left side of the pool table?

14       A.   That's correct.

15       Q.   And you at least in your statement have him stopping

16   just slightly past the pool table?

17       A.   That's correct.

18       Q.   And how far past it would you estimate he stopped?

19       A.   I would estimate less than five feet.

20       Q.   And did anyone request him to stop?

21       A.   Yes, I did.

22       Q.   And when you requested him to stop, at some point

23   after that request he did stop?

24       A.   That's correct.

25       Q.   Would you at least agree that in the few minutes

1   before he stopped, there was at least some acts of compliance

2   by Mr. Perez?

3        A.   Yes.

4        Q.   And those would include I think what we just talked

5   about; right?  Putting the gun down; standing up; walking

6   towards you; and stopping?

7        A.   That's correct.

8        Q.   Now, when he stopped as you described, you know,

9   less than five feet past the pool table, would he have been

10  close at that point to the threshold of the open garage?

11       A.   Yes, sir.

12       Q.   And were some of your deputies positioned close to

13  the threshold on the outside of the threshold?

14       A.   Yes, sir.

15       Q.   Did any of them, if you know, have cover?

16            And I mean not lethal cover or shield, but actually

17  using a vehicle or portion of the structure as cover?

18       A.   We had a portion of the structure as cover.

19            I would have to refresh my memory with the photo to

20  see exactly, but we were using a portion of the structure of

21  the garage structure for cover, and we also had a shield, a

22  handgun shield on each side.  So each element on the right

23  and the left side or the east and west however you want to

24  call it had a shield in front of them.

25            When I say shield, I mean a ballistic shield.

1  were you able to see his hands at that point?

2      A.   I'm sorry, sir.  I don't know at what point you're

3  talking about.

4      Q.   I'm going back now to the point where he stopped at

5  the end of the pool table.

6      A.   Okay.

7      Q.   Where he was in that stopped position for

8  approximately five minutes.

9           Are you with me?

10     A.   Yes, sir.

11     Q.   So my next questions are going to be during that

12  approximate five minutes.

13     A.   Okay.

14          MR. GALIPO:  We can take this off for now,

15  Shannon.

16  BY MR. GALIPO:

17     Q.   Could you see his hands at all during that five

18  minutes?

19     A.   Yes, sir.

20     Q.   And did you see any weapons in his hands at that

21  point?

22     A.   No, sir.

23     Q.   Was it your understanding that the gun had been

24  placed down on the ground near the chair that he had been

25  sitting at?

1      A.    Yes, sir.

2      Q.    Was anybody on your team assigned to Taser?

3      A.    Everybody in the Division is assigned a Taser.

4      Q.    Did they have them on their persons, if you know, at

5    the time that he ended up walking forward and coming to a

6    stop?

7      A.    I believe we had one, possibly two.

8      Q.    And who do you believe had Tasers on them?

9      A.    I believe Deputy Pollick and Deputy Stone --

10     Q.    Was that part -- go ahead.

11     A.    Sorry.  I don't recall specifically.

12     Q.    Was that part of the tactical plan, that if he walks

13   forward without the gun, that maybe we can tase him?

14     A.    No, sir.

15     Q.    Now, did you tell Deputy Stone that if Mr. Perez did

16   not comply with commands, he could deploy the 40-millimter?

17     A.    No.  I don't believe I told him that.

18     Q.    What do you believe you told him with respect to the

19   deployment of the 40-millimeter?

20     A.    So I believe Deputy Stone knows when it's

21   appropriate to use less-lethal munition because he is the one

22   responsible for shooting the munition.

23          However, I did tell them -- I did tell him once

24   Mr. Perez got to the threshold or about the threshold where

25   you're talking about past the pool table and above the

1   threshold of the garage, and I noticed that he was not

2   complying.  So he was complying for a bit, and then he

3   stopped complying.

4           I made sure that Stone -- I told Stone, and it was

5   on the radio so everybody heard or I believe everybody heard,

6   not to let him get back to the firearm.

