# EXHIBIT 7

A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL
Deputy Anthony Alcala on 12/28/2023

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

A.J.P. and A.M.P., minors,       ) Case No. 5:22-cv-01291-
by and through their guardian    )       SSS-SHK
ad litem Cynthia Nunez,          )
individually and as successor    )
in interest to Albert Perez,     )
deceased; and PATRICIA RUIZ,     )
individually                     )
                                 )
            Plaintiffs,          )
                                 )
      vs.                        )
                                 )
COUNTY OF SAN BERNARDINO; and    )
DOES 1-10, inclusive,            )
                                 )
            Defendants.          )
_____)

DEPOSITION OF DEPUTY ANTHONY ALCALA

APPEARING REMOTELY FROM SAN BERNARDINO, CALIFORNIA

THURSDAY, DECEMBER 28, 2023

REPORTED BY:

JOHANNA MANGUAL LEDESMA, RPR, CSR 6951

APPEARING REMOTELY FROM VENTURA COUNTY, CALIFORNIA

1    6:45 p.m.

2         Q.    I appreciate the translation from military time.

3    Thank you.

4              And what was the nature of that call from your

5    sergeant?

6         A.    It was through an e-mail sort of notification.

7    And exactly what was the information given, I do not

8    recall, but it was a barricaded subject with a firearm

9    inside a garage with the address, the city, and that was

10   the information I received.

11        Q.    And in the time from when you first got the

12   e-mail notification from your sergeant and the time that

13   you arrived on scene, did you learn any additional

14   information about the incident?

15        A.    Not until I arrived on scene.

16        Q.    Okay.  So did you have any information that

17   Mr. Perez was under the influence of anything?

18             MS. ANDERSEN:  Objection to the extent that

19   calls for speculation, but you can answer.

20             THE WITNESS:  No.  No information was provided

21   to me regarding that.

22        Q.    BY MS. LEAP:  And did you have any information

23   that anyone had been physically injured related to this

24   call?

25        A.    I did not have any information on that.

```
 1        A.    It was on the street just out, just outside of
 2   the incident location.
 3        Q.    Okay.  And the armed plate carrier vest -- did I
 4   get that right?
 5        A.    Yes.
 6        Q.    Is that a vest that you wear on your person or
 7   is it like a shield that you hold?
 8        A.    No.  It's a vest that I put on, on my person.
 9        Q.    Okay.  And is that a bullet-proof vest?
10        A.    Yes.
11        Q.    Okay.  And did you have any information where
12   the gun was?
13        A.    Yes.
14        Q.    And what was the information that you had?
15        A.    That Mr. Perez was holding the gun.
16        Q.    In his hand?
17        A.    Yes, in his hand.
18        Q.    Did you have information as to which hand?
19        A.    I do not recall.
20        Q.    Okay.  So after you spoke with the Watch
21   Commander and the reporting parties, was it then that you
22   went over to the garage?
23        A.    Yes.
24        Q.    And were there other patrol deputies already on
25   scene when you arrived?
```

**A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Deputy Anthony Alcala on 12/28/2023                                  Page 27

```
 1        Q.     Do you know how long those deputies had been
 2   there prior to your arrival?
 3        A.     I do not.
 4        Q.     Okay.  And once you arrived at the garage, did
 5   you receive any additional information that Mr. Perez had
 6   pointed the gun at anyone including the deputies?
 7        A.     No information that was provided.
 8        Q.     During that same time period, did you have any
 9   information that Mr. Perez had physically injured anyone
10   such that they needed medical attention?
11        A.     No.  To my understanding -- sorry.  To my
12   understanding, he did not point the gun at anybody or
13   injure anybody prior to my arrival.
14        Q.     Okay.  Did you have any specific information as
15   to whether the gun was loaded or not?
16        A.     No, I did not have any information on that.
17        Q.     Did you have any information as to whether
18   Mr. Perez had a criminal history or not?
19        A.     No, I had no information on that.
20        Q.     And did the SED deputies arrive at some point
21   and switch out positions with those initially responding
22   patrol deputies?
23        A.     Yes, they did.
24        Q.     And if you can recall, approximately how long
25   were you on scene at the garage before the SED deputies
```

