LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (Bar No. 144074)
dalekgalipo@yahoo.com
Shannon J. Leap, Esq. (Bar No. 339574)
sleap@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Tel:  (818) 347-3333
Fax:  (818) 347-4118

*Attorneys for Plaintiffs A.J.P., et al.*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.J.P. and A.M.P., minors by and through their guardian ad litem Cynthia Nunez, individually and as successor in interest to Albert Perez, deceased; and PATRICIA RUIZ, individually,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN BERNARDINO; DAVID MOORE; ANDREW POLLICK; CORY MCCARTHY; CRISTINA OLIVAS; and DOES 5-10, inclusive,<br><br>Defendants. | Case No. 5:22-CV-01291 SSS (SHKx)<br><br>[*Honorable Sunshine S. Sykes*]<br><br>**DECLARATION OF SCOTT DEFOE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**<br><br>[*Filed concurrently with Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment; Plaintiffs' Separate Statement of Facts and Additional Material Facts; Plaintiffs' Objections to Defendants' Evidence; Declaration of Shannon J. Leap and exhibits thereto; Declaration of Bennet Omalu, M.D.*]<br><br>Date: April 19, 2024<br>Time: 2:00 p.m.<br>Courtroom: Riverside, 2 |

# DECLARATION OF SCOTT A. DEFOE

I, Scott DeFoe, declare as follows:

1. I am a police practices expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3. My opinions are based in part on my training, professional experience, and education. I am a twenty-year veteran of the Los Angeles Police Department. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 commendations, including the Medal of Valor, Purple Heart, and Police Star.

4. Before reaching my opinions in this case, I reviewed the following materials:

   a. Second Amended Complaint for Damages, <u>Case No. 5:22-cv-01291-SSS-SHK.</u>

   b. Protective Order, <u>Case No. 5:22-cv-01291-SSS-SHK</u>.

   c. Sheriff's Department, County of San Bernardino, California, Evidence/Property Report, Case No. 172108196, (COSB 000106-000109).

   d. Deputy Interview of Deputy Sheriff David Moore, San Bernardino County Sheriff's Department, DR No. 172108196, (COSB 000393-000448).

   e. Deputy Interview of Deputy Sheriff Cristina Olivas, San Bernardino County Sheriff's Department, DR No. 172108196, (COSB 000450-000537).

f. Deputy Interview of Deputy Sheriff Andrew Pollick, San Bernardino County Sheriff's Department, DR No. 172108196, (COSB 000539-000613).

g. Deputy Interview of Deputy Sheriff Joshua Stone, San Bernardino County Sheriff's Department, DR No. 172108196, (COSB 000620-000664).

h. Department Manual, San Bernardino Sheriff's Department, (On-Line).

i. Deputy Interview of Deputy Sheriff Cory McCarthy, San Bernardino County Sheriff's Department, DR No. 172108196, (COSB 000688-000732).

j. Deputy Interview of Deputy Sheriff Sergeant Luke Gaytan, San Bernardino County Sheriff's Department, DR No. 172108196, (COSB 000748-000811).

k. Photographs of Scene & Garage, (COSB 002236-002280).

l. Operations Text Thread, 082921 & 091521, (COSB 003535).

m. Audio, Special Enforcement Division, (SED), Belt Recording of Deputy Andrew Pollick, 2 of 2, (1:05:39).

n. Deposition Transcript of David Moore taken on September 15, 2023.

o. Deposition Transcript of Andrew Pollick taken on September 15, 2023.

p. Deposition Transcript of Cristina Olivas taken on October 3, 2023.

q. Deposition Transcript of Anthony Alcala taken on December 28, 2023.

r. Deposition Transcript of Cory McCarthy taken on November 9, 2023.

-3-
DECLARATION OF SCOTT DEFOE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

    s.  Deposition Transcript of Luke Gaytan taken on December 14, 2023.

    t.  Deposition Transcript of Joshua Stone taken on December 14, 2023.

    u.  Audio-Recording, SED, Belt Recording of Sergeant Luke Gaytan, 08/29/21, (COSB 00831).

    v.  San Bernardino County Sheriff's Department Crime Report, DR No. 172108196, (COSB 000001-000009).

    w.  San Bernardino County Sheriff's Department, Coroner Division, Autopsy Protocol, A-1929-21, Alberto Ruiz Perez, (COSB 000061-000067).

    x.  San Bernardino County Sheriff's Department, Officer-Involved Shooting Report, Incident Details, 08/29/29, DR No. 172108196, (COSB 000010-000021).

    y.  Detailed History for Police Incident No. VC212410229, (COSB 000034-000043).

    z.  Sheriff's Department, County of San Bernardino, California, Evidence/Property, (COSB 000110-000112).

