LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (Bar No. 144074)
dalekgalipo@yahoo.com
Shannon J. Leap (Bar No. 339574)
sleap@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Tel:   (818) 347-3333
Fax:   (818) 347-4118

***Attorneys for Plaintiffs A.J.P., et al.***

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.J.P. and A.M.P., minors, by and through their guardian *ad litem* Cynthia Nunez, individually and as successor in interest to Albert Perez, deceased; and PATRICIA RUIZ, individually,<br><br>        Plaintiffs,<br><br>        vs.<br><br>COUNTY OF SAN BERNARDINO; and DOES 1-10, inclusive,<br><br>        Defendants. | **Case No. 5:22-cv-01291-SSS-SHK**<br><br>*Hon. Sunshine S. Sykes,*<br>*Hon. Magistrate Shashi H. Kewalramani*<br><br>**PLAINTIFFS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL MATERIAL FACTS AND CONCLUSIONS OF LAW**<br><br>[*Filed concurrently with Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment; Plaintiffs' Objections to Defendants' Evidence; Declaration of Shannon J. Leap and Exhibits attached thereto; Declaration of Scott A. DeFoe; and Declaration of Bennet Omalu, M.D. and Exhibit Attached thereto.*]<br><br>Date: April 19, 2024<br>Time: 2:00 P.M.<br>Courtroom: Courtroom 2, 2nd Floor |

**PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS IN RESPONSE TO DEFENDANTS' UNDISPUTED MATERIAL FACTS AT DKT. 43-1**

| Allegedly Undisputed Facts and Evidence | Disputed/Undisputed Fact and Evidence |
|---|---|
| 1. On Sunday, August 29, 2021, at approximately 1726 hours, San Bernardino County Sheriffs' Dispatch received a 911 call for service at 16576 Zenda Street #1, Victorville. (Call Log History (Ex. "A") at pg. 1.) | Undisputed. |
| 2. The reporting party, Helen Fregoso, reported her daughter's friend, Albert Perez ("Perez"), was in the garage, causing a disturbance, and that he had a gun in his front right pocket. (Call Log History (Ex. "A") at pg. 1; Fregoso Depo. (Ex. "B") at 32:5-17, 22-25, 33:1-3.) | Undisputed. |
| 3. Helen Fregoso's daughter, Renee Caudillo, advised Sheriffs Dispatch that Perez told her that she was causing him problems and thought people were after him, and that he pulled out a black gun from his pocket. (Call Log History (Ex. "A") at pg. 1.) | Undisputed. |
| 4. Deputy Steven Carter was the first to arrive at the incident location, and located Perez in the garage and observed a black gun in Perez' hand. (Call Log History (Ex. "A") at pg. 2.) | Undisputed. |
| 5. Deputy Steven Carter ordered Perez | Undisputed. |

| | | |
|---|---|---|
| 1 2 | to drop the gun, but Perez did not comply. (Call Log History (Ex. "A") at pg. 2.) | |
| 3 4 5 6 | 6. Perez remained in the garage with the gun in his hand and refusing commands from deputies to drop the gun. (Call Log History (Ex. "A") at pgs. 2, 3, 4.) | Undisputed. |
| 7 8 9 10 11 12 13 14 15 16 17 18 19 20 | 7. At approximately 1900 hours, Sergeant Luke Gaytan ("Sergeant Gaytan") requested via text message that all members of the San Bernardino County Sheriff's Department Specialized Enforcement Division Team 1 ("SED Team") respond to Zenda Street in Victorville for a barricade situation where the subject had threatened a female with a firearm, and the subject was still armed and barricaded in the garage of a multi-unit complex where he did not live. (Gaytan Decl., ¶ 2; McCarthy Decl., ¶ 2; Olivas Decl., ¶ 2; Pollick Decl., ¶ 2; Moore Decl., ¶ 2; Stone Decl., ¶ 2; McCarthy Depo. (Ex. "D") at 9:4-10. 24:1-6.) | Objection: Compound.<br><br>Disputed on the grounds that the deputies had no specific information that the subject had threatened a female with a firearm.<br><br>Perez never verbally threatened to injure anyone.<br>Ex. 2 to Leap Decl. ("Pollick Depo.") at 61:13-24; Deposition of Anthony Alcala ("Alcala Depo.") attached as "Exhibit 7" to Leap Decl., at 20:22-25, Deposition of Helen Fregoso ("Fregoso Depo.") attached as "Exhibit 8" to Leap Decl. at 46:19-50:5. |
| 21 22 23 24 25 26 | 8. Sergeant Gaytan also notified the SED Team that a crisis negotiator, Negotiator Anthony Alcala, was also responding to the incident location. (Gaytan Decl., ¶ 3; McCarthy Decl., ¶ 3; Olivas Decl., ¶ 3; Pollick Decl., ¶ 3; Moore Decl., ¶ 3; Stone Decl., ¶ 3.) | Undisputed. |
| 27 | 9. Sergeant Gaytan had all members of the SED Team, which included | Undisputed. |
| 28 | | |

| | |
|---|---|
| Sergeant Gaytan, Corporal Andrew Pollick, Deputy Josh Stone, Deputy David Moore, Corporal Cristina Olivas, Corporal Cory McCarthy, and Corporal Greg Gary, meet at the Victorville Library just west of the incident location for a briefing prior to arriving at the subject location. (Gaytan Decl., ¶ 4; McCarthy Decl., ¶ 4; Olivas Decl., ¶ 4; Pollick Decl., ¶ 4; Moore Decl., ¶ 4; Stone Decl., ¶ 4; Pollick Depo. (Ex. "C") at 5:25-6:4; McCarthy Depo. (Ex. "D") at 22:6-13.) | |
| 10. During this briefing, the SED Team learned that patrol deputies from the Victorville Sheriff's Station were negotiating with the suspect, Perez, who was seated on a stool at the rear of the garage behind a pool table and was in possession of a gun. (Gaytan Decl., ¶ 5; McCarthy Decl., ¶ 5; Olivas Decl., ¶ 5; Pollick Decl., ¶5; Moore Decl., ¶ 5; Stone Decl., ¶ 5; McCarthy Depo. (Ex. "D") at 23:5-13; Perez Photos (Ex. "K")). | Undisputed. |
| 11. The SED Team also learned that the door from the garage to the home had been locked by the homeowner, and that both sides of the garage were contained by patrol units and they were trying to de-escalate the situation by attempting to convince him to surrender peacefully, but he refused to put the gun down. (Gaytan Decl., ¶ 6; McCarthy Decl., ¶ 6; | Objection: Vague as to time.<br><br>Disputed on the grounds that Mr. Perez eventually put the gun down in response to commands. |

| | |
|---|---|
| Olivas Decl., ¶ 6; Pollick Decl., ¶ 6; Moore Decl., ¶ 6; Stone Decl., ¶ 6.) | |
| 12. During this briefing, the SED Team also developed an operational plan, which included medical plans, gas plans, and less lethal plans, before going to the incident location. (Gaytan Decl., ¶ 7; McCarthy Decl., ¶ 7; Olivas Decl., ¶ 7; Pollick Decl., ¶ 7; Moore Decl., ¶ 7; Stone Decl., ¶ 7; Pollick Depo. (Ex. "C") at Pollick Depo. (Ex. "C") at 5:25-6:4, 22-24.) | Undisputed. |
| 13. The SED Team's medical plan included requesting Victorville Fire Department, American Medical Response, and air rescue, the sheriff's helicopter, to be on standby in the event that there was a medical emergency, the BearCat and Corporal Olivas' vehicle were also set up as medical extract vehicles. (Gaytan Decl., ¶ 8; McCarthy Decl., ¶ 8; Olivas Decl., ¶ 8; Pollick Decl., ¶ 8; Moore Decl., ¶ 8; Stone Decl., ¶ 8; McCarthy Depo. (Ex. "D") at 26:14-24.) | Undisputed. |
| 14. The SED Team's gas plans included Corporal Pollick and Deputy Moore having chemical agents should the need and opportunity to use them arise, and Corporal Pollick developed a chemical agent plan for the house. The SED Team developed numerous less lethal plans to be used at the appropriate point if the opportunity presented itself. (Gaytan Decl., ¶ 9; | Undisputed. |

-4-

| | |
|---|---|
| McCarthy Decl., ¶ 9; Olivas Decl., ¶ 9; Pollick Decl., ¶ 9; Moore Decl., ¶ 9; Stone Decl., ¶ 9; Pollick Depo. (Ex. "C") at 7:8-12.) | |
| 15. The SED Team's operational plan included containing both sides of the garage, with Corporal McCarthy, Corporal Olivas and Deputy Stone to be positioned on the southeast corner of the garage, with Corporal Olivas with a shield and her pistol, Corporal McCarthy behind Corporal Olivas with lethal cover, and Deputy Stone with a less lethal 40 mm multi-launcher. On the other side, Deputy Moore, Corporal Pollick, and Sergeant Gaytan were to be positioned on the southwest corner of the garage, with Deputy Moore with a shield and his pistol, Corporal Pollick behind Deputy Moore with lethal cover, and Sergeant Gaytan with a less lethal 40 mm single-launcher. (Gaytan Decl., ¶ 10; McCarthy Decl., ¶ 10; Olivas Decl., ¶ 10; Pollick Decl., ¶ 10; Moore Decl., ¶ 10; Stone Decl., ¶ 10.) | Undisputed. |
| 16. Additionally, the SED Team was going to position the BearCat, which is an armored rescue vehicle, in the driveway and face it towards the garage to light up the garage because it was dark outside. (Gaytan Decl., ¶ 11; McCarthy Decl., ¶ 11; Olivas Decl., ¶ 11; Pollick Decl., ¶ 11; Moore Decl., ¶ 11; Stone Decl., ¶ 11; | Undisputed. |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| McCarthy Depo. (Ex. "D") at 26:3-7; Moore Depo. (Ex. "E") at 19:10-18.) | |
| 17. Sergeant Gaytan made it clear to the SED Team that if the suspect was to separate himself from the firearm, the team could not allow him to gain access back to that firearm because we did not want him to be able to shoot at us or any members of the public. (Gaytan Decl., ¶ 12; McCarthy Decl., ¶ 12; Olivas Decl., ¶ 12; Pollick Decl., ¶ 12; Moore Decl., ¶ 12; Stone Decl., ¶ 12; Pollick Depo. (Ex. "C") at 6:25-7:7; McCarthy Depo. (Ex. "D") at 45:19-46:2, 76:2-8; Moore Depo. (Ex. "E") at 29:15-30:1; Olivas Depo. (Ex. "F") at 20:18-21:2; Stone Depo. (Ex. "G") at 28:19-29:8.) | Disputed on the grounds that it was unreasonable for the deputies to believe that Mr. Perez would fire any shots with the gun if he were to retrieve the gun after putting it on the ground in compliance with the deputies' commands.<br><br>Mr. Perez never pointed the firearm at anyone, including the reporting party. Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-14; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-23; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Deposition of Joshua Stone ("Stone Depo.") attached to Leap Decl. as Exhibit 5, at 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22' Ex. 1 to Leap Decl. ("Moore Depo.") at 66:20-24); Ex. 7 to Leap Decl. ("Alcala Depo.") at 27:4-13; 32:7-23; Ex. 8 to Leap Decl. ("Fregoso Depo.") at 46:19-50:5.<br><br>Mr. Perez never fired any shots from the gun. Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-16:6; 32:19-20; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-17:7; Ex. 5 to Leap Decl. ("Stone Depo.") at 56:5-14.<br><br>When Mr. Perez was holding the gun when he sat on the stool, he never |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| | raised the gun. Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-14, 66:20-24; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-23; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Ex. 5 to Leap Decl. ("Stone Depo.") at 24:7-16, 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22; Ex. 7 to Leap Decl. ("Alcala Depo.") at 27:4-13; 32:7-23. |
| 18. Additionally, during the briefing, the SED Team learned that there was a family who stayed in their home in the northwest corner of the multi-unit complex. (Gaytan Decl., ¶ 13; McCarthy Decl., ¶ 13; Olivas Decl., ¶ 13; Moore Decl., ¶ 13; Stone Decl., ¶ 13.) | Objection: relevance. The deputies had the garage contained. (Def. SUF 15). Otherwise, undisputed. |
| 19. The SED Team made contact with the family, and the family decided to stay in the home as there was an elderly female at the home who was not easily mobile, and the SED Team advised the family to shelter in place. (Gaytan Decl., ¶ 13; McCarthy Decl., ¶ 13; Olivas Decl., ¶ 13; Pollick Decl., ¶ 13; Moore Decl., ¶ 13; Stone Decl., ¶ 13.) | Objection: relevance. The deputies had the garage contained. (Def. SUF 15). Otherwise, undisputed. |
| 20. The SED Team arrived to the incident location with the BearCat and met with the patrol sergeant to gain additional information. (Gaytan Decl., ¶ 14; McCarthy Decl., ¶ 15; Olivas Decl., ¶ 15; Pollick Decl., ¶ 15; Moore Decl., ¶ 15; Stone Decl., | Undisputed. |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| ¶14.) | |
| 21. The SED Team learned that Perez was kind of nodding off, he was kind of lucid, and that it was unclear if he was under the influence of any narcotics or alcohol. (Gaytan Decl., ¶ 14; McCarthy Decl., ¶ 15; Olivas Decl., ¶ 15; Pollick Decl., ¶ 15; Moore Decl., ¶ 15; Stone Decl., ¶ 14.) | Disputed on the grounds that at the time of the shooting, the Deputies had no information that Mr. Perez was under the influence of any illegal substances.<br><br>Deposition of Cory McCarthy ("McCarthy Depo.") attached to Leap Decl. as "Exhibit 4," at 25:13-18; Ex. 1 to Leap Decl. ("Moore Depo.") at 13:8-14; Ex. 7 to Leap Decl. ("Alcala Depo.") at 20:16-21. |
| 22. Due to the patrol deputies being fatigued after hours of attempted negotiations and attempts to gain compliance from Perez, the SED Team took over and took their assigned positions on the corners of the garage as was discussed in briefing. (Gaytan Decl., ¶ 15; McCarthy Decl., ¶ 16; Olivas Decl., ¶ 16; Pollick Decl., ¶ 16; Moore Decl., ¶ 16; Stone Decl., ¶ 15.) | Undisputed. |
| 23. Perez remained seated directly behind the pool table, approximately 16 feet away from the garage opening, with the gun in his right hand, and looking back and forth between the members of the SED team on each side of the garage. (McCarthy Depo. (Ex. "D") at 26:25-27:3, 28:3-7, 30:6-14; Moore Depo. (Ex. "E") at 10:21-23, 22:11-14, 18-19, 23-24; Olivas Depo. (Ex. "F") at 10:20-11:6: Alcala Depo. (Ex. "H") | Undisputed. |