7           I was concerned with his demeanor and the change in

8   his demeanor that he was contemplating going back to the

9   gun.

10      Q.   Do you recall a time period where when he was

11   standing past the end of the pool table by the threshold of

12   the garage where he was told to put his hands up, and he kind

13   of threw his hands out kind of showing you I don't have

14   anything?

15      A.   Yes, yes, sir.

16           MR. GALIPO:  And then can we go to Page 33 of the

17   sergeant's statements, please.

18   BY MR. GALIPO:

19      Q.   So I think this is the part we were just discussing

20   on Lines 14.  This would be Page 33.

21           So I think you say -- it's kind of a long sentence,

22   but, "So I told the team --" I'm on Line 14 -- "over the

23   radio don't let him get back to that gun, and if he does

24   anything other than what we're telling him to do, deploy

25   less-lethal like immediately."

```
 1     A.   That's correct.
 2          Q.   But as far as where he was, he was close to the
 3     threshold of the that open garage door?
 4          A.   Correct.
 5          Q.   And how far do you think you were from Mr. Perez
 6     when he was in that standing position?
 7          A.   Again, I would have to estimate maybe between seven
 8     and ten feet, approximately.
 9          Q.   Okay.  And how about your deputies that you had on
10     the west side, how far were they positioned approximately
11     from Mr. Perez when he was in that standing position by the
12     threshold?
13          A.   The same, give or take a foot or two.
14               We were all pretty close together, my team.
15     Q.   If we can go to Page 42, please, of the interview.
16          Now, on Lines 21 through 24, this is part of your
17     response which is a relatively long response.
18          You say on Line 21 after a parenthesis, "But he took
19     a step back and mind you, up to this point I told -- I told
20     everybody, hey, if he does anything to go back towards the
21     gun or anything other than movements than what we're telling
22     him to do, hit him with less-lethal."
23          Do you see that?
24     A.   Yes.
25     Q.   And again, are you referring to your radio
```

1  communication of telling them if he does anything that we're

2  not telling him to do or make some move towards the gun, to

3  hit him with less-lethal?

4      A.   Yes, sir.

5      Q.   So going to the top of Page 43, the next page, I

6  think this is the time frame when you're discussing the first

7  deployment by Deputy Stone.

8           I'll let you take a sip of your water.

9      A.   Thank you.  Did you say the top, what line?

10     Q.   So we're looking at the top of Page 43, and I

11 believe this is when you're discussing the first BIP round

12 from Deputy Stone.

13          You say, and I'm starting on Line 1, "He took a step

14 back and Deputy Stone hit him with a BIP round and hit him

15 center mass."

16          Do you see that sentence?

17     A.   Yes, sir.

18     Q.   And the step back you're referring to, was that with

19 the left foot, if you remember?

20     A.   I don't -- I don't recall which foot he stepped back

21 with.  I just recall watching him take a step back.

22          And when I say back, it was back towards the

23 direction that he had come.

24     Q.   But are you saying that he took the step back from

25 the area of the open threshold of the garage?

1       A.    Yes.  Which was back towards the direction of where

2    the gun was put down.

3       Q.    Right.  And back towards the pool table?

4       A.    Yeah.  The pool table was behind him, so yes.

5       Q.    I mean the pool table as I understand it was in

6    between where he was at the threshold of the garage and the

7    gun?

8       A.    Yes.  But he was off -- the way I remember, if I

9    remember correctly, he was off to the left side.

10            So it wasn't like he was standing in front of the

11   pool table.

12      Q.    Okay.

13      A.    And the pool table was between him and the gun.

14      Q.    Okay.

15      A.    If that makes sense.

16      Q.    Yes.  So you say it hit him center mass.

17            You thought it was somewhere in the stomach; is that

18   correct?

19      A.    I believe so.

20      Q.    And you say you watched it bounce off, and he

21   continued turning?