**A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Deputy Anthony Alcala on 12/28/2023                                          Page 32

```
 1      A.    And that's when the SED got there?

 2      Q.    Right.  So you estimated that you were with the

 3   initially responding patrol deputies for an hour.  And

 4   then I'm curious how long you were there from after the

 5   SED deputies responded.

 6      A.    To my recollection, it was 10 to 15 minutes.

 7      Q.    Okay.  So would you estimate that you were at

 8   the garage for about an hour and 15 minutes or so before

 9   the shooting?

10      A.    Yes, approximately.

11      Q.    And in that hour and 15 minutes, did you ever

12   see Mr. Perez point the gun at any of the officers?

13      A.    No, I did not.

14      Q.    And during that hour and 15 minutes, did you

15   ever see Mr. Perez fire the gun at anyone or anything?

16      A.    No, I did not.

17      Q.    During that hour and 15 minutes, did you ever

18   see Mr. Perez raise the weapon from where it was in his

19   hand at the direction of anyone?

20      A.    I did not see him raise the weapon, no.

21      Q.    Did you hear him verbally threaten to harm any

22   of the deputies during that time period?

23      A.    No, I did not.

24      Q.    Did you give Mr. Perez any orders to put the gun

25   down?
```

**A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**

Deputy Anthony Alcala on 12/28/2023                    Page 33

```
 1        A.    I did.

 2        Q.    And at some point did you learn that Mr. Perez

 3    did put the gun down?

 4        A.    Yes.

 5        Q.    And how did you learn that?

 6        A.    Deputy Stone relayed that information based on

 7    his observations of watching Mr. Perez put the gun down.

 8    So he relayed that to myself and Olivas that were on the

 9    same side of the garage together.

10        Q.    Okay.  Did he relay that, if you know, over the

11    radio or did he just tell you verbally in person?

12        A.    I do not know if he relayed that on the radio or

13    not.

14        Q.    So you heard him just from him verbally telling

15    you?

16        A.    He did say it out loud, yes.

17        Q.    Okay.  And did you consider the active

18    putting-the-gun-on-the-ground an act of compliance?

19        A.    Initially, yes.

20        Q.    And did you have an understanding as to where he

21    placed the gun, Mr. Perez placed the gun in relation to

22    the chair he was sitting on?

23        A.    I did not see where he put the gun down, no.

24        Q.    Okay.  Did you receive any information from

25    Mr. -- from Deputy Stone as to where the gun was when he
```

**A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Deputy Anthony Alcala on 12/28/2023                               Page 35

```
 1   with that.  Then I just continued to speak to him, you
 2   know, reassuring him that, you know, we did not want any
 3   violence.  We wanted to end the situation peacefully.
 4            You know, I tried to encourage him to stand up,
 5   walk, walk towards us so we can, so the SWAT operators
 6   could detain him, handcuff him and in hopes that he would
 7   continue to want to or start to talk to me and we can talk
 8   in person without any weapons or violence.  So that was
 9   what I was working towards as far as negotiating with him,
10   just trying to get him to surrender peacefully and
11   encourage him to do that.
12        Q.    So did the communications that you had with
13   Mr. Perez include commands that he stand up?
14        A.    I did -- I did ask him.  I did encourage him to
15   stand up and walk towards us.  Yes.
16        Q.    Okay.  And at some point do you know if
17   Mr. Perez did stand up from the chair?
18        A.    He did.
19        Q.    And did you consider that an act of compliance?
20        A.    Yes.
21            MS. LEAP:  I think this might be a good point to
22   take a break if that works for everyone.  We've been going
23   for about an hour.
24            MS. ANDERSEN:  Yes.
25            MS. LEAP:  Okay.  We can go off the record.
```

1  was attempting to negotiate with Mr. Perez for that hour,

2  hour and 15 before SED got there.  Like I said, I went

3  over to the left side of the garage for approximately

4  twice which was the same side as Deputy Mata was on.

5        Q.    Okay.  Thank you.

6              And how about after the SED deputies arrived,

7  did you go over to the left-hand side after their arrival

8  as well?

9        A.    No.  I stayed on the right side.

10       Q.    Okay.  And what portion of Mr. Perez were you

11 able to see when you were on the right-hand side of the

12 garage?

13       A.    The same, his upper chest to his head.

14       Q.    Okay.  Just so I make sure I am understanding

15 correctly, you stayed on the right-hand side for the

16 entire time that the SED deputies were on the scene until

17 the time of the shooting at least?

18       A.    Yes.

19       Q.    Okay.  And while you were on the right-hand

20 side, you could see basically his chest up?  Is that what

21 you said?

22       A.    Yes, portions of his shoulders and his arms, but

23 from the upper torso to his head.

24       Q.    Okay.  Were you able to see his hands?

25       A.    Periodically when he rose them up, yes.

A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL
Deputy Anthony Alcala on 12/28/2023                    Page 41

1      Q.    And when he rose them up, did he have anything

2   in his hands --

3      A.    No.

4      Q.    -- that you could see I mean?

5      A.    No, he did not.

6      Q.    And before our break, we were at the point in

7   time where Mr. Perez stood up from the chair.  And were

8   there additional commands given to Mr. Perez once he stood

9   up?