**Police Officer Standards and Training On Deadly Force:**

5. At the time of the shooting of Mr. Perez on August 29, 2021, police officer training on the use of deadly force included that:

    a.  Deadly force is the highest level of force.

    b.  Deadly force should only be used as a last resort.

    c.  Deadly force should only be used in the direst of circumstances when all other options have been exhausted and no other reasonable measures are available.

    d.  When feasible, a warning should be given before using deadly

force.

e. Deadly force is only justified on the basis of an "objectively reasonable" belief that the suspect poses an immediate threat of death or serious bodily injury; in other words, a subjective fear is not enough.

f. Deadly force can only be used in an "immediate defense of life" situation; in other words, in defense of immediate or imminent death or serious bodily injury.

g. The decision to use deadly force must be guided by the reverence for human life.

h. An officer must justify every shot he or she fires.

i. An overreaction in using deadly force is excessive force.

**The Use of Lethal Force Was Inappropriate and Contrary to Police Officer Standards and Training:**

6. Under the facts of this case, Sheriff's Deputies Moore, Olivas, Pollick, and McCarthy ("the Deputies") could not justify shooting at Mr. Perez simply because Mr. Perez took a step backwards as he turned around, in compliance with the Deputies' commands, and then ran away from the deputies, while he was unarmed.

7. The presence of a gun is insufficient to justify the use of deadly force. In this case, the Deputies could not have justified shooting Mr. Perez when he had the gun in his hand, with his finger on the trigger because having a gun in his hand alone would be insufficient justification for use of deadly force. Furthermore, the Deputies could not justify shooting Mr. Perez simply because he previously had a gun in his hand, had placed the gun down on the ground in the Deputies' view, separated himself from the gun by at least seven feet, and after being struck by two to three BIP rounds, ran for cover behind the pool table to avoid being shot by lethal fire.

-5-
DECLARATION OF SCOTT DEFOE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

8. Additionally, the Deputies could not justify shooting Mr. Perez on the basis that he was running away from the Deputies. Police officers are trained that they can only shoot a fleeing felon where (1) the officer has information that the suspect has committed an atrocious felony involving the infliction of injury or death, AND (2) the suspect poses an immediate threat of death or serious bodily injury.  None of those factors were present in the incident involving Mr. Perez.  At the time of this incident on August 29, 2021, Peace Officer Standards and Training ("POST"), Learning Domain 20, Chapter 3—Use of Deadly Force, set forth four requirements that would make it reasonable for an officer to use deadly force against a fleeing subject escaping on foot.  None of the four requirements were met in this case. These four requirements are:

(1) ". . . if the subject threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction of serious bodily harm [or death] . . ."

(2) ". . . probable cause to believe that the subject poses a threat of death or serious physical harm, either to the officer or others . . ."

(3) ". . .probable cause to believe that the use of deadly force is reasonably necessary . . ." [to prevent escape]

(4) ". . . some warning be given prior to the use of deadly force where feasible. . ."

9. Police officers and sheriff's deputies are trained that they can only use deadly force in an immediate defense of life situation, in other words, when there is an immediate or imminent threat of death or serious bodily injury.  There was no immediate defense of life situation when any of the Deputies fired their approximately 35 lethal shots at Mr. Perez.  The Deputies knew there was no person in Mr. Perez's immediate vicinity when they fired their shots, he did not have a gun in his hand at the time they fired their shots, he did not have access to the inside of

-6-
Declaration of Scott DeFoe in Support of Plaintiffs' opposition to defendants' Motion for Summary Judgment

the residence that was attached to the garage, no serious crime was in progress, and Mr. Perez had not verbally or physically threatened anyone with the gun, including raising or pointing the gun at the deputies, even when he did have it in his hands earlier in the evening. The Deputies did not issue any warning to Mr. Perez that they were going to use less-lethal or lethal force prior to using such force, despite it being feasible to do so.