| | |
|---|---|
| at 25:6-19; Gaytan Depo. (Ex. "I") at 11:22-25; Perez Photos (Ex. "K"); Garage Photos (Ex. "L")). | |
| 24. Before the lethal force encounter, Corporal McCarthy changed positions from the side of the garage to the BearCat in the driveway so that he could have a different vantage point to see Perez in the garage. (McCarthy Decl., ¶ 16.) | Undisputed. |
| 25. During the incident, Negotiator Alcala was the assigned crisis negotiator and attempted numerous times to negotiate with Perez and gain his compliance. (Gaytan Decl., ¶ 16; McCarthy Decl., ¶ 17; Olivas Decl., ¶ 17; Pollick Decl., ¶ 17; Moore Decl., ¶ 17; Stone Decl., ¶ 16; McCarthy Depo. (Ex. "D") at 27:9-22, 28:8-14; Gaytan Depo. (Ex. "I") at 17:12-15; Incident Audio (Ex. "J").) | Undisputed. |
| 26. During the negotiation, Negotiator Alcala was able to convince Perez to put the gun down. Perez put the gun by the stool behind the pool table, and the deputies viewed this as an act of compliance. (Pollick Depo. (Ex. "C") at 12:9-14, 18:19-19:1; McCarthy Depo. (Ex. "D") at 39:3-13, 67:8-12; Moore Depo. (Ex. "E") at 11:3-15, 12:23-25; Olivas Depo. (Ex. "F") at 13:7-14; Stone Depo. (Ex. "G") at 20:22-21:14, 30:22-24, 48:10-15; Alcala Depo. (Ex. "H") at 32:24-33:9, 34:13-35:11; Incident | Undisputed. |

| | |
|---|---|
| Audio (Ex. "J") at 25:00-27:00.) | |
| 27. Then, Negotiator Alcala encouraged Perez to stand up and walk towards the deputies, Perez complied and walked toward the front of the garage. (Pollick Depo. (Ex. "C") at 13:2-6, 19:17-21; McCarthy Depo. (Ex. "D") at 41:13-14, 67:13-16; Olivas Depo. (Ex. "F") at 13:15-20, 14:5-13; Moore Depo. 10:11-13, 11:24-12:10; Stone Depo. (Ex. "G") at 21:18-21, 25, 22:1-5, 48:10-23; Alcala Depo. (Ex. "H") at 35:12-20, 41:6-15; Incident Audio (Ex. "J") at 27:00-28:00.) | Undisputed. |
| 28. As Perez started to move towards the front of the garage, where the SED Team was waiting, Sergeant Gaytan instructed Perez to stop so that the SED Team could safely take Perez into custody. (Gaytan Decl., ¶ 16; McCarthy Decl., ¶ 17; Olivas Decl., ¶ 17; Pollick Decl., ¶ 17; Moore Decl., ¶ 17; Stone Decl., ¶ 16; Stone Depo. (Ex. "G") at 22:6-8, 18-21, 26:19-21, 48:16-18; Alcala Depo. (Ex. "H") at 41:11-17, 47:20-24; Gaytan Depo. (Ex. "I") at 20:20-24; Incident Audio (Ex. "J") at 28:00-31:50.) | Undisputed. |
| 29. Sergeant Gaytan communicated to Perez that the deputies were going to have to take him into custody, which appeared to the deputies to frustrate Perez, and lead the deputies to believe that Perez was no longer cooperating. (Moore Depo. (Ex. "E") | Objection: Calls for speculation as to Mr. Perez's state of mind.<br><br>Disputed that Mr. Perez was not cooperating.<br>Sergeant Gaytan instructed Mr. Perez to stop when Mr. Perez reached the |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| at 21:22-22:1, 41:10-16; Olivas Depo. (Ex. "F") at 19:24-20:7, 49:3-25; Stone Depo. (Ex. "G") at 48:16-18; Gaytan Depo. (Ex. "I") at 40:5-13, 23-25, 41:1-19; Incident Audio (Ex. "J") at 28:00-31:50). | southwest corner of the pool table, and Mr. Perez complied by stopping at the corner of the pool table. Ex. 6 to Leap Decl. ("Gaytan Depo.") at 20:20-21:7; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-42:2; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 20:20-21:7; Ex. 7 to Leap Decl. ("Alcala Depo.") at 47:11-15.<br><br>When Mr. Perez stopped at the end of the pool table, the deputies could see that his hands were visibly empty. Ex. 2 to Leap Decl. ("McCarthy Depo.") at 41:13-25. Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 29:10-15.<br><br>Sergeant Gaytan then instructed Mr. Perez to turn around and get on his knees. Belt Recording of Sergeant Luke Gaytan ("Incident Audio") attached to Declaration of Kayleigh Anderson ("Anderson Decl.") as Exhibit J at 30:29-30:59; Ex. 7 to Leap Decl. ("Alcala Depo.") at 52:9-14.<br><br>After Sergeant Gaytan instructed Mr. Perez to turn around and get on his knees, Mr. Perez took an approximately half-foot step back with his left foot and began to turn to his left. Ex. 1 to Leap Decl. ("Moore Depo.") at |

| | |
|---|---|
| | 41:4-9, 55:1-3; Ex. 2 to Leap Decl. ("Pollick Depo.") at 20:19-24. |
| 30. For a few minutes, while Sergeant Gaytan continued to talk to Perez to have him peacefully surrender, Perez stood parallel to the middle of the pool table, approximately eight feet north of the garage opening and approximately eight feet away from the gun's location, Perez then put his hands up and shook his head back and forth, with an irritated and frustrated look, without making eye contact with anyone. (Pollick Depo. (Ex. "C") at 13:7-19; McCarthy Depo. (Ex. "D") at 47:1-12, 53:3-7; Moore Depo. (Ex. "E") at 14:18-21, 21:22-22:1, 39:24-25, 40:1, 8-9, 24-25, 41:1-3, 10-16; Stone Depo. (Ex. "G") at 31:8-10; Gaytan Depo. (Ex. "I") at 31:5-14, 40:23-41:19; Incident Audio (Ex. "J") at 28:00-31:50; Garage Photos (Ex. "L"). | Objection: Calls for speculation as to Mr. Perez's state of mind.<br><br>Disputed that Mr. Perez was not cooperating.<br>Sergeant Gaytan instructed Mr. Perez to stop when Mr. Perez reached the southwest corner of the pool table, and Mr. Perez complied by stopping at the corner of the pool table.<br>Ex. 6 to Leap Decl. ("Gaytan Depo.") at 20:20-21:7; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-42:2; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 20:20-21:7; Ex. 7 to Leap Decl. ("Alcala Depo.") at 47:11-15.<br><br>When Mr. Perez stopped at the end of the pool table, the deputies could see that his hands were visibly empty.<br>Ex. 2 to Leap Decl. ("McCarthy Depo.") at 41:13-25. Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 29:10-15.<br><br>Sergeant Gaytan then instructed Mr. Perez to turn around and get on his knees.<br>Belt Recording of Sergeant Luke Gaytan ("Incident Audio") attached to Declaration of Kayleigh Anderson ("Anderson Decl.") as Exhibit J at |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| | 30:29-30:59; Ex. 7 to Leap Decl. ("Alcala Depo.") at 52:9-14.<br><br>After Sergeant Gaytan instructed Mr. Perez to turn around and get on his knees, Mr. Perez took an approximately half-foot step back with his left foot and began to turn to his left.<br>Ex. 1 to Leap Decl. ("Moore Depo.") at 41:4-9, 55:1-3; Ex. 2 to Leap Decl. ("Pollick Depo.") at 20:19-24. |
| 31. Suddenly, Perez turned slightly east, stepping back with his left foot, and pivoting on his right foot. (Pollick Depo. (Ex. "C") at 20:25-21:8, 15-25, 22:1; McCarthy Depo. (Ex. "D") at 52:19-24, 67:17-19, 70:2-9; Moore Depo. (Ex. "E") at 36:12-14, 18-24, 41:10-22; Olivas Depo. (Ex. "F") at 20:3-7; Stone Depo. (Ex. "G") at 27:4-28:4, 46:11-18, 48:19-49:6; Alcala Depo. (Ex. "H") at 48:7-15; Gaytan Depo. (Ex. "I") at 32:18-33:4, 40:5-13; Incident Audio (Ex. "J") at 28:00-31:50.) | Disputed that Perez made this move "suddenly" as opposed to in compliance with commands.<br><br>Sergeant Gaytan instructed Mr. Perez to stop when Mr. Perez reached the southwest corner of the pool table, and Mr. Perez complied by stopping at the corner of the pool table.<br>Ex. 6 to Leap Decl. ("Gaytan Depo.") at 20:20-21:7; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-42:2; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 20:20-21:7; Ex. 7 to Leap Decl. ("Alcala Depo.") at 47:11-15.<br><br>When Mr. Perez stopped at the end of the pool table, the deputies could see that his hands were visibly empty.<br>Ex. 2 to Leap Decl. ("McCarthy Depo.") at 41:13-25. Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18; Ex. 6 to Leap Decl. ("Gaytan Depo.") at |