22      A.    Correct.

23      Q.    And then he took a step like he started to run.

24            Do you see that?

25      A.    Yes.

```
1      Q.   So am I understanding this correctly, that the front
2  of Mr. Perez had to be directed towards Deputy Stone when
3  Deputy Stone fired the first round in order for it to hit him
4  in the stomach?
5      A.   Yes.  I mean it could be off a little bit to an
6  angle, but for it to him in the front of the stomach, you
7  would have to have a general -- Stone would have had to been
8  generally in front of him, yes.
9      Q.   And then you're saying after it struck him, he
10 continued turning and took a step like he started to run.
11          Was that what you observed?
12     A.   Yes.
13     Q.   And then you deployed a BIP round, but as you
14 described, you only had the one round?
15     A.   That's correct.
16     Q.   And where do you believe you were aiming when you
17 struck him about the BIP round?
18     A.   Center mass in the back, somewhere in the back.
19     Q.   Okay.  And then you heard Stone or you say you heard
20 Stone hit him twice again.
21          Did you hear two more rounds being fired by Deputy
22 Stone?
23     A.   I believe so.
24     Q.   You reference the first one I heard a "uhh."
25          Was the "uhh" I'm taking it from Mr. Perez as
```

1    opposed to Deputy Stone?

2        A.   Yes, that's correct.

3        Q.   And the 40-millimeters are intended to cause pain,

4    kind of a pain compliance tool?

5        A.   Yes, sir.

6        Q.   And then you say, "And that's when everybody who

7    fired the lethal weapons started firing on him."

8             Do you see that sentence?

9        A.   I do.  Is that on Line 11?

10       Q.   Yeah, 11 and 12.

11            MR. GALIPO:  We can go back to the full screen for a

12   moment.

13   BY MR. GALIPO:

14       Q.   So when you fired your round that hit him in the

15   back, obviously, he would have turned away from you at that

16   point?

17       A.   Correct.

18       Q.   And you're saying you heard two more rounds from

19   Deputy Stone after you fired your round?

20       A.   I believe so, yes.

21       Q.   And then just as Deputy Stone was firing his last

22   two rounds, that is when you started hearing the lethal

23   rounds?

24       A.   Yes, sir.

25       Q.   Could you distinguish in your mind the lethal rounds

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                    Page 36

1    from the 40-millimeters?

2          A.    Yes, sir.

3          Q.    They have a different sound?

4          A.    Yes, sir.

5          Q.    So the lethal rounds started as he was on the side

6    of the pool table; is that true?

7          A.    I believe they started as he was rounding the back

8    corner of the pool table.  So if you take the side of the

9    pool table back north I guess you could say back towards the

10   back of the garage, he would have to go or he did go back

11   towards the east where the stool and the gun were.

12          And that's where he was running and that's about the

13   area that the lethal rounds were fired I believe.

14         Q.    And you knew they were rounds being fired by the

15   deputies, correct?

16         A.    The lethal rounds?

17         Q.    Yes.

18         A.    I assumed they were.

19         Q.    Did you hear anybody give a warning to Mr. Perez

20   that less-lethal was going to be deployed?

21         A.    No, sir.

22         Q.    Did you hear anyone give a verbal warning to

23   Mr. Perez that lethal force was going to be deployed?

24         A.    No, sir.  Not a verbal warning.

25         Q.    Could you tell if one deputy or more than one deputy

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                           Page 37

1    was firing?

2        A.    They sounded to me more than one was firing.

3        Q.    Could you tell where the shots were coming from,

4    whether it was from your left or right or both?

5        A.    It sounds to me it was both.

6        Q.    Prior to hearing the lethal rounds, did you ever see

7    Mr. Perez actually pick up that gun?

8        A.    Can you state the question one more time?

9        Q.    Yes.  Prior to hearing the lethal rounds starting

10   after he had come to that standing position and took the step

11   at the less-lethal was deployed, I realize he had a gun in

12   his hand earlier in the encounter.

13           But I'm asking when he started running as you

14   described, did you ever see him pick up the gun before the

15   less-lethal was -- before the lethal was deployed?