10     A.    Yes.

11     Q.    And were you still the primary or the only

12  deputy giving him commands at that point?

13     A.    I was primary until he got to a certain point

14  after he stood up.  Once he started to comply with walking

15  forward towards the SWAT operators on the left side, the

16  west side of the garage, Deputy Gaytan took over giving

17  him comprehension commands.

18     Q.    Okay.  Prior to him beginning to walk forward,

19  did you give him a command to walk forward?

20     A.    Yes.

21     Q.    Okay.  And did he start walking forward?

22     A.    Yes.

23     Q.    And did you also consider that act of walking

24  forward an act of compliance?

25     A.    Yes.

1    Q.    And when he walked forward, where was it that he

2    walked in relation to the pool table, for example?  And I

3    can bring up that photo if it would be easier for you to

4    describe.

5    A.    So where he was sitting down at the head of the

6    pool table, he walked towards -- he walked in the

7    direction of his right side to which would be towards the

8    west side of the garage.  That's where he walked which

9    were the instructions I was giving him.

10   Q.    Okay.  So if, from your vantage point looking

11   into the garage, he was walking on the left-hand side of

12   the pool table?

13   A.    Yes.

14   Q.    Okay.  But it was his, his left side would also

15   have been on the side of the pool table, I believe?

16   A.    It was his, it was his right because if he was

17   looking out, so he went off to his right.

18   Q.    Right.  I think I may be getting things a little

19   bit too confusing with the left and the right, but he

20   walked in the direction of the right, of his right, but

21   his left arm would be the arm closer to the pool table; is

22   that correct?

23   A.    Yes.

24   Q.    Okay.  Thank you.  I just want to make sure we

25   had the same image in our mind.

1              And when he was walking following your

2     instructions, could you see his hands at that point?

3          A.    Yes.

4          Q.    And could you see if there was anything in his

5     hands?

6          A.    Yes.  There was nothing in his hands.

7          Q.    Okay.  Did you see him reach for anything in his

8     pockets?

9          A.    Not that I recall.

10          Q.    And was he walking slowly or how would you

11     describe his pace as he was walking?

12          A.    Slowly would be a good definition.

13          Q.    And did you give him a command to stop at some

14     point?

15          A.    Yes.

16          Q.    And I think I'll pull up the exhibit again.

17               (Screen sharing.)

18          Q.    BY MS. LEAP:  And so this was Exhibit Number 2.

19     Can you all see that okay?

20          A.    Yes.

21          Q.    And can you identify in this image where he was

22     when you told him to stop?

23          A.    I would say where that black glove's at on the

24     ground, probably right on top of it, maybe, maybe a step

25     in front of that black glove, but about right there.

```
 1      Q.    Okay.  So maybe between the black glove and the

 2   front end of the pool table?

 3      A.    Yes.

 4      Q.    Okay.  And in case I didn't say this, this is

 5   Exhibit 2.  Here is Exhibit 1.

 6            (Screen sharing.)

 7      Q.    BY MS. LEAP:  You can't see the black glove in

 8   this image, but does this image provide any -- is this

 9   image helpful in identifying where Mr. Perez was when you

10   told him to stop or is the other one more helpful?

11      A.    The other one.  The other one would be more

12   helpful.

13      Q.    Okay.  Then we'll stick with Exhibit 2.  And

14   when he -- when you told him to stop, did he comply with

15   that command as well?

16      A.    Yes.

17      Q.    Okay.  And approximately how many feet was

18   Mr. Perez from the chair that he was sitting at when he

19   stopped?

20      A.    I would say 5 to 7.

21      Q.    Okay.  Do you recall in your statement that you

22   estimated that he was about 8 feet away from the chair?

23      A.    I don't recall that, but it's possible.

24      Q.    Okay.  Would it be helpful to refresh your

25   recollection if I played a portion of your statement?
```

  1        Q.    BY MS. LEAP:  Okay.  So did you hear yourself
  2   say that he had come 8 feet, 9 feet from the chair?
  3        A.    Yes.  8 to 9 feet, yes, that's what I said.
  4   Yes.
  5        Q.    Okay.  Is it your testimony today that he was 5
  6   to 7 feet from the chair?
  7        A.    After looking at the photo, it gives me a better
  8   estimate of distance, so I would say between 5 to 7.
  9   During the interview, it was early in the morning right
 10   after we got done with that scene so --
 11        Q.    Understood.  So if he was about 5 to 7 feet away
 12   from the chair and identified, you identified him as being
 13   close to where that black glove was on the ground and the
 14   front of the pool table in Exhibit 2, would you be able to
 15   estimate how far Mr. Perez was from the deputies on the
 16   side of the garage that you were on, on the right-hand
 17   side?
 18        A.    He was probably about, about the same, about 5
 19   to 7 feet away from us, from where we were on the right
 20   side of the garage.
 21        Q.    Okay.  And do you have an estimate as to how
 22   long he was in a stopped position at that point where you
 23   identified him by the pool table?
 24        A.    From when he stopped until -- are you asking
 25   from when he stopped until the shooting occurred?