10. In this case, the Defendant Deputies had cover available to them at all relevant times.

    a. According to Deputy David Moore, Deputy Moore was positioned on the western corner of the garage, at the threshold of the garage, behind a ballistic shield, and had lethal cover.

    b. Deputy Andrew Pollick was positioned behind Deputy Moore and also had lethal cover.

    c. Sergeant Luke Gaytan was positioned between the western corner of the garage and the center of the garage and had a 40 millimeter bean bag, blunt impact projectile ("BIP") launcher as less-lethal coverage.

    d. Deputies Christina Olivas, Corporal Cory McCarthy (who, by the time of the shooting, had moved to the center of the driveway in the BearCat Armored vehicle), Deputy Joshua Stone, and Deputy Anthony Alcala were positioned on the eastern corner of the garage, at the threshold of the garage. Deputy Olivas also had a ballistic shield and lethal cover. Corporal McCarthy had lethal cover and was positioned in the Bearcat, which has ballistic paneling.

11. The Defendant Deputies fired shots at Mr. Perez's backside and fired shots at Mr. Perez after he was already on the ground.

    a. According to Deputy Pollick, he fired at Mr. Perez's legs during his second volley of shots, after Mr. Perez fell to the floor of the garage.

     b. According to Corporal McCarthy, he was aiming for the back of Mr. Perez's head when he fired his first volley of two shots.

12. Mr. Perez was compliant during this incident.

     a. According to Deputy Joshua Stone and Corporal McCarthy, Mr. Perez completed four acts of compliance with the Deputies' commands prior to his less lethal deployment:

          i. Placed the firearm on the ground in front of the stool on which he was sitting;

          ii. Standing up from the stool;

          iii. Slowly walked forward towards the Deputies with his hands visible;

          iv. stopped at the end of the pool table, where Sergeant Gaytan instructed him to stop;

     b. According to Deputy Athony Alcala, after Sergeant Gaytan gave Mr. Perez the command to turn around and get on his knees, Mr. Perez took a step back with his left foot and simultaneously began to turn to his left, which is when Deputy Stone fired his first BIP round. Deputy Alcala agreed that if Mr. Perez turned around, he would view that as an additional act of compliance.

13. From the standpoint of police practices and basic police training, the Defendant Deputies' uses of deadly force were contrary to Peace Officer Standards and Training ("POST"), improper, inappropriate, excessive, and unreasonable, including (but not limited to) for the following reasons:

     a. **Mr. Perez was Unarmed at all relevant times**. At the time the Deputies used lethal force, they knew that Mr. Perez was separated from the gun and that he did not have the gun in his hand. Mr. Perez complied with the Deputies commands, as stated above. Additionally,

-8-
DECLARATION OF SCOTT DEFOE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Deputy Olivas testified that she did not see Mr. Perez reach for the gun prior to the shooting.

b. **The Defendant Deputies Could Not Shoot Mr. Perez for Moving Towards a Firearm or for Previously Having a Gun**. Under the facts of this case, the Defendant Deputies cannot justify shooting at Mr. Perez simply because Mr. Perez reacted to being struck by at least two less lethal rounds and moved away from the deputies, in the direction of the firearm. The Deputies each admitted at their depositions that they were trained that you cannot shoot someone for merely having a firearm in their hand.

c. There was **No Immediate Defense of Life Situation** as explained above. At the time of the shooting, Mr. Perez posed no immediate threat of death or serious bodily injury to any person.

d. **The Defendant Deputies Could Not Shoot Mr. Perez for Fleeing** for the reasons explained above.

e. **No crime involving the infliction of serious injury or death.** The deputies, including the Defendant Deputies, were not responding to a violent crime in this case. The deputies had no information that Mr. Perez had injured anyone and no information that Mr. Perez had threatened to injure anyone with the firearm. According to Sergeant Gaytan, Mr. Perez was possibly involved in 602 PC Misdemeanor Trespassing. Even when Mr. Perez did have the firearm in his hand earlier in the incident, he never raised it and never pointed it anyone.

f. **No verbal threats**. Mr. Perez never verbally threatened to harm anyone.

g. **Officers Must Justify Every Shot.** Police officers must justify every shot they fire. Force is unreasonable when the type, degree, and

-9-

duration of the force employed was not necessary or appropriate. In this case, each of the 35 shots were excessive, unreasonable, inappropriate, and unjustified. The officers overreacted, and an overreaction in using deadly force is excessive force. The officers fired shots at Mr. Perez as he was going to the ground and after he was already on the ground.

h. **<u>Other reasonable alternative measures available</u>**. Police officers and sheriff's deputies are trained that they can only use deadly force in a "last resort" situation. Shooting was not a "last resort" in this case. Other reasonable alternative measures were available, including giving a warning that the Deputies were prepared to use deadly force and utilizing the taser and/or beanbag gun in an appropriate manner so as not to escalate the situation, if that were necessary.