| | |
|---|---|
| | 29:10-15.<br><br>Sergeant Gaytan then instructed Mr. Perez to turn around and get on his knees.<br>Belt Recording of Sergeant Luke Gaytan ("Incident Audio") attached to Declaration of Kayleigh Anderson ("Anderson Decl.") as Exhibit J at 30:29-30:59; Ex. 7 to Leap Decl. ("Alcala Depo.") at 52:9-14.<br><br>After Sergeant Gaytan instructed Mr. Perez to turn around and get on his knees, Mr. Perez took an approximately half-foot step back with his left foot and began to turn to his left.<br>Ex. 1 to Leap Decl. ("Moore Depo.") at 41:4-9, 55:1-3; Ex. 2 to Leap Decl. ("Pollick Depo.") at 20:19-24. |
| 32. As soon as Perez stepped back, Deputy Stone deployed a less-lethal 40-millimeter round, as was discussed in the SED Teams planning briefing, which hit Perez somewhere between his waist and the top of his shoulders. (Pollick Depo. (Ex. "C") at 20:25-21:8; McCarthy Depo. (Ex. "D") at 52:25-53:12, 70:2-9; Moore Depo. (Ex. "E") at 34:23-35:17, 36:8-14, 41:20-22, 54:10-15; Olivas Depo. (Ex. "F") at 21:16-22:9, 50:1-3; | Disputed that the less-lethal deployment was reasonable.<br><br>After Sergeant Gaytan instructed Mr. Perez to turn around and get on his knees, Mr. Perez took an approximately half-foot step back with his left foot and began to turn to his left.<br>Ex. 1 to Leap Decl. ("Moore Depo.") at 41:4-9, 55:1-3; Ex. 2 to Leap Decl. ("Pollick Depo.") at 20:19-24. |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| Stone Depo. (Ex. "G") at 27:4-28:4, 8-25, 29:1-8, 12-17, 46:11-18, 48:19-49:6; Gaytan Depo. (Ex. "I") at 28:18-29:9; Incident Audio (Ex. "J") at 31:49-31:57.) | Mr. Perez was not advancing or charging at any person, including any deputies when Deputy Stone and Sergeant Gaytan fired their BIP rounds. Ex. 3 to Leap Decl. ("Olivas Depo.") at 22:21-23; Ex. 5 ("Stone Depo") at 26:22-11).<br><br>Deputy Stone and Sergeant Gaytan observed that Mr. Perez's hands were empty at the time they deployed their BIP rounds. Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 29:10-15.<br><br>At the time of the second BIP round, Mr. Perez was moving away from the first BIP round and away from the deputies. Ex. J to Anderson Decl. ("Incident Audio") at 30:25-31:05; Ex. 3 to Leap Decl. ("Olivas Depo.) at Ex. 7 to Leap Decl. ("Alcala Depo.") at 52:9-14; Ex. 5 to Leap Decl. ("Stone Depo.) at 31:25-33:10.<br><br>Mr. Perez was approximately 6-8 feet from the firearm at the time he was struck by the first BIP round. Ex. 5 to Leap Decl. ("Stone Depo.") at 31:6-10.<br><br>Based on police training, a BIP round can cause injury. |

| | | |
|---|---|---|
| | | Ex. 4 to Leap Decl. ("McCarthy Depo.") at 17:15-21.<br><br>No deputy issued a verbal warning to Mr. Perez that they would deploy less lethal munitions against him prior to deploying less lethal munitions. Ex. 5 to Leap Decl. ("Stone Depo.") at 38:5-7; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 36:19-21; Ex. J to Anderson Decl. ("Incident Audio") at 31:30-31:51.<br><br>Mr. Perez ran away from the BIP to avoid being struck by additional projectiles. Ex. 5 to Leap Decl. ("Stone Depo.") at 49:10-25. Basic police training provides that a subject's common reaction to being struck by less lethal munitions is to run away from the less lethal to avoid being struck by additional projectiles. DeFoe Decl. at ¶ 15; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 56:17-21. |
| | 33. Sergeant Gaytan and Deputy Stone each deployed another less-lethal round at Perez, which also appeared to strike Perez at center mass. However, the less-lethal rounds appeared to be ineffective in gaining Perez' compliance. (Pollick Depo. (Ex. "C") at 23:17-25:10; McCarthy Depo. (Ex. "D") at 56:22-57:3, 67:24-68:2; Moore Depo. (Ex. "E") at 34:23-35:17, 54:10-15; Olivas | Disputed that the less-lethal rounds were ineffective.<br><br>Mr. Perez was struck by two or three 40 millimeter "BIP" rounds within a 1-2 second timeframe. Ex. J to Anderson Decl. ("Incident Audio") at 31:39-31:50.<br><br>Mr. Perez flinched in reaction to being struck by the BIP rounds. |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| Depo. (Ex. "F") at 22:10-19; Alcala Depo. (Ex. "H") at 49:17-20; Gaytan Depo. (Ex. "I") at 34:9-18; Incident Audio (Ex. "J") at 31:49-31:57.) | Ex. 2 to Leap Decl. ("McCarthy Depo.") at 22:19-23:3; Ex. 3 to Leap Decl. ("Olivas Depo.") at 22:6-9; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 55:17-23.<br><br>Mr. Perez ran away from the BIP to avoid being struck by additional projectiles.<br>Ex. 5 to Leap Decl. ("Stone Depo.") at 49:10-25.<br><br>Basic police training provides that a subject's common reaction to being struck by less lethal munitions is to run away from the less lethal to avoid being struck by additional projectiles. DeFoe Decl. at ¶ 15; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 56:17-21. |
| 34. Although it appeared to the deputies that Perez was hit with three (3) less-lethal rounds, he accelerated and ran toward where the gun was located at the back of the pool table. (Pollick Depo. (Ex. "C") at 23:12-17, 27:23-28:4, 30:17-18, 22-25, 41:16-20, 42:6-11; McCarthy Depo. (Ex. "D") at 65:19-24, 68:3-11, 24-25, 69:1, 6-10; Moore Depo. (Ex. "E") at 35:22-36:3, 41:23-42:1, 54:16-18, 67:15, 19-21; Gaytan Depo. (Ex. "I") at 38:1-23.) | Disputed that Mr. Perez was running toward the gun.<br><br>Mr. Perez ran away from the BIP to avoid being struck by additional projectiles.<br>Ex. 5 to Leap Decl. ("Stone Depo.") at 49:10-25.<br><br>Basic police training provides that a subject's common reaction to being struck by less lethal munitions is to run away from the less lethal to avoid being struck by additional projectiles. DeFoe Decl. at ¶ 15; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 56:17-21. |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| 35. After the less-lethal rounds had been deployed and were ineffective in gaining Perez' compliance, and in response to Perez accelerating toward the back of the pool table where the gun was located, Corporal Cory McCarthy, Deputy Olivas, Deputy Pollick, and Deputy Moore each fired lethal rounds, at Perez in order to stop the immediate threat they perceived from Perez' actions. (Pollick Depo. (Ex. "C") at 30:6-18, 22-25, 31:2-12, 55:22-56:1, 20-22; McCarthy Depo. (Ex. "D") at 59:4-11; 60:14-24; 63:19-22; 65:13-18; Moore Depo. (Ex. "E") at 43:1-8, 11-19, 64:19-25; Olivas Depo. (Ex. "F") at 24:13-15; Incident Audio (Ex. "J") at 31:49-31:57.) | Disputed that the less-lethal rounds were ineffective.<br><br>The deputies failed to give Mr. Perez time to comply with the 40 mm rounds. DeFoe Decl. at ¶ 16-17.<br><br>Mr. Perez was struck by two or three 40 millimeter "BIP" rounds within a 1-2 second timeframe. Ex. J to Anderson Decl. ("Incident Audio") at 31:39-31:50.<br><br>Mr. Perez flinched in reaction to being struck by the BIP rounds. Ex. 2 to Leap Decl. ("McCarthy Depo.") at 22:19-23:3; Ex. 3 to Leap Decl. ("Olivas Depo.") at 22:6-9; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 55:17-23.<br><br>Mr. Perez ran away from the BIP to avoid being struck by additional projectiles. Ex. 5 to Leap Decl. ("Stone Depo.") at 49:10-25.<br><br>Disputed that an objectively reasonable officer in the position of the deputies would have formed an objectively reasonable belief that Mr. Perez posed an immediate threat of death or serious bodily injury.<br><br>Basic police training provides that a subject's common reaction to being |

struck by less lethal munitions is to run away from the less lethal to avoid being struck by additional projectiles. DeFoe Decl. at ¶ 15; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 56:17-21.

At the time of all the shots, the deputies knew the firearm was on the ground, behind the pool table. Ex. 1 to Leap Decl. ("Moore Depo.") at 67:10-16; 67:23-24; 68:7-23; Ex. 2 to Leap Decl. ("Pollick Depo") at 12:15-18, 15:9-17, 22:15-18, 41:16-42:11, Ex. 3 to Leap Decl. ("Olivas Depo") at 17:16-18, 62:9-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7, 69:6-13; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 37:9-16.

When the shots started, the deputies could see Mr. Perez's hands and could see that there was nothing in his hands. Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-25; Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 29:10-15.

The Deputies did not see Mr. Perez reach for the gun after he placed it on the ground, prior to the shooting. Ex. 3 to Leap Decl. ("Olivas Depo.") at 62:9-14; Ex. 5 ("Stone Depo.") at 43:1-6, Ex. 6 to Leap Decl. ("Gaytan Depo.") at 37:9-16.

-19-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Under the facts of this case, the Deputies could not justify shooting at Mr. Perez simply because Mr. Perez was running away.

DeFoe Decl. at ¶ 6, 8.

Mr. Perez was moving away from the Deputies during all of the shots.
Ex. 1 to Leap Decl. ("Moore Depo.") at 45:17-46:11; Ex. 2 to Leap Decl. ("Pollick Depo.") at 27:2-11, 28:17-29:5, 43:8-11; Ex. 3 to Leap Decl. ("Olivas Depo.") at 29:11-21, 32:18-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 59:7-11; 61:7-20.

The trajectories of the bullet wounds indicate that Mr. Perez was falling to the ground or on the ground when he was shot.
Declaration of Bennet Omalu, M.D. ("Omalu Decl.") at ¶ 13(a-d, f-g, i).

Basic police training instructs, and the deputies were trained that they cannot shoot someone merely because they see a gun in that person's hands.
Ex. 1 to Leap Decl. ("Moore Depo.") at 66:2-18; Ex. 3 to Leap Decl. ("Olivas Depo.") at 60:16-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 12:19-21, 69:3-5.

Pursuant to the deputies' training, it would not have been appropriate to shoot Mr. Perez when he was sitting on

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the bar stool with the firearm in his hand with his finger on the trigger.
Ex. 1 to Leap Decl. ("Moore Depo.") at 28:20-29:7; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 33:5-11.

Mr. Perez never pointed the firearm at anyone, including the reporting party.
Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-14; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-23; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Deposition of Joshua Stone ("Stone Depo.") attached to Leap Decl. as Exhibit 5, at 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22' Ex. 1 to Leap Decl. ("Moore Depo.") at 66:20-24); Ex. 7 to Leap Decl. ("Alcala Depo.") at 27:4-13; 32:7-23; Ex. 8 to Leap Decl. ("Fregoso Depo.") at 46:19-50:5.

Mr. Perez never fired any shots from the gun.
Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-16:6; 32:19-20; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-17:7; Ex. 5 to Leap Decl. ("Stone Depo.") at 56:5-14.