16       A.    No.

17       Q.    Do you have an estimate as to how many shots you

18   heard?

19       A.    I would say I would estimate between 20, somewhere

20   in the area of 20.

21       Q.    Okay.  Do you have an understanding now being the

22   team leader how many shots were fired by your team?

23       A.    I don't know the exact number that was fired.

24       Q.    Did Mr. Perez go out of your view at some point?

25       A.    Yes, sir.

A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL
Luke Gaytan on 12/14/2023                                          Page 38

1     Q.   And did you hear any shots being fired after he went

2     out of your view?

3     A.   So when I say he went out of my view, I lost

4     observation of the upper part of his body.  As the rounds

5     were being fired, it appeared to me that he dove behind the

6     pool table where the firearm was and just -- I forgot to say

7     this, but as the lethal rounds were being fired, he was

8     running, but he wasn't just running upright.  He was running

9     and it appeared that he dropped his center of gravity and he

10    was getting ready to go around to where that firearm was.

11         So he was preparing himself to get closer to the

12    ground and which caused me to believe he was trying to get to

13    the firearm.

14    Q.   Did you ever consider that he might have been

15    running to try to avoid from being shot?

16    A.   No.  That did cross my mind.

17         Given everything that led up to that situation, that

18    did not cross my mind because he had every opportunity in the

19    world to give up peacefully and not put himself in that

20    situation.  He had been there for several hours with the gun

21    in his hand.

22         In my mind there was zero chance that he was doing

23    anything other than trying to get back to that firearm.

24    Q.   Well, do you think that it's illogical for someone

25    who is being fired at, let's say lethal rounds, let's take a

1   police officer that's having lethal rounds being fired at

2   them, do you think it's illogical for the police officer to

3   try to get to an area of cover or safety?

4          MS. ANDERSON:  I'm going to object.  Calls for

5   speculation; also an incomplete hypothetical.

6          But you can answer.

7          THE WITNESS:  I think that it was at the moment I

8   was thinking that it was completely illogical that he would

9   have had us there after three or four hours of attempting to

10  negotiate, that he would put the gown down and that he would

11  take off running back towards the gun.

12         Again, everything that he had done up that point is

13  what caused our reaction; right?  He failed to comply with

14  everything up to that point.  So I felt it was illogical for

15  him to run away from us after less-lethal had been deployed

16  and he had been told to essentially give up, that he would

17  ran back towards that firearm.

18  BY MR. GALIPO:

19      Q.  Well, you say that he failed to comply with every

20  command, but I thought you told me he complied with the

21  command to put the gun down; complied with the command to

22  stand up; complied with the command to walk towards you; and

23  complied with the command to stop.

24         He at least complied with those commands, true?

25      A.  He did.  And he didn't get a response, he didn't get

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                            Page 40

1    a negative response from us when he was complying.

2              It wasn't until he decided not to comply that the

3    less-lethal was deployed and ultimately lethal force had to

4    be used.

5        Q.   When you say the less-lethal was deployed when he

6    decided not to comply, you're talking about the one step he

7    took?

8        A.   Yes.  There was -- the negotiations and the

9    non-compliance had deteriorated up to that point.  So he was

10   complying, and then while he was stopped, there is a lot more

11   to the interview that we didn't talk about in my interview

12   that was in between that wasn't discussed, that negotiations

13   were deteriorating.

14       Q.   Let me ask -- sorry.  Let me ask you this.

15            Do you think it would have been appropriate to use

16   less-lethal on him when he was standing there if he had not

17   taken a step back?

18       A.   Your question is, do I believe it would have been

19   appropriate?

20       Q.   Yes.

21       A.   I believe at that point it would have been

22   appropriate, yes.

23       Q.   But it sounds like he didn't run or move swiftly

24   towards the area where the gun was until after the first

25   less-lethal was deployed.

A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL
Luke Gaytan on 12/14/2023                                    Page 43

1       Q.    Okay.  In other words, he got up and he walked

2    forward and he was standing in approximately the same

3    position by the threshold of the garage for five minutes;

4    correct?