**A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Deputy Anthony Alcala on 12/28/2023                                      Page 47

```
1        Q.    Sure.

2        A.    I would say from the time he stopped to when the

3   less lethal rounds were deployed, I would say less than a

4   minute.  And then when the lethal rounds were deployed,

5   that's probably just around the same time, about a minute,

6   a minute, couple of seconds if that.

7        Q.    Okay.  And were you still in that same position

8   near the deputies and near the, sort of the passenger side

9   of that silver vehicle when Mr. Perez stopped?

10       A.    When he stopped, yes.

11       Q.    Okay.  So at this point when Mr. Perez had

12  stopped, would you agree that he'd made several acts of

13  compliance including dropping the gun, getting up,

14  walking, stopping?

15       A.    Yes.

16       Q.    And did sergeant -- or strike that.

17             Would you identify any other acts of compliance

18  that I did not list?

19       A.    No.  That's -- that pretty much summarizes it.

20       Q.    Did Sergeant Gaytan begin to give Mr. Perez some

21  commands at some point?

22       A.    Yes.

23       Q.    Was that when Mr. Perez stopped?

24       A.    Yes.

25       Q.    Okay.  And could you hear Sergeant Gaytan's
```

1    commands?

2         A.    Yes.

3         Q.    And can you remind me if he was on the same side

4    of the garage as you were or was he on the other side of

5    the garage?

6         A.    The other side.

7         Q.    Okay.  And did it look like at some point

8    Mr. Perez took a step back with his left foot?

9         A.    Yes, it did.

10        Q.    And did it appear that he started to turn to his

11   left at that point as well?

12        A.    Simultaneously, yes.

13        Q.    Okay.  And is that when you saw that the

14   40 millimeter was fired?

15        A.    Yes.  I heard it more than I saw it, yes.

16        Q.    Okay.  And the 40 millimeter, was that -- do you

17   know if that was fired from your side of the garage or

18   from the other side of the garage?

19        A.    From my side of the garage.

20        Q.    Okay.  So that would have been Deputy Stone?

21        A.    Yes.

22        Q.    Okay.  And did you see that the 40 millimeter

23   round struck him, Mr. Perez?

24        A.    I believe it did because after it was deployed,

25   when I heard the 40 millimeter deployment, Mr. Perez kind

**A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL**
Deputy Anthony Alcala on 12/28/2023                    Page 49

1  of bent over to his left side which, based on my training

2  and experience, indicated that it did impact.

3      Q.    Okay.  And did you see if he, if Mr. Perez

4  continued to turn after the 40 millimeter appeared to

5  strike him?

6      A.    I do not know because I moved out of the way for

7  cover on the next driveway over.

8      Q.    Okay.  Could you hear the second less -- sorry.

9  Strike that.

10          Could you hear a second less lethal round fired?

11     A.    I did.

12     Q.    And could you approximate about how long after

13  the first less lethal round was fired, the second one was

14  fired?

15     A.    I couldn't put a timeline on it, but it was very

16  fast.  It was very quickly after the first deployment.

17     Q.    Okay.  Did you hear any other less lethal rounds

18  fired?

19     A.    In total, I believe I heard two to three total

20  of the 40 millimeter less lethal rounds deployed.

21     Q.    Okay.  And in your training and experience, do

22  less lethal rounds generally sound different from lethal

23  rounds?

24     A.    Yes.

25     Q.    Can you describe how they sound different from

1    each other?

2        A.    I would say the 40 millimeter deployment in my

3    experience, my training, has a little bit more of a lower

4    base if I were to call it.  And a lethal round would be

5    more, more of a pop sound than a base.

6        Q.    Okay.  And you estimated that about two to three

7    less lethal rounds were fired, you believe.

8        A.    Yes.  That's what I believe I heard.

9        Q.    Okay.  Did you hear any lethal rounds being

10   fired?

11       A.    Yes.  From what I could hear taking cover at the

12   next driveway, yes.

13       Q.    And excuse me.  Can you estimate about how long

14   after the less lethal rounds you heard the lethal rounds

15   being fired?