i. **<u>Not the direst of circumstances</u>**. Police officers and sheriff's deputies are trained that they can only use deadly force in the direst of circumstances. This was not the "direst of circumstances." The incident took place inside a garage, with the door to the residence locked, and where Mr. Perez had no avenue of escape. Additionally, the responding deputies outnumbered Mr. Perez, and the Deputies had individual patrol vehicles, a BearCat Armored Vehicle and less-than-lethal weapons at their disposal, including chemical munitions, the taser, and the beanbag gun.

j. **<u>No warning regarding deadly force</u>**. Police officers and sheriff's deputies are trained to give a verbal warning that deadly force will be used when feasible. All Deputies failed to issue a verbal warning prior to using less-lethal and deadly force, even though it would have been feasible to do so under this set of facts.

k. **<u>Subjective fear is insufficient to justify a use of deadly force</u>**. Basic

police training requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." Fear of a potential future threat is insufficient to justify use of deadly force. In this case, the record does not support any objectively reasonable explanation that Mr. Perez posed an immediate threat of death or serious bodily injury at the time that any of the shots were fired. It was unreasonable to believe that Mr. Perez was running towards the pistol that he voluntarily placed on the ground during the effective negotiation process with Crisis Negotiator/Deputy Sheriff Anthony Alcala. In addition, from the beginning incident on 08/29/21 at 17:26 to 21:43, when the shooting occurred, (4 hours and 16 minutes), Mr. Albert Perez never threatened or ever pointed the firearm at any time. Mr. Albert Perez was shot while the firearm was on the ground and not in his possession.

l. **No reverence for human life**. Police officers and sheriff's deputies are trained that they must show a reverence for human life. The Defendant Deputies showed no reverence for human life when they fired approximately 35 rounds at Mr. Perez striking him in his head, back, and lower legs while he was running away without issuing a verbal warning that deadly force would be used.

**Pre-Shooting Negligent Tactics**

14. The Defendant Deputies failed to employ appropriate situational awareness and appropriate tactics in this incident. The Deputies failed to avoid contagious fire, meaning that they failed to assess whether a threat of imminent death or serious bodily injury was actually present when they shot, and instead fired because other deputies were firing. Contagious fire could have also resulted from the Deputies' failure to determine that the shots being fired at Mr. Perez were

coming from their fellow deputies, which caused the Defendant Deputies to continue shooting. In this way, they also failed to distinguish between their own shots and their perception that Mr. Perez was firing shots at them, when he was not.

15. Additionally, the Defendant Deputies failed to determine that Mr. Perez could have been running away from the less lethal deployment when they fired lethal rounds at him, even though a properly trained operator/Deputy Sheriff in the deployment of a BIP round would know that a common response to the pain associated with being struck with a single BIP or multiple BIP's could cause the subject to run to avoid the pain associated with being struck with the projectile(s) or additional projectiles.

16. Additionally, the Defendant Deputies failed to respond appropriately, given that they had information that Mr. Perez may have been experiencing a mental health crisis or was mentally ill.

### The 40 Millimeter Deployment Escalated the Situation

17. Law enforcement officers are trained that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident.  Sgt. Gaytan formulated a plan that if Mr. Perez made any movements towards the firearm after separating from it, that Deputy Stone was to deploy less-lethal munition. Deputy Stone prematurely and unnecessarily deployed the BIP rounds as soon as Mr. Perez took a step back and began to turn around, which Sergeant Gaytan had commanded Mr. Perez to do.  Such premature and unnecessary use of BIP rounds escalated the situation especially given that the Deputies gave no warning to Mr. Perez that bean bag rounds would be deployed, they could have ordered Mr. Perez into a prone position and given him a reasonable opportunity to comply prior to the deployment of the BIP rounds. In addition, Sergeant Gaytan took over commands from Deputy Alcala, who had been successfully negotiating with Mr. Perez.  Multiple verbal commands coming from different officers instead of one Contact Officer along with

the deployment of the BIP rounds caused Mr. Perez to run away from the deputies to avoid being struck by BIP rounds. Moreover, in this case, there was no rush, as there was no crime in progress. The tactical plan should have outlined verbal skills (defusing and de-escalation techniques) and less lethal force options.

      I declare under penalty of perjury of the laws of the United States of America, that the foregoing is true and correct. Executed on March 3, 2024, at Huntington Beach, California.

*/s/ Scott A. DeFoe*

<u>Scott A. DeFoe</u>