Mr. Perez never threatened to fire the gun.
Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-24, 66:20-24; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:9-16:24, 61:13-62:6; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Ex.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| | 5 to Leap Decl. ("Stone Depo.") at 24:7-16, 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22; Ex. 7 to Leap Decl. ("Alcala Depo.") at 20:22-25, 27:4-13; 32:7-23; Ex. 8 Leap Decl. ("Fregoso Depo.") at 46:19-50:5.<br><br>When Mr. Perez was holding the gun when he sat on the stool, he never raised the gun.<br>Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-14, 66:20-24; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-23; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Ex. 5 to Leap Decl. ("Stone Depo.") at 24:7-16, 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22; Ex. 7 to Leap Decl. ("Alcala Depo.") at 27:4-13; 32:7-23.<br><br>At no point while Mr. Perez's finger was on the trigger of the gun did any of the Deputies use force against Mr. Perez.<br>Ex. 5 to Leap Decl. ("Stone Depo.") at 47:23-48:9. |
| 36. The deputies fired at Perez as he ran toward the back of the garage, rounding the corner of the pool table, dropped his center of gravity as if crouching down behind the pool table, within arms' reach of where the gun was located on the floor. The deputies reasonably believed that Perez was trying to get to the gun to shoot someone. (Pollick Depo. (Ex. | Disputed that it was reasonable for the deputies to believe that Perez was trying to get the gun to shoot someone.<br><br>Mr. Perez did not start running until the less-lethal was deployed, and Mr. Perez was running away from the BIP to avoid being struck by additional projectiles.<br>Ex. 5 to Leap Decl. ("Stone Depo.") at |

| | |
|---|---|
| "C") at 27:2-8, 28:13-21; 39:16-18, 21-24. 56:20-22; McCarthy Depo. (Ex. "D") at 59:4-11, 60:19-24, 65:13-18, 68:24-69:1, 6-10; Moore Depo. (Ex. "E") at 43:11-19, 44:2-12, 45:3-4, 8-12, 48:4-6, 11-14, 52:7-13; Olivas Depo. (Ex. "F") at 32:11-13, 22-25, 33:1-3; Stone Depo. (Ex. "G") at 45:22-46:3, 7-18, 50:4-7, 11-15; Gaytan Depo. (Ex. "I") at 38:1-23.) | 49:10-25.<br><br>Basic police training provides that a subject's common reaction to being struck by less lethal munitions is to run away from the less lethal to avoid being struck by additional projectiles. DeFoe Decl. at ¶ 15; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 56:17-21.<br><br>At the time of all the shots, the deputies knew the firearm was on the ground, behind the pool table. Ex. 1 to Leap Decl. ("Moore Depo.") at 67:10-16; 67:23-24; 68:7-23; Ex. 2 to Leap Decl. ("Pollick Depo") at 12:15-18, 15:9-17, 22:15-18, 41:16-42:11, Ex. 3 to Leap Decl. ("Olivas Depo") at 17:16-18, 62:9-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7, 69:6-13; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 37:9-16.<br><br>When the shots started, the deputies could see Mr. Perez's hands and could see that there was nothing in his hands. Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-25; Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 29:10-15.<br><br>The Deputies did not see Mr. Perez reach for the gun after he placed it on the ground, prior to the shooting. Ex. 3 to Leap Decl. ("Olivas Depo.") at 62:9-14; Ex. 5 ("Stone Depo.") at 43:1- |

| | |
|---|---|
| 1 | 6, Ex. 6 to Leap Decl. ("Gaytan Depo.") at 37:9-16. |
| 2 | |
| 3 | Under the facts of this case, the Deputies could not justify shooting at Mr. Perez simply because Mr. Perez was running away. |
| 4 | |
| 5 | |
| 6 | DeFoe Decl. at ¶ 6, 8. |
| 7 | |
| 8 | Mr. Perez was moving away from the Deputies during all of the shots. |
| 9 | |
| 10 | Ex. 1 to Leap Decl. ("Moore Depo.") at 45:17-46:11; Ex. 2 to Leap Decl. ("Pollick Depo.") at 27:2-11, 28:17-29:5, 43:8-11; Ex. 3 to Leap Decl. ("Olivas Depo.") at 29:11-21, 32:18-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 59:7-11; 61:7-20. |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | The trajectories of the bullet wounds indicate that Mr. Perez was falling to the ground or on the ground when he was shot. |
| 17 | |
| 18 | |
| 19 | Declaration of Bennet Omalu, M.D. ("Omalu Decl.") at ¶ 13(a-d, f-g, i). |
| 20 | |
| 21 | Basic police training instructs, and the deputies were trained that they cannot shoot someone merely because they see a gun in that person's hands. |
| 22 | |
| 23 | |
| 24 | Ex. 1 to Leap Decl. ("Moore Depo.") at 66:2-18; Ex. 3 to Leap Decl. ("Olivas Depo.") at 60:16-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 12:19-21, 69:3-5. |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6 | Pursuant to the deputies' training, it would not have been appropriate to shoot Mr. Perez when he was sitting on the bar stool with the firearm in his hand with his finger on the trigger.<br>Ex. 1 to Leap Decl. ("Moore Depo.") at 28:20-29:7; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 33:5-11. |
| 7<br>8<br>9<br>10<br>11 | At no point while Mr. Perez's finger was on the trigger of the gun did any of the Deputies use force against Mr. Perez.<br>Ex. 5 to Leap Decl. ("Stone Depo.") at 47:23-48:9. |
| 12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22 | When Mr. Perez was holding the gun when he sat on the stool, he never raised the gun.<br>Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-14, 66:20-24; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-23; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Ex. 5 to Leap Decl. ("Stone Depo.") at 24:7-16, 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22; Ex. 7 to Leap Decl. ("Alcala Depo.") at 27:4-13; 32:7-23. |
| 23<br>24<br>25<br>26<br>27<br>28 | Mr. Perez never pointed the firearm at anyone, including the reporting party.<br>Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-14; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-23; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Deposition of Joshua Stone |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| 1 | ("Stone Depo.") attached to Leap Decl. as Exhibit 5, at |
| 2 | 47:10-15; Ex. 6 to Leap Decl. ("Gaytan |
| 3 | Depo.") at 9:15-25, 10:14-22' Ex. 1 to |
| 4 | Leap Decl. ("Moore Depo.") at 66:20-24); Ex. 7 to Leap Decl. ("Alcala |
| 5 | Depo.") at 27:4-13; 32:7-23; Ex. 8 to |
| 6 | Leap Decl. ("Fregoso Depo.") at 46:19-50:5. |
| 7 | |
| 8 | Mr. Perez never fired any shots from the gun. |
| 9 | |
| 10 | Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-16:6; 32:19-20; Ex. 4 to Leap |
| 11 | Decl. ("McCarthy Depo.") at 66:19-17:7; Ex. 5 to Leap Decl. ("Stone |
| 12 | Depo.") at 56:5-14. |
| 13 | |
| 14 | Mr. Perez never threatened to fire the gun. |
| 15 | |
| 16 | Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-24, 66:20-24; Ex. 2 to Leap |
| 17 | Decl. ("Pollick Depo.") at 15:9-16:24, 61:13-62:6; Ex. 4 to Leap Decl. |
| 18 | ("McCarthy Depo.") at 66:19-67:7; Ex. |
| 19 | 5 to Leap Decl. ("Stone Depo.") at 24:7-16, 47:10-15; Ex. 6 to Leap Decl. |
| 20 | ("Gaytan Depo.") at 9:15-25, 10:14-22; Ex. 7 to Leap Decl. ("Alcala Depo.") at |
| 21 | 20:22-25, 27:4-13; 32:7-23; Ex. 8 Leap |
| 22 | Decl. ("Fregoso Depo.") at 46:19-50:5. |
| 23 | |
| 24 | Perez never verbally threatened to injure anyone. |
| 25 | |
| 26 | Ex. 2 to Leap Decl. ("Pollick Depo.") at 61:13-24; Deposition of Anthony |
| 27 | |
| 28 | |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | | |
|---|---|---|
| 1<br>2<br>3<br>4 | | Alcala ("Alcala Depo.") attached as "Exhibit 7" to Leap Decl., at 20:22-25, Deposition of Helen Fregoso ("Fregoso Depo.") attached as "Exhibit 8" to Leap Decl. at 46:19-50:5. |
| 5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27 | 37. Based on the totality of the circumstances, Perez having the gun in his hands for several hours and having every opportunity to surrender peacefully, the deputies had no reason to believe that Perez was running back into the garage for any other reason than to get back to the gun.  (Pollick Depo. (Ex. "C") at 39:16-18, 21-24, 40:4-5, 9-13; McCarthy Depo. (Ex. "D") at 65:13-18; Stone Depo. (Ex. "G") at 45:22-46:3; Gaytan Depo. (Ex. "I") at 38:14-23.) | Disputed.<br><br>Mr. Perez was running away from the BIP to avoid being struck by additional projectiles.<br>Ex. 5 to Leap Decl. ("Stone Depo.") at 49:10-25.<br><br>Basic police training provides that a subject's common reaction to being struck by less lethal munitions is to run away from the less lethal to avoid being struck by additional projectiles. DeFoe Decl. at ¶ 15; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 56:17-21.<br><br>At the time of all the shots, the deputies knew the firearm was on the ground, behind the pool table.<br>Ex. 1 to Leap Decl. ("Moore Depo.") at 67:10-16; 67:23-24; 68:7-23; Ex. 2 to Leap Decl. ("Pollick Depo") at 12:15-18, 15:9-17, 22:15-18, 41:16-42:11, Ex. 3 to Leap Decl. ("Olivas Depo") at 17:16-18, 62:9-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7, 69:6-13; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 37:9-16.<br><br>When the shots started, the deputies |
| 28 | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

could see Mr. Perez's hands and could see that there was nothing in his hands. Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-25; Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 29:10-15.

The Deputies did not see Mr. Perez reach for the gun after he placed it on the ground, prior to the shooting. Ex. 3 to Leap Decl. ("Olivas Depo.") at 62:9-14; Ex. 5 ("Stone Depo.") at 43:1-6, Ex. 6 to Leap Decl. ("Gaytan Depo.") at 37:9-16.

Under the facts of this case, the Deputies could not justify shooting at Mr. Perez simply because Mr. Perez was running away.
DeFoe Decl. at ¶ 6, 8.

Mr. Perez was moving away from the Deputies during all of the shots. Ex. 1 to Leap Decl. ("Moore Depo.") at 45:17-46:11; Ex. 2 to Leap Decl. ("Pollick Depo.") at 27:2-11, 28:17-29:5, 43:8-11; Ex. 3 to Leap Decl. ("Olivas Depo.") at 29:11-21, 32:18-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 59:7-11; 61:7-20.

The trajectories of the bullet wounds indicate that Mr. Perez was falling to the ground or on the ground when he was shot.

-28-

| | |
|---|---|
| | Declaration of Bennet Omalu, M.D. ("Omalu Decl.") at ¶ 13(a-d, f-g, i). |
| | Basic police training instructs, and the deputies were trained that they cannot shoot someone merely because they see a gun in that person's hands. Ex. 1 to Leap Decl. ("Moore Depo.") at 66:2-18; Ex. 3 to Leap Decl. ("Olivas Depo.") at 60:16-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 12:19-21, 69:3-5. |
| | Pursuant to the deputies' training, it would not have been appropriate to shoot Mr. Perez when he was sitting on the bar stool with the firearm in his hand with his finger on the trigger. Ex. 1 to Leap Decl. ("Moore Depo.") at 28:20-29:7; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 33:5-11. |
| | At no point while Mr. Perez's finger was on the trigger of the gun did any of the Deputies use force against Mr. Perez. Ex. 5 to Leap Decl. ("Stone Depo.") at 47:23-48:9. |
| | When Mr. Perez was holding the gun when he sat on the stool, he never raised the gun. Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-14, 66:20-24; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-23; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Ex. 5 to Leap |