5       A.    Correct.

6       Q.    And during that five minutes, he didn't run to try

7    to get to the other side of the pool table to get the gun,

8    would you agree?

9       A.    Correct.

10      Q.    He didn't run to the other side of the pool table at

11   any time before Deputy Stone fired his 40-millimeter at him;

12   isn't that true?

13         MS. ANDERSON:  Objection.  Lacks foundation;

14   misstates testimony.

15         You can answer.

16         THE WITNESS:  It's true that he didn't run, but his

17   movements were telling me that he intended on going back to

18   the gun, and the step back in my opinion was the beginning of

19   his movements to get back to the firearm.

20   BY MR. GALIPO:

21      Q.    But he had not turned around completely yet because

22   we know the initial round by Deputy Stone hit him in the

23   abdomen.

24      A.    I believe so.  I believe that's a correct

25   statement.

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                    Page 44

```
 1      Q.   Okay.

 2           MR. GALIPO:  We're making a lot of progress.

 3           I think if it's okay with everyone, this would be a

 4  good time for a ten-minute break.

 5           (Recess taken.)

 6  BY MR. GALIPO:

 7      Q.   When you were briefing your officers on the tactical

 8  plan, did you ever tell them, hey, if we get there and he's

 9  got the gun in his hand and he doesn't drop it, we should use

10  deadly force?

11      A.   No.

12      Q.   Did you ever tell them that if he drops the gun and

13  comes out and he takes a step or starts going back towards

14  the gun, to use deadly force?

15      A.   No.  I don't tell -- ever tell anybody else when to

16  use deadly force.  That's not -- each person individually has

17  to make that decision on their own.

18      Q.   So at some point he goes behind the pool table from

19  your perspective, at least his upper body?

20      A.   Yes.

21      Q.   Could you still see his legs from your

22  perspective?

23      A.   Yes, sir.

24      Q.   Could you hear any shots being fired when you could

25  only see his legs, and not his upper body?
```

1    A.    Yes, sir.

2    Q.    And do you know how many shots were fired

3    approximately during that time frame?

4    A.    I do not.

5    Q.    Would it be multiple shots?

6    A.    Yes.

7    Q.    And could you tell if they were coming from one

8    officer or more than one?

9    A.    I don't -- I don't recall.

10   Q.    Now, at some point you actually yelled out words to

11   that effect "cease fire" or "stop shooting?"

12   A.    Correct.

13   Q.    And why did you do that?

14   A.    So when he went down, and I heard -- I continued

15   hearing gunfire, it appeared to me that he was trying to move

16   his body.  It appeared to me that he hit the ground before he

17   was all the way behind the pool table, and it looked to me

18   that he was trying to get the rest of his body behind the

19   pool table.

20         I perceived he got ahold of the gun, and he was

21   going to take cover behind the pool table, and he was going

22   to start firing upon us.  When I saw his legs stop moving and

23   I saw a blood start to pool, so what I had to do was at that

24   point, the less-lethal after I shot my less-lethal round, I

25   kind of detached myself from the situation and start to

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                         Page 47

```
 1   saw the diving-type motion?

 2        A.   I can't even estimate.  Everything happened so fast,

 3   and I was assigned to less-lethal, but also as the team

 4   leader, I couldn't break down and tell you how many shots

 5   were fired lethal before or after or really in between.

 6             I couldn't.

 7        Q.   Would it be fair to say you heard lethal shots

 8   before he made the diving motion?

 9        A.   No, I don't believe so.

10        Q.   Do you think you heard lethal shots as he was

11   diving?

12        A.   I believe so, yes.

13        Q.   And do you think you heard lethal shots after he

14   made the diving motion?

15        A.   Yes.

16        Q.   To your knowledge, did anybody on your team ever

17   actually see a gun in his hand after the less-lethal was

18   deployed?

19        A.   That's not -- we didn't talk.

20             So I don't -- I wouldn't know if they did or they

21   didn't.

22        Q.   Did anyone ever tell you they saw a gun in his hand

23   when he was on the other side of the pool table after

24   less-lethal was deployed?

25        A.   Not that I recall.  When we made our approach to
```

 1   detain him or take him into custody and render medical

 2   attention, I don't recall if somebody said his hand was on

 3   the gun or if I believe somebody said his hand was on the

 4   gun, and the gun was kicked out of his hand or off, away from

 5   his hand.