16       A.    Again, it was very quickly, within a minute.

17       Q.    Within a minute you said?

18       A.    Yes.

19       Q.    Okay.  Was it within seconds?

20       A.    Yes.  I would say within, between probably close

21   to 10 to 30 seconds.  Very quickly.

22       Q.    Just so that I'm understanding correctly, are

23   you estimating that there were from your memory 10 to 30

24   seconds between the less lethal shots being fired and the

25   lethal shots being fired or all of the shots together?  I

1    just want to make sure I understand.

2         A.    No.  Thank you.  I believe there was close to, I

3    would say close to 30 seconds for the whole shooting

4    entirely with the less lethal and lethal rounds that I

5    heard.  And then within 5 to 10 seconds, between the less

6    lethal and lethal rounds.

7         Q.    Okay.  Could you hear how many lethal rounds

8    were fired?

9         A.    I do not recall, no.

10        Q.    Okay.  At some point could you hear the command

11   to cease-fire?

12        A.    Yes.

13        Q.    Do you know who gave that command?

14        A.    Sergeant Gaytan.

15        Q.    Can you estimate how long after the initial

16   lethal shots were fired until you heard the cease-fire

17   command given?

18        A.    From the last lethal round you're asking?

19        Q.    The initial lethal round.

20        A.    I couldn't estimate that.  Again, I was focused

21   on taking cover.  But from the last lethal round, it was,

22   it was right away.

23        Q.    Okay.  So did you hear any lethal rounds fired

24   after the cease-fire command?

25        A.    No.

```
 1        Q.    And just so I'm clear, after the first less

 2   lethal round was fired, you did not see any additional

 3   rounds fired because you took cover on the side of the

 4   house?

 5        A.    Correct.  In the next driveway over, yes.

 6        Q.    Okay.  But you could still hear what was going

 7   on in the garage?

 8        A.    Yes.

 9        Q.    Okay.  Prior to Mr. Perez taking that step back

10   with his left foot when he was, I guess, after he was

11   stopped at the pool table, did anyone tell him to turn

12   around?

13        A.    I believe Sergeant Gaytan told him to turn

14   around and get on his knees.

15        Q.    Okay.  And prior to Mr. Perez taking that step

16   back with his left foot, did you hear anyone give a

17   warning that less lethal would be used?

18        A.    I did not hear any of those commands.

19        Q.    Okay.  Prior to Mr. Perez taking that step back

20   with his left foot, did you hear anyone give a warning

21   that lethal force would be used?

22        A.    I did not.

23        Q.    Have you ever been in a situation where someone

24   is struck by a 40 millimeter round?

25        A.    No, not personally.
```

A.J.P. AND A.M.P. MINORS, ET AL vs COUNTY OF SAN BERNARDINO, ET AL
Deputy Anthony Alcala on 12/28/2023                              Page 53

```
 1       Q.    Okay.  I'm just going to review my notes

 2    quickly.

 3             If Mr. Perez had been asked to turn around and

 4    did so, would you also view that as an act of compliance?

 5             MS. ANDERSEN:  Objection.  Calls for speculation

 6    and also incomplete hypothetical, but you can answer.

 7             THE WITNESS:  If he did follow that instruction

 8    to turn around, I would -- I would feel that was a sense

 9    of compliance from Mr. Perez, yes.

10             MS. LEAP:  Okay.  Those are all the questions I

11    have today.  I don't know if you have any follow up,

12    Kayleigh.

13             MS. ANDERSEN:  No, I don't.

14             MS. LEAP:  Okay.

15             Madam Court Reporter, I don't know if you need

16    any spellings or clarifications?

17             THE REPORTER:  Can we go off the record?  I

18    don't need anything.

19             MS. ANDERSEN:  Can I order a copy of the

20    transcript, please?

21             THE REPORTER:  And may I get Officer Alcala's

22    e-mail address so I can send him an electric transcript to

23    review?  We can do that off the record.

24             MS. ANDERSEN:  Yeah, we'll do that off the

25    record.
```

1    STATE OF_____)
                                    )  SS.
2    COUNTY OF_____)

3

4

5

6

7            I, DEPUTY ANTHONY ALCALA, do hereby declare

8    under penalty of perjury that I have read the foregoing

9    transcript; that I have made any corrections, additions or

10   deletions that I was desirous of making; that the

11   foregoing is a true and correct transcript of my testimony

12   contained therein.

13           EXECUTED this_____ day of_____, ____,

14   at _____, _____.
                  (City)                    (State)

15

16

17

18

19

20

21

22
                     _____
23                   DEPUTY ANTHONY ALCALA

24

25