-29-

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| 1 | Decl. ("Stone Depo.") at 24:7-16, 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22; Ex. 7 to Leap Decl. ("Alcala Depo.") at 27:4-13; 32:7-23. |
| 2 | |
| 3 | |
| 4 | |
| 5 | Mr. Perez never pointed the firearm at anyone, including the reporting party. Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-14; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-23; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Deposition of Joshua Stone ("Stone Depo.") attached to Leap Decl. as Exhibit 5, at 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22' Ex. 1 to Leap Decl. ("Moore Depo.") at 66:20-24); Ex. 7 to Leap Decl. ("Alcala Depo.") at 27:4-13; 32:7-23; Ex. 8 to Leap Decl. ("Fregoso Depo.") at 46:19-50:5. |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | Mr. Perez never fired any shots from the gun. Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-16:6; 32:19-20; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-17:7; Ex. 5 to Leap Decl. ("Stone Depo.") at 56:5-14. |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | Mr. Perez never threatened to fire the gun. Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-24, 66:20-24; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:9-16:24, |
| 25 | |
| 26 | |
| 27 | |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| | 61:13-62:6; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Ex. 5 to Leap Decl. ("Stone Depo.") at 24:7-16, 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22; Ex. 7 to Leap Decl. ("Alcala Depo.") at 20:22-25, 27:4-13; 32:7-23; Ex. 8 Leap Decl. ("Fregoso Depo.") at 46:19-50:5.<br><br>Perez never verbally threatened to injure anyone. Ex. 2 to Leap Decl. ("Pollick Depo.") at 61:13-24; Deposition of Anthony Alcala ("Alcala Depo.") attached as "Exhibit 7" to Leap Decl., at 20:22-25, Deposition of Helen Fregoso ("Fregoso Depo.") attached as "Exhibit 8" to Leap Decl. at 46:19-50:5. |
| 38. Sergeant Gaytan ordered the deputies to stop shooting as it appeared Perez had fallen to the ground and had stopped moving. (Pollick Depo. (Ex. "C") at 44:6-8; Gaytan Depo. (Ex. "I") at 45:10-46:21; Incident Audio (Ex. "J") at 31:49-32:10.) | Disputed to the extent that this mischaracterizes the evidence, as the deputies fired shots at Perez as he was going to the ground and after he was on the ground. Declaration of Bennet Omalu, M.D. ("Omalu Decl.") at ¶ 13(a-d, f-g, i).<br><br>During Deputy Pollick's second volley of shots, he was aiming at Mr. Perez's lower legs after Mr. Perez was on the ground behind the pool table. Ex. 2 to Leap Decl. ("Pollick Depo.") at 10:10-12; 27:2-11; 33:1-17; 43:8-11. |
| 39. The deputies at the scene retrieved an SED robot, to confirm that Perez was no longer a threat.  Once it was | Disputed that Mr. Perez was ever a threat. |

| | |
|---|---|
| confirmed Perez was no longer moving, the SED Team approached and secured to scene. (Gaytan Decl., ¶ 18; McCarthy Decl., ¶ 19; Olivas Decl., ¶ 19; Pollick Decl., ¶ 19; Moore Decl., ¶ 19; Stone Decl., ¶ 18; Pollick Depo. (Ex. "C") at 44:9-13, 45:4-9, McCarthy Depo. (Ex. "D") at 70:11-12, 16-19; Incident Audio (Ex. "J") at 32:10-36:00.) | Mr. Perez was running away from the BIP to avoid being struck by additional projectiles.<br>Ex. 5 to Leap Decl. ("Stone Depo.") at 49:10-25.<br><br>Basic police training provides that a subject's common reaction to being struck by less lethal munitions is to run away from the less lethal to avoid being struck by additional projectiles. DeFoe Decl. at ¶ 15; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 56:17-21.<br><br>At the time of all the shots, the deputies  knew the firearm was on the ground, behind the pool table.<br>Ex. 1 to Leap Decl. ("Moore Depo.") at 67:10-16; 67:23-24; 68:7-23; Ex. 2 to Leap Decl. ("Pollick Depo") at 12:15-18, 15:9-17, 22:15-18, 41:16-42:11, Ex. 3 to Leap Decl. ("Olivas Depo") at 17:16-18, 62:9-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7, 69:6-13; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 37:9-16.<br><br>When the shots started, the deputies could see Mr. Perez's hands and could see that there was nothing in his hands. Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-25; Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 29:10-15. |

The Deputies did not see Mr. Perez reach for the gun after he placed it on the ground, prior to the shooting.
Ex. 3 to Leap Decl. ("Olivas Depo.") at 62:9-14; Ex. 5 ("Stone Depo.") at 43:1-6, Ex. 6 to Leap Decl. ("Gaytan Depo.") at 37:9-16.

Under the facts of this case, the Deputies could not justify shooting at Mr. Perez simply because Mr. Perez was running away.
DeFoe Decl. at ¶ 6, 8.

Mr. Perez was moving away from the Deputies during all of the shots.
Ex. 1 to Leap Decl. ("Moore Depo.") at 45:17-46:11; Ex. 2 to Leap Decl. ("Pollick Depo.") at 27:2-11, 28:17-29:5, 43:8-11; Ex. 3 to Leap Decl. ("Olivas Depo.") at 29:11-21, 32:18-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 59:7-11; 61:7-20.

The trajectories of the bullet wounds indicate that Mr. Perez was falling to the ground or on the ground when he was shot.
Declaration of Bennet Omalu, M.D. ("Omalu Decl.") at ¶ 13(a-d, f-g, i).

Basic police training instructs, and the deputies were trained that they cannot shoot someone merely because they see a gun in that person's hands.
Ex. 1 to Leap Decl. ("Moore Depo.") at

66:2-18; Ex. 3 to Leap Decl. ("Olivas Depo.") at 60:16-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 12:19-21, 69:3-5.

Pursuant to the deputies' training, it would not have been appropriate to shoot Mr. Perez when he was sitting on the bar stool with the firearm in his hand with his finger on the trigger.
Ex. 1 to Leap Decl. ("Moore Depo.") at 28:20-29:7; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 33:5-11.

At no point while Mr. Perez's finger was on the trigger of the gun did any of the Deputies use force against Mr. Perez.
Ex. 5 to Leap Decl. ("Stone Depo.") at 47:23-48:9.

When Mr. Perez was holding the gun when he sat on the stool, he never raised the gun.
Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-14, 66:20-24; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-23; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Ex. 5 to Leap Decl. ("Stone Depo.") at 24:7-16, 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22; Ex. 7 to Leap Decl. ("Alcala Depo.") at 27:4-13; 32:7-23.

Mr. Perez never pointed the firearm at anyone, including the reporting party.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| 1 | Ex. 1 to Leap Decl. ("Moore Depo.") at |
| 2 | 22:11-14; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-23; Ex. 4 to Leap |
| 3 | Decl. ("McCarthy Depo.") at 66:19- |
| 4 | 67:7; Deposition of Joshua Stone ("Stone Depo.") attached to Leap Decl. |
| 5 | as Exhibit 5, at |
| 6 | 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22' Ex. 1 to |
| 7 | Leap Decl. ("Moore Depo.") at 66:20- |
| 8 | 24); Ex. 7 to Leap Decl. ("Alcala |
| 9 | Depo.") at 27:4-13; 32:7-23; Ex. 8 to |
| 10 | Leap Decl. ("Fregoso Depo.") at 46:19- |
| 11 | 50:5. |
| 12 | Mr. Perez never fired any shots from the gun. |
| 13 | Ex. 2 to Leap Decl. ("Pollick Depo.") |
| 14 | at 15:18-16:6; 32:19-20; Ex. 4 to Leap |
| 15 | Decl. ("McCarthy Depo.") at 66:19- |
| 16 | 17:7; Ex. 5 to Leap Decl. ("Stone Depo.") at 56:5-14. |
| 17 | |
| 18 | Mr. Perez never threatened to fire the gun. |
| 19 | Ex. 1 to Leap Decl. ("Moore Depo.") at |
| 20 | 22:11-24, 66:20-24; Ex. 2 to Leap |
| 21 | Decl. ("Pollick Depo.") at 15:9-16:24, 61:13-62:6; Ex. 4 to Leap Decl. |
| 22 | ("McCarthy Depo.") at 66:19-67:7; Ex. |
| 23 | 5 to Leap Decl. ("Stone Depo.") at |
| 24 | 24:7-16, 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22; |
| 25 | Ex. 7 to Leap Decl. ("Alcala Depo.") at |
| 26 | 20:22-25, 27:4-13; 32:7-23; Ex. 8 Leap |
| 27 | Decl. ("Fregoso Depo.") at 46:19-50:5. |
| 28 | |

| | |
|---|---|
| | Perez never verbally threatened to injure anyone.<br>Ex. 2 to Leap Decl. ("Pollick Depo.") at 61:13-24; Deposition of Anthony Alcala ("Alcala Depo.") attached as "Exhibit 7" to Leap Decl., at 20:22-25, Deposition of Helen Fregoso ("Fregoso Depo.") attached as "Exhibit 8" to Leap Decl. at 46:19-50:5. |
| 40. Corporal Pollick and Corporal McCarthy approached Perez and saw that Perez was laying on top of the gun. (Pollick Depo. (Ex. "C") at 49:10-21; McCarthy Depo. (Ex. "D") at 71:1-4, 8-12; Moore Depo. (Ex. "E") at 82:1-11, 83:13-22; Incident Audio (Ex. "J") at 36:00-37:20.) | Disputed to the extent that Perez was lying on top of the gun.<br><br>When the Deputies approached Mr. Perez after the shooting, McCarthy observed the gun near Mr. Perez's, left arm. Ex. 4 to Leap Decl. ("McCarthy Depo.") at 71:11-16. |
| 41. Deputy Stone saw the gun sticking out from under Perez' stomach where his hands were also located, and kicked it away from him so that Corporal Pollick and Corporal McCarthy could start to provide medical aid. (Stone Decl., ¶ 18; Pollick Depo. (Ex. "C") at 49:10-21; McCarthy Depo. (Ex. "D") at 70:16-19, 71:1-4; Moore Depo. (Ex. "E") at 81:14-25, Olivas Depo. (Ex. "F") at 52:14-18; Incident Audio (Ex. "J") at 36:00-37:20.) | Undisputed.  Plaintiffs dismiss their claim for denial of medical care. |
| 42. Corporal Pollick and Corporal McCarthy, who are certified EMTs, provided immediate medical aid to Perez, who was still breathing when | Undisputed.  Plaintiffs dismiss their claim for denial of medical care. |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| they approached him. (Gaytan Decl., ¶ 18; McCarthy Decl., ¶ 19; Olivas Decl., ¶ 19; Pollick Decl., ¶ 19; Moore Decl., ¶ 19; Stone Decl., ¶ 18; Pollick Depo. (Ex. "C") at 45:10-14, 46:3-14, 17-20, 47:8-20; McCarthy Depo. (Ex. "D") at 70:22-24, 71:3-4, 17-22; Olivas Depo. (Ex. "F") at 57:12-17; Incident Audio (Ex. "J") at 37:20-39:30.) | |
| 43. Victorville Fire Department and American Medical Response were staged in the area, and responded and provided medical treatment immediately after the scene was secured. (Pollick Depo. (Ex. "C") at 46:21-47:4; McCarthy Depo. (Ex. "D") at 74:18-21, 75:1-17; Olivas Depo. (Ex. "F") at 57:12-23.) | Undisputed.  Plaintiffs dismiss their claim for denial of medical care. |
| 44. Perez was transported to Victor Valley Global Medical Center for treatment. (Pollick Depo. (Ex. "C") at 46:15-16.) | Undisputed.  Plaintiffs dismiss their claim for denial of medical care. |
| 45. The deputies on the scene were not able to give commands to Perez before to lethal force encounter occurred as the situation was very dynamic, uncertain, and rapidly-evolving. (Pollick Depo. (Ex. "C") at 26:9-16, 33:18-23; Moore Depo. (Ex. "E") at 51:6-10) | Plaintiffs dispute this self-serving statement.

At the time of this incident, the Deputies were trained, pursuant to basic police training, that officers shall give a verbal warning before using deadly force, when feasible.

DeFoe Decl. at ¶ 5(d); Ex. 4 to Leap Decl. ("McCarthy Depo.") at 21:14-17; Ex. 3 to Leap Decl. ("Olivas Depo.") at 59:12-14; Ex. 1 to Leap Decl. ("Moore Depo.") at 70:14-18. |

| | |
|---|---|
| | In this case, it would have been feasible for the deputies to give Perez a verbal warning prior to using deadly force, but they failed to do so. DeFoe Decl. at ¶ 9. |
| 46. San Bernardino County Sheriff's Department Policy 3.608, The Use of Lethal Force, states that a deputy may use deadly force to protect himself or others from what he reasonably believes to be a threat of death or serious bodily injury. (Pollick Depo. (Ex. "C") at 56:13-19; Moore Depo. (Ex. "E") at 65:17-18, 22-24, 66:7-10, 14-18; Olivas Depo. (Ex. "F") at 58:11-14; Use of Force Policy (Ex. M").) | Objection: Irrelevant. When the Deputies fired their shots, there was no immediate threat of death or serious bodily injury. DeFoe Decl. at ¶ 13 (a-l).<br><br>At the time of all the shots, the deputies knew the firearm was on the ground, behind the pool table. Ex. 1 to Leap Decl. ("Moore Depo.") at 67:10-16; 67:23-24; 68:7-23; Ex. 2 to Leap Decl. ("Pollick Depo") at 12:15-18, 15:9-17, 22:15-18, 41:16-42:11, Ex. 3 to Leap Decl. ("Olivas Depo") at 17:16-18, 62:9-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7, 69:6-13; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 37:9-16.<br><br>When the shots started, the deputies could see Mr. Perez's hands and could see that there was nothing in his hands. Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-25; Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 29:10-15.<br><br>The Deputies did not see Mr. Perez reach for the gun after he placed it on the ground, prior to the shooting. |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ex. 3 to Leap Decl. ("Olivas Depo.") at 62:9-14; Ex. 5 ("Stone Depo.") at 43:1-6, Ex. 6 to Leap Decl. ("Gaytan Depo.") at 37:9-16.

Under the facts of this case, the Deputies could not justify shooting at Mr. Perez simply because Mr. Perez was running away.

DeFoe Decl. at ¶ 6, 8.

Mr. Perez was moving away from the Deputies during all of the shots.

Ex. 1 to Leap Decl. ("Moore Depo.") at 45:17-46:11; Ex. 2 to Leap Decl. ("Pollick Depo.") at 27:2-11, 28:17-29:5, 43:8-11; Ex. 3 to Leap Decl. ("Olivas Depo.") at 29:11-21, 32:18-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 59:7-11; 61:7-20.

The trajectories of the bullet wounds indicate that Mr. Perez was falling to the ground or on the ground when he was shot.

Declaration of Bennet Omalu, M.D. ("Omalu Decl.") at ¶ 13(a-d, f-g, i).

Basic police training instructs, and the deputies were trained that they cannot shoot someone merely because they see a gun in that person's hands.

Ex. 1 to Leap Decl. ("Moore Depo.") at 66:2-18; Ex. 3 to Leap Decl. ("Olivas Depo.") at 60:16-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 12:19-21,

| | |
|---|---|
| | 69:3-5. |
| 47. Since the Sheriff's academy, Corporal McCarthy, Deputy Olivas, Deputy Pollick, Deputy Moore, Deputy Stone, and Sergeant Gaytan have been trained in accordance with San Bernardino County Sheriff's Department Policy 3.608, The Use of Lethal Force, that the use of lethal force is justified to protect themselves or others from what they reasonably believe to be an immediate threat of death or serious bodily injury. (Gaytan Decl., ¶ 17; McCarthy Decl., ¶ 18; Olivas Decl., ¶ 18; Pollick Decl., ¶ 18; Moore Decl., ¶ 18; Stone Decl., ¶ 17; McCarthy Depo. (Ex. "D") at 13:6-16, 19:1-8; Use of Force Policy (Ex. M")) | Objection: Irrelevant.<br>When the Deputies fired their shots, there was no immediate threat of death or serious bodily injury.<br>DeFoe Decl. at ¶ 13 (a-l).<br><br>At the time of all the shots, the deputies knew the firearm was on the ground, behind the pool table.<br>Ex. 1 to Leap Decl. ("Moore Depo.") at 67:10-16; 67:23-24; 68:7-23; Ex. 2 to Leap Decl. ("Pollick Depo") at 12:15-18, 15:9-17, 22:15-18, 41:16-42:11, Ex. 3 to Leap Decl. ("Olivas Depo") at 17:16-18, 62:9-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7, 69:6-13; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 37:9-16.<br><br>When the shots started, the deputies could see Mr. Perez's hands and could see that there was nothing in his hands. Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-25; Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 29:10-15.<br><br>The Deputies did not see Mr. Perez reach for the gun after he placed it on the ground, prior to the shooting.<br>Ex. 3 to Leap Decl. ("Olivas Depo.") at 62:9-14; Ex. 5 ("Stone Depo.") at 43:1-6, Ex. 6 to Leap Decl. ("Gaytan |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

Depo.") at 37:9-16.

Under the facts of this case, the Deputies could not justify shooting at Mr. Perez simply because Mr. Perez was running away.
DeFoe Decl. at ¶ 6, 8.

Mr. Perez was moving away from the Deputies during all of the shots.
Ex. 1 to Leap Decl. ("Moore Depo.") at 45:17-46:11; Ex. 2 to Leap Decl. ("Pollick Depo.") at 27:2-11, 28:17-29:5, 43:8-11; Ex. 3 to Leap Decl. ("Olivas Depo.") at 29:11-21, 32:18-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 59:7-11; 61:7-20.

The trajectories of the bullet wounds indicate that Mr. Perez was falling to the ground or on the ground when he was shot.
Declaration of Bennet Omalu, M.D. ("Omalu Decl.") at ¶ 13(a-d, f-g, i).

Basic police training instructs, and the deputies were trained that they cannot shoot someone merely because they see a gun in that person's hands.
Ex. 1 to Leap Decl. ("Moore Depo.") at 66:2-18; Ex. 3 to Leap Decl. ("Olivas Depo.") at 60:16-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 12:19-21, 69:3-5.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| Pl.s' SUF No. | Plaintiffs' Additional Material Facts | Plaintiffs' Supporting Evidence |
|---|---|---|
| | **Background of the Shooting** | |
| 48. | Prior to the shooting, Deputy Moore, Deputy Pollick, Deputy Olivas, and Corporal McCarthy ("the deputies") had information that Mr. Perez was mentally ill or experiencing a mental health crisis and was "possibly 5150." | Deposition of Andrew Pollick, ("Pollick Depo.") attached to Leap Decl. as "Exhibit 2," at 16:8-13. |
| 49. | Prior to the shooting, the Deputies had no specific information that Mr. Perez verbally threatened to injure anyone. | Ex. 2 to Leap Decl. ("Pollick Depo.") at 61:13-62:6; Deposition of Anthony Alcala ("Alcala Depo.") attached as "Exhibit 7" to Leap Decl., at 20:22-25, Deposition of Helen Fregoso ("Fregoso Depo.") attached as "Exhibit 8" to Leap Decl. at 46:19-50:5. |
| 50. | At the time of the incident, the Deputies had no information that Mr. Perez had committed an act of violence against another person. | Deposition of Christina Olivas ("Olivas Depo.") attached as Ex. 3 to Leap Decl. at 48:10-20; Deposition of Luke Gaytan ("Gaytan Depo."), attached as Ex. 6 to Leap Decl. at 10:14-22. |
| 51. | At the time of the incident, the Deputies had no information that Mr. Perez committed a felony involving the infliction of injury or death. | Ex. 6 to Leap Decl. ("Gaytan Depo."), at 49:16-50:6; Deposition of David Moore ("Moore Depo."), attached as Exhibit 1 to Leap Decl. at 22:6-14. |
| 52. | At the time of the incident, the Deputies had no information that Mr. Perez had injured another person. | Ex. 1 to Leap Decl. ("Moore Depo.") at 22:6-14; Ex. 3 to Leap Decl. ("Olivas Depo.") at 47:3-6. |
| 53. | At the time of the shooting, the Deputies had no information that Mr. Perez was under the influence of any illegal substances. | Deposition of Cory McCarthy ("McCarthy Depo.") attached to Leap Decl. as "Exhibit 4," at 25:13-18; Ex. 1 to Leap Decl. |

| | | | |
|---|---|---|---|
| | | | ("Moore Depo.") at 13:8-14; Ex. 7 to Leap Decl. ("Alcala Depo.") at 20:16-21. |
| | 54. | Mr. Perez never pointed the firearm at anyone, including the reporting party. | Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-14, 66:20-24; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-23; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Deposition of Joshua Stone ("Stone Depo.") attached to Leap Decl. as Exhibit 5, at 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22; Ex. 7 to Leap Decl. ("Alcala Depo.") at 27:4-13; 32:7-23; Ex. 8 to Leap Decl. ("Fregoso Depo.") at 46:19-50:5. |
| | 55. | Mr. Perez never fired any shots from the gun. | Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-16:6; 32:19-20; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-17:7; Ex. 5 to Leap Decl. ("Stone Depo.") at 56:5-14. |
| | 56. | Mr. Perez never threatened to fire the gun | Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-24, 66:20-24; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:9-16:24; 61:13-62:6; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Ex. 5 to Leap Decl. ("Stone Depo.") at 24:7-16, 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22; Ex. 7 to Leap Decl. ("Alcala Depo.") at 20:22-25, 27:4-13; 32:7-23; Ex. 8 Leap Decl. ("Fregoso Depo.") at 46:19-50:5. |
| | 57. | At no point while Mr. Perez's finger was on the trigger of the gun did any of the Deputies use force on Mr. Perez. | Ex. 5 to Leap Decl. ("Stone Depo.") at 47:23-48:9. |

| 58. | When Mr. Perez was holding the gun when he sat on the stool, he never raised the gun. | Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-14, 66:20-24; Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:18-23; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7; Ex. 5 to Leap Decl. ("Stone Depo.") at 24:7-16, 47:10-15; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 9:15-25, 10:14-22; Ex. 7 to Leap Decl. ("Alcala Depo.") at 27:4-13; 32:7-23 |
| --- | --- | --- |
| 59. | Deputy Alcala instructed Mr. Perez to put the firearm on the ground, and Mr. Perez complied with that command by placing the firearm on the ground between the stool on which he was sitting and the pool table. | Ex. 7 to Leap Decl. ("Alcala Depo.") at 32:2, 34-33:19; Ex. 1 to Leap Decl. ("Moore Depo.") at 16:5-17, Ex. 3 to Leap Decl. ("Pollick Depo.") at 12:15-18; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 20:25-21:7; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 39:3-18. |
| 60. | At the time Mr. Perez put the firearm on the ground, Deputy Moore, Deputy Pollick, and Corporal McCarthy could see the firearm on the ground from their vantage points. | Ex. 1 to Leap Decl. ("Moore Depo.") at 16:5-12; Ex. 2 to Leap Decl. ("Pollick Depo.") at 12:9-18; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 39:3-13. |
| 61. | Prior to the shooting, Deputy Pollick communicated to all deputies on scene that Mr. Perez had put the firearm on the ground. | Ex. 2 to Leap Decl. ("Pollick Depo."), at 15:9-17' Ex. 6 to Leap Decl. ("Gaytan Depo.") at 17:21-23. |
| 62. | Deputy Alcala instructed Mr. Perez to stand up from the stool, and Mr. Perez complied by standing up from the stool. | Ex. 7 to Leap Decl. ("Alcala Depo.") at 35:12-20. |
| 63. | Deputy Alcala then instructed Mr. Perez to walk toward the deputies, and Mr. Perez complied by slowly walking toward the deputies. | Ex. 1 to Leap Decl. ("Moore Depo.") at 14:12-15-8; Ex. 7 to Leap Decl. ("Alcala Depo.") at 41:18-25, 42:10-13; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-42:2; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 20:20-21:7; |

| | | | |
|---|---|---|---|
| | | | Ex. 7 to Leap Decl. ("Alcala Depo.") at 41:18-25. |
| 64. | | Sergeant Gaytan instructed Mr. Perez to stop when Mr. Perez reached the southwest corner of the pool table, and Mr. Perez complied by stopping at the corner of the pool table. | Ex. 6 to Leap Decl. ("Gaytan Depo.") at 20:20-21:7; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-42:2; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 20:20-21:7; Ex. 7 to Leap Decl. ("Alcala Depo.") at 47:11-15. |
| 65. | | The deputies considered all four of these acts of compliance by Mr. Perez. | Ex. 4 to Leap Decl. ("McCarthy Depo.") at 39:3-18, 41:13-42:2; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 20:20-21:7; Ex. 7 to Leap Decl. ("Alcala Depo.") at 33:17-19, 35:12-20, 41:18-25, 47:11-15. |
| 66. | | When Mr. Perez stopped at the southwest corner of the pool table, he was at least 7-13 feet from the firearm. | Ex. 1 to Leap Decl. ("Moore Depo.") at 39:24-40:9; Ex. 2 to Leap Decl. ("Pollick Depo.") at 19:22-20:4; Ex. 4 to Leap Decl. ("McCarthy Depo") at 47:1-5; Ex. 7 ("Alcala Depo.") at 46:11-20. |
| 67. | | When Mr. Perez stopped at the southwest corner of the pool table, he was approximately 5-7 feet from the deputies. | Ex. 1 to Leap Decl. ("Moore Depo.") at 39:24-40:9; Ex. 2 to Leap Decl. ("Pollick Depo.") at 19:22-20:4; Ex. 7 ("Alcala Depo.") at 46:11-20. |
| 68. | | When Mr. Perez stopped at the end of the pool table, the deputies could see that his hands were visibly empty. | Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-25. Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 29:10-15. |
| 69. | | Sergeant Gaytan then instructed Mr. Perez to turn around and get on his knees. | Belt Recording of Sergeant Luke Gaytan ("Incident Audio") attached to Declaration of Kayleigh Anderson ("Anderson Decl.") as Exhibit J at 30:29-30:59; Ex. 7 to Leap Decl. ("Alcala Depo.") at 52:9-14. |
| 70. | | After Sergeant Gaytan instructed Mr. Perez to turn around and get on his knees, Mr. Perez took an | Ex. 1 to Leap Decl. ("Moore Depo.") at 41:4-9, 55:1-3; Ex. 2 to |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | | approximately half-foot step back with his left foot and began to turn to his left. | Leap Decl. ("Pollick Depo.") at 20:19-24. |
|---|---|---|---|
| | **Less-Lethal Preceding the Shooting** | | |
| 71. | | Before Mr. Perez took the step back with his left foot following Sergeant Gaytan's commands, Deputy Stone fired a 40 millimeter blunt impact projectile ("BIP") less lethal round at Mr. Perez. | Ex. 5 to Leap Decl. ("Stone Depo.") at 26:22-27:3; Ex. 1 to Leap Decl. ("Moore Depo.") at 41:4-9, 55:1-3; Ex. 2 to Leap Decl. ("Pollick Depo.") at 20:19-24. |
| 72. | | Deputy Stone perceived that his BIP struck Mr. Perez on the right side of his torso. | Ex. 5 to Leap Decl. ("Stone Depo.") at 28:15-18. |
| 73. | | Deputy Stone deployed two additional BIP rounds. | Ex. 5 to Leap Decl. ("Stone Depo.") at 32:11-33:10. |
| 74. | | Sergeant Gaytan also deployed one BIP round, striking Mr. Perez in his back. | Ex. 6 to Leap Decl. ("Gaytan Depo.") at 34:13-18. |
| 75. | | Mr. Perez was struck by two or three 40 millimeter "BIP" rounds within a 1-2 second timeframe. | Ex. J to Anderson Decl. ("Incident Audio") at 31:39-31:50. |
| 76. | | Mr. Perez flinched in reaction to being struck by the BIP rounds. | Ex. 2 to Leap Decl. ("Pollick Depo.") at 22:19-23:3; Ex. 3 to Leap Decl. ("Olivas Depo.") at 22:6-9; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 55:17-23. |
| 77. | | Mr. Perez was not advancing or charging at any person, including any deputies when Deputy Stone and Sergeant Gaytan fired their BIP rounds. | Ex. 3 to Leap Decl. ("Olivas Depo.") at 22:21-23; Ex. 5 ("Stone Depo") at 26:22-11). |
| 78. | | Deputy Stone and Sergeant Gaytan observed that Mr. Perez's hands were empty at the time they deployed their BIP rounds. | Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 29:10-15. |
| 79. | | Mr. Perez was unarmed when he was struck by the BIP rounds. | Ex. 4 to Leap Decl. ("McCarthy Depo.") at 57:12-14; Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18, |

| | | |
|---|---|---|
| | | 30:11-24; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 29:10-15. |
| 80. | At the time of the second BIP round, Mr. Perez was moving away from the first BIP round and away from the deputies. | Ex. J to Anderson Decl. ("Incident Audio") at 30:25-31:05; Ex. 3 to Leap Decl. ("Olivas Depo.) at Ex. 7 to Leap Decl. ("Alcala Depo.") at 52:9-14; Ex. 5 to Leap Decl. ("Stone Depo.) at 31:25-33:10. |
| 81. | Mr. Perez was approximately 6-8 feet from the firearm at the time he was struck by the first BIP round. | Ex. 5 to Leap Decl. ("Stone Depo.") at 31:6-10. |
| 82. | Based on police training, a BIP round can cause injury. | Ex. 4 to Leap Decl. ("McCarthy Depo.") at 17:15-21. |
| 83. | BIP rounds have a recognizably different sound than lethal rounds. | Ex. 5 to Leap Decl. ("Stone Depo.") at 54:4-19; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 35:25-36:4. |
| 84. | No deputy issued a verbal warning to Mr. Perez that they would deploy less lethal munitions against him prior to deploying less lethal munitions. | Ex. 5 to Leap Decl. ("Stone Depo.") at 38:5-7; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 36:19-21; Ex. J to Anderson Decl. ("Incident Audio") at 31:30-31:51. |
| 85. | Mr. Perez ran away from the BIP to avoid being struck by additional projectiles and did not start running until the less-lethal shots began. | Ex. 5 to Leap Decl. ("Stone Depo.") at 49:10-25; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 33:20-34:18. |
| 86. | Basic police training provides that a subject's common reaction to being struck by less lethal munitions is to run away from the less lethal to avoid being struck by additional projectiles. | DeFoe Decl. at ¶ 15; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 56:17-21. |
| **The Shooting** | | |
| 87. | The first lethal round was fired simultaneously or within the same second as the final less-lethal round. | Ex. J to Anderson Decl. ("Incident Audio") at 31:50; Ex. 5 to Leap Decl. ("Stone Depo.") at 37:20-38:2. |
| 88. | When the shots started, the deputies could see Mr. Perez's | Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-25; Ex. 5 to Leap Decl. ("Stone Depo.") at 26:10-18; |

-47-

| | | hands and could see that there was nothing in his hands. | Ex. 6 to Leap Decl. ("Gaytan Depo.") at 29:10-15. |
|---|---|---|---|
| | 89. | Deputy Moore fired five shots. | Ex. 1 to Leap Decl. ("Moore Depo.") at 45:17-46:11. |
| | 90. | Deputy Olivas fired three shots. | Ex. 3 to Leap Decl. ("Olivas Depo.") at 6:15-16, 25:1-3, 28:15-17; 29:11-21. |
| | 91. | Corporal McCarthy fired fourteen shots, including shots to the back of Mr. Perez's head. | Ex. 4 to Leap Decl. ("McCarthy Depo.") at 59:7-11; 61:7-20. |
| | 92. | Deputy Pollick fired approximately fifteen shots. | Ex. 2 to Leap Decl. ("Pollick Depo.") at 10:10-12; 27:2-11; 33:1-17; 43:8-11. |
| | 93. | During Deputy Pollick's second volley of shots, he was aiming at Mr. Perez's lower legs after Mr. Perez was on the ground behind the pool table. | Ex. 2 to Leap Decl. ("Pollick Depo.") at 10:10-12; 27:2-11; 33:1-17; 43:8-11. |
| | 94. | Mr. Perez was moving away from the Deputies during all of the shots. | Ex. 1 to Leap Decl. ("Moore Depo.") at 45:17-46:11; Ex. 2 to Leap Decl. ("Pollick Depo.") at 27:2-11, 28:17-29:5, 43:8-11; Ex. 3 to Leap Decl. ("Olivas Depo.") at 29:11-21, 32:18-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 59:7-11; 61:7-20. |
| | 95. | At the time of all the shots, the deputies knew the firearm was on the ground, behind the pool table. | Ex. 1 to Leap Decl. ("Moore Depo.") at 67:10-16; 67:23-24; 68:7-23; Ex. 2 to Leap Decl. ("Pollick Depo") at 12:15-18, 15:9-17, 22:15-18, 41:16-42:11, Ex. 3 to Leap Decl. ("Olivas Depo") at 17:16-18, 62:9-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 66:19-67:7, 69:6-13; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 37:9-16. |
| | 96. | The Deputies did not see Mr. Perez reach for the gun after he placed it on the ground, prior to the shooting. | Ex. 3 to Leap Decl. ("Olivas Depo.") at 62:9-14; Ex. 5 ("Stone Depo.") at 43:1-6; Ex. 6 to Leap Decl. ("Gaytan Depo.") at 37:9-16. |

-48-

| 97. | Prior to firing their lethal rounds, no deputy issued a verbal warning that deadly force would be used. | Ex. 1 to Leap Decl. ("Moore Depo.") at 51:6-8; Ex. 2 to Leap Decl. ("Pollick Depo.") at 26:9-12, 33:18-23; Ex. 3 to Leap Decl. ("Olivas Depo.") at 25:6-8; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 76:15-22. |
|---|---|---|
| 98. | In total, the deputies fired approximately 35 lethal rounds at Mr. Perez. | Ex. 1 to Leap Decl. ("Moore Depo.") at 45:20-22; Ex. 2 to Leap Decl. ("Pollick Depo.") at 43:8-11; Ex. 3 to Leap Decl. ("Olivas Depo.") at 6:15-16; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 61:7-20. |
| 99. | When the Deputies approached Mr. Perez after the shooting, McCarthy observed the gun near Mr. Perez's, left arm. | Ex. 4 to Leap Decl. ("McCarthy Depo.") at 71:11-16. |
| 100. | Mr. Perez suffered at least eleven gunshot wounds, including to his head, right upper back/shoulder, and legs. | Declaration of Bennet Omalu, M.D. ("Omalu Decl.") at ¶ 12(a-i). |
| 101. | The trajectories of these bullet wounds indicate that Mr. Perez was falling to the ground or on the ground when he was shot. | Declaration of Bennet Omalu, M.D. ("Omalu Decl.") at ¶ 13(a-d, f-g, i). |
| **Standards and Training on the Use of Deadly Force** | | |
| 102. | At the time of this incident, the Deputies were trained, pursuant to basic police training, that deadly force can only be used where the officer has an objectively reasonable belief that the subject poses an immediate threat of death or serious bodily injury to the officers or others. | Ex. 1 to Leap Decl. ("Moore Depo.") at 69:3-20; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 18:20-20:11; Ex. 3 to Leap Decl. ("Olivas Depo.") at 58:7-14; Ex. 2 to Leap Decl. ("Pollick Depo.") at 56:3-57:4; DeFoe Decl. at ¶ 5(e)-(f) |
| 103. | At the time of this incident, the Deputies were trained, pursuant to basic police training, that officers | DeFoe Decl. at ¶ 5(d); Ex. 4 to Leap Decl. ("McCarthy Depo.") at 21:14-17; Ex. 3 to Leap Decl. |

| | | | |
|---|---|---|---|
| | | shall give a verbal warning before using deadly force, when feasible. | ("Olivas Depo.") at 59:12-14; Ex. 1 to Leap Decl. ("Moore Depo.") at 70:14-18. |
| | 104. | Basic police training provides that a subject's common reaction to being struck by less lethal munitions is to run away from the less lethal to avoid being struck by additional projectiles. | DeFoe Decl. at ¶ 15; Ex. 4 to Leap Decl. ("McCarthy Depo") at 56:17-21. |
| | 105. | At the time of this incident, basic police training provided, and the Deputies were trained, that deadly force is the highest level of force. | DeFoe Decl. at ¶ 5(a); Ex. 1 to Leap Decl. ("Moore Depo.") at 69:3-20; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 18:20-20:11; Ex. 3 to Leap Decl. ("Olivas Depo.") at 58:7-14. |
| | 106. | At the time of this incident, basic police training provided, and the Deputies were trained, that officers must have a reverence for human life. | DeFoe Decl. at ¶ 5(g); Ex. 4 to Leap Decl. ("McCarthy Depo.") at 19:16-19. |
|  | **The Shooting Was Inappropriate and Contrary to Basic Police Training** | | |
| | 107. | Under the facts of this case, the Deputies could not justify shooting at Mr. Perez simply because Mr. Perez was running away. | DeFoe Decl. at ¶ 6, 8. |
| | 108. | Under the facts of this case, the Deputies could not justify shooting at Mr. Perez under a fleeing felon theory. | DeFoe Decl. at ¶ 6, 8. |
| | 109. | Police officers are trained that they can only justify shooting under the fleeing felon theory where (1) they have information that the suspect has committed an atrocious felony involving the infliction of injury or death, AND (2) the suspect poses | DeFoe Decl. at ¶ 8. |

| | | | |
|---|---|---|---|
| | | an immediate threat of death or serious bodily injury. | |
| | 110. | At the time of this incident on August 29, 2021, Peace Officer Standards and Training ("POST"), Learning Domain 20, Chapter 3—Use of Deadly Force, set forth four requirements that would make it reasonable for an officer to use deadly force against a fleeing subject escaping on foot.  None of the four requirements were met in this case.  These four requirements are:<br>　　(1) ". . . if the subject threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction of serious bodily harm [or death] . . ."<br>　　(2) ". . . probable cause to believe that the subject poses a threat of death or serious physical harm, either to the officer or others . . ."<br>　　(3) ". . .probable cause to believe that the use of deadly force is reasonably necessary . . ." [to prevent escape]<br>(4) ". . . some warning be given prior to the use of deadly force where feasible. . ." | DeFoe Decl. at ¶ 8 (quoting POST LD 20, Ch. 3). |
| | 111. | Basic police training instructs, and the deputies were trained that they cannot shoot someone merely because they see a gun in that person's hands. | Ex. 1 to Leap Decl. ("Moore Depo.") at 66:2-18; Ex. 3 to Leap Decl. ("Olivas Depo.") at 60:16-21; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 12:19-21, 69:3-5. |
| | 112. | When the Deputies fired their shots, there was no immediate | DeFoe Decl. at ¶ 13 (a-l). |

| | | | |
|---|---|---|---|
| | | threat of death or serious bodily injury. | |
| | 113. | The Deputies were trained on the importance of situational awareness, which includes avoiding "contagious fire." | DeFoe Decl. at ¶ 14; Ex. 1 to Leap Decl. ("Moore Depo.") at 33:22-8; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 50:23-25. |
| | 114. | Pursuant to the deputies' training, it would not have been appropriate to shoot Mr. Perez when he was sitting on the bar stool with the firearm in his hand with his finger on the trigger. | Ex. 1 to Leap Decl. ("Moore Depo.") at 28:20-29:7; Ex. 4 to Leap Decl. ("McCarthy Depo.") at 33:5-11. |
| | 115. | From the standpoint of police practices and basic police training, the Defendant Deputies' use of deadly force was contrary to Peace Officer Standards and Training ("POST"), improper, inappropriate, excessive, and unreasonable, including (but not limited to) for the following reasons:<br><br>(1) There was no immediate threat of death or serious bodily injury at the time of any of the shots.<br><br>(2) Mr. Perez was unarmed during all of the shots, and the Deputies knew that Mr. Perez had placed the gun on the ground before any force was deployed.<br><br>(3) The Deputies did not see Mr. Perez reach for the gun after he placed it on the ground, prior to the shooting.<br><br>(4) Mr. Perez was compliant during this incident.<br><br>(5) Mr. Perez was in the process of complying with Gaytan's | DeFoe Decl. at ¶ 5-13(a – 1), 14-17.<br><br>Ex. 1 to Leap Decl. ("Moore Depo.") at 22:11-14, 45:17-46:11, 67:10-16; 67:23-24; 68:7-23;<br><br>Ex. 2 to Leap Decl. ("Pollick Depo.") at 15:9-16:6, 27:2-11, 28:17-29:5, 43:8-11;<br><br>Ex. 3 to Leap Decl. ("Olivas Depo.") at, 29:11-21, 32:18-21, 48:10-49:2, 62:5-21;<br><br>Ex. 4 to Leap Decl. ("McCarthy Depo.") at 41:13-42:2, 59:7-11; 61:7-20, 66:19-67:7, 69:6-13;<br><br>Ex. 6 to Leap Decl. ("Gaytan Depo.") at 20:20-21:7, 37:9-16, 38:24-40:1, 47:22-25;<br><br>Ex. 7 to Leap Decl. ("Alcala Depo.") at 35:12-20, 52:9-14.<br><br>Ex. J to Anderson Decl. ("Incident Audio") 30:29-33:00. |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' SEPARATE STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

command to turn around when the 40 mm rounds were deployed.

(6) The 40 mm deployment escalated the situation.

(7) At the time of the shooting, Mr. Perez was moving away from the 40 mm rounds and away from the deputies.

(8) At the time of the shooting, Mr. Perez was not advancing toward any person.

(9) The Deputies could not shoot Mr. Perez for fleeing.

(10) Mr. Perez committed no crime involving the infliction of injury or death.

(11) Mr. Perez never threatened to use the firearm, never raised the firearm and never pointed the firearm at anyone.

(12) Mr. Perez never verbally threatened to harm anyone.

(13) Officers are required to justify every shot they fire, and here, all 35 shots were unjustified.

(14) The Deputies fired shots as Mr. Perez was going to the ground and after he was on the ground.

(15) The Deputies overreacted when they fired, and an overreaction in using deadly force can be excessive force.

(16) The Deputies engaged in contagious shooting.

(17) Under the facts of this case, the Deputies cannot justify

| | | |
|---|---|---|
| | shooting at Mr. Perez simply because Mr. Perez previously had a firearm in his hands. | |
| | (18) There were other reasonable alternative measures available rather than shooting, including the Taser and the beanbag shotgun, 40 mm launcher, giving further commands and a warning. | |
| | (19) The Deputies had information that Mr. Perez was mentally ill or experiencing a mental crisis and failed to respond appropriately. | |
| | (20) The Deputies did not give a verbal warning that they were prepared to use deadly force prior to shooting, despite it being feasible to do so. | |
| | (21) Subjective fear, or fear of a potential future threat, is insufficient to justify a use of deadly force. | |
| | (22) The Deputies showed no reverence for human life when they fired. | |
| **Pre-Shooting Negligent Tactics and Escalation** | | |
| 116. | The Deputies failed to employ appropriate situational awareness and appropriate tactics in this incident. | DeFoe Decl. at ¶ 14. |
| 117. | The Deputies failed to avoid contagious fire, meaning that they failed to assess whether a threat of imminent death or serious bodily injury was actually present when they shot, and instead fired because other deputies were firing. | DeFoe Decl. at ¶ 14. |
| 118. | The Deputies escalated the situation by deploying less lethal | DeFoe Decl. at ¶ 16-17. |

| | | rounds against a person who they had information may be mentally ill or experiencing a mental health crisis. | |
|---|---|---|---|
| | 119. | The Deputies failed to give Mr. Perez time to comply with commands prior to deploying the 40 mm rounds and failed to give Mr. Perez time to comply with the 40 mm rounds prior to shooting. | DeFoe Decl. at ¶ 16-17. |
| | 120. | Law enforcement officers are trained that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident.  In this case, there was no rush, as there was no crime in progress. | DeFoe Decl. at ¶ 17. |
| | 121. | The Deputies failed to respond appropriately, given that they had information Mr. Perez may have been experiencing a mental health crisis or was mentally ill. | DeFoe Decl. at ¶ 16. |

**PLAINTIFFS' RESPONSIVE CONCLUSIONS OF LAW**

1. Disputed issues of material fact preclude granting qualified immunity on summary judgment. *See Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2012) (declining to decide qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom"); *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003)

("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate."); *Brosseau v. Haugen*, 543 U.S. 194, 206 (2004) (Stevens J., dissenting) (the reasonableness of an officer's belief "…is a quintessentially 'fact-specific' question, not a question that judges should try to answer 'as a matter of law…"). Many factual disputes remain in this case. Additionally, "certain principles are clearly established . . . that implement the fundamental rules regarding the use of deadly force. Law enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others or is fleeing and his escape will result in serious threat of injury to persons." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997). Courts are particularly cautioned in cases such as this one, where the victim is deceased and the involved officers are the only surviving eye-witnesses. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014), *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Thus, summary judgment should be granted "sparingly" in deadly force cases and courts must take special care to "ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Gonzalez*, 747 F.3d at 795 (quoting *Scott*, 39 F.3d at 915), *See*, *Bator v. State of Hawai'i*, 39 F.3d 1021, 1026 (9th Cir. 1994) ("At the summary judgment stage, ... the district court may not make credibility determinations or weigh conflicting evidence.").

2. Plaintiffs dismiss their second cause of action for denial of medical care 42 U.S.C. § 1983.

3. Again, material disputes of fact preclude granting qualified immunity on summary judgment. *See Santos*, 287 F.3d 855 n.12. Where the facts regarding practical deliberation are disputed, only the jury can determine which of the two "shocks the conscience" standards apply. *Greer v. City of Hayward*, 229 F. Supp. 3d 1091 (N.D. Cal. 2017). In *Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009), the Ninth Circuit made clear that acting with "deliberate indifference to or reckless disregard for [a person's] rights" was "consistent with the standard imposed in the substantive due process context, in which government action may violate due process if it 'shocks the conscience.'" The Ninth Circuit has indicated that a standard higher than "deliberate indifference" should apply only in situations "that escalate so quickly that the officer must make a snap judgment." *Porter v. Osborn*, 546 F.3d 1131, 1137-40 (9th Cir. 2008). The "snap judgment" to use deadly force must be a reaction to an "unforeseen" escalation by the subject. *Porter v. Osborn*, 546 F.3d 1131, 1230 (9th Cir. 2008).

4. Plaintiffs dismiss their fourth cause of action for *Monell* Liability – inadequate training under 42 U.S.C. § 1983.

5. Plaintiffs dismiss their fifth cause of action for *Monell* Liability – unconstitutional custom, practice, and policy under 42 U.S.C. §.

6. "Federal civil rights claims of excessive force are the federal counterpart to state battery and wrongful death claims; in both, the plaintiff must prove the unreasonableness of the officer's conduct. Accordingly, federal cases are instructive." *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1121, fn. 6 (2004) *see also Hayes v. County of San Diego*, 736 F. 3d 1223 (9th Cir. 2013), 1232; *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1274 (1998).

7. The California Supreme Court has clarified that in police shooting cases, the negligence analysis is even broader than a typical Fourth Amendment analysis because state law specifically considers negligent "pre-shooting" tactics as part of the "totality of the circumstances" evaluation. *Hayes*, 57 Cal. 4th at 639 (an officer's tactical conduct and decisions preceding the use of deadly force are relevant considerations in determining whether the use of deadly force gives rise to negligence liability, which can arise, for example, if the tactical conduct and decisions show, as part of the totality of circumstances, that the use of deadly force was unreasonable.")

8. The Ninth Circuit in interpreting *Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766, 798 (2017) stated, "it is not necessary for the defendants to have been 'thinking in constitutional *or legal terms* at the time of the incident[], because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights.'" *Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) (quoting *United States v. Reese*, 2 F. 3d 870 (9th Cir. 1993).

9. Cal. Gov. Code § 815.2(a) provides that "a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would... have given rise to a cause of action against that employee or his personal representative." There is no dispute that the deputies were employees, acting under the color of law and within in the course and scope of their employment with the County of San Bernardino on the date of the incident. For this, and for all of the reasons set forth above, the individual deputies would be liable for their battery and negligence in violation of California law. Therefore, the County of San Bernardino would also be liable for the actions and inactions of it employees under Cal. Gov. Code § 815.2(a).

10. Plaintiffs' request for punitive damages, whether Plaintiffs are entitled to punitive damages is a question for the jury to consider after the presentation of all the evidence at trial. *Herrera v. Las Vegas Metropolitan Police Dept.*, 298 F. Supp. 2d 1043, 1055-56 (D. Nev. 2004) (the appropriateness of punitive damages must be determined after the presentation of all the evidence at trial); *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 821 (1979) ("Determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury.")

DATED:  March 15, 2024          LAW OFFICES OF DALE K. GALIPO

By_____*/s/ Shannon J. Leap*_____
Dale K. Galipo
Shannon J. Leap
Attorneys for Plaintiff