 6        Q.   Actually, wasn't the gun away from his hand when you

 7   approached, if you remember?

 8        A.   I don't recall.

 9        Q.   Do you know who kicked the gun or took the gun

10   away?

11        A.   I do not.

12        Q.   So can you go to Page 57 of the statement, please.

13             Okay.  So I think about Line 11, you say, "About the

14   same time Stone's last BIP was going off is when I started

15   hearing gunfire."

16             Do you see that?

17        A.   Yes, sir.

18        Q.   Does that sound right, about the last, the third BIP

19   round from Stone, that was about the time you heard, were

20   hearing gunfire?

21        A.   I'm sorry.  Give me one second.

22        Q.   Sure.

23        A.   Can you reask the question, please.

24        Q.   Sure.  Does that sound right that you started

25   hearing gunfire about the time of Stone's last BIP round

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                              Page 49

1     going off?

2          A.   Yes, that's correct.

3          Q.   Okay.   And then if we scroll down a little bit on

4     this page, the detective is asking you on Line 22, I think,

5     "So when the initial gunshots are fired, is he behind the

6     pool table or is he getting close to the pool table, just

7     trying to picture it."

8               And you said, "I would say he was at the pool

9     table."

10              Do you see that?

11         A.   I'm sorry.   What line?

12         Q.   22 through 25.

13         A.   Yes, I see that.

14         Q.   Okay.   And does that seem accurate as well?

15         A.   Yeah, I believe that statement's accurate.

16         Q.   What you had initially on this really was a

17    trespass; is that right?

18         A.   We were trying to -- I was trying to determine that

19    with Sergeant Lafeeber [phonetic], whether we had a criminal

20    threat which was a felony or if we had an assault with a

21    deadly weapon with a firearm or if it was a trespass or if it

22    was a misdemeanor brandishing a weapon.

23              We did have that discussion.

24         Q.   I'm sorry.   Would you agree that you had not

25    determined that yet as of the time of the shooting?

**A.J.P. AND A.M.P., MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Luke Gaytan on 12/14/2023                                            Page 50

 1        A.   I had not.  I was not aware of whether they had

 2    determined that or not.

 3        Q.   And therefore, would you agree you had not

 4    communicated that to your team because you did not know that

 5    yet?

 6        A.   I believe that's correct.

 7        Q.   Okay.

 8             MR. GALIPO:  That's fine.  Thank you, Shannon.

 9             We can take that off.

10    BY MR. GALIPO:

11        Q.   So after the shooting when you approached Mr. Perez,

12    was he still breathing, if you know?

13        A.   I believe he was.

14        Q.   And would it be fair to say that you saw bleeding on

15    him and on the ground?

16        A.   Yes, sir.

17        Q.   I think you might have indicated you saw a pool of

18    blood forming at some point?

19        A.   Yes, sir.

20        Q.   Did you determine afterwards which of your officers

21    used deadly force?

22             Did you ask them who shot, for example?

23        A.   Yes, sir.

24        Q.   And what did you determine as to who used lethal

25    force?

1              DECLARATION UNDER PENALTY OF PERJURY

2

3   Case Name:  A.J.P., et al. Vs. County of San Bernardino, et

4   al.

5   Date of Deposition:  December 14, 2023

6   Job No.:  30390

7

8           I, _____, hereby certify

9   under penalty of perjury under the laws of the State of

10  California that the foregoing is true and correct.

11          Executed this _____ day of _____.

12  20____, at _____, California.

13

14

15

16

17

18          _____

19                    LUKE GAYTAN

20

21

22

23

